## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DELPHI CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 05-10415 (WGY) |
| LITEX, INC., | ) |
| Defendant. | ) |

## ANSWER AND COUNTERCLAIMS

Litex responds to the allegations in the plaintiff's Complaint for Declaratory Judgment and other Relief ("Complaint") as follows:

## FIRST AFFIRMATIVE DEFENSE

1.      Litex admits there was a previous litigation between the parties entitled Litex v. Delphi, Civil Action No. 01-CV-10910 (WGY) ("*Litex I*").  Litex also admits that the parties executed a settlement agreement in *Litex I*.  Litex denies the remaining allegations of paragraph 1.

2.      The Stipulation of Dismissal entered in *Litex I* is a written document, the contents of which speak for themselves.  Litex is without sufficient knowledge to admit or deny the remaining allegations of paragraph 2.

3.      Litex is without sufficient knowledge to admit or deny the allegations of paragraph 3.

4.      Litex admits it is a Delaware corporation with the alleged California place of business, but it no longer has a place of business in Massachusetts and, therefore, denies the remaining allegations of paragraph 4.

5.      Paragraph 5 contains conclusions of law to which no response is required.

6.      The Court's previous orders in *Litex I* are transcribed in writing and speak for

themselves.  The Stipulation of Dismissal signed by the parties is also in writing and speaks for itself.  The remaining allegations of paragraph 6 are conclusions of law to which no response is required.

7.    Paragraph 7 contains conclusions of law to which no response is required.  To the extent paragraph 7 contains allegations requiring a response, those allegations are denied.

8.    Litex admits it filed its initial complaint in *Litex I* on May 25, 2001, the contents of which speak for themselves.  Litex further admits that *Litex I* was initially assigned to the Honorable Joseph Tauro.

9.    Litex admits the allegations of paragraph 9.

10.    Litex admits the Court entered a Stipulation and Protective Order in *Litex I* on April 11, 2002, a true and accurate copy of which is attached to the Complaint, and the content of said Stipulation and Protective Order speak for themselves.

11.    Litex admits the trial in *Litex I* began on November 3, 2003.  Litex denies the parties were permitted to complete discovery fully and denies the remaining allegations of paragraph 11.

12.    Litex denies the allegations of paragraph 12.

13.    Litex admits the allegations of paragraph 13.

14.    Litex admits the parties reached a settlement during trial of *Litex I* and, on November 11, 2003 executed a written Settlement Term Sheet and Release, the contents of which speak for themselves.  Litex is without sufficient knowledge to respond to the remaining allegations of paragraph 14.

15.    Litex admits the parties agreed to dismiss *Litex I* and submit the issue of patent reasonable royalty damages suffered by Litex to arbitration pursuant to the written Settlement Term Sheet and Releases, the terms of which speak for themselves.

16.    Litex admits the parties executed a Stipulation of Dismissal, signed by Judge Young, the contents of which speak for themselves.

17.    Litex admits the parties arbitrated the issue of Litex's damages from Delphi's

admitted patent infringement in the Spring of 2004.  Litex denies the remaining allegations of paragraph 17.

18.    Litex admits the arbitrator issued a decision dated September 7, 2004, including an award, which Delphi has now satisfied.  To the extent paragraph 18 contains allegations to which a further response is required, Litex denies those allegations.

19.    Litex admits that its counsel sent Delphi a letter and draft complaint, the contents of which speak for themselves.  Litex is without sufficient knowledge to admit when Delphi did or did not receive the letter and draft complaint.  Litex denies the remaining allegations of paragraph 19.

20.    Litex is without sufficient knowledge to respond to the allegations of paragraph 20, including when Delphi will or will not provide the Court with the noted documents.  To the extent any further response is required to the allegations of paragraph 20, Litex denies those allegations.

21.    Litex denies the allegations of paragraph 21.

<u>**COUNT I**</u>

<u>**(Declaratory Judgment)**</u>

22.    Litex repeats its above-stated responses to paragraphs 1-21.

23.    Litex admits executing a written settlement to *Litex I*, the contents of which speak for themselves.  To the extent paragraph 23 contains allegations other than those that seek to characterize the contents of the settlement, Litex denies those allegations.

24.    Litex admits the arbitrator issued his written decision and award, the contents of which speak for themselves.  Litex further admits that Delphi has satisfied the arbitrator's award.

25.    The letter and draft complaint sent to Delphi are written documents, the contents of which speak for themselves.  The remaining allegations contained in paragraph 25 are conclusions of law to which no response is required.  To the extent any further response is required to the allegations of paragraph 25, Litex denies those allegations.

26.    The allegations of paragraph 26 constitute conclusions of law to which no

response is required. Litex is without information sufficient to respond to the allegations in paragraph 26 regarding Delphi's apprehensions. To the extent any further response is required to the allegations in paragraph 26, Litex denies those allegations.

27.    Litex is without information sufficient to respond to Delphi's allegations in paragraph 27 as to what Delphi requests of the Court. Litex denies the remaining allegations of paragraph 27.

## COUNT II

### (Breach of the Stipulation and Protective Ordered [sic] entered in *Litex I*)

28.    Litex repeats its above-stated responses to paragraphs 1 to 27.

29.    The Stipulation and Protective Order in *Litex I* is a written document the contents of which speak for themselves. To the extent paragraph 29 contains allegations beyond those seeking to characterize the contents of the Stipulation and Protective Order, Litex denies those allegations.

30.    The allegations of paragraph 30 seek to characterize the contents of the Stipulation and Protective Order in *Litex I*, a written document the contents of which speak for themselves. Litex admits the Stipulation and Protective Order in *Litex I* has not been vacated. To the extent paragraph 30 contains allegations beyond those seeking to characterize the contents of the Stipulation and Protective Order, Litex denies those allegations.

31.    Litex denies the allegations in paragraph 31.

32.    The allegations of paragraph 32 seek to characterize the written Stipulation and Protective Order in *Litex I*, the contents of which speak for themselves. To the extent paragraph 32 contains any further allegations requiring a response, Litex denies those allegations.

33.    Litex denies the allegations in paragraph 33. Furthermore, Litex notes that Dorsey & Whitney appeared as substitute counsel for Litex prior to the conclusion of the arbitration of Litex's patent damages in *Litex I*. Litex also notes that Delphi's inside counsel corresponded with Dorsey & Whitney as counsel for Litex regarding the arbitration and even sent Dorsey & Whitney a copy of the arbitrator's decision and award.

34.    Litex denies the allegations of paragraph 34.

## SECOND AFFIRMATIVE DEFENSE

35.    Delphi's claims are barred by the doctrine of unclean hands.

## THIRD AFFIRMATIVE DEFENSE

36.    Delphi's claims are barred by the doctrine of waiver.

## FOURTH AFFIRMATIVE DEFENSE

37.    Delphi's claims are barred by the doctrine of estoppel.

## FIFTH AFFIRMATIVE DEFENSE

38.    Delphi's claims are barred by Delphi's fraud in inducing Litex to enter into the Term Sheet and Release.  In support of this defense, Litex makes the following particular allegations:

39.    In May 2001, Litex sued Delphi for infringement of its NTP patents.  Litex v. Delphi, Civil Action No. 01-CV-10910 (WGY) ("Litex I").  Through discovery in that litigation, Delphi learned details about the licensing and business development relationships Litex was pursing then with Delphi's automotive component competitors.

40.    At the same time, Delphi poisoned the market with public statements touting Delphi's alleged success in developing NTP.

41.    For example, in response to Litex's patent infringement suit, and in particular, to Litex's amendment of suit adding an additional patent, Delphi issued a press release on July 20, 2001 claiming to be continuing to develop and achieving success with NTP:

> We are excited, however, to discuss our technology.  Delphi is developing non-thermal plasma catalysis components and systems relying upon its significant technical capabilities and sound, demonstrable and credible scientific principles.  Recognition has been given by the *Financial Times Global Automotive Award* (September 1999), singling out Delphi's technical development as demonstrating the greatest potential to improve environmental performance and by industry acceptance of Delphi's technology over other available alternatives.

42.    On July 30, 2001, Delphi issued a press release announcing that its NTP development efforts had received another award, the prestigious R&D 100 Award, for "its role in the development of catalyst materials for plasma-catalysis engine exhaust treatment." Delphi's Engineering Director, Dr. Andrew Brown, Jr., stated:

> It is truly an honor to be selected for this award for the fourth consecutive year which demonstrates the ongoing innovation of Delphi's scientists and engineers. . . . We are extremely proud of this year's award, which recognizes the potential for our revolutionary NTP Exhaust Aftertreatment System with its significant reduction in emissions.

43.    On September 12, 2001, Delphi's CEO and President, J.T. Battenberg III, made a presentation to an international gathering of the automotive industry. In that presentation, shortened due to the prior day's terrorist attacks, Battenberg focused on Delphi's highlight technologies, including its alleged development of NTP. He said:

> Let me also mention that Delphi is the only supplier with full diesel injection and exhaust aftertreatment capability including our award winning non-thermal plasma aftertreatment technology that helps remove nitrogen oxide to improve emissions for diesel and lean burn.

44.    On October 16, 2001, Delphi issued yet another press release regarding its NTP technology. In this press release, Delphi's Chairman, CEO and President, J.T. Battenberg III, stated that "Delphi is developing new systems to help take the automotive industry toward the ultimate goal of removing vehicles from the environmental equation." The one specific technology discussed under the heading "Reducing Emissions" was Delphi's infringing NTP Exhaust Aftertreatment System technology. The press release falsely stated that

> Delphi has developed an innovative aftertreatment solution, non-thermal plasma technology that works in conjunction with a catalytic converter and a particulate filter.

45.    Moreover, Delphi repeated these false assertions about its NTP Exhaust Aftertreatment System in its 2001 Annual Report, also known as the SEC Form 10-K. Delphi told the investing public:

> Responding to global demands for improved fuel efficiency and reduced exhaust emissions, <u>Delphi offers advanced powertrain control systems such as</u> cylinder deactivation, gasoline direct injection and <u>non-thermal plasma (NTP) exhaust aftertreatment</u>. (Emphasis added.)

46.     The Annual Report then alluded to Delphi's joint collaboration with PSA Peugeot relating to NTP, stating:

> Late in 2001, Delphi and PSA Peugeot Citroen debuted a Peugeot 206 Environmental Technologies Vehicle, featuring NTP exhaust aftertreatment which significantly reduces oxides of nitrogen emissions, enabling more rapid use of advanced fuel-efficient technologies.

47.     In addition, during 2002, Delphi continued to list on its website a "product profile" for Non-thermal Plasma Exhaust Aftertreatment.

48.     Unbeknownst at the time to Litex and the public, these material public statements by Delphi were false.  The truth was that in early to mid-2001, Delphi had concluded that its NTP project was in very serious jeopardy, and Delphi had essentially given up on the NTP technology.  Indeed, as early as May 2001, Delphi seriously doubted the future of its NTP project, and in July 2001, cut the NTP development budget in half.  Nonetheless, Delphi continued to make the public statements outlined above, not only touting its NTP technology and NTP Aftertreatment Exhaust System, but also claiming to be continually achieving success and expecting it to continue into a commercial product.

49.     It was not until Delphi personnel were under oath at arbitration in April 2004, that Delphi finally admitted the true facts about its negative conclusions in 2001 regarding the NTP technology and the NTP Exhaust Aftertreatment System.  Throughout its patent litigation with Litex in 2001-2003, and despite its ongoing discovery obligations, Delphi never admitted that the heads of the Delphi NTP program believed in 2001 that the program would <u>never</u> succeed and had reported their beliefs to Delphi's management.  All Delphi revealed, in the documents it produced and in the deposition testimony of its witnesses, was that the NTP project started to fail in March of 2002, after Delphi's materially misleading statements about NTP had been made in 2001.

50.     As a result, when it proceeded to arbitrate the issue of the damages it had suffered

from Delphi's patent infringement, Litex and its expert, and for that matter Delphi's experts, read

and actually and reasonably relied on Delphi positive public statements in 2001 extolling the

virtues of Delphi's NTP program.

51.     During arbitration testimony, however, Delphi's chief technologist Jean Botti and

the program manager of the Delphi NTP project Joseph Bonadies both testified that beginning in

May 2001 they were extremely skeptical that the NTP program would ever succeed or that

Delphi would ever be able to develop a successful real-world application of the NTP technology

that would be attractive to customers.  In fact, Botti testified he was prepared to terminate the

NTP project as a failure in July 2001.  Both admitted reporting the conclusions of their NTP tests

and their resulting negative conclusions to Delphi management.

52.     The following excerpts from the testimony of Jean Botti, Delphi's chief

technologist, during arbitration revealed Delphi's true expectations for the NTP program and the

timing of when Delphi knew its NTP program would likely fail:

> Q     Let me ask you this:  In July, if you can focus on July of 2001, what was
> your level of confidence at that point in time that the nonthermal plasma
> exhaust aftertreatment project would ever get out of ADP?
>
> A     Very minimal at that time.
>
> Q     And why was it very minimal at that time?
>
> A     Because we're going through a phase of the disappoint with technology . .
> . .  It was totally unacceptable even in diesel, you know, engine
> environment.

(Arbitration Hrng., p. 835-836, Lns. 21-22, 1-17.)

> Q     Between July of 2001 and when you canceled the project [in October
> 2002], had there been some additional engine testing of the product?
>
> A     From July 2001 to 2002?
>
> Q     Yes.
>
> A     Absolutely.
>
> Q     And have – have – what did that testing indicated (sic)?

A     Well, they're all negative.  I mean it was – I mean, a big disappointment. Like I said, we, in the labs, we're getting, you know, up to some 90 percent NO reduction in real conditions, you know, when we did the co-development with PSA and we started early to have that technology on engines and cars in real life, you know.  We could only get 15 percent, which was very disappointing to us.

And every time we would go and redevelop the technology, you know, the costs of the system would go up, because you had to have many other, you know, I would say tricks and devices to try to increase the efficiency, but we could never make it work.

(Arbitration Hrng., p. 844-845, Lns. 4-22, 1-3.)

Q     So my question is – and I know your answer was that the NTP exhaust aftertreatment system worked on diesel.  But by question is a little different.  It's didn't – as of July 2001 –

A     And I want to make sure.

Q     Right

A     It never worked on diesel.

Q     Okay.

A     We could never make it work.

Q     Okay.  Well, as of – that was designed to go with a diesel.  Is this a better way to say it?

A     It was designed to be on diesel and lean burn engines but –

Q     And isn't it –

A     -- it didn't work.

Q     -- the case that in July – and that as of July 2001 the company had expectations that the NTP exhaust aftertreatment system would have a synergistic effect for its business and help it to compete in the diesel business?

A     If I were to represent the company, I would say no.

Q     Okay.

A     I had no expectation right in July that this would ever work.  The results I got through the PSA development were just not there.

(Arbitration Hrng., p. 890-891, Lns. 3-22, 1-6.)

Q     Right.  But as of 2000 – July 2001, did the company know it wouldn't work, or was that your personal opinion?

A    No.  I think – I mean, you know, like every big company there is inertia.  But I already had given my opinion to my upper management that this thing was not going the way I wanted it.

(Arbitration Hrng., p. 893, Lns. 15-21.)

Q    And was there still speculation to that effect in July 2001 among some people in the company?

A    Not anymore.  From my level to, uh, it was pretty clear already, you know.  I told my management I was going to stop the project.

Q    Uh, did the management ever give – you had told them that as of July 2001?

A    Well, I started to, uh, update the management after we had that PSA review that will show that the results were disastrous.  And, uh, you know, I – I had to step up and tell my management that, because I was a customer interface, and there was a shared, I would say, development that I needed to update the management and say, We're not going anywhere with this.

Q    And do you recall about when that occurred?

A    Uh, PSA review, quite honestly, I – I – I don't recall, but it was – I'm sure it was before July 2001.  It must have been in the spring of 2001 when we started to get those terrible results.

(Arbitration Hrng., p. 896-897, Lns. 4-22, 1-2.)

53.    Joseph Bonadies, the program manager for Delphi's NTP program, similarly

testified as follows:

Q    What – what was your feeling about the likelihood of success of the Delphi NTP project after seeing the results as of May 5, 2001, of these impact tests?

A    I was very skeptical that we would come up with a system that could achieve these really high NOx efficiencies.

(Arbitration Hrng., p. 956, Lns. 5-11.)

Q    Had the Delphi NTP project been able to meet any of these requirements [for the Requirements and Concepts Gate Review] as of August 1, 2001?

A    No, not at that time.

(Arbitration Hrng., p. 962, Lns. 4-6.)

Q    Uh, as of August 1, 2001, were you optimistic that the Delphi NTP project would ever leave the advanced development phase?

A       No, I wasn't very optimistic.

(Arbitration Hrng., p. 966, Lns. 4-7.)

54.     These 2004 admissions about Delphi's true beliefs in 2001 are directly contrary to the contents of its 2001-02 public statements.  Until hearing this testimony at arbitration, however, Litex had no knowledge that the public statements Delphi made in 2001, and detailed above, were false.  As a result, prior to the arbitration, when Litex entered into the Settlement Term Sheet and Release ("Settlement") with Delphi it believed those 2001 public statements were true and reasonably relied to its detriment on those material statements in signing the Settlement.

55.     Delphi knew the true negative state of its NTP program in 2001 and early 2002 when it made its positive statements directly to the contrary.  On information and belief, therefore, Delphi intentionally, or with knowledge, made the false public statements in 2001-2002 to deceive Litex, Delphi's competitors in the automotive industry, and the public.

56.     Furthermore, in November 2003 when Delphi and Litex signed the Settlement, Delphi knew that the 2001-2002 public statements were false, also knew that Litex was unaware that the public statements had been false, and knew that Litex had read and was reasonably relying to its detriment on those Delphi public statements.  Therefore, Delphi intentionally, or with knowledge, deceived and defrauded Litex into entering into the Settlement.

57.     To the extent that any portion of the Settlement or its release would bar Litex's counterclaims against Delphi for tortious interference with prospective economic relations or unfair competition and deceptive trade practices, Litex would be injured.

58.     Therefore, Delphi is barred by its fraud from asserting the Settlement against Litex to prevent such claims.

## COUNTERCLAIMS

Plaintiff Litex, Inc. counterclaims as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over the subject matter of these counterclaims pursuant to 28 U.S.C. § 1367(a) because plaintiff's Complaint alleges a breach of the settlement agreement in a previous matter before this Court over which it had and retained jurisdiction pursuant to 28 U.S.C.  §§ 1331 and 1338, and these counterclaims are so related to that prior action, and to Delphi's conduct both therein and in regard to the settlement agreement in that prior action, that they form part of the same case or controversy.

2.  Venue for these Counterclaims is proper in this district pursuant to 28 U.S.C. § 1391, because counterclaim defendant Delphi resides in this district in that it is subject to personal jurisdiction here.

## Parties

3.      Litex, Inc. ("Litex") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Sherman Oaks, California.

4.      Based on information and belief, Defendant Delphi Corporation is a corporation organized under the laws of Delaware, with its principal place of business in Troy, Michigan. Based on information and belief, Defendant Delphi Corporation was formerly known as Delphi Automotive Systems Corporation.  Delphi Corporation and Delphi Automotive Systems Corporation will be collectively referred to herein as "Delphi."

## Summary of Counterclaims

5.      Litex, a small start-up technology company, invented a revolutionary technology that achieved substantial reductions in automobile emissions to the benefit of both consumers and the environment.  Litex, however, was prevented from bringing these benefits to the market and the public by the wrongful conduct of Delphi.  Delphi attempted to develop the technology on its own but was unsuccessful and resorted to infringing Litex's patents.  At the same time, Delphi embarked on a campaign to create the false impression that it had invented the technology, was successfully developing the technology, would be the "first to market" with the technology, and was ahead in developing commercial applications of the technology.  In truth,

however, Delphi had concluded in May 2001 that it would never be able to develop a working, real world application of the technology.

6.    Despite coming to these conclusions, Delphi concealed them from the world. Delphi also kept them secret from Litex despite the fact that Litex sued Delphi in 2001 for patent infringement and Delphi owed Litex ongoing discovery obligations in that lawsuit. Instead, Delphi continued throughout 2001 and into 2002 to tell Litex and the public that Delphi was progressing with its development and commercialization of the product.

7.    At the time it made these materially false statements, Delphi knew Litex was actively negotiating with Delphi's competitors to license or buy the Litex technology, or to strategically invest in Litex. Furthermore, Delphi knew, or should have known, and on information and belief intended for its materially false statements to negatively impact those discussions and advantageous relationships. As a result of all of Delphi's false statements, Litex was in fact driven from the market, unable to license or sell its technology and unable to obtain needed capital. Only in April 2004, after Delphi admitted to patent infringement in its litigation with Litex in exchange for obtaining a release from Litex and proceeded to an arbitration on damages, did Delphi finally reveal to Litex that in 2001 Delphi had possessed no confidence in its research and development efforts at the exact same time Delphi was trumpeting the alleged progress of those efforts to the world.

**Factual Allegations**

**I.    Litex Invests Substantial Time and Effort to Develop the NTP Technology.**

8.    Litex was formed to develop technology to reduce harmful exhaust emissions from internal combustion engines. In the Fall of 1996, Litex achieved hydrocarbon and carbon monoxide reduction by injecting ozone generated remotely into the post-combustion flow stream.

9.    Starting in Spring of 1997, Litex began its development efforts in full. It obtained $2.4 million in a Series B round financing. It designed and built a corona discharge non-thermal plasma ("NTP") reactor to be positioned in the engine exhaust passageway upstream of the

catalytic converter.

10.     Litex decided to out-source the manufacture of the NTP reactor.  In the Summer of 1997, in an effort to find a manufacturer, Litex met with and disclosed its technology to Magna International ("Magna") and to Delphi.  This initial meeting with Delphi occurred in August 1997, and through that and subsequent meetings, Delphi learned of Litex's technology, as well as Litex's interest in a licensing or similar business relationship with automobile component manufacturers.

11.     By early 1998, Litex had entered into an agreement with Magna, and started working with Magna towards the development and manufacture of a commercial implementation of its NTP reactor, which would become known as the Litex CDD™ Pollution Reduction System.  (CDD was an abbreviation for Corona Discharge Device, referring to the corona or bluish glow created by the plasma in the gap between the electrodes of the NTP reactor.)  In the Spring of 1999, Litex changed from Magna to Saturn Electronics as its development/manufacturing partner.  The focus was on the development of an NTP reactor for use in the exhaust stream of a gasoline engine; however, Litex's technology was equally applicable to diesel engines.

12.     Litex CDD™ devices manufactured by Magna and later Saturn, began to receive recognition in the industry press.  For example, in October 1999, Litex's CDD™ received the Global Powertrain Congress's Powertrain Excellence Award.

13.     As a result of these efforts, Litex was able to obtain further financing. Specifically, in 1998 and 1999, JP Morgan invested about $11 million total in Litex in a Series C round financing with an after money valuation in excess of $50 million.

## II.     Delphi Prematurely Touts its Attempts to Develop NTP Technology.

14.     In 1998, Delphi commenced its own internal project to develop non-thermal plasma technology for use in an Exhaust Aftertreatment System.  Delphi's eventual NTP Exhaust Aftertreatment System project practiced Litex's invention by employing a catalyst in conjunction with and downstream of the NTP generator.  (Later, after over two years of litigating the

question with Litex, Delphi would admit it infringed Litex's patents.)

15.    Delphi's entry into the non-thermal plasma emissions control market was very significant. Delphi was and is the leading Tier One automotive parts manufacturer in the world, and the dominant Tier One manufacturer in the United States. By its own account in its 1999 Form 10-K, Delphi had an "expansive global presence with a network of manufacturing sites, technical centers, sales offices and joint ventures located in every major region of the world" and sales totaling in excess of $25 billion a year. By 2003, Delphi would report that its sales totaled over $28 billion.

16.    In the Fall of 1999, Delphi began to tout the NTP Exhaust Aftertreatment System in statements to potential customers, the public and the financial community including its own shareholders.

17.    In September 1999, Delphi's NTP Exhaust Aftertreatment System received the Financial Times Global Automotive Award at the Frankfurt Motor Show. A Delphi press release regarding the award claimed – despite Litex and its NTP patents – that this technology "was developed by Delphi to reduce oxides of nitrogen ("NOx") and particulate emissions" in diesel engines.

18.    In August 2000, Delphi made further public statements connecting its dominance in the diesel market to its ability to develop and sell its NTP Exhaust Aftertreatment System. Specifically, in a press release, Delphi stated that it was "uniquely positioned with a full line of diesel engine management systems to respond to the rising popularity of diesel engine's worldwide." Delphi went on to state that:

19.    Further exhaust particulate and NOx emission reductions will be possible with Delphi's comprehensive systems solutions for exhaust aftertreatment. For example, <u>Delphi is developing a non-thermal plasma exhaust system that will allow diesel engines to meet stringent NOx emissions standards and reduce particulates and hydrocarbons</u>. (Emphasis added.)

20.    Then, in September 2000, Delphi and PSA Peugeot jointly announced a co-development contract on non-thermal plasma exhaust aftertreatment. In the press release, Delphi

again claimed that NTP "was developed by Delphi," completely ignoring Litex's efforts and patents.

21.     All of these statements contributed to the impression that Delphi developed the NTP technology and was successfully developing commercial applications for NTP.  Unknown to the public, Delphi's investors and Litex, Delphi was never able to develop a working, "real world" NTP system.  Nonetheless, Delphi was more than willing to make the above-described claims about its NTP system.

### III.    Throughout 2000 and 2001 Litex Pursues Financing Acquisition and Licensing Options with Potential Partners.

22.     Given the strength of its technology, during the Spring of 2000, Litex's business was valued at $250 to $260 million by JP Morgan.  As a result, JP Morgan (on behalf of Litex) began contacting companies, including Tier One suppliers Delphi and Bosch, to raise further funds in a Series D round financing.  Bosch was the second largest automotive supplier after Delphi, and a leader in diesel engine control systems.

23.     By May 2000, Bosch was engaged in long-term testing of Litex's CDD™.  Bosch told Litex that it was considering an equity position in Litex, acquiring Litex, and/or taking an exclusive license to the company's technology.

24.     The results of Bosch's test were positive.  As a result, talks with Bosch continued throughout the Fall of 2000, and Bosch requested that Litex present a proposal for Bosch's acquisition of the company.  Litex responded with a proposal for staged acquisition of the company for $200 million over three years and the receipt of an exclusive license during the buyout period.

25.     In the meantime, Saturn still wanted to go forward with the manufacture of a commercial product incorporating the Litex CDD™.  But, due to Delphi's poisoning of the market, Litex's Series D round had still not funded.  As a result, Litex had little choice but to terminate its relationship with Saturn and focus exclusively on a strategy of licensing its technology to Bosch or others.

26.    In early August 2001, Bosch presented a proposal to Litex that would provide Bosch an option until June 20, 2002 to either acquire Litex's technology or take a license to that technology.

27.    Also, in 2001, in May, Litex sued Delphi for infringement of its NTP patents. Litex v. Delphi, Civil Action No. 01-CV-10910 (WGY) ("Litex I"). Through discovery in this litigation, Delphi learned further details about the licensing and business development relationships Litex was pursing with Delphi's automotive component competitors.

## IV.    Ultimately, Delphi's False Statements and Wrongful Conduct Interferes with the Bosch Deal and Drives Litex From The NTP Market.

28.    At the same time, Delphi continued to poison the market with public statements touting alleged success in developing NTP.

29.    In response to Litex's patent infringement suit, and in particular, to Litex's amendment of suit adding an additional patent, Delphi issued a press release on July 20, 2001 claiming to be continuing to develop and achieving success with NTP:

> We are excited, however, to discuss our technology. Delphi is developing non-thermal plasma catalysis components and systems relying upon its significant technical capabilities and sound, demonstrable and credible scientific principles. Recognition has been given by the *Financial Times Global Automotive Award* (September 1999), singling out Delphi's technical development as demonstrating the greatest potential to improve environmental performance and by industry acceptance of Delphi's technology over other available alternatives.

30.    On July 30, 2001, Delphi issued a press release announcing that its NTP development efforts had received another award, the prestigious R&D 100 Award, for "its role in the development of catalyst materials for plasma-catalysis engine exhaust treatment." Delphi's Engineering Director, Dr. Andrew Brown, Jr. stated

> It is truly an honor to be selected for this award for the fourth consecutive year which demonstrates the ongoing innovation of Delphi's scientists and engineers. . . . We are extremely proud of this year's award, which recognizes the potential for our revolutionary NTP Exhaust Aftertreatment System with its significant reduction in emissions.

31.    On September 12, 2001, Delphi's CEO and President, J.T. Battenberg III, made a presentation to an international gathering of the automotive industry. In that presentation, shortened due to the prior day's terrorist attacks, Battenberg focused on Delphi's highlight technologies, including its alleged development of NTP. He said:

> Let me also mention that Delphi is the only supplier with full diesel injection and exhaust aftertreatment capability including our award winning non-thermal plasma aftertreatment technology that helps remove nitrogen oxide to improve emissions for diesel and lean burn.

32.    All of these material public statements by Delphi touting the NTP Exhaust Aftertreatment System and the progress of Delphi's NTP program, which would only be revealed as false and misleading much later in 2004, took a toll on Litex and on the Litex/Bosch negotiations. In particular, these statements and actions had the effect of poisoning the market for Litex's NTP technology and CDD™ device, diverting customer interest and also deceiving the investing public, including Delphi's own investors, into believing that Delphi was actively and successfully pursuing the revolutionary (and environmentally-friendly) NTP technology. On information and belief, by continuing to make these false and misleading statements, Delphi intended to interfere with Litex's efforts to enter into licensing agreements with Delphi's competitors.

33.    In fact Delphi's continued pursuit of an NTP system and its 2001 public statements alleging success in NTP development began adversely affecting Litex's ability to license its technology and obtain investment funds in its Series D round of financing. For example, one of Litex's potential investors/licensees was Denso, the largest Japanese automotive parts supplier. In April 2001, Denso wrote to Litex indicating its concerns that:

> [I]f Delphi is developing CDD for diesel engines with a certain car maker and going to produce in 2004, they must have some advantages and their own patent rights about CDD for diesel. That means it is difficult to catch up them. Maybe Denso Japan is not interested in the technology for which we probably have to pay patent fees. (Especially for Delphi.)

34.     In late September 2001, Bosch informed Litex that it preferred to commence negotiating a nonexclusive license while conducting tests of Litex's CDD™ in diesel applications.  Litex then made a proposal to Bosch for a nonexclusive license.  Bosch ultimately did not accept this offer, and Litex was unable to conclude a deal with Bosch, despite ongoing discussions through the end of 2001 and into 2002.

35.     On October 16, 2001, Delphi issued yet another press release regarding its NTP technology.  In this press release, Delphi's Chairman, CEO and President, J.T. Battenberg III, stated that "Delphi is developing new systems to help take the automotive industry toward the ultimate goal of removing vehicles from the environmental equation."  The one specific technology discussed under the heading "Reducing Emissions" was Delphi's infringing NTP Exhaust Aftertreatment System technology.  The press release falsely stated that:

> Delphi has developed an innovative aftertreatment solution, non-thermal plasma technology that works in conjunction with a catalytic converter and a particulate filter.

36.     Moreover, Delphi repeated these false assertions about its NTP Exhaust Aftertreatment System in its 2001 Annual Report, also known as the SEC Form 10-K.  Delphi told the investing public:

> Responding to global demands for improved fuel efficiency and reduced exhaust emissions, Delphi offers advanced powertrain control systems such as cylinder deactivation, gasoline direct injection and non-thermal plasma (NTP) exhaust aftertreatment. (Emphasis added.)

37.     The Annual Report then alluded to Delphi's joint collaboration with PSA Peugeot relating to NTP, stating:

> Late in 2001, Delphi and PSA Peugeot Citroen debuted a Peugeot 206 Environmental Technologies Vehicle, featuring NTP exhaust aftertreatment which significantly reduces oxides of nitrogen emissions, enabling more rapid use of advanced fuel-efficient technologies.

38.     In addition, during 2002, Delphi continued to list on its website a "product profile" for Non-thermal Plasma Exhaust Aftertreatment.

**V.    Not Until 2004, Did Delphi Finally Admit the State of its NTP Program in 2001.**

39.    These public statements were false.  The truth was that in early to mid-2001, Delphi had concluded that its NTP project was in very serious jeopardy, and Delphi had essentially given up on the NTP technology.  Indeed, as early as May 2001, Delphi seriously doubted the future of its NTP project, and in July 2001, cut the NTP development budget in half. Nonetheless, Delphi continued to make the public statements outlined above not only touting its NTP technology and NTP Aftertreatment Exhaust System, but also claiming to be continually achieving success and expecting it to continue into a commercial product.

40.    It was not until Delphi personnel were under oath at arbitration in April 2004, however, that Delphi finally admitted the true facts about its negative conclusions in 2001 regarding the NTP technology and the NTP Exhaust Aftertreatment System.  Throughout its patent litigation with Litex in 2001-2003, and despite its ongoing discovery obligations, Delphi never admitted that the heads of the Delphi NTP program believed in 2001 that the program would <u>never</u> succeed and had reported their beliefs to Delphi's management.  All Delphi revealed, in the documents it produced and in the deposition testimony of its witnesses, was that the NTP project started to fail in March of 2002, after Delphi's materially misleading statements about NTP in 2001.

41.    As a result, when it proceeded to arbitrate the issue of the damages it had suffered from Delphi's patent infringement, Litex and its expert, and for that matter Delphi's experts, actually and reasonably relied on the Delphi positive public statements in 2001 extolling the virtues of Delphi's NTP program.

42.    During arbitration testimony, however, Delphi's chief technologist Jean Botti and the program manager of the Delphi NTP project Joseph Bonadies both testified that beginning in May, 2001 they were extremely skeptical that the NTP program would ever succeed or that Delphi would ever be able to develop a successful real-world application of the NTP technology that would be attractive to customers.  In fact, Botti testified he was prepared to terminate the

NTP project as a failure in July 2001. Both admitted reporting the conclusions of their NTP tests and their resulting negative conclusions to Delphi management.

43.    The following excerpts from the testimony of Jean Botti, Delphi's chief technologist, during arbitration revealed Delphi's true expectations for the NTP program and the timing of when Delphi knew its NTP program would likely fail:

> Q    Let me ask you this: In July, if you can focus on July of 2001, what was your level of confidence at that point in time that the nonthermal plasma exhaust aftertreatment project would ever get out of ADP?
>
> A    Very minimal at that time.
>
> Q    And why was it very minimal at that time?
>
> A    Because we're going through a phase of the disappoint with technology . . .. It was totally unacceptable even in diesel, you know, engine environment.

(Arbitration Hrng., p. 835-836, Lns. 21-22, 1-17.)

> Q    Between July of 2001 and when you canceled the project [in October 2002], had there been some additional engine testing of the product?
>
> A    From July 2001 to 2002?
>
> Q    Yes.
>
> A    Absolutely.
>
> Q    And have – have – what did that testing indicated (sic)?
>
> A    Well, they're all negative. I mean it was – I mean, a big disappointment. Like I said, we, in the labs, we're getting, you know, up to some 90 percent NO reduction in real conditions, you know, when we did the co-development with PSA and we started early to have that technology on engines and cars in real life, you know. We could only get 15 percent, which was very disappointing to us.
>
> And every time we would go and redevelop the technology, you know, the costs of the system would go up, because you had to have many other, you know, I would say tricks and devices to try to increase the efficiency, but we could never make it work.

(Arbitration Hrng., p. 844-845, Lns. 4-22, 1-3.)

> Q    So my question is – and I know your answer was that the NTP exhaust aftertreatment system worked on diesel. But by question is a little different. It's didn't – as of July 2001 –

A     And I want to make sure.

Q     Right

A     It never worked on diesel.

Q     Okay.

A     We could never make it work.

Q     Okay.  Well, as of – that was designed to go with a diesel.  Is this a better way to say it?

A     It was designed to be on diesel and lean burn engines but –

Q     And isn't it –

A     -- it didn't work.

Q     -- the case that in July – and that as of July 2001 the company had expectations that the NTP exhaust aftertreatment system would have a synergistic effect for its business and help it to compete in the diesel business?

A     If I were to represent the company, I would say no.

Q     Okay.

A     I had no expectation right in July that this would ever work.  The results I got through the PSA development were just not there.

(Arbitration Hrng., p. 890-891, Lns. 3-22, 1-6.)

Q     Right.  But as of 2000 – July 2001, did the company know it wouldn't work, or was that your personal opinion?

A     No.  I think – I mean, you know, like every big company there is inertia.  But I already had given my opinion to my upper management that this thing was not going the way I wanted it.

(Arbitration Hrng., p. 893, Lns. 15-21.)

Q     And was there still speculation to that effect in July 2001 among some people in the company?

A     Not anymore.  From my level to, uh, it was pretty clear already, you know.  I told my management I was going to stop the project.

Q     Uh, did the management ever give – you had told them that as of July 2001?

A     Well, I started to, uh, update the management after we had that PSA review that will show that the results were disastrous.  And, uh, you know,

> I – I had to step up and tell my management that, because I was a customer interface, and there was a shared, I would say, development that I needed to update the management and say, We're not going anywhere with this.

> Q     And do you recall about when that occurred?

> A     Uh, PSA review, quite honestly, I – I – I don't recall, but it was – I'm sure it was before July 2001. It must have been in the spring of 2001 when we started to get those terrible results.

(Arbitration Hrng., p. 896-897, Lns. 4-22, 1-2.)

44.     Joseph Bonadies, the program manager for Delphi's NTP program testified as follows:

> Q     What – what was your feeling about the likelihood of success of the Delphi NTP project after seeing the results as of May 5, 2001, of these impact tests?

> A     I was very skeptical that we would come up with a system that could achieve these really high NOx efficiencies.

(Arbitration Hrng., p. 956, Lns. 5-11.)

> Q     Had the Delphi NTP project been able to meet any of these requirements [for the Requirements and Concepts Gate Review] as of August 1, 2001?

> A     No, not at that time.

(Arbitration Hrng., p. 962, Lns. 4-6.)

> Q     Uh, as of August 1, 2001, were you optimistic that the Delphi NTP project would ever leave the advanced development phase?

> A     No, I wasn't very optimistic.

(Arbitration Hrng., p. 966, Lns. 4-7.)

45.     These admissions about Delphi's true beliefs in 2001 are directly contrary to the contents of its public statements at the same time. Litex is informed and believes, and on that basis alleges, that long after it had decided to abandon the NTP technology Delphi intentionally misled the investing public including its own investors and Litex's potential investors, licensees, purchasers and customers to believe that it was developing the NTP technology and NTP Aftertreatment Exhaust Systems.

46.     As a result of these false statements, not only was the investing public, including Delphi's investors, deceived, but Litex was unable to raise capital or license its NTP technology. Litex was driven from the market by the combination of Delphi's immense market power in the market for automobile emissions control systems, combined with its unfair and fraudulent practice of making false public and private statements.  Litex thus lost not only potential capital infusions but also potential licensing revenue, the opportunity to sell the company, and the over $15 million it spent on developing and promoting its NTP technology.

47.     The net effect of Delphi's wrongful conduct is that Litex was unable to license its technology, unable to obtain further funding, and has been reduced to a shell corporation holding patents to NTP technology that it cannot exploit or market.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment that Settlement Term Sheet and Release Does Not Bar Litex's Counterclaims Due to Delphi's Fraud)

48.     Litex realleges Paragraph 1 to 47 herein.

49.     Until hearing this testimony at arbitration, however, Litex had no knowledge that the public statements Delphi made in 2001, and detailed above, were false.  As a result, prior to the arbitration, when Litex entered into the Settlement Term Sheet and Release ("Settlement") with Delphi it read and believed those 2001 public statements were true and relied to its detriment on those material statements in signing the settlement.

50.     As set forth above, Delphi knew the true negative state of its NTP program in 2001 and early 2002 when it made its positive statements directly to the contrary.  On information and belief, therefore, Delphi, as set forth above, intentionally or with knowledge made the false public statements in 2001-2002 to deceive Litex, Delphi's competitors in the automotive industry and the public.

51.     Furthermore, in November 2003 when Delphi and Litex signed the Settlement, Delphi knew that the 2001-2002 public statements were false, also knew that Litex in November

2003 was unaware that the public statements had been false, and also knew Litex was relying to its determent on those Delphi public statements. Therefore, Delphi intentionally, or with knowledge, deceived and defrauded Litex into entering into the Settlement.

52.     Delphi also knew, or should have known, when it negotiated and signed the Settlement with Litex that Litex had read Delphi's public statements from 2001-2002. Delphi further knew or should have known, through discovery, expert disclosures and others, that when Litex signed the Settlement, Litex believed Delphi's 2001-2002 public statements were true, that those statements were material to Litex's decision to enter into the Settlement, and that Litex was relying on those statements to Litex's detriment.

53.     To the extent that any portion of the Settlement or its release would bar its counterclaims here against Delphi for tortuous interference with prospective economic relations and unfair competition and deceptive trade practices, Litex would be injured.

54.     Litex, therefore, respectfully requests that this Court order and declare that the terms of the parties' Settlement and its release do not bar Litex's remaining counterclaims due to Delphi's deceit and fraud inducing Litex into the Settlement.

## SECOND CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Relations – California Law)

55.     Litex realleges Paragraphs 1 to 54 herein.

56.     At all times relevant, Litex shared a prospective economic relationship with its potential licensees, purchasers and customers, as explained above, which contained the probability of future economic benefits to Litex. Litex planned to license and/or sell its NTP technology to potential purchasers, licensees, and customers, including, but not limited to, Bosch, Denso, PSA and Faurecia.

57.     At all times relevant, Delphi knew of the prospective economic relationships between Litex and its potential licensees, purchasers, customers, and investors.

58.     Litex is informed and believes, and on that basis alleges that, Delphi intended to, and did, disrupt the prospective economic relationship between Litex and its potential licensees,

purchasers and customers by, among other things, making false public statements about Delphi's NTP technology and NTP Aftertreatment Exhaust System.

59.     Delphi's intentionally and knowingly false public statements concerning the NTP technology and Delphi's NTP Aftertreatment Exhaust System actually interfered with Litex's prospective economic relations, and constitute intentional interference with those prospective economic relations.

60.     Litex has suffered damages as a proximate result of Delphi's disruption of its prospective economic relationships, in an amount greater than $25,000, to be proven at trial.

61.     Litex is informed and believes, and on that basis alleges that Delphi interfered with Litex's prospective economic relationships maliciously, oppressively, and/or with conscious disregard for Litex's rights, and Litex is therefore entitled to recover punitive damages against Delphi in an amount to be determined by the trier of fact.

### THIRD CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Relations – California Law)

62.     Litex realleges Paragraphs 1 to 61 herein.

63.     At all times relevant, Litex shared a prospective economic relationship with its potential licensees, purchasers and customers, as explained above, which contained the probability of future economic benefits to Litex.  Litex planned to license and/or sell its NTP technology to potential purchasers, licensees, and customers, including, but not limited to, Bosch, Denso, PSA and Faurecia.

64.     At all times relevant, Delphi knew of the prospective economic relationships between Litex and its potential licensees, purchasers and customers.

65.     Delphi negligently disrupted the prospective economic relationship between Litex and its potential licensees, purchasers and customers by, among other things, making false public statements about Delphi's NTP technology and NTP Aftertreatment Exhaust System.  The disruption resulting from Delphi's false and disparaging statements was reasonably foreseeable by Delphi.

51305552_1.DOC  055115-00010                              -26-

66.    Delphi's false public statements concerning the NTP technology and Delphi's NTP Aftertreatment Exhaust System actually interfered with Litex's prospective economic relations, and constitute negligent interference with those prospective economic relations.

67.    Litex has suffered damages as a proximate result of Delphi's disruption of its prospective economic relationships, in an amount, greater than $25,000, to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Unfair Competition Under California Bus & Prof. Code Section 17200 et seq.)

68.    Litex realleges paragraphs 1 – 67 herein.

69.    The conduct of Delphi alleged above constitutes unlawful, unfair and/or fraudulent business acts or practices under California Business and Professions Code 17200 et seq.  Delphi's conduct violates the common and statutory law prohibiting interference with prospective economic relations and fraud.

70.    As a result, Litex is entitled to an injunction prohibiting Delphi's unlawful, unfair and fraudulent conduct, and to restitution of money and benefits Delphi has received or taken from Litex.

WHEREFORE, Litex respectfully requests that this Court enter an Order:

(a)    Declaring that due to Delphi's deceit and fraud the Settlement Term Sheet and Release of November 11, 2003 does not bar or in any way restrict Litex from bringing its counterclaims against Delphi for tortious or negligent interference with prospective economic relations or unfair competition or business practices and enjoining Delphi from so asserting the Settlement against Litex;

(b)    Declaring that Delphi tortiously and/or negligently interfered with Litex's prospective economic relations;

(c)    Declaring that Delphi unlawfully, unfairly and/or fraudulently competed, and that Delphi committed unlawful, unfair and/or fraudulent business acts or practices in violation of California law;

(d)    Denying Delphi the relief it seeks in its Complaint;

(e)    Awarding Litex the damages it has suffered, and restitution it is due, as a result of Delphi's conduct;

(f)    Awarding Litex punitive damages as a result of Delphi's conduct;

(g)    Awarding Litex its reasonable attorneys fees and costs resulting from Delphi's conduct; and

(h)    Such other relief as this Court may deem just and appropriate.

## **JURY DEMAND**

Plaintiff Litex, Inc. demands a jury trial on all issues so triable.

Respectfully submitted,

LITEX, INC.,

By its attorneys,


_____/s/ John T. Gutkoski_____
John T. Gutkoski (BBO #567182)
Alexandra C. Fennell (BBO #658692)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, MA  02110
Telephone:  (617) 345-4600
Fax:  (617) 345-4745

Francis H. Morrison III (BBO # 645515)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, CT   06103-3499
Telephone:  (860) 275-0100
Fax:  (203) 275-0343

April 18, 2005

## CERTIFICATE OF SERVICE

I, John T. Gutkoski, do hereby certify that I filed a true copy of the above document with the Court by causing copies to be hand delivered to the Court on April 18, 2005. I hereby certify that I served a true copy of the above document by causing copies to be hand delivered to H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111 on April 18, 2005. I further certify that a true copy of the above document was filed electronically on April 29, 2005 following the Court's order denying defendant's Motion for Temporary Impoundment of its Answer and Counterclaims. Notice of this filing will be sent to all parties by the Court's electronic filing system.


_____/s/    John T. Gutkoski_____
John T. Gutkoski

51305552_1.DOC  055115-00010

-29-