# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DELPHI CORPORATION, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 05-10415 (WGY) |
| LITEX, INC., | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DELPHI CORPORATION'S MOTION FOR SUMMARY JUDGMENT

H. Joseph Hameline, BBO # 218710
Matthew C. Hurley, BBO # 643638
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

*Attorneys for Plaintiff Delphi Corporation*

Dated: May 31, 2005

## TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION                                                                    1

II.   STATEMENT OF FACTS AND SUMMARY OF ALLEGATIONS                                   2

      A.    Delphi's NTP Research Project                                             2

      B.    Litex I Dispute                                                           3

      C.    The Current Dispute - *Litex II*                                          5

III.  ARGUMENT                                                                        7

      A.    Standard For Summary Judgment                                            7

      B.    The Court Should Summarily Enforce the Settlement Term
            Sheet & Release as a Matter of Law                                        8

      C.    The Settlement Term Sheet & Release Bars Litex's Tort Claims              9

      D.    Litex's Claim for Fraudulent Misrepresentation Must
            Fail as a Matter of Law                                                  10

            1.    Delphi's Allegedly False Press Releases were Not Made to
                  Induce Litex to Execute the Settlement Term Sheet & Release        11

            2.    Litex's Alleged Reliance on Statements Made in Delphi's
                  Press Release is Unreasonable                                      12

                  a.    Litex's Reliance is Unreasonable Because it
                        Contended During *Litex I* That Delphi's Public Releases
                        Were Inaccurate, Caused it Damage and Interfered With
                        Litex's Potential Business Relationships                     12

                  b.    Litex's Alleged Reliance is Unreasonable Because It
                        Possessed Sufficient Information to Reasonably
                        Know that Delphi Had Doubts About The Success of
                        its NTP Project in 2001                                      17

IV.   CONCLUSION                                                                     20

## INDEX OF AUTHORITIES

**Case**                                                                    **Page No.**

*Anderson v Liberty Lobby, Inc.,*
477 U.S. 242 (1986)                                                              7

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)                                                              7

*Clark v. State Street Trust Co.,*
270 Mass. 140; 169 N.E. 897 (1940)                                               8

*Cote v. Astra USA, Inc.*
1998 Mass. Super. LEXIS 276, *13 (1998)                                     10, 11, 18

*Edmund Wright Ginsberg Corp. v. C.D. Kepner Leather Co.,*
317 Mass. 581; 59 NE.2d 253 (1945)                                               8

*Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.*
831 F. Supp. 920 (D. Mass. 1993)                                               10, 11

*Flebotte v. Dow Jones & Co., Inc.,*
2001 U.S. Dist. LEXIS 21327 (D. Mass. 2001)                                 8, 9, 10, 18

*G.E.E.N. Corp. v. Southeast Toyota Distributors, Inc.,*
1994 U.S. Dist. LEXIS 21553, *11 (M.D. Fla. 1994)                               11

*Mergens v. Dreyfoos,*
166 F.3d 1114 (11th Cir. 1999)                                                  11

*Nash v. Trustees of Boston University,*
946 F.2d 960 (1st Cir. 1991)                                                     8

*Northeastern University v. Deutsch,*
2002 Mass. Super. LEXIS 100, *4 (2002)                                     10, 12, 13, 14

*Scripps Clinic & Research Foundation v. Genentech, Inc.,*
927 F.2d 1565 (Fed Cir 1991)                                                     7

*Sweats Fashions, Inc. v. Pannill Knitting Co.,*
833 F.2d 1560 (Fed. Cir. 1987)                                                   7

*T & T Mfg. Co. v. AT Cross Co.,*
587 F.2d 533 (1st Cir. 1978)                                                     8

*Trent Partners and Associates, Inc. v. Digital Equipment Corp.*,
120 F.2d 84 (D. Mass. 1999)                                              7, 10

*White v. U.S.*,
1998 U.S. Dist. LEXIS 2194, No. 95-10314-JLT (D. Mass. Feb. 25, 1998)    9

*Willett v. Herrick*,
258 Mass. 585 (1927)                                                    11, 12

## I.   INTRODUCTION

On November 12, 2003, Litex, Inc. ("Litex") and Delphi Corporation ("Delphi") resolved litigation before this Court concerning Delphi's research on non-thermal plasma ("NTP") catalysis, a technology Delphi evaluated to potentially reduce automotive exhaust pollutants. Litex claimed patent rights relating to NTP. The parties agreed to settle the litigation in favor of a private arbitration and executed a Settlement Term Sheet & Release. By the Release, Litex released Delphi from all claims, including those in tort. Thereafter, the parties arbitrated, as agreed, and the arbitrator rendered an award, which Delphi paid in full.

Apparently unsatisfied with the arbitration result and notwithstanding the unambiguous terms of the Settlement Term Sheet & Release, Litex now asserts claims against Delphi in this action based on the same facts at issue in the previous litigation. Litex claims that Delphi's 2001 and 2002 press releases addressing Delphi's NTP research were allegedly false and had damaged Litex's licensing efforts, investment financing, and other business relationships. To avoid its release of these claims, Litex contends that Delphi fraudulently induced it, by representation in its press releases, to execute the Settlement Term Sheet & Release. Litex claims it relied on Delphi's press releases and only learned of their alleged falsity from Delphi's witnesses at the arbitration.

Litex improperly seeks to circumvent its obligations under the Settlement Term Sheet & Release. To do so, it fabricates its fraudulent inducement claim to avoid the settlement it previously struck. Litex comes before this Court again, with the same facts and evidence as before, asserting claims, this time with torts of different names. However, the only deceit here is attributable to Litex. The undisputed facts of this matter conclusively demonstrate that: (1) the Settlement Term Sheet & Release is enforceable, (2) Delphi did not fraudulently induce Litex to

sign the Settlement Term Sheet & Release; and (3) Litex knew or should have known of the

factual allegations underlying the tort claims it now asserts before executing the Settlement Term

Sheet & Release, making its reliance on Delphi's statements unreasonable as a matter of law. As

a result, Delphi respectfully requests that the Court grant summary judgment to Delphi on Count

I of its Complaint and dismiss Litex's counterclaims and defenses.

## II.    STATEMENT OF FACTS AND SUMMARY OF ALLEGATIONS

### A.    Delphi's NTP Research Project

In 1994, Delphi began researching applications of an old science called non-thermal

plasma ("NTP"). SMF ¶1.[1] Delphi's research focused on combining a reactor that generated

NTP with a specialized designed catalyst to remove nitrogen oxide pollutants (NOx) from diesel

engine exhaust. SMF ¶2. To commercialize this technology for vehicle use, Delphi determined

that its NTP project needed to satisfy the following targets:

(2)    90% reduction efficiency of NOx in diesel exhaust;
(3)    Less than 3% fuel penalty to operate NTP on a vehicle[2]; and
(4)    A robust, low cost product.

SMF ¶3.

In 1999 and 2000, Delphi had achieved some laboratory results that suggested that NTP

could be a potential viable diesel exhaust treatment solution. SMF ¶4. To inform others of this

research, Delphi issued press releases and applied for industry research awards. SMF ¶5. But, in

2001, Delphi began experiencing problems with its on-vehicle testing of its NTP project. SMF

¶6. The positive results Delphi experienced earlier in the laboratory did not translate into vehicle

---

[1] References to "SMF ¶__" refer to paragraphs recited in the Statement of Undisputed Material Facts in Support of Delphi's Corporation's Motion for Summary Judgment filed concurrently with this Memorandum.

[2] Fuel penalty is the amount of vehicle fuel that the vehicle would use to operate an onboard NTP system.

tests. SMF ¶6. Principally, Delphi's 2001 vehicle tests resulted in less than 15% NOx reduction and a fuel penalty of 8%, results far shy of its goal and its earlier laboratory results. SMF ¶6. In 2001, Delphi's management, namely its executive vice-president, was informed of the diminishing success of the NTP project. SMF ¶9. With the hope of finding solutions, Delphi continued its efforts to improve its NTP project through additional testing conducted during the summer of 2001 until March 2002. SMF ¶14. Unfortunately, Delphi's further research efforts failed.

In April 2002, Delphi abandoned research efforts on NTP catalysts. SMF ¶15. In September 2002, Delphi abandoned its entire NTP project. SMF ¶16. At no time did Delphi commercialize any NTP product. SMF ¶17.

**B.    *Litex I* Dispute**

Despite knowledge that Delphi never sold an NTP product and its NTP activity involved only research, Litex sued Delphi for patent infringement. SMF ¶18. In April 2002, the Honorable Joseph Tauro issued a discovery order requiring the parties to produce relevant documents relating to the issues of liability and damages and provide depositions for specified witnesses. SMF ¶19. Delphi complied with this discovery order, and Litex took the deposition of each specified witness. SMF ¶20. The Court did not permit the parties to take any additional discovery other than specified in the order. SMF ¶21.

Evidence disclosed during discovery in *Litex I* clearly showed the lack of performance of Delphi's NTP project in vehicle testing in 2001 and the ultimate decision to abandon this research in 2002:

(1)    Delphi abandoned catalyst development for its NTP project in April 2002. SMF ¶15;

(2)    Delphi terminated its entire NTP research project in September 2002.
       SMF ¶16;

(3)    During the Summer and Fall of 2001, Delphi's tests of its NTP project
       recorded less than 15% NOx reduction efficiencies when 90% NOx
       reduction efficiencies where need for a viable commercial product. SMF
       ¶¶6, 14;

(4)    In 2001, Delphi had 25 engineers working on the NTP project; in 2002,
       that number was reduced to 12 or 13. SMF ¶7;

(5)    By 2002, Delphi had cut its NTP research project budget in half, compared
       to the level of funding budgeted for the same project in 1998. SMF ¶8;

(6)    Delphi's management knew of the diminishing success of the NTP
       project. SMF ¶9; and

(7)    By July 2001, because of poor testing results, Delphi was not confident
       about the success or commercial viability of it NTP research. SMF ¶¶ 10-
       13.

Similarly, during discovery and in related pleadings in *Litex I*, Litex admitted that it

believed that Delphi's press releases were inaccurate. SMF ¶¶22, 23. Indeed, Litex alleged that

Delphi's press releases and other public statements concerning its NTP research interfered with

Litex's patent licensing, products sale, investment financing, and business sale efforts. SMF

¶¶24-31. Despite these accusations, at no time did Litex move to add any tort claims to *Litex I*

and never filed a separate action. SMF ¶32. Instead, Litex used these allegations to support its

extraordinary damages claim that Litex intended to advance at trial and ultimately did advance at

the arbitration. SMF ¶¶ 27, 29-31.

On November 3, 2003, the *Litex I* trial commenced. SMF ¶33. After the fifth day of trial

and the recusal of Judge Tauro as the presiding judge, Delphi and Litex settled and dismissed the

case with prejudice in favor of a private and confidential arbitration in accordance with terms

specified in the Settlement Term Sheet & Release. SMF ¶34. An integration clause

acknowledges that the Settlement Term Sheet & Release represents the entire agreement of the

4

parties. SMF ¶35. Additionally, the parties conveyed mutual releases dismissing all claims of the parties against the other including those in tort. SMF ¶36. Counsel represented both parties during the settlement negotiations and at the execution the Settlement Term Sheet & Release. SMF ¶39. At no time during the settlement negotiations or execution of the Settlement Term Sheet & Release did the parties discuss any Delphi press releases. SMF ¶41. On November 12, 2003, this Court entered a Stipulation of Dismissal dismissing *Litex I* with prejudice. SMF ¶43.

In April 2004, former judge from the U.S. District Court for the District of Delaware, Roderick McKelvie, presided over a five-day arbitration. SMF ¶44. On September 7, 2004, Judge McKelvie issued his arbitration award and opinion, awarding Litex damages and interest. SMF ¶45. Delphi paid the award, and Litex accepted the payment. SMF ¶46.

## C.    The Current Dispute - *Litex II*

On March 1, 2005, Litex sent Delphi a letter and a draft complaint asserting its intention to sue Delphi in tort for intentional and negligent interference with prospective business relations, fraud, negligent misrepresentation, trade libel, and unfair competition. SMF ¶47. Litex asserted these claims despite the release it granted in the Settlement Term Sheet & Release, releasing Delphi from "any and all claims, demands, obligations, actions, liabilities or causes of action, under the patent laws, in tort, or otherwise in any jurisdiction...." SMF ¶38. Because of Litex's blatant disregard and obvious intention to ignore its contractual obligations under the Settlement Term Sheet & Release, Delphi filed this action for declaratory relief requesting the Court to enforce the terms of the parties' prior settlement agreement.[3] SMF ¶48. Delphi seeks

---

[3] Delphi also requested declaratory relief from Litex and its counsel's violation of the protective order previously ordered by the Court in *Litex I*, which remains in effect today. Delphi contends that Litex violated the protective order by using confidential information disclosed during *Litex I* and the arbitration to bring these tort claims.

relief in this Court under the parties' and this Court's agreement to retain jurisdiction to enforce the parties' settlement. SMF ¶40.

On April 18, 2005, Litex answered Delphi's Complaint for Declaratory Relief and asserted four counterclaims: (1) Declaratory Judgment that the Settlement Term Sheet and Release Does Not Bar Litex's Counterclaims Due To Delphi's Fraud; (2) Intentional Interference with Prospective Economic Relations – California Law; (3) Negligent Interference with Prospective Economic Relations – California Law; and (4) Unfair Competition Under California Bus & Prof. Code Section 17200 et seq.[4] SMF ¶49.

To avoid Litex's release of such tort claims, Litex now alleges that Delphi fraudulently induced Litex to execute the Settlement Term Sheet & Release because Delphi allegedly failed to disclose the alleged falsity of various Delphi press releases and a statement in its 2001 annual report. SMF ¶51. In summary, Litex alleges the following:

(1)     Delphi continued throughout 2001 and into 2002 to tell Litex and the public that Delphi was progressing with its development and commercialization of an NTP product. SMF ¶52;

(2)     Not until April 2004 did Delphi reveal to Litex that, by 2001, it possessed no confidence in its NTP research and development efforts and had serious doubts as to the future of its NTP project. SMF ¶53;

(3)     Delphi intended to interfere with Litex's patent licensing efforts with Delphi's competitors by making allegedly false and misleading public statements regarding its NTP project. SMF ¶54;

(5)     Delphi's allegedly false and misleading public statements regarding its NTP project adversely affected Litex's ability to obtain investment funds in its Series D round of financing. SMF ¶55;

(6)     Delphi intended to deceive Litex by its allegedly false and misleading public statements regarding its NTP project. SMF ¶56;

---

[4] On the face of the Counterclaims, it appears that Litex has abandoned its claims for negligent misrepresentation and trade libel that were present in the draft complaint that accompanied Litex's assertion letter of March 1, 2005. SMF ¶¶47, 49.

(7)     Delphi allegedly failed to disclose in *Litex I* that it possessed no
        confidence in its NTP research efforts and by 2001 had serious doubts as
        to the future of its NTP project. SMF ¶57; and

(8)     Litex believed that Delphi's 2001 and 2002 public statements about its
        NTP project were true and relied upon these statements to its detriment.
        SMF ¶58.

## III.   ARGUMENT

### A.     Standard For Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment should be granted in favor of the moving

party if the record shows that "there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  The non-moving party may not

establish the existence of a genuine issue of material fact by mere denials or assertions that a fact

is challenged.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 256 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560,

1562 (Fed. Cir. 1987).  "When a sufficiently supported motion has been submitted, the burden of

coming forward and showing that there is a genuine issue of material fact shifts to the non-

movant." *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1571 (Fed.

Cir. 1991).  A genuine issue of material fact exists when there is "sufficient evidence … to

require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*,

477 U.S. at 249; *accord Scripps Clinic*, 927 F.2d at 1571.  This court resolves claims of

fraudulent inducement or misrepresentation at summary judgment. *Trent Partners and*

*Associates, Inc. v. Digital Equipment Corp.*, 120 F.2d 84, 108-09 (D. Mass. 1999).

**B.    The Court Should Summarily Enforce the Settlement Term Sheet & Release as a Matter of Law.**

This Court summarily enforces settlement agreements in cases before it. "[W]hen parties voluntarily enter into a settlement agreement, it cannot be repudiated by either party, and the court will summarily enforce that agreement." *Flebotte v. Dow Jones & Co., Inc.*, 2001 U.S. Dist. LEXIS 21327, *5-6 (D. Mass. 2001), *citing*, *Petition of Mal de Mer Fisheries, Inc.*, 884 F. Supp. 635, 637 (D. Mass. 1995). "Because settlement agreements enjoy great favor with the courts, however, it is only in the most extraordinary circumstances that such a pact will be vacated." *Flebotte*, 2001 U.S. Dist. LEXIS 21327 at *9 (internal citation omitted).

The First Circuit directs that Massachusetts contract principles govern federal courts' evaluation of fraudulent inducement claims. *Nash v. Trustees of Boston University*, 946 F.2d 960, 967 (1st Cir. 1991). Settlement agreements are contracts, and courts will generally interpret their terms as such. *T & T Mfg. Co. v. A.T. Cross Co.*, 587 F.2d 533, 537 (1st Cir. 1978). Massachusetts' courts give clear written terms of a settlement contract full effect and will interpret the language in accordance with its plain meaning. *See Clark v. State Street Trust Co.*, 270 Mass. 140, 155, 169 N.E. 897, 904 (1940) (subscribing to "canon … of contracts that every word and phrase must be presumed to have been employed with a purpose, and must be given a meaning and effect whenever reasonably possible."); *Edmund Wright Ginsberg Corp. v. C.D. Kepner Leather Co.*, 317 Mass. 581, 587, 59 NE.2d 253, 257 (1945) (declaring all words of contract to be given their ordinary meaning, and continuing "[i]t is to be assumed that the parties in executing the agreement thought that the words they employed were necessary to express their intent….").

In this case, enforcement of the Settlement Term Sheet & Release at the summary judgment stage is appropriate because there is no issue of genuine material fact regarding the

8

existence or terms of the settlement agreement. *Flebotte*, 2001 U.S. Dist. LEXIS 21327 at \*9.

Litex's Answer and Counterclaims does not dispute the existence of the agreement, nor does it

claim that the agreement is in any way ambiguous. SMF ¶50. Because an enforceable agreement

exists, "enforcing the agreed-upon settlement is essential 'to enable [this Court] to function

successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its

decrees." *Flebotte*, 2001 U.S. Dist. LEXIS 21327 at \*10, *citing*, *White v. U.S.*, 1998 U.S. Dist.

LEXIS 2914, No. 95-10314-JLT, 1998 WL 773626, at \*3 (D. Mass. Feb. 25, 1998).

### C.    The Settlement Term Sheet & Release Bars Litex's Tort Claims.

Here, Litex's release unequivocally releases Delphi from all claims including those in

tort.  The Release states:

> In consideration of the Settlement Term Sheet executed by the Parties on November 11,
> 2003, Litex hereby completely **RELEASES, ACQUITS AND FOREVER
> DISCHARGES** Delphi and their present or former officers, directors, employees, agents
> attorneys, heirs, executors, administrators, predecessors, successors, reorganized
> successors, beneficiaries, assigns, subsidiaries, affiliates, parents, representatives,
> divisions, and any and all other persons or entities acting in their behalf from any and all
> claims, demands, obligations, actions, liabilities or causes of action, under the patent
> laws, in tort, or otherwise in any jurisdiction including the claims for patent infringement
> in the Lawsuit, known or unknown, anticipated or unanticipated, regardless of whether
> such could have or could not have been brought in the Lawsuit, whether legal or
> equitable in nature and damages related to such any and all claims, demands, obligations,
> actions, liabilities or causes of action including attorneys fees, costs, interest, and all
> other expenses.  Such release shall not extend to future acts, including acts of alleged
> patent infringement.

SMF ¶38. This Release completely discharges all of Litex's claims against Delphi as of its

execution date.  It expressly includes the release of tort claims and all unknown and

unanticipated claims. SMF ¶38.  The Settlement Term Sheet incorporates the Release (Exhibit

B).  SMF ¶37.  The Settlement Term Sheet further states, "this agreement is entire and complete

and represents the entire agreement between the parties."  SMF ¶35.  Because Litex's Answer

and Counterclaim fails to raise an issue of ambiguity or contend that the counterclaims are

beyond the scope of the Release, the clear terms of the Settlement Term Sheet & Release must be enforced. *Northeastern University v. Deutsch*, 2002 Mass. Super. LEXIS 100, *4 (2002). Accordingly, Litex's counterclaims, which allegedly relate to activities in 2001 and 2002, must be dismissed because Litex expressly released Delphi from all existing known and unknown tort claims when it signed the Release in November 2003. SMF ¶38.

### D. Litex's Claim for Fraudulent Misrepresentation Must Fail as a Matter of Law.

To avoid the unambiguous Release that bars Litex's counterclaims, Litex concocts a claim of fraudulent misrepresentation[5] to avoid its terms. To succeed, Litex must show "the defendant [Delphi] made a false representation of a material fact with knowledge of its falsity, that the defendant made the statement for the purpose of inducing the plaintiff [Litex] to act thereon, and that the plaintiff relied upon that statement to his or her detriment." *Trent Partners*, 120 F. Supp.2d at 108-09; *Northeastern University*, 2002 Mass. Super. LEXIS 100, *9. Importantly, the unreasonableness of Litex's reliance is a complete bar to a fraudulent misrepresentation claim. *Cote v. Astra USA, Inc.*, 1998 Mass. Super. LEXIS 276, *13 (1998).

Massachusetts courts hold that reliance on statements of general business goals for the future to be unreasonable as a matter of law. *Trent Partners*, 120 F. Supp.2d at 109; *Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F. Supp. 920, 926-927 (D. Mass. 1993). Litex's Answer & Counterclaims contend that Delphi's press releases created "false impression that it had invented the technology, was successfully developing the technology, would be the 'first to market' with the technology, and was ahead in developing commercial applications of the technology." SMF ¶59. However, these allegedly "false impressions" relate

---

[5] This claim is also known as fraud in the inducement. *Flebotte*, 2001 U.S. Dist. LEXIS 21327 at *14-15. Regardless of the name, the elements for such a claim are the same. *Id.*

directly to Delphi's business plans and goals for its NTP research. Such statements constitute nothing more than "puffing" or "trade talk," upon which no reasonable person would rely. *Elias Brothers*, 831 F. Supp. at 927. For example, this court has found that statements relating to plans to expand a business or to provide goods at competitive prices are nothing more than unactionable opinions of future events. *Id.* at 926. To that end, Delphi statements, like being "first to market," are nothing more than "trade talk" and an expression of future business goals, making Litex's alleged reliance thereon unreasonable as a matter of law. *Elias Brothers*, 831 F. Supp. at 926.

Additionally, courts have found that reasonable reliance cannot be established where the adversarial relationship between the parties has been "plagued with distrust." *Mergens v. Dreyfoos*, 166 F.3d 1114, 1118 (11th Cir. 1999); *G.E.E.N. Corp. v. Southeast Toyota Distributors, Inc.*, 1994 U.S. Dist. LEXIS 21553, *11 (M.D. Fla. 1994). In *Litex I*, the parties' vigorously litigated their dispute for over two and half years. It is disingenuous and unreasonable for Litex to now claim reliance on the truth of specific press releases after so many years of a festering adversarial relationship.

### 1. Delphi's Allegedly False Press Releases were Not Made to Induce Litex to Execute the Settlement Term Sheet & Release.

To succeed on a fraudulent misrepresentation claim, Litex must establish that Delphi made the allegedly false statements to *induce* Litex to execute the Settlement Term Sheet & Release on November 11, 2003. *Cote*, 1998 Mass. Super. LEXIS 276 at *13. "To enable a party to rescind a contract because of fraud or misrepresentation, the fraud or misrepresentation relied on must have operated to cause him to make the contract or have been intended to influence the action in the particular complained of." *Willett v. Herrick*, 258 Mass. 585, 596-97 (1927). Fraudulent inducement requires a causal relation between the making of the misrepresentation

11

and the giving of the release. *Id.* at 597. Here, no evidence exists to establish the requisite causal relationship between the press releases or any alleged omissions, on one hand, and Litex's execution of the Settlement Term Sheet & Release, on the other.

First, Delphi issued the press releases in 2001, years before execution of the Settlement Term Sheet & Release. SMF ¶5. Second, Delphi made these statements publicly to inform the industry about its research at the time. Obviously, Delphi neither directed these statements to Litex nor made them to induce Litex to execute the Settlement Term Sheet & Release. Third, the parties never discussed the press releases during the parties' settlement discussions or negotiation of the Settlement Term Sheet & Release terms. SMF ¶41. Nor did Delphi make any statements concerning Delphi's position on the success or failure of its NTP project as of the summer of 2001 during the settlement negotiations. SMF ¶42. As a result, Litex has failed to satisfy the "inducement" element of its fraudulent misrepresentation claim. *Willett*, 258 Mass. at 596-97 (finding that alleged misrepresentations made months before and not in connection with the negotiation of a release were not inherent to its execution and did not result in fraudulent inducement).

> **2.    Litex's Alleged Reliance on Statements Made in Delphi's Press Release is Unreasonable.**
>
> > **a.    Litex's Reliance is Unreasonable Because it Contended During *Litex I* That Delphi's Public Releases Were Inaccurate, Caused it Damage and Interfered With Litex's Potential Business Relationships.**

A claim for fraudulent misrepresentation fails when the plaintiff knew that the defendant made a false statement, thereby making his reliance unreasonable. *Northeastern University*, 2002 Mass. Super. LEXIS 100 at *10. To succeed on this claim, Litex must prove that it did not

know or could not have known of facts that made his reliance unreasonable. *Northeastern University*, 2002 Mass. Super. LEXIS 100 at *10. Here, Litex cannot satisfy this burden.

Litex admitted during its depositions and papers that Delphi's press releases and public statements were allegedly inaccurate and caused it damage. SMF ¶¶22-31. Therefore, Delphi's testimony at the arbitration did not give raise to new tort claims. Instead, Litex had knowledge of these claims during *Litex I* and at the time it executed the Settlement Term Sheet & Release.

Litex alleges in its Counterclaims that until the arbitration Litex had no knowledge that the public statements Delphi made in 2001were false. SMF ¶60. Litex also contends that it relied upon the truth of the Delphi's press releases. SMF ¶58. These contentions are baldly false. Litex's CEO, Leon Ekchian, admitted during his October 2, 2002 deposition that Litex had been damaged by Delphi's alleged inaccurate press releases:

> Q.    Are there areas of damage that you have identified?
>
> A.    Negative comments made by Delphi about our product publicly.
>
> Q.    Any other areas of damage that you've identified, putting aside for the moment the quantification of the damage?
>
> A.    The inaccurate press releases that were made by Delphi.

SMF ¶22. Litex CEO also confirmed that Delphi's allegedly inaccurate press releases damaged Litex. SMF ¶23. These admissions confirm that Litex believed that the press releases were allegedly false and caused it damage, thereby making its alleged reliance on the truthfulness of these statements, as proffered in its Answer & Counterclaims, unreasonable as a matter of law. *Northeastern University*, 2002 Mass. Super. LEXIS 100 at *10-11. In *Northeastern University*, the court dismissed a fraudulent misrepresentation claim under similar circumstances based on deposition testimony of the plaintiff that showed his reliance to be unreasonable. In that case, the plaintiff contended that Northeastern's representation that no pending or potential third-party

claims existed induced him to sign a settlement agreement with an indemnification clause.

*Northeastern University*, 2002 Mass. Super. LEXIS 100 at *10. However, at his deposition the

plaintiff admitted that he had knowledge that a student had filed a complaint before he executed

the settlement agreement. *Id.* at *11. Relying on this admission, the court found that the plaintiff

was on notice of a potential third party (the student's) claim and therefore should have verified

Northeastern's representation to the contrary before signing the settlement agreement. *Id.* The

plaintiff's failure to do so rendered his reliance on the Northeastern's alleged fraudulent

misrepresentation unreasonable. *Id.*

Litex also contends in its Answer and Counterclaims in this matter that Delphi issued its

press releases to negatively impact Litex's negotiation with Delphi's competitors to license or

sell its technology thereby damaging Litex. SMF ¶54. Similarly, Litex contends that Delphi

issued its press releases to negatively impact Litex's efforts to secure investment funding,

thereby damaging Litex. SMF ¶55. Again, the *Litex I* record establishes that Litex long ago

believed that Delphi's press releases interfered with Litex's licensing, sales, and investment

funding opportunities, causing it damage. SMF ¶¶22-31. Specifically, Litex's CEO testified that

Delphi's activities caused the failure of Litex's Series D financing:

> Q.    So one of the areas of damage that you believe that Litex has
>        sustained as result of Delphi's activities is a failure to close Series
>        D?
>
> A.    Yes. And all the damages that flow from that.

SMF ¶24. Additionally, Litex's CEO also identified that Delphi's press releases interfered with

Litex's potential business relationships:

> Q.    I'll even take a general comment associated with the general subject
>        matter of Delphi press releases. Has somebody ever indicated to you or
>        somebody else at Litex to your knowledge that gee, I've read one or more
>        Delphi press releases, and based upon what I've learned in those press

14

> releases, I'm not going to do business with Litex? Are you aware of any such --

A.    I'm glad that we talked for a few minutes longer, because as we were speaking, the Denso communication to Vic Nowak comes to mind.

That is a situation – now, that's not directly Series D, but as I sit here now, I'm recalling that there are communications where people, your competitors – I beg your pardon. Delphi's competitors...are reading the press releases and are drawing conclusions, and Denso is an example of someone that's following the press releases that Delphi was issuing.

SMF ¶25. Similarly, in *Litex I*, Litex alluded that Delphi comments to third parties, public or otherwise, regarding Litex and its product harmed Litex. SMF ¶26. By these admissions, it is undisputable that Litex, by at least October 2, 2002, thirteen months before executing the Settlement Term Sheet & Release, believed that Delphi's releases interfered and damaged Litex's business.

Even more, Litex's damages expert, Larry Evans, confirmed in his December 23, 2002 expert report that Delphi's publicity regarding its NTP project directly damaged Litex:

Because of Delphi's infringement (which may well have been willful) **and its aggressive publicity telling the world (including Litex's potential investors, partners, and customers) that it (Delphi) developed NTP** (Depo. Exhibit 43) **and that its would be first-to-market with NTP systems** (Depo. Exhibits 40,41, 57; [LIT1366112]), **Litex suffered considerable damage** including the opportunity to further develop its patented NTP business opportunity with one infusion of funding, e.g. via the Series D proposal as well as equity participation by potential partners, such as Bosch and Denso.

SMF ¶27 (emphasis added). Similarly, on October 1, 2003, less than six weeks before executing the Settlement Term Sheet & Release, Litex complained in an opposition brief that Delphi's press releases damaged Litex's business efforts:

Delphi's publicized development activities and press releases indicating its plans to market and NTP system seriously undermined Litex's efforts to license its technologies, raise capital for research and development activities and enter into partnerships to fund development of its CDD$^{TM}$ system.

SMF ¶28.  Even after executing the Settlement Term Sheet & Release, Litex continued to

contend that Delphi's press releases damaged Litex to support Litex's potential damage award at

the arbitration. SMF ¶¶29-31.  For example, Litex's Pre-Arbitration Brief made the following

assertion:[6]

> Delphi's public announcements about its NTP Exhaust Aftertreatment System in
> the months leading up to the time the '544 patent issued had adversely affected
> Litex's attempts to raise funding for its company.

SMF ¶29.  Even more telling, Litex's allegations in its Pre-Arbitration Brief nearly mirror

allegations now asserted in its Counterclaims:

| Litex's Pre-Arbitration Brief (Litex I) | Litex's Counterclaim (Litex II) |
| --- | --- |
| Delphi's public announcements about its NTP Exhaust Aftertreatment System continues to adversely affect Litex's ability to license its technology and obtain investment funds in its Series D round financing. For example, in April 2001 Denso wrote to Litex indicating its concern that: | In fact Delphi's continued pursuit of an NTP system and its 2001 public statements alleging success in NTP development began to adversely affecting Litex's ability to license its technology and obtain investment funds in its Series D round of financing.  For example, one of Litex's potential investors/licensees was Denso, the largest Japanese automotive parts supplier.  In April 2001, Denso wrote to Litex indicating its concern that: |
| [I]f Delphi is developing CDD for diesel engines with a certain car maker and going to produce in 2004, they must have some advantages and their own patent rights about CDD for diesel.  That means it is difficult to catch up them.  Maybe Denso Japan is not interested in the technology for which we probably have to pay patent fees. (Especially for Delphi.) | [I]f Delphi is developing CDD for diesel engines with a certain car maker and going to produce in 2004, they must have some advantages and their own patent rights about CDD for diesel.  That means it is difficult to catch up them.  Maybe Denso Japan is not interested in the technology for which we probably |
| SMF ¶30; Ex. 16, Litex's Pre-Arbitration Brief, p. 9, second complete paragraph. | |

[6] Although the statements in Litex's March 31, 2004 Pre-Arbitration Brief occurred after
execution of the Settlement Term Sheet & Release, these statements are relevant here because
Litex made them *before* Delphi's witnesses testified at the arbitration – the time at which,
according to Litex's Answer & Counterclaims, the alleged falsity of Delphi's press statements
allegedly first became revealed to Litex.  SMF ¶53.

|  | have to pay patent fees. (Especially for Delphi.) <br><br> Ex.4, Litex's Answer & Counterclaims, ¶33. |
|---|---|
| All of this extensive publicity directed to Delphi's NTP Exhaust Aftertreatment System, and the fact that Delphi did not cease its infringing activities even after being sued by Litex, took its toll on the Litex/Bosch negotiations. <br><br> SMF ¶ 31; Ex.16, Litex's Pre-Arbitration Brief, p. 10, second complete paragraph. | All of these material public statements by Delphi touting the NTP Exhaust Aftertreatment System and the progress of Delphi's NTP program, which would only be revealed as false and misleading much later in 2004, took a toll on Litex and on the Litex/Bosch negotiations. <br><br> Ex.4, Litex's Answer & Counterclaims, ¶32. |

Overall, Litex's admissions made during *Litex I* clearly establish that prior to executing the Settlement Term Sheet & Release, Litex believed: (1) that Delphi's press releases were inaccurate, and therefore false; SMF ¶¶22-23; (2) that Delphi's press releases interfered with Litex's business opportunities, whether licensing, financing, or otherwise; SMF ¶¶23-31; and (3) that Litex was damaged thereby. SMF ¶¶23-31. Therefore, Litex's contention that it relied upon the truth of Delphi's press releases when it executed the Settlement Term Sheet & Release is not only unreasonable, but also patently false. The undisputed evidence shows that Litex knew of the claims, or at a minimum the facts and evidence underlying such claims, that it now asserts before executing the Settlement Term Sheet & Release, and by executing the Release, knowingly forfeited them.

   **b.    Litex's Alleged Reliance is Unreasonable Because It Possessed Sufficient Information to Reasonably Know that Delphi Had Doubts About The Success of its NTP Project in 2001.**

The undisputed facts of this matter show that Litex possessed sufficient information before executing the Settlement Term Sheet & Release to make Litex's reliance on Delphi's alleged misrepresentation unreasonable as a matter of law. The *Litex I* record shows that Delphi disclosed at least the following information regarding the lack of success of its NTP project:

(1)    Delphi abandoned catalyst development for its NTP project in April 2002. SMF ¶15;

(2)    Delphi terminated its entire NTP research project in September 2002. SMF ¶16;

(3)    During the Summer and Fall of 2001, Delphi's tests of its NTP project recorded less than 15% NOx reduction efficiencies when 90% NOx reduction efficiencies where need for a viable commercial product. SMF ¶¶ 6, 14;

(4)    In 2001, Delphi had 25 engineers working on the NTP project; in 2002, that number was reduced to 12 or 13.  SMF ¶7;

(5)    By 2002, Delphi had cut its NTP research project budget in half, compared to the level of funding budgeted for the same project in 1998.  SMF ¶8;

(6)    Delphi's management knew of the diminishing success of the NTP project.  SMF ¶9; and

(7)    By July 2001, because of poor testing results, Delphi was not confident about the success or commercial viability of it NTP Research.  SMF ¶10-13.

These facts establish that during the time proximate to the press releases (2001-2002), Delphi's NTP project was achieving unfavorable results, the budget and work force assign to the project had been reduced, and that Delphi's management knew of the waning success. SMF ¶¶6-14. Even more, within months of the press releases, Delphi terminated the project. SMF ¶¶15-16. Based on these facts, the only reasonable inference to draw is that Litex knew, long before executing the Settlement Term Sheet & Release, that Delphi itself doubted the commercial viability of NTP in 2001. *Flebotte*, 2001 U.S. Dist. LEXIS 21327 at 15-16 (finding no fraudulent misrepresentation where the plaintiff was aware of enough information that the "opportunity to discover any purported misrepresentation 'could not have presented itself more readily than it did'"). At the very least, these facts placed Litex on notice that some checking on the continued accuracy of Delphi's press statements would be prudent. *Cote*, 1998 Mass. Super.

18

LEXIS 276 at *22. Litex's purported blind reliance on the press releases, as it now contends, must be unreasonable.

As if that information were not enough, Delphi's damages expert, Dr. Hoffman, in his expert report dated April 18, 2003, expressly recognized Delphi's doubt of the success of its NTP project in July 2001. SMF ¶¶10-13. On this point Dr. Hoffman's report plainly states: "Even in July 2001 and beyond, Delphi remained unsure that it could develop a suitable catalyst or produce an NTP system at an acceptable economic or energy cost." SMF ¶11. Further elaborating on this point, Dr. Hoffman expressly identified Delphi's lack of certainty of the project's success:

> The situation between Delphi and Litex changed only slightly by July 2001....
> Delphi continued testing its NTP prototype with companies such as PSA and
> Renault, but it still did not have a commercial product. They could not find a
> suitable catalyst and the fuel penalty was above the level that customers would
> accept. If anything, Delphi was even less certain that an NTP product would
> succeed.

SMF ¶12. Dr. Hoffman further stated:

> By July 2001, ... In addition, because Delphi did not have a commercial NTP
> product and was not confident that it would, it would have only wanted a license
> for testing proposes and possibly an option for future commercialization....

SMF ¶13. The Hoffman Report further highlights similar points regarding Delphi's uncertainty as to the commercial viability of its NTP project in 2001. SMF ¶10. Therefore, almost seven months before Litex executed the Settlement Term Sheet and Release, Delphi and its expert Dr. Hoffman directly stated that in July 2001, Delphi possessed serious doubts as to the commercial viability of its NTP technology as a result of the unfavorable vehicle testing results. SMF ¶¶ 6, 9-13.

Overall, no doubt exists that the information provided by Delphi's witnesses and summarized in Dr. Hoffman's report directly contradicts Litex's current position alleging that

Delphi failed to disclose its concerns over the success of the NTP project as of the Summer of 2001. The record fails to support Litex's contention that Delphi fraudulently omitted this information until the arbitration. Therefore, Litex's contention that it relied on Delphi's allegedly contrary press releases cannot constitute reasonable reliance.

## IV.   CONCLUSION

For the reasons discussed above, there is no genuine dispute of material fact that the Settlement Term Sheet & Release is enforceable. As a result, Delphi respectfully requests that the Court grant summary judgment to Delphi on Count I of its Complaint and dismiss Litex's counterclaims and defenses.

Respectfully submitted,

**DELPHI CORPORATION**

By its attorneys,

H. Joseph Hameline, BBO # 218710
Matthew C. Hurley, BBO # 643638
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

Dated: May 31, 2005

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by mail/hand on _May 31, 2005_

20