UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DELPHI CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>LITEX, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 05-10415 (WGY)<br>)<br>)<br>)<br>)<br>) |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DELPHI CORPORATION'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Local Rule 56.1, Plaintiff and Counterclaim Defendant Delphi Corporation submits its Statement Of Undisputed Material Facts in support of its Motion for Summary Judgment.

1. In 1994, Delphi began researching non-thermal plasma ("NTP") as an automotive exhaust treatment application. Ex. 8, Hoffman Rpt. ¶15.[1]

2. Delphi's research focused on combining a reactor that generated NTP with a specialized designed catalyst to remove nitrogen oxide pollutants (NOx) from diesel engine exhaust. Ex. 9, Kupe Dep. pp. 21:19-22:6.

3. To commercialize this technology for vehicle use, Delphi determined that its NTP project needed to satisfy the following targets:

---

[1] References to "Ex. __" refer to the exhibits attached to the Affidavit of William Cosnowski, Jr. in Support of Delphi's Motion for Summary Judgment filed concurrently herewith. References to "Cosnowski Aff. ¶__" refer to specific paragraphs in the Affidavit of William Cosnowski, Jr.

1

      (1)    90% reduction efficiency of NOx in diesel exhaust;
      (2)    Less than 3% fuel penalty to operate NTP on a vehicle; and
      (3)    A robust, low cost product.

Ex. 8, Hoffman Rpt. ¶30; Ex. 9; Kupe Dep. pp. 326:9-327:4, 368:8-22.

4.     In 1999 and 2000, Delphi had achieved some laboratory results that suggested that NTP could be a potential viable diesel exhaust treatment solution. Ex. 9, Kupe Dep. pp. 381:23-383:6.

5.     Delphi issued press releases regarding its NTP research and applied for industry research awards. Ex. 4, Answer ¶¶ 41, 42.

6.     In 2001, Delphi began experiencing problems with its on-vehicle testing of its NTP project. The positive results Delphi experienced earlier in the laboratory did not translate into vehicle tests. Delphi's 2001 vehicle tests resulted in less than 15% NOx reduction and a fuel penalty of 8%, results far shy of its goal and its earlier laboratory results. Ex. 8, Hoffman Expert Rpt., ¶¶ 30; Ex. 11, Goulette Dep. pp. 140:3-19, 147:15-148:7, 148:19-149:5; Ex. 9, Kupe Dep. pp. 48:18-25, 245:2-24.

7.     In 2001, Delphi had 25 engineers working on the NTP project; in 2002, that number was reduced to 12 or 13. Ex. 9, Kupe Dep. pp. 277:21-278:7.

8.     By 2002, Delphi had cut its NTP research project budget in half, compared to the level of funding budgeted for the NTP project in 1998. Ex. 10, Botti Dep. 43:3-9.

9.     Delphi's management, namely its executive vice-president Donald Runkle, knew of the diminishing success of the NTP project in 2001. Ex. 12, Runkle Dep., pp. 114:11-17; 117:17-238; Cosnowski Aff. ¶22.

10.     By July 2001, because of poor testing results, Delphi was not confident about the success or commercial viability of it NTP research. Ex. 8, Hoffman Rpt. ¶¶ 52, 152 (3rd bullet), 154, 156, 158, 159.

11.     The expert report of Delphi's damages expert, Dr. Abram Hoffman, dated April 18, 2003, stated:

> Even in July 2001 and beyond, Delphi remained unsure that it could develop a suitable catalyst or produce an NTP system at an acceptable economic or energy cost.

Ex. 8, Hoffman Rpt. ¶ 52.

12.     The expert report of Delphi's damages expert, Dr. Abram Hoffman, dated April 18, 2003, stated:

> The situation between Delphi and Litex changed only slightly by July 2001.... Delphi continued testing its NTP prototype with companies such as PSA and Renault, but it still did not have a commercial product. They could not find a suitable catalyst and the fuel penalty was above the level that customers would accept. If anything, Delphi was even less certain that an NTP product would succeed.

Ex. 8, Hoffman Rpt. ¶ 158.

13.     The expert report of Delphi's damages expert, Dr. Abram Hoffman, dated April 18, 2003, stated:

> By July 2001, ... In addition, because Delphi did not have a commercial NTP product and was not confident that it would, it would have only wanted a license for testing proposes and possibly an option for future commercialization....

Ex. 8, Hoffman Rpt. ¶ 159.

14.     Delphi continued its efforts to improve its NTP project through additional testing conducted during the summer of 2001 until March 2002. Ex. 11, Goulette Dep. pp. 130:1-131:20, 140:3-19, 147:15-148:7, 148:19-149:5.

15.     In April 2002, Delphi abandoned research efforts on NTP catalysts. Ex. 9, Kupe Dep. pp. 62:17-23, 339:21-340:19; Ex. 8, Hoffman Rpt. ¶¶ 32, 52.

16. In September 2002, Delphi abandoned its entire NTP project. Ex. 8, Hoffman Rpt., ¶¶ 33, 52; Ex. 9, Kupe Dep. pp. 245:25-246:6; Ex. 11, Goulette Dep. pp. 54:15-55:13.

17. Delphi never commercialized any NTP product. Ex. 8, Hoffman Rpt. ¶33.

18. Despite knowledge that Delphi never commercialized any NTP product and its NTP activity involved only research, Litex sued Delphi for patent infringement. Ex. 18; Ex. 4, Answer, ¶39.

19. In April 2002, the Honorable Joseph Tauro issued a discovery order in *Litex I* requiring the parties to produce relevant documents relating to the issues of liability and damages and provide depositions for specified witnesses. Ex. 6.

20. Delphi complied with this discovery order, and Litex took the deposition of each specified witness. Cosnowski Aff. ¶3.

21. The Court did not permit the parties to take any additional discovery other than specified in the April 2002 order. Cosnowski Aff. ¶3; Ex. 7.

22. On October 2, 2002, Litex's CEO, Leon Ekchian, testified:

> Q. Are there areas of damage that you have identified?
>
> A. Negative comments made by Delphi about our product publicly.
>
> Q. Any other areas of damage that you've identified, putting aside for the moment the quantification of the damage?
>
> A. The inaccurate press releases that were made by Delphi.

Ex. 13, L. Ekchian Dep. p. 340:6-15.

23. On October 2, 2002, Litex's CEO, Leon Ekchian, testified that Delphi's allegedly inaccurate press releases damaged Litex. Ex. 13, L. Ekchian Dep. pp. 377:20-380:19, 386:18-389:11, 393:7-394:7.

4

24. On October 2, 2002, Litex's CEO, Leon Ekchian, testified:

> Q. So one of the areas of damage that you believe that Litex has sustained as result of Delphi's activities is a failure to close Series D?
>
> A. Yes. And all the damages that flow from that.

Ex.13, L. Ekchian Dep. pp. 339:24-340:5.

25. On October 2, 2002, Litex's CEO, Leon Ekchian, testified:

> Q. I'll even take a general comment associated with the general subject matter of Delphi press releases. Has somebody ever indicated to you or somebody else at Litex to your knowledge that gee, I've read one or more Delphi press releases, and based upon what I've learned in those press releases, I'm not going to do business with Litex? Are you aware of any such --
>
> A. I'm glad that we talked for a few minutes longer, because as we were speaking, the Denso communication to Vic Nowak comes to mind.
>
> That is a situation – now, that's not directly Series D, but as I sit here now, I'm recalling that there are communications where people, your competitors – I beg your pardon. Delphi's competitors...are reading the press releases and are drawing conclusions, and Denso is an example of someone that's following the press releases that Delphi was issuing.

Ex. 13, L. Eckhian Dep. pp. 393:7-394:7.

26. On October 2, 2002, Litex's CEO, Leon Ekchian, testified that Delphi comments to third parties, the public or otherwise, regarding Litex and its product allegedly harmed Litex. Ex. 13, L. Eckhian Dep. pp. 300:13-305:3; 323:17-324:14, 339:24-340:5, 348:24-349:22, 368:16-370:9, 393:7-394:7. See. Also Ex. 17, Winkler Dep. pp. 182:9-21; 183:15-25; 185:10-186:7.

27. The expert report of Litex's damages expert, Larry Evans, dated December 23, 2002, stated:

> Because of Delphi's infringement (which may well have been willful) and its aggressive publicity telling the world (including Litex's potential investors, partners, and customers) that it (Delphi) developed NTP (Depo. Exhibit 43) and

5

that its would be first-to-market with NTP systems (Depo. Exhibits 40,41, 57; [LIT1366112]), Litex suffered considerable damage including the opportunity to further develop its patented NTP business opportunity with one infusion of funding, e.g. via the Series D proposal as well as equity participation by potential partners, such as Bosch and Denso.

Ex. 14, Evans Rpt. ¶ 44.

28.     On October 1, 2003, Litex stated in an opposition brief filed in *Litex I*:

> Delphi's publicized development activities and press releases indicating its plans to market and NTP system seriously undermined Litex's efforts to license its technologies, raise capital for research and development activities and enter into partnerships to fund development of its CDD$^{TM}$ system.

Ex. 15, Plaintiff's Memorandum in Opposition To Defendants' Motion To Exclude The Expert Report and Testimony of Larry E. Evans and To Exclude Evidence and Testimony Regarding Litex's Value, p. 4, second complete paragraph.

29.     Litex's Pre-Arbitration Brief, dated March 31, 2004, stated:

> Delphi's public announcements about its NTP Exhaust Aftertreatment System in the months leading up to the time the '544 patent issued had adversely affected Litex's attempts to raise funding for its company.

Ex. 16, Litex's Pre-Arbitration Brief, p. 14, fifth bullet.

30.     Litex's Pre-Arbitration Brief, dated March 31, 2004, stated:

> Delphi's public announcements about its NTP Exhaust Aftertreatment System continues to adversely affect Litex's ability to license its technology and obtain investment funds in its Series D round financing. For example, in April 2001 Denso wrote to Litex indicating its concern that:
>
>> [I]f Delphi is developing CDD for diesel engines with a certain car maker and going to produce in 2004, they must have some advantages and their own patent rights about CDD for diesel. That means it is difficult to catch up them. Maybe Denso Japan is not interested in the technology for which we probably have to pay patent fees. (Especially for Delphi.)

Ex. 16, Litex's Pre-Arbitration Brief, p. 9, second complete paragraph.

31.     Litex's Pre-Arbitration Brief, dated March 31, 2004, stated:

6

> All of this extensive publicity directed to Delphi's NTP Exhaust Aftertreatment System, and the fact that Delphi did not cease its infringing activities even after being sued by Litex, took its toll on the Litex/Bosch negotiations.

Ex. 16, Litex's Pre-Arbitration Brief, p. 10, second complete paragraph.

32. Litex never moved to add any tort claims to the action in *Litex I* and never filed a separate action based on any tort claims before the settlement and dismissal of *Litex I*. Cosnowski Aff. ¶4.

33. On November 3, 2003, the *Litex I* trial commenced. Cosnowski Aff. ¶5.

34. After the fifth day of trial and the recusal of Judge Tauro as the presiding judge, Delphi and Litex settled and dismissed *Litex I* with prejudice in favor of a private and confidential arbitration in accordance with the terms of the Settlement Term Sheet & Release. Ex. 1, Settlement Term Sheet, ¶1; Cosnowski Aff. ¶6.

35. The Settlement Term Sheet states that "this agreement is entire and complete and represents the entire agreement between the parties." Ex. 1, Settlement Term Sheet ¶ 9.

36. The parties conveyed in the Settlement Term Sheet & Release mutual releases dismissing all claims of the parties against the other including those in tort. Ex. 1, Release ¶¶ 1.0, 2.0.

37. The Settlement Term Sheet & Release incorporates the Release, Exhibit B. Ex. 1, Settlement Term Sheet ¶9.

38. In the Settlement Term Sheet & Release, Litex granted Delphi the following release:

> In consideration of the Settlement Term Sheet executed by the Parties on November 11, 2003, Litex hereby completely **RELEASES, ACQUITS AND FOREVER DISCHARGES** Delphi and their present or former officers, directors, employees, agents attorneys, heirs, executors, administrators, predecessors, successors, reorganized successors, beneficiaries, assigns, subsidiaries, affiliates, parents, representatives, divisions, and any and all other persons or entities acting in their behalf from any and all claims, demands, obligations, actions, liabilities or causes of action, under the patent laws, in tort, or otherwise in any jurisdiction including the claims for patent infringement in the Lawsuit, known or unknown, anticipated or unanticipated, regardless of whether such could have or could not have been brought in the Lawsuit, whether legal or

7

> equitable in nature and damages related to such any and all claims, demands, obligations, actions, liabilities or causes of action including attorneys fees, costs, interest, and all other expenses.  Such release shall not extend to future acts, including acts of alleged patent infringement.

Ex. 1, Release ¶ 1.1 (emphasis in original).

39. Counsel represented both parties during the settlement negotiations, and both parties and their counsel executed the Settlement Term Sheet & Release. Ex. 1; Cosnowski Aff. ¶7.

40. The parties agreed in the Settlement Term Sheet and the Stipulation of Dismissal states that the Court retains jurisdiction to enforce the parties' settlement. Ex. 1, Settlement Term Sheet, ¶ 11; Ex. 2.

41. At no time during the settlement negotiations or execution of the Settlement Term Sheet & Release did the parties discuss any Delphi press releases. Cosnowski Aff. ¶8.

42. At no time during the settlement negotiations or execution of the Settlement Term Sheet & Release did Delphi make any statements concerning Delphi's position on the success or failure of its NTP project as of the summer of 2001 or otherwise. Cosnowski Aff. ¶8.

43. On November 12, 2003, the Court entered a Stipulation of Dismissal dismissing *Litex I* with prejudice. Ex. 2.

44. In April 2004, former Federal Judge from the District of Delaware, Roderick McKelvie, presided over a five-day arbitration between the parties. Cosnowski Aff. ¶9.

45. On September 7, 2004, Judge McKelvie issued his arbitration award and opinion, awarding Litex damages and interest. Cosnowski Aff. ¶10.

46. Delphi paid the arbitration award, and Litex accepted the payment. Ex. 4, Answer ¶ 18; Cosnowski Aff. ¶11.

47. On March 1, 2005, Litex sent Delphi a letter and a draft complaint asserting its intention to sue Delphi in tort for intentional and negligent interference with prospective business relations, fraud, negligent misrepresentation, trade libel, and unfair competition. Ex. 5.

48. Delphi filed this pending action (*Litex II*) for declaratory relief requesting the Court to enforce the terms of the parties' prior settlement agreement. Ex. 3.

49. On April 18, 2005, Litex answered Delphi's Complaint for Declaratory Judgment and Other Relief and asserted four counterclaims: (1) Declaratory Judgment that Settlement Term Sheet and Release Does Not Bar Litex's Counterclaims Due To Delphi's Fraud; (2) Intentional Interference with Prospective Economic Relations – California Law; (3) Negligent Interference with Prospective Economic Relations – California Law; and (4) Unfair Competition Under California Bus & Prof. Code Section 17200 et seq. Ex. 4.

50. Litex's Answer and Counterclaims do not allege that any term of the Settlement Term Sheet & Release is ambiguous or allege that the counterclaims are beyond the scope of the Release. Ex. 4.

51. Litex's Answer & Counterclaims allege that Delphi fraudulently induced Litex to execute the Settlement Term Sheet & Release because Delphi allegedly failed to disclose the alleged falsity of various Delphi 2001 press releases and a statement in its 2001 annual report. Ex. 4, Counterclaims ¶¶48-54.

52. Litex's Answer & Counterclaims allege that Delphi continued throughout 2001 and into 2002 to tell Litex and the public that Delphi was progressing with its development and commercialization of an NTP product. Ex. 4, Counterclaims ¶¶ 6, 39.

53. Litex's Answer & Counterclaims allege that not until April 2004 at the arbitration did Delphi reveal to Litex that, by 2001, it possessed no confidence in its NTP research and

9

development efforts and had serious doubts as to the future of its NTP project. Ex. 4, Counterclaims ¶¶ 7, 39, 40, 42.

54. Litex's Answer & Counterclaims allege that Delphi intended to interfere with Litex's patent licensing efforts with Delphi's competitors by making allegedly false and misleading public statements regarding its NTP project. Ex. 4, Counterclaims ¶¶ 32, 33, 45, 46, 47, 58, 65.

55. Litex's Answer & Counterclaims allege that Delphi's allegedly false and misleading public statements regarding its NTP project adversely affected Litex's ability to obtain investment funds in its Series D round of financing. Ex. 4, Counterclaims ¶¶ 33, 45, 46, 47, 58, 65.

56. Litex's Answer & Counterclaims allege that Delphi intended to deceive Litex by its allegedly false and misleading public statements regarding its NTP project. Ex. 4, Counterclaims ¶¶ 50, 51.

57. Litex's Answer & Counterclaims allege that Delphi allegedly failed to disclose in *Litex I* that it possessed no confidence in its NTP research efforts and by 2001 had serious doubts as to the future of its NTP project. Ex. 4, Counterclaims ¶ 40.

58. Litex's Answer & Counterclaims allege that Litex believed that Delphi's 2001 and 2002 public statements about its NTP project were true and relied upon these statements to its detriment. Ex. 4, Counterclaims ¶¶ 41, 49, 51, 52.

59. Litex's Answer & Counterclaims contend that Delphi's press releases created a "false impression that it had invented the technology, was successfully developing the technology, would be the 'first to market' with the technology, and was ahead in developing commercial applications of the technology." Ex. 4, Counterclaims ¶ 5.

60. Litex alleges in its Counterclaims that until the arbitration Litex had no knowledge that the public statements Delphi made in 2001 were false. Ex. 4, Counterclaims ¶¶ 49, 51, 52.

Respectfully submitted,

**DELPHI CORPORATION**

By its attorneys,

*/s/ Matthew C. Hurley*

H. Joseph Hameline, BBO # 218710
Matthew C. Hurley, BBO # 643638
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31th day of May, 2005, I caused the foregoing *Statement of Undisputed Material Facts in Support of Delphi's Motion for Summary Judgment* to be served by hand upon the following counsel for Litex, Inc.:

John T. Gutkoski, Esq.
Day, Berry & Howard LLP
260 Franklin Street
Boston, Massachusetts 02110

*/s/ Matthew C. Hurley*
Matthew C. Hurley

LIT 1523895v1