UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DELPHI CORPORATION,                        )<br>                                            )<br>        Plaintiff,                          )<br>                                            )<br>v.                                          )<br>                                            )<br>LITEX, INC.,                                )<br>                                            )<br>        Defendant.                          )<br>                                            ) | Civil Action No. 05-10415 (WGY) |

**AFFIDAVIT OF WILLIAM COSNOWSKI, JR. IN SUPPORT OF
DELPHI CORPORATION'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

1.      I am in-house counsel for Delphi Corporation and am an attorney licensed to practice law

in the State of Michigan. Formerly, I was admitted to practice *pro hac vice* before the United

States District Court for the District of Massachusetts in the case *Litex, Inc. v. Delphi Automotive*

*Systems Corporation, et al.*, Civil Action No. 01-CV-10910 (*Litex I*). I have personal knowledge

of the facts set forth in this affidavit, and if called as a witness, could competently testify thereto.

2.      I was the person at Delphi responsible for the defense of the litigation initiated by Litex

in *Litex I* in May 2001. To that end, I was responsible for the production of Delphi's discovery

to Litex and the development of Delphi's defenses. I served as a counsel of record at trial in

*Litex I* and at the private arbitration that followed pursuant to the parties' agreement in the

Settlement Term Sheet & Release. Attached as Exhibit 1 is a true and correct copy of select

excerpts of Settlement Term Sheet & Release, dated November 11, 2003. The remainder of this

1

document has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary.

3.      Delphi produced all documents and made available all Delphi witnesses called for in the Court's April 2, 2002 Order (See paragraph 16 below). Litex, through its counsel, took the deposition of each Delphi witness specified in the Court's April 2, 2002 Order. Except for the discovery specified in that Order, the Court did not permit the parties to take any additional fact discovery (see paragraph 17 below).

4.      Litex never moved to add any tort claims to the action in *Litex I* and never filed a separate action based on any tort claims before the settlement and dismissal of *Litex I*.

5.      The trial in *Litex I* commenced on November 3, 2003.

6.      After the fifth day of trial and the recusal of Judge Tauro as the presiding judge, Delphi and Litex settled and dismissed the case with prejudice in favor of a private and confidential arbitration in accordance with the terms of the Settlement Term Sheet & Release.

7.      During the trial of *Litex I*, the parties discussed settlement on numerous occasions. I was personally involved in all settlement discussions between the parties. At all times during the parties' settlement discussions or negotiations, their respective counsel represented the parties. In the same manner, the parties were represented by counsel at the execution of the Settlement Term Sheet & Release.

8.      At no time during the settlement negotiations or execution of the Settlement Term Sheet & Release did the parties discuss any Delphi press releases. Additionally, during these negotiations, Delphi did not make any statements concerning Delphi's position on the success or failure of its NTP project as of the summer of 2001 or otherwise.

2

9.      In April 2004, the parties conducted a private and confidential five-day arbitration before former Federal Judge for the District of Delaware, the Honorable Roderick McKelvie.

10.     On September 7, 2004, Judge McKelvie issued his arbitration award and opinion, awarding Litex damages and interest.

11.     Delphi paid Litex the arbitration award. Delphi's records indicate that Litex cashed the check by which Delphi paid the arbitration award.

12.     Attached as Exhibit 2 is a true and correct copy of the Stipulation of Dismissal in *Litex I*, dated November 12, 2003.

13.     Attached as Exhibit 3 is a true and correct copy of Delphi's Complaint for Declaratory Judgment and Other Relief in this matter, dated March 4, 2005.

14.     Attached as Exhibit 4 is a true and correct copy of Litex's Answer and Counterclaims in this matter, dated April 18, 2005.

15.     Attached as Exhibit 5 is a true and correct copy of a letter, dated March 1, 2005, and a draft complaint sent by Litex's counsel to Delphi asserting various tort claims.

16.     Attached as Exhibit 6 is a true and correct copy of the Court's April 2, 2002 Order in *Litex I*.

17.     Attached as Exhibit 7 is a true and correct copy of the Court's October 16, 2002 Order in *Litex I*.

18.     Attached as Exhibit 8 is a true and correct copy of select excerpts of the Rebuttal Expert Witness Report of Dr. Abram E. Hoffman, dated April 18, 2003. Dr. Hoffman served as Delphi's damages expert in *Litex I* and at the arbitration. The remainder of this document has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary.

19.     Attached as Exhibit 9 is a true and correct copy of select excerpts of the deposition transcripts of Dr. Joachim Kupe, dated September 5, 2002 and September 26, 2002. The remainder of these deposition transcripts has been redacted to preserve their confidentiality, but are available for *in camera* review should the Court deem it necessary. Dr. Kupe served as the chief engineer for Delphi's NTP research project.

20.     Attached as Exhibit 10 is a true and correct copy of select excerpts of the deposition transcript of Dr. Jean Botti, dated September 4, 2002. The remainder of this deposition transcript has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary. Dr. Botti served as the chief technologist for Delphi's NTP research project.

21.     Attached as Exhibit 11 is a true and correct copy of select excerpts of the deposition transcript of David Goulette, dated September 20, 2002. The remainder of this deposition transcript has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary. Mr. Goulette served as a systems engineer for Delphi's NTP research project.

22.     Attached as Exhibit 12 is a true and correct copy of select excerpts of the deposition transcript of Donald Runkle, dated September 6, 2002. The remainder of this deposition transcript has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary. Mr. Runkle served as Delphi's executive vice-president and later as its Chief Technology Officer.

23.     Attached as Exhibit 13 is a true and correct copy of select excerpts of the deposition transcript of Leon Ekchian, dated October 2, 2002. The remainder of this deposition transcript

4

has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary. Mr. Ekchian serves as Litex's Chief Executive Officer.

24.     Attached as Exhibit 14 is a true and correct copy of select excerpts of the Expert Witness Report of Larry Evans, dated December 23, 2002. The remainder of this document has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary. Mr. Evans served as Litex's damages expert in *Litex I* and at the arbitration.

25.     Attached as Exhibit 15 is a true and correct copy of select excerpts of the opposition brief filed by Litex in *Litex I* entitled "Plantiff's Memorandum in Opposition to Defendants' Motion to Exclude the Expert Report and Testimony of Larry Evans", dated October 1, 2002. The remainder of this document has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary.

26.     Attached as Exhibit 16 is a true and correct copy of select excerpts of Litex's Pre-Arbitration Brief, dated March 31, 2004. The remainder of this document has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary.

27.     Attached as Exhibit 17 is a true and correct copy of select excerpts of the deposition transcript of Charles Winckler, dated September 23, 2002. The remainder of this deposition transcript has been redacted to preserve its confidentiality, but is available for *in camera* review should the Court deem it necessary. Mr. Winckler served as Litex's assistant treasurer.

28.     Attached as Exhibit 18 is a true and correct copy of a letter from Litex's counsel to Delphi, dated June 18, 2001.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 31, 2005

William Cosnowski, Jr.

I hereby certify that a true copy of the
above document was served upon the
attorney of record for each party by
mail/hand on _May 31, 2005_
Matthew C. Hurley

6

# EXHIBIT 1

## SETTLEMENT TERM SHEET

THEREFORE, Litex, Inc. ("Litex") and Delphi Corporation ("Delphi") agree as follows:

1. The parties have settled the Lawsuit in whole. This Settlement Term Sheet is binding on the parties and enforceable. This Settlement Term Sheet is not an admission of liability by either side.

2. On November 12, 2003, Litex, Inc. ("Litex") will dismiss the Lawsuit with prejudice and Delphi Corporation ("Delphi") will dismiss its counterclaims with prejudice. On November 11, 2003, each party will execute a general release in favor of the opposing party and its affiliates, predecessors, successors, assigns, subsidiaries, officers, directors, and employees, of all claims, including claims for patent infringement or any other claim, made in the Lawsuit or not, then existing, known or unknown. Such releases will not extend to future acts, including acts of alleged patent infringement.

9. This agreement incorporates by reference Exhibits A and B hereto. This agreement is entire and complete and represents the entire agreement between the parties. Any modifications hereto shall be in writing and executed by both parties.

11. The undersigned have authority to enter into this settlement and term sheet on behalf of their respective employers. The terms of this settlement will be kept confidential, except as necessary for internal and external reporting requirements. The parties will jointly request that the United States District Court for the District of Massachusetts retain jurisdiction over this settlement and the protective order previously entered in the Lawsuit.

Date: November 11, 2003            Litex, Inc.

                                   By: _____

                                   Its  *President & CEO*

Date: November 11, 2003            Delphi Corporation

                                   By: _____

                                   Its: *VICE PRESIDENT & GENERAL COUNSEL*

2

Approved as to form:

Heller Ehrman White & McAuliffe LLP

By:

Attorneys for Defendants

•

Pennie & Edmonds

By:

Attorneys for Plaintiff

3

**EXHIBIT A**
**ARBITRATOR'S INSTRUCTIONS**

1

**EXHIBIT B**
**RELEASES**

These RELEASES ("Releases") are executed by and between Litex, Inc. ("Litex") and Delphi Corporation, Delphi Automotive Systems Corporation and Delphi Automotive Systems LLC ("Delphi") (collectively the "Parties").

**WHEREAS**, the Parties seek an amicable resolution and settlement of any and all claims and counterclaims which have been asserted in Civil Action No. 01-CV-10910, filed in the United States District Court, District of Massachusetts (the "Lawsuit"), on the terms and conditions set forth in the Settlement Term Sheet;

**WHEREAS**, Paragraph 2 of the Settlement Term Sheet calls for the Parties to execute full and complete Releases;

**NOW, THEREFORE**, the Parties agree as follows:

## 1.0    RELEASE AND DISCHARGE BY LITEX

### 1.1    RELEASE AND DISCHARGE OF DELPHI

In consideration of the Settlement Term Sheet executed by the Parties on November 11, 2003, Litex hereby completely **RELEASES, ACQUITS AND FOREVER DISCHARGES** Delphi and their present or former officers, directors, employees, agents, attorneys, heirs, executors, administrators, predecessors, successors, reorganized successors, beneficiaries, assigns, subsidiaries, affiliates, parents, representatives, divisions, and any and all other persons or entities acting in their behalf from any and all claims, demands, obligations, actions, liabilities or causes of action, under the patent laws, in tort, or otherwise in any jurisdiction including the claims for patent infringement in the Lawsuit, known or unknown, anticipated or unanticipated, regardless of whether such could have or could not have been brought in the Lawsuit, whether legal or equitable in nature and damages related to such any and all claims, demands, obligations, actions, liabilities or causes of action including attorneys fees, costs, interest, and all other expenses. Such release shall not extend to future acts, including acts of alleged patent infringement.

### 1.2    RELEASE AND DISCHARGE OF DELPHI'S CUSTOMERS

In consideration of the Settlement Term Sheet executed by the Parties on November 11, 2003, Litex hereby completely **RELEASES, ACQUITS AND FOREVER DISCHARGES** any person who heretofore received any component of the Delphi Nonthermal Plasma Aftertreatment System from Delphi and their present or former officers, directors, employees from any and all claims for patent infringement grounded on any component of the Delphi Nonthermal Plasma Aftertreatment System, known or unknown, anticipated or unanticipated, regardless of whether such could have or could not have been brought in the Lawsuit, whether legal or equitable in nature and damages related to such any and all claims, demands, obligations, actions, liabilities or causes of action including attorneys fees, costs, interest, and all other expenses. Such release shall not extend to future acts, including acts of alleged patent infringement.

1

## 2.0    RELEASE AND DISCHARGE BY DELPHI

In consideration of the Settlement Terms executed by the Parties on November 11, 2003, Delphi hereby completely **RELEASES, ACQUITS AND FOREVER DISCHARGES** Litex and their present or former officers, directors, employees, agents, attorneys, heirs, executors, administrators, predecessors, successors, reorganized successors, beneficiaries, assigns, subsidiaries, affiliates, parents, representatives, divisions, and any and all other persons or entities acting in their behalf from any and all claims, demands, obligations, actions, liabilities or causes of action, under the patent laws, in tort, or otherwise in any jurisdiction including the claims for patent infringement in the Lawsuit, known or unknown, anticipated or unanticipated, regardless of whether such could have or could not have been brought in the Lawsuit, whether legal or equitable in nature and damages related to such any and all claims, demands, obligations, actions, liabilities or causes of action including attorneys fees, costs, interest, and all other expenses.  Such release shall not extend to future acts.

## 3.0    DEFINITION OF "AFFILIATE"

For purposes of the Releases in Section 1 and 2 above, the term "Affiliates" shall mean any company or entity directly or indirectly controlling or controlled by the Party.  A company or entity is controlled by (a) ownership of at least fifty percent (50%) of the stock entitled to vote for directors or persons performing a function similar to that of directors, or (b) ownership that controls the Board of Directors or ultimate governing body of the company.

Date: November 11, 2003          Litex, Inc.
                                 By: _____
                                 Its: President & CEO

Date: November 11, 2003          Delphi Corporation
                                 By: _____
                                 Its: Vice President & General Counsel

Approved as to form:             Heller Ehrman White & McAuliffe LLP
                                 By: _____
                                 Attorneys for Defendants


                                 Pennie & Edmonds
                                 By: _____
                                 Attorneys for Plaintiff

-2-

1479687.1

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

"FILED IN OPEN COURT"
11/12/03
2 a L.

LITEX, INC.,

                         Plaintiff,

            v.

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION and DELPHI AUTOMOTIVE
SYSTEMS LLC,

                         Defendants.

CIVIL ACTION NO. 01 CV 10910 (WCY)

The Honorable William C. Young

## STIPULATION OF DISMISSAL

The parties to the above-captioned action, through their undersigned authorized counsel,

hereby agree and stipulate that this action, and all claims and counterclaims asserted therein, by

either the plaintiff or the defendants are hereby dismissed with prejudice, each side to bear their

own attorneys fees and costs.

This Court shall retain jurisdiction for the purpose of enforcing the parties' settlement.

By: _____
Alexander L. Brainerd
Keith R. Weed
Joshua M. Masur
Heller Ehrman White & McAuliffe LLP
275 Middlefield Road
Menlo Park, CA 94025-3506
(650) 324-7000

Attorneys for Defendants
DELPHI AUTOMOTIVE SYSTEMS
CORP.
DELPHI AUTOMOTIVE SYSTEMS
LLC.

By: _____
Berj A. Terzian, BBO #645578
John J. Lauter
Brian M. Rothery
Thomas P. Scully
PENNIE & EDMONDS LLP
1155 Avenue of the Americas
New York, New York 10036-2711
(212) 790-9090

Attorneys for Plaintiff
LITEX, INC.

SO ORDERED:

_____
Chief United States District Judge

November 12, 2003

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DELPHI CORPORATION,⠀⠀⠀⠀⠀) | |
| ⠀⠀⠀⠀⠀) | |
| ⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀) | |
| ⠀⠀⠀⠀⠀) | |
| v.⠀⠀⠀⠀⠀) | Civil Action No. _____ |
| ⠀⠀⠀⠀⠀) | |
| LITEX, INC.,⠀⠀⠀⠀⠀) | |
| ⠀⠀⠀⠀⠀) | |
| ⠀⠀⠀Defendant.⠀⠀⠀⠀⠀) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiff Delphi Corporation ("Delphi"), for its Complaint against defendant Litex, Inc. ("Litex"), alleges as follows:

### INTRODUCTION

1.⠀⠀⠀This is an action to enforce a settlement agreement, a general release, and a Stipulation of Dismissal with Prejudice entered by the Honorable William G. Young of this Court in a previous litigation between the parties. *See Litex v. Delphi*, Civil Action No. 01-CV-10910 (WGY) ("*Litex I*"). On November 11, 2003, Litex executed a settlement agreement and general release in *Litex I*. The following day, Litex stipulated to a dismissal with prejudice in that case. In flagrant violation of the settlement agreement, general release and stipulation of dismissal entered in *Litex I*, Litex has recently threatened to file an action in California state court in which it intends to assert claims based on events that allegedly occurred *before* the dismissal of *Litex I* and *before* it signed the general release. Litex had full knowledge of these events and claims during the pendency of *Litex I*. Indeed, in *Litex I* and in a binding arbitration

that the parties agreed to as part of the settlement of *Litex I*, Litex relied upon the same baseless factual allegations that it now seeks to assert in California state court.

2. In the Stipulation of Dismissal that he entered in *Litex I*, Judge Young ordered that "[t]his Court shall retain jurisdiction for the purpose of enforcing the parties' settlement." (A true and accurate copy of the Stipulation of Dismissal from *Litex I* is attached hereto as Exhibit A). Delphi has filed this Complaint to enforce the parties' settlement and to obtain a declaration that that the claims Litex has threatened to assert in California state court are barred by the settlement agreement, release, and stipulation of dismissal entered in *Litex I*, and by the binding decision entered by the arbitrator in connection with the settlement of *Litex I*.

## PARTIES

3. Plaintiff Delphi is a Delaware corporation with its principal place of business at 5725 Delphi Drive, Troy, Michigan 48098. Delphi was formerly known as Delphi Automotive Systems Corporation, which was a defendant in *Litex I*.

4. On information and belief, defendant Litex is a Delaware corporation with places of business at 15260 Ventura Blvd., Suite 1220, Sherman Oaks, CA 91403 and 2235 Massachusetts Ave., Cambridge, MA 02140.

## JURISDICTION AND VENUE

5. This Court may enter the declaratory relief sought in this Complaint because this case presents an actual controversy within this Court's jurisdiction. *See* 28 U.S.C. §§ 2201, 2202.

6. This Court has jurisdiction over this matter because, among other reasons, it previously ordered that it "shall retain jurisdiction for the purpose of enforcing the parties'

settlement" and the parties stipulated to the Court's exercise of jurisdiction for the purpose of enforcing the settlement. *See* Ex. A.

7.    Venue is proper in this judicial district because Litex resides in this district and because a substantial part of the acts giving rise to this claim occurred in this district. *See* 28 U.S.C. § 1391.

<div align="center">FACTS</div>

## Litex filed suit against Delphi in Massachusetts Federal District Court

8.    On May 25, 2001, Litex filed *Litex I*, in which it alleged that Delphi was liable for infringement of two patents licensed to Litex. *Litex I* was originally assigned to the Honorable Joseph Tauro.

9.    On January 7, 2002, Delphi filed counterclaims against Litex in *Litex I*.

10.    On April 11, 2002, this Court entered a Stipulation and Protective Order that governs the exchange and use of confidential information disclosed in *Litex I*. A true and accurate copy of the Stipulation and Protective Order is attached hereto as Exhibit B.

11.    On November 3, 2003, after the parties had completed over two years of discovery and engaged in extensive motion practice (including dispositive motions), the trial in *Litex I* began.

12.    As a basis for its damages claim against Delphi in *Litex I*, Litex asserted that Delphi's press releases, statements in its annual report, and alleged discussions with other automotive companies had allegedly damaged Litex's ability to license its patents, sell its product, achieve a sale of its company, and/or acquire additional funding to support its business enterprise.

13.     On November 10, 2003, Judge Tauro recused himself as the presiding judge and Judge Young assumed responsibility for *Litex I*.

## The parties settled *Litex I* and exchanged general releases

14.     During trial, the parties reached a settlement of *Litex I* and executed a Settlement Term Sheet and Releases on November 11, 2003.  The parties agreed to keep the terms of the settlement confidential, and therefore a copy of the settlement agreement and general release will be filed only upon an appropriate order of the Court to protect the confidential nature of the documents.

15.     In connection with the settlement, the parties agreed to dismiss *Litex I* in favor of a private, confidential arbitration.  The parties also executed general releases as part of the settlement.

16.     On November 12, 2003, the parties and Judge Young executed a Stipulation of Dismissal, whereby the parties dismissed all claims and counterclaims with prejudice.  In the Stipulation of Dismissal, Judge Young ordered that "[t]his Court shall retain jurisdiction for the purpose of enforcing the parties' settlement."  *See* Ex. A.

17.     Following the settlement and dismissal of *Litex I*, the parties arbitrated their dispute in the spring of 2004.

18.     On September 7, 2004, the arbitrator issued his decision.  Delphi has fully complied with the arbitrator's decision.

## Litex is threatening to file suit against Delphi in California state court

19.     On March 1, 2005, Delphi received a letter and a draft complaint from the law firm of Dorsey & Whitney LLP, new counsel for Litex, in which Litex threatened to file a lawsuit in California state court (the "California Action").  In the California Action, Litex intends

4

to allege the same facts that formed the basis for its damages claim in *Litex I* and in the arbitration to which the parties agreed. The "facts" asserted by Litex in the California Action allegedly occurred *before* the dismissal of *Litex I* and *before* Litex executed the settlement agreement and general release in *Litex I*, and thus Litex was well aware of these factual allegations during *Litex I* and during the arbitration.

20.    Because the correspondence and draft complaint in the California Action refer to and rely upon confidential information subject to the Protective Order entered in *Litex I*, a copy of Litex's counsel's letter and draft complaint will be provided only upon an appropriate order of the Court to protect the confidential nature of the information at issue.

21.    Litex intends to assert in the California Action the same operative set of facts that formed the basis for its damages claim in *Litex I* and in the binding arbitration proceeding that the parties agreed to in connection with the settlement of *Litex I*. Once again, Litex intends to assert that Delphi's press releases, statements in its annual reports, and alleged discussions with other automotive companies allegedly damaged Litex's ability to license its patents, sell its product, achieve a sale of its company, and/or acquire additional funding to support its business enterprise. These factual allegations are the same in every material respect as the factual allegations upon which Litex relied in support of its damage claim in *Litex I* and in the parties' binding arbitration.

## COUNT I
### (*Declaratory Judgment*)

22.    Delphi repeats and realleges the allegations contained in paragraphs 1 to 21 as if set forth fully herein.

23.    As part of the settlement of *Litex I*, Delphi and Litex executed a settlement agreement and general release, pursuant to which the parties mutually released each other from

all claims, with the exception of the claims that the parties agreed to submit to binding
arbitration.

    24.    The arbitrator has issued his decision in the binding arbitration to which the
parties agreed, and Delphi has fully complied with the arbitrator's decision.

    25.    In its counsel's letter dated March 1, 2005 and the draft complaint it sent to
Delphi, Litex has threatened to file suit against Delphi and to assert various claims in the
California Action that rely upon the same allegations asserted by Litex in *Litex I* and in the
binding arbitration agreed upon by the parties. Litex's actions in this regard violate the terms of
the parties' settlement and general release. Furthermore, Litex's claims in the California Action
are barred due to the Stipulation of Dismissal (with prejudice) entered in *Litex I* and the binding
decision issued by the arbitrator. Additionally, Litex's claims in the California Actions are
barred by the doctrines or statutes of repose, including collateral estoppel, accord and
satisfaction, among others.

    26.    An actual controversy exists between Delphi and Litex regarding the claims that
Litex has threatened to assert in the California Action. Delphi reasonably apprehends that Litex
intends to act in violation of the parties' settlement and general releases.

    27.    Delphi respectfully requests that this Court order and declare that Litex's
threatened action in the California Action violates the terms of the parties' settlement and general
release, and that Litex's claims in the California Action are barred due to the Stipulation of
Dismissal (with prejudice) entered in *Litex I* and the binding decision issued by the arbitrator.

## COUNT II
### *(Breach of the Stipulation and Protective Ordered entered in Litex I)*

    28.    Delphi repeats and realleges the allegations contained in paragraphs 1 to 27 as if
set forth fully herein.

29.    The Stipulation and Protective Order agreed to by the parties and entered by the Court in *Litex I* provides that Confidential and Confidential-Attorneys Eyes Only Information "shall be used only for purposes of [*Litex I*]." *See* Ex. B, ¶ 8. The Protective Order further provides that "Confidential Information or Confidential – Attorneys Eyes Only Information shall not be used for any competitive, commercial, business, research and development purpose or for the purpose of filing and prosecuting a patent application *or litigating any second action*." *Id.* (emphasis added).

30.    The Protective Order states that it "shall survive the final conclusion of [*Litex I*] and the Court shall have jurisdiction to enforce this Protective Order beyond the conclusion of [*Litex I*], unless this Order is vacated," which it was not.

31.    Litex is using the Confidential Information disclosed in *Litex I* to litigate a second action, in violation of the Protective Order entered in *Litex I*.

32.    Furthermore, the Protective Order limited access to the Confidential Information exchanged in *Litex I* to certain parties, including "outside counsel for any party . . . provided that they are (a) assisting in the prosecution or defense of [*Litex I*]." *See* Ex. B, ¶ 4(a).

33.    Litex's counsel in the threatened California Action – Dorsey & Whitney – was not outside counsel to Litex in *Litex I*, did not assist in the prosecution or defense of *Litex I*, and did not sign the Protective Order entered in *Litex I*. However, it is clear from a review of Litex's draft Complaint in the California Action that Litex has provided Confidential Information to its new counsel, in violation of the Protective Order.

34.    Litex has violated the terms of the Protective Order, and Delphi has suffered damages as a result.

7

**WHEREFORE,** Delphi respectfully requests that the Court enter judgment in its favor and against Litex on all Counts herein, and enter an Order:

(a)    Declaring that Litex's threatened actions in the California Action violate the terms of the parties' settlement and general release;

(b)    Declaring that Litex's claims in the California Action are barred due to the parties' settlement agreement and general release in *Litex I*, the Stipulation of Dismissal (with prejudice) entered in *Litex I*, the binding decision issued by the arbitrator in the arbitration agreed upon by the parties in connection with the settlement of *Litex I*, and/or other applicable doctrines or statutes of repose;

(c)    Declaring that Litex has violated the terms of the Protective Order entered in *Litex I*;

(d)    Awarding Delphi the damages it has suffered as a result of Litex's violation of the terms of the Protective Order entered in *Litex I*;

(e)    Awarding Delphi the attorneys' fees and costs that it has incurred as a result of Litex's threatened actions in the California Action and as a result of Litex's violation of the Protective Order entered in *Litex I*; and

(f)    Such other relief as this Court may deem just and appropriate.

Respectfully submitted,

**DELPHI CORPORATION**

By its attorneys,

*Matthew C. Hurley*

H. Joseph Hameline, BBO # 218710
Matthew C. Hurley, BBO # 643638
Geri L. Haight, BBO # 638185
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

Dated:  March 4, 2005

LIT 1508012v1

8

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DELPHI CORPORATION,

       Plaintiff,

v.

       C.A. No. 05-10415 (WGY)

LITEX, INC.,

       Defendant.

## ANSWER AND COUNTERCLAIMS

Litex responds to the allegations in the plaintiff's Complaint for Declaratory Judgment and other Relief ("Complaint") as follows:

### FIRST AFFIRMATIVE DEFENSE

1.    Litex admits there was a previous litigation between the parties entitled <u>Litex v. Delphi</u>, Civil Action No. 01-CV-10910 (WGY) ("*Litex I*"). Litex also admits that the parties executed a settlement agreement in *Litex I*. Litex denies the remaining allegations of paragraph 1.

2.    The Stipulation of Dismissal entered in *Litex I* is a written document, the contents of which speak for themselves. Litex is without sufficient knowledge to admit or deny the remaining allegations of paragraph 2.

3.    Litex is without sufficient knowledge to admit or deny the allegations of paragraph 3.

4.    Litex admits it is a Delaware corporation with the alleged California place of business, but it no longer has a place of business in Massachusetts and, therefore, denies the remaining allegations of paragraph 4.

5.    Paragraph 5 contains conclusions of law to which no response is required.

6.    The Court's previous orders in *Litex I* are transcribed in writing and speak for

themselves. The Stipulation of Dismissal signed by the parties is also in writing and speaks for itself. The remaining allegations of paragraph 6 are conclusions of law to which no response is required.

7.    Paragraph 7 contains conclusions of law to which no response is required. To the extent paragraph 7 contains allegations requiring a response, those allegations are denied.

8.    Litex admits it filed its initial complaint in *Litex I* on May 25, 2001, the contents of which speak for themselves. Litex further admits that *Litex I* was initially assigned to the Honorable Joseph Tauro.

9.    Litex admits the allegations of paragraph 9.

10.   Litex admits the Court entered a Stipulation and Protective Order in *Litex I* on April 11, 2002, a true and accurate copy of which is attached to the Complaint, and the content of said Stipulation and Protective Order speak for themselves.

11.   Litex admits the trial in *Litex I* began on November 3, 2003. Litex denies the parties were permitted to complete discovery fully and denies the remaining allegations of paragraph 11.

12.   Litex denies the allegations of paragraph 12.

13.   Litex admits the allegations of paragraph 13.

14.   Litex admits the parties reached a settlement during trial of *Litex I* and, on November 11, 2003 executed a written Settlement Term Sheet and Release, the contents of which speak for themselves. Litex is without sufficient knowledge to respond to the remaining allegations of paragraph 14.

15.   Litex admits the parties agreed to dismiss *Litex I* and submit the issue of patent reasonable royalty damages suffered by Litex to arbitration pursuant to the written Settlement Term Sheet and Releases, the terms of which speak for themselves.

16.   Litex admits the parties executed a Stipulation of Dismissal, signed by Judge Young, the contents of which speak for themselves.

17.   Litex admits the parties arbitrated the issue of Litex's damages from Delphi's

admitted patent infringement in the Spring of 2004. Litex denies the remaining allegations of paragraph 17.

18.     Litex admits the arbitrator issued a decision dated September 7, 2004, including an award, which Delphi has now satisfied. To the extent paragraph 18 contains allegations to which a further response is required, Litex denies those allegations.

19.     Litex admits that its counsel sent Delphi a letter and draft complaint, the contents of which speak for themselves. Litex is without sufficient knowledge to admit when Delphi did or did not receive the letter and draft complaint. Litex denies the remaining allegations of paragraph 19.

20.     Litex is without sufficient knowledge to respond to the allegations of paragraph 20, including when Delphi will or will not provide the Court with the noted documents. To the extent any further response is required to the allegations of paragraph 20, Litex denies those allegations.

21.     Litex denies the allegations of paragraph 21.

### COUNT I

### (Declaratory Judgment)

22.     Litex repeats its above-stated responses to paragraphs 1-21.

23.     Litex admits executing a written settlement to *Litex I*, the contents of which speak for themselves. To the extent paragraph 23 contains allegations other than those that seek to characterize the contents of the settlement, Litex denies those allegations.

24.     Litex admits the arbitrator issued his written decision and award, the contents of which speak for themselves. Litex further admits that Delphi has satisfied the arbitrator's award.

25.     The letter and draft complaint sent to Delphi are written documents, the contents of which speak for themselves. The remaining allegations contained in paragraph 25 are conclusions of law to which no response is required. To the extent any further response is required to the allegations of paragraph 25, Litex denies those allegations.

26.     The allegations of paragraph 26 constitute conclusions of law to which no

response is required. Litex is without information sufficient to respond to the allegations in paragraph 26 regarding Delphi's apprehensions. To the extent any further response is required to the allegations in paragraph 26, Litex denies those allegations.

27.    Litex is without information sufficient to respond to Delphi's allegations in paragraph 27 as to what Delphi requests of the Court. Litex denies the remaining allegations of paragraph 27.

## COUNT II

### (Breach of the Stipulation and Protective Ordered [sic] entered in *Litex I*)

28.    Litex repeats its above-stated responses to paragraphs 1 to 27.

29.    The Stipulation and Protective Order in *Litex I* is a written document the contents of which speak for themselves. To the extent paragraph 29 contains allegations beyond those seeking to characterize the contents of the Stipulation and Protective Order, Litex denies those allegations.

30.    The allegations of paragraph 30 seek to characterize the contents of the Stipulation and Protective Order in *Litex I*, a written document the contents of which speak for themselves. Litex admits the Stipulation and Protective Order in *Litex I* has not been vacated. To the extent paragraph 30 contains allegations beyond those seeking to characterize the contents of the Stipulation and Protective Order, Litex denies those allegations.

31.    Litex denies the allegations in paragraph 31.

32.    The allegations of paragraph 32 seek to characterize the written Stipulation and Protective Order in *Litex I*, the contents of which speak for themselves. To the extent paragraph 32 contains any further allegations requiring a response, Litex denies those allegations.

33.    Litex denies the allegations in paragraph 33. Furthermore, Litex notes that Dorsey & Whitney appeared as substitute counsel for Litex prior to the conclusion of the arbitration of Litex's patent damages in *Litex I*. Litex also notes that Delphi's inside counsel corresponded with Dorsey & Whitney as counsel for Litex regarding the arbitration and even sent Dorsey & Whitney a copy of the arbitrator's decision and award.

34.    Litex denies the allegations of paragraph 34.

## SECOND AFFIRMATIVE DEFENSE

35.    Delphi's claims are barred by the doctrine of unclean hands.

## THIRD AFFIRMATIVE DEFENSE

36.    Delphi's claims are barred by the doctrine of waiver.

## FOURTH AFFIRMATIVE DEFENSE

37.    Delphi's claims are barred by the doctrine of estoppel.

## FIFTH AFFIRMATIVE DEFENSE

38.    Delphi's claims are barred by Delphi's fraud in inducing Litex to enter into the Term Sheet and Release. In support of this defense, Litex makes the following particular allegations:

39.    In May 2001, Litex sued Delphi for infringement of its NTP patents. Litex v. Delphi, Civil Action No. 01-CV-10910 (WGY) ("Litex I"). Through discovery in that litigation, Delphi learned details about the licensing and business development relationships Litex was pursing then with Delphi's automotive component competitors.

40.    At the same time, Delphi poisoned the market with public statements touting Delphi's alleged success in developing NTP.

41.    For example, in response to Litex's patent infringement suit, and in particular, to Litex's amendment of suit adding an additional patent, Delphi issued a press release on July 20, 2001 claiming to be continuing to develop and achieving success with NTP:

> We are excited, however, to discuss our technology. Delphi is developing non-thermal plasma catalysis components and systems relying upon its significant technical capabilities and sound, demonstrable and credible scientific principles. Recognition has been given by the *Financial Times Global Automotive Award* (September 1999), singling out Delphi's technical development as demonstrating the greatest potential to improve environmental performance and by industry acceptance of Delphi's technology over other available alternatives.

42.    On July 30, 2001, Delphi issued a press release announcing that its NTP

development efforts had received another award, the prestigious R&D 100 Award, for "its role in

the development of catalyst materials for plasma-catalysis engine exhaust treatment." Delphi's

Engineering Director, Dr. Andrew Brown, Jr., stated:

> It is truly an honor to be selected for this award for the fourth
> consecutive year which demonstrates the ongoing innovation of
> Delphi's scientists and engineers. . . . We are extremely proud of
> this year's award, which recognizes the potential for our
> revolutionary NTP Exhaust Aftertreatment System with its
> significant reduction in emissions.

43.    On September 12, 2001, Delphi's CEO and President, J.T. Battenberg III, made a

presentation to an international gathering of the automotive industry.  In that presentation,

shortened due to the prior day's terrorist attacks, Battenberg focused on Delphi's highlight

technologies, including its alleged development of NTP.  He said:

> Let me also mention that Delphi is the only supplier with full
> diesel injection and exhaust aftertreatment capability including our
> award winning non-thermal plasma aftertreatment technology that
> helps remove nitrogen oxide to improve emissions for diesel and
> lean burn.

44.    On October 16, 2001, Delphi issued yet another press release regarding its NTP

technology.  In this press release, Delphi's Chairman, CEO and President, J.T. Battenberg III,

stated that "Delphi is developing new systems to help take the automotive industry toward the

ultimate goal of removing vehicles from the environmental equation."  The one specific

technology discussed under the heading "Reducing Emissions" was Delphi's infringing NTP

Exhaust Aftertreatment System technology.  The press release falsely stated that

> Delphi has developed an innovative aftertreatment solution, non-
> thermal plasma technology that works in conjunction with a
> catalytic converter and a particulate filter.

45.    Moreover, Delphi repeated these false assertions about its NTP Exhaust

Aftertreatment System in its 2001 Annual Report, also known as the SEC Form 10-K.  Delphi

told the investing public:

Responding to global demands for improved fuel efficiency and reduced exhaust emissions, <u>Delphi offers advanced powertrain control systems such as</u> cylinder deactivation, gasoline direct injection and <u>non-thermal plasma (NTP) exhaust aftertreatment.</u> (Emphasis added.)

46.     The Annual Report then alluded to Delphi's joint collaboration with PSA Peugeot relating to NTP, stating:

Late in 2001, Delphi and PSA Peugeot Citroen debuted a Peugeot 206 Environmental Technologies Vehicle, featuring NTP exhaust aftertreatment which significantly reduces oxides of nitrogen emissions, enabling more rapid use of advanced fuel-efficient technologies.

47.     In addition, during 2002, Delphi continued to list on its website a "product profile" for Non-thermal Plasma Exhaust Aftertreatment.

48.     Unbeknownst at the time to Litex and the public, these material public statements by Delphi were false. The truth was that in early to mid-2001, Delphi had concluded that its NTP project was in very serious jeopardy, and Delphi had essentially given up on the NTP technology. Indeed, as early as May 2001, Delphi seriously doubted the future of its NTP project, and in July 2001, cut the NTP development budget in half. Nonetheless, Delphi continued to make the public statements outlined above, not only touting its NTP technology and NTP Aftertreatment Exhaust System, but also claiming to be continually achieving success and expecting it to continue into a commercial product.

49.     It was not until Delphi personnel were under oath at arbitration in April 2004, that Delphi finally admitted the true facts about its negative conclusions in 2001 regarding the NTP technology and the NTP Exhaust Aftertreatment System. Throughout its patent litigation with Litex in 2001-2003, and despite its ongoing discovery obligations, Delphi never admitted that the heads of the Delphi NTP program believed in 2001 that the program would <u>never</u> succeed and had reported their beliefs to Delphi's management. All Delphi revealed, in the documents it produced and in the deposition testimony of its witnesses, was that the NTP project started to fail in March of 2002, after Delphi's materially misleading statements about NTP had been made in 2001.

50.    As a result, when it proceeded to arbitrate the issue of the damages it had suffered from Delphi's patent infringement, Litex and its expert, and for that matter Delphi's experts, read and actually and reasonably relied on Delphi positive public statements in 2001 extolling the virtues of Delphi's NTP program.

51.    During arbitration testimony, however, Delphi's chief technologist Jean Botti and the program manager of the Delphi NTP project Joseph Bonadies both testified that beginning in May 2001 they were extremely skeptical that the NTP program would ever succeed or that Delphi would ever be able to develop a successful real-world application of the NTP technology that would be attractive to customers. In fact, Botti testified he was prepared to terminate the NTP project as a failure in July 2001. Both admitted reporting the conclusions of their NTP tests and their resulting negative conclusions to Delphi management.

52.    The following excerpts from the testimony of Jean Botti, Delphi's chief technologist, during arbitration revealed Delphi's true expectations for the NTP program and the timing of when Delphi knew its NTP program would likely fail:

Q    Let me ask you this: In July, if you can focus on July of 2001, what was your level of confidence at that point in time that the nonthermal plasma exhaust aftertreatment project would ever get out of ADP?

A    Very minimal at that time.

Q    And why was it very minimal at that time?

A    Because we're going through a phase of the disappoint with technology . . . . It was totally unacceptable even in diesel, you know, engine environment.

(Arbitration Hrng., p. 835-836, Lns. 21-22, 1-17.)

Q    Between July of 2001 and when you canceled the project [in October 2002], had there been some additional engine testing of the product?

A    From July 2001 to 2002?

Q    Yes.

A    Absolutely.

Q    And have – have – what did that testing indicated (sic)?

A    Well, they're all negative. I mean it was – I mean, a big disappointment. Like I said, we, in the labs, we're getting, you know, up to some 90 percent NO reduction in real conditions, you know, when we did the co-development with PSA and we started early to have that technology on engines and cars in real life, you know. We could only get 15 percent, which was very disappointing to us.

And every time we would go and redevelop the technology, you know, the costs of the system would go up, because you had to have many other, you know, I would say tricks and devices to try to increase the efficiency, but we could never make it work.

(Arbitration Hrng., p. 844-845, Lns. 4-22, 1-3.)

Q    So my question is – and I know your answer was that the NTP exhaust aftertreatment system worked on diesel. But by question is a little different. It's didn't – as of July 2001 –

A    And I want to make sure.

Q    Right

A    It never worked on diesel.

Q    Okay.

A    We could never make it work.

Q    Okay. Well, as of – that was designed to go with a diesel. Is this a better way to say it?

A    It was designed to be on diesel and lean burn engines but –

Q    And isn't it –

A    -- it didn't work.

Q    -- the case that in July – and that as of July 2001 the company had expectations that the NTP exhaust aftertreatment system would have a synergistic effect for its business and help it to compete in the diesel business?

A    If I were to represent the company, I would say no.

Q    Okay.

A    I had no expectation right in July that this would ever work. The results I got through the PSA development were just not there.

(Arbitration Hrng., p. 890-891, Lns. 3-22, 1-6.)

Q    Right. But as of 2000 – July 2001, did the company know it wouldn't work, or was that your personal opinion?

A   No. I think – I mean, you know, like every big company there is inertia. But I already had given my opinion to my upper management that this thing was not going the way I wanted it.

(Arbitration Hrng., p. 893, Lns. 15-21.)

Q   And was there still speculation to that effect in July 2001 among some people in the company?

A   Not anymore. From my level to, uh, it was pretty clear already, you know. I told my management I was going to stop the project.

Q   Uh, did the management ever give – you had told them that as of July 2001?

A   Well, I started to, uh, update the management after we had that PSA review that will show that the results were disastrous. And, uh, you know, I – I had to step up and tell my management that, because I was a customer interface, and there was a shared, I would say, development that I needed to update the management and say, We're not going anywhere with this.

Q   And do you recall about when that occurred?

A   Uh, PSA review, quite honestly, I – I – I don't recall, but it was – I'm sure it was before July 2001. It must have been in the spring of 2001 when we started to get those terrible results.

(Arbitration Hrng., p. 896-897, Lns. 4-22, 1-2.)

53.   Joseph Bonadies, the program manager for Delphi's NTP program, similarly testified as follows:

Q   What – what was your feeling about the likelihood of success of the Delphi NTP project after seeing the results as of May 5, 2001, of these impact tests?

A   I was very skeptical that we would come up with a system that could achieve these really high NOx efficiencies.

(Arbitration Hrng., p. 956, Lns. 5-11.)

Q   Had the Delphi NTP project been able to meet any of these requirements [for the Requirements and Concepts Gate Review] as of August 1, 2001?

A   No, not at that time.

(Arbitration Hrng., p. 962, Lns. 4-6.)

Q   Uh, as of August 1, 2001, were you optimistic that the Delphi NTP project would ever leave the advanced development phase?

A.    No, I wasn't very optimistic.

(Arbitration Hrng., p. 966, Lns. 4-7.)

54.    These 2004 admissions about Delphi's true beliefs in 2001 are directly contrary to the contents of its 2001-02 public statements. Until hearing this testimony at arbitration, however, Litex had no knowledge that the public statements Delphi made in 2001, and detailed above, were false. As a result, prior to the arbitration, when Litex entered into the Settlement Term Sheet and Release ("Settlement") with Delphi it believed those 2001 public statements were true and reasonably relied to its detriment on those material statements in signing the Settlement.

55.    Delphi knew the true negative state of its NTP program in 2001 and early 2002 when it made its positive statements directly to the contrary. On information and belief, therefore, Delphi intentionally, or with knowledge, made the false public statements in 2001-2002 to deceive Litex, Delphi's competitors in the automotive industry, and the public.

56.    Furthermore, in November 2003 when Delphi and Litex signed the Settlement, Delphi knew that the 2001-2002 public statements were false, also knew that Litex was unaware that the public statements had been false, and knew that Litex had read and was reasonably relying to its detriment on those Delphi public statements. Therefore, Delphi intentionally, or with knowledge, deceived and defrauded Litex into entering into the Settlement.

57.    To the extent that any portion of the Settlement or its release would bar Litex's counterclaims against Delphi for tortious interference with prospective economic relations or unfair competition and deceptive trade practices, Litex would be injured.

58.    Therefore, Delphi is barred by its fraud from asserting the Settlement against Litex to prevent such claims.

## COUNTERCLAIMS

Plaintiff Litex, Inc. counterclaims as follows:

## Jurisdiction and Venue

1.    This Court has jurisdiction over the subject matter of these counterclaims pursuant to 28 U.S.C. § 1367(a) because plaintiff's Complaint alleges a breach of the settlement agreement in a previous matter before this Court over which it had and retained jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, and these counterclaims are so related to that prior action, and to Delphi's conduct both therein and in regard to the settlement agreement in that prior action, that they form part of the same case or controversy.

2.    Venue for these Counterclaims is proper in this district pursuant to 28 U.S.C. § 1391, because counterclaim defendant Delphi resides in this district in that it is subject to personal jurisdiction here.

## Parties

3.    Litex, Inc. ("Litex") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Sherman Oaks, California.

4.    Based on information and belief, Defendant Delphi Corporation is a corporation organized under the laws of Delaware, with its principal place of business in Troy, Michigan. Based on information and belief, Defendant Delphi Corporation was formerly known as Delphi Automotive Systems Corporation. Delphi Corporation and Delphi Automotive Systems Corporation will be collectively referred to herein as "Delphi."

## Summary of Counterclaims

5.    Litex, a small start-up technology company, invented a revolutionary technology that achieved substantial reductions in automobile emissions to the benefit of both consumers and the environment. Litex, however, was prevented from bringing these benefits to the market and the public by the wrongful conduct of Delphi. Delphi attempted to develop the technology on its own but was unsuccessful and resorted to infringing Litex's patents. At the same time, Delphi embarked on a campaign to create the false impression that it had invented the technology, was successfully developing the technology, would be the "first to market" with the technology, and was ahead in developing commercial applications of the technology. In truth,

however, Delphi had concluded in May 2001 that it would never be able to develop a working, real world application of the technology.

6.    Despite coming to these conclusions, Delphi concealed them from the world. Delphi also kept them secret from Litex despite the fact that Litex sued Delphi in 2001 for patent infringement and Delphi owed Litex ongoing discovery obligations in that lawsuit. Instead, Delphi continued throughout 2001 and into 2002 to tell Litex and the public that Delphi was progressing with its development and commercialization of the product.

7.    At the time it made these materially false statements, Delphi knew Litex was actively negotiating with Delphi's competitors to license or buy the Litex technology, or to strategically invest in Litex. Furthermore, Delphi knew, or should have known, and on information and belief intended for its materially false statements to negatively impact those discussions and advantageous relationships. As a result of all of Delphi's false statements, Litex was in fact driven from the market, unable to license or sell its technology and unable to obtain needed capital. Only in April 2004, after Delphi admitted to patent infringement in its litigation with Litex in exchange for obtaining a release from Litex and proceeded to an arbitration on damages, did Delphi finally reveal to Litex that in 2001 Delphi had possessed no confidence in its research and development efforts at the exact same time Delphi was trumpeting the alleged progress of those efforts to the world.

## Factual Allegations

### I.    Litex Invests Substantial Time and Effort to Develop the NTP Technology.

8.    Litex was formed to develop technology to reduce harmful exhaust emissions from internal combustion engines. In the Fall of 1996, Litex achieved hydrocarbon and carbon monoxide reduction by injecting ozone generated remotely into the post-combustion flow stream.

9.    Starting in Spring 1997, Litex began its development efforts in full. It obtained $2.4 million in a Series B round financing. It designed and built a corona discharge non-thermal plasma ("NTP") reactor to be positioned in the engine exhaust passageway upstream of the

catalytic converter.

10.    Litex decided to out-source the manufacture of the NTP reactor. In the Summer of 1997, in an effort to find a manufacturer, Litex met with and disclosed its technology to Magna International ("Magna") and to Delphi. This initial meeting with Delphi occurred in August 1997, and through that and subsequent meetings, Delphi learned of Litex's technology, as well as Litex's interest in a licensing or similar business relationship with automobile component manufacturers.

11.    By early 1998, Litex had entered into an agreement with Magna, and started working with Magna towards the development and manufacture of a commercial implementation of its NTP reactor, which would become known as the Litex CDD™ Pollution Reduction System. (CDD was an abbreviation for Corona Discharge Device, referring to the corona or bluish glow created by the plasma in the gap between the electrodes of the NTP reactor.) In the Spring of 1999, Litex changed from Magna to Saturn Electronics as its development/manufacturing partner. The focus was on the development of an NTP reactor for use in the exhaust stream of a gasoline engine; however, Litex's technology was equally applicable to diesel engines.

12.    Litex CDD™ devices manufactured by Magna and later Saturn, began to receive recognition in the industry press. For example, in October 1999, Litex's CDD™ received the Global Powertrain Congress's Powertrain Excellence Award.

13.    As a result of these efforts, Litex was able to obtain further financing. Specifically, in 1998 and 1999, JP Morgan invested about $11 million total in Litex in a Series C round financing with an after money valuation in excess of $50 million.

## II.    Delphi Prematurely Touts its Attempts to Develop NTP Technology.

14.    In 1998, Delphi commenced its own internal project to develop non-thermal plasma technology for use in an Exhaust Aftertreatment System. Delphi's eventual NTP Exhaust Aftertreatment System project practiced Litex's invention by employing a catalyst in conjunction with and downstream of the NTP generator. (Later, after over two years of litigating the

question with Litex, Delphi would admit it infringed Litex's patents.)

15.     Delphi's entry into the non-thermal plasma emissions control market was very significant. Delphi was and is the leading Tier One automotive parts manufacturer in the world, and the dominant Tier One manufacturer in the United States. By its own account in its 1999 Form 10-K, Delphi had an "expansive global presence with a network of manufacturing sites, technical centers, sales offices and joint ventures located in every major region of the world" and sales totaling in excess of $25 billion a year. By 2003, Delphi would report that its sales totaled over $28 billion.

16.     In the Fall of 1999, Delphi began to tout the NTP Exhaust Aftertreatment System in statements to potential customers, the public and the financial community including its own shareholders.

17.     In September 1999, Delphi's NTP Exhaust Aftertreatment System received the Financial Times Global Automotive Award at the Frankfurt Motor Show. A Delphi press release regarding the award claimed – despite Litex and its NTP patents – that this technology "was developed by Delphi to reduce oxides of nitrogen ("NOx") and particulate emissions" in diesel engines.

18.     In August 2000, Delphi made further public statements connecting its dominance in the diesel market to its ability to develop and sell its NTP Exhaust Aftertreatment System. Specifically, in a press release, Delphi stated that it was "uniquely positioned with a full line of diesel engine management systems to respond to the rising popularity of diesel engine's worldwide." Delphi went on to state that:

19.     Further exhaust particulate and NOx emission reductions will be possible with Delphi's comprehensive systems solutions for exhaust aftertreatment. For example, <u>Delphi is developing a non-thermal plasma exhaust system that will allow diesel engines to meet stringent NOx emissions standards and reduce particulates and hydrocarbons</u>. (Emphasis added.)

20.     Then, in September 2000, Delphi and PSA Peugeot jointly announced a co-development contract on non-thermal plasma exhaust aftertreatment. In the press release, Delphi

again claimed that NTP "was developed by Delphi," completely ignoring Litex's efforts and patents.

21.    All of these statements contributed to the impression that Delphi developed the NTP technology and was successfully developing commercial applications for NTP. Unknown to the public, Delphi's investors and Litex, Delphi was never able to develop a working, "real world" NTP system. Nonetheless, Delphi was more than willing to make the above-described claims about its NTP system.

## III.    Throughout 2000 and 2001 Litex Pursues Financing Acquisition and Licensing Options with Potential Partners.

22.    Given the strength of its technology, during the Spring of 2000, Litex's business was valued at $250 to $260 million by JP Morgan. As a result, JP Morgan (on behalf of Litex) began contacting companies, including Tier One suppliers Delphi and Bosch, to raise further funds in a Series D round financing. Bosch was the second largest automotive supplier after Delphi, and a leader in diesel engine control systems.

23.    By May 2000, Bosch was engaged in long-term testing of Litex's CDD™. Bosch told Litex that it was considering an equity position in Litex, acquiring Litex, and/or taking an exclusive license to the company's technology.

24.    The results of Bosch's test were positive. As a result, talks with Bosch continued throughout the Fall of 2000, and Bosch requested that Litex present a proposal for Bosch's acquisition of the company. Litex responded with a proposal for staged acquisition of the company for $200 million over three years and the receipt of an exclusive license during the buyout period.

25.    In the meantime, Saturn still wanted to go forward with the manufacture of a commercial product incorporating the Litex CDD™. But, due to Delphi's poisoning of the market, Litex's Series D round had still not funded. As a result, Litex had little choice but to terminate its relationship with Saturn and focus exclusively on a strategy of licensing its technology to Bosch or others.

26.    In early August 2001, Bosch presented a proposal to Litex that would provide Bosch an option until June 20, 2002 to either acquire Litex's technology or take a license to that technology.

27.    Also, in 2001, in May, Litex sued Delphi for infringement of its NTP patents. Litex v. Delphi, Civil Action No. 01-CV-10910 (WGY) ("Litex I"). Through discovery in this litigation, Delphi learned further details about the licensing and business development relationships Litex was pursing with Delphi's automotive component competitors.

## IV.    Ultimately, Delphi's False Statements and Wrongful Conduct Interferes with the Bosch Deal and Drives Litex From The NTP Market.

28.    At the same time, Delphi continued to poison the market with public statements touting alleged success in developing NTP.

29.    In response to Litex's patent infringement suit, and in particular, to Litex's amendment of suit adding an additional patent, Delphi issued a press release on July 20, 2001 claiming to be continuing to develop and achieving success with NTP:

> We are excited, however, to discuss our technology. Delphi is developing non-thermal plasma catalysis components and systems relying upon its significant technical capabilities and sound, demonstrable and credible scientific principles. Recognition has been given by the *Financial Times Global Automotive Award* (September 1999), singling out Delphi's technical development as demonstrating the greatest potential to improve environmental performance and by industry acceptance of Delphi's technology over other available alternatives.

30.    On July 30, 2001, Delphi issued a press release announcing that its NTP development efforts had received another award, the prestigious R&D 100 Award, for "its role in the development of catalyst materials for plasma-catalysis engine exhaust treatment." Delphi's Engineering Director, Dr. Andrew Brown, Jr. stated

> It is truly an honor to be selected for this award for the fourth consecutive year which demonstrates the ongoing innovation of Delphi's scientists and engineers. . . . We are extremely proud of this year's award, which recognizes the potential for our revolutionary NTP Exhaust Aftertreatment System with its significant reduction in emissions.

31.     On September 12, 2001, Delphi's CEO and President, J.T. Battenberg III, made a

presentation to an international gathering of the automotive industry. In that presentation,

shortened due to the prior day's terrorist attacks, Battenberg focused on Delphi's highlight

technologies, including its alleged development of NTP. He said:

> Let me also mention that Delphi is the only supplier with full
> diesel injection and exhaust aftertreatment capability including our
> award winning non-thermal plasma aftertreatment technology that
> helps remove nitrogen oxide to improve emissions for diesel and
> lean burn.

32.     All of these material public statements by Delphi touting the NTP Exhaust

Aftertreatment System and the progress of Delphi's NTP program, which would only be revealed

as false and misleading much later in 2004, took a toll on Litex and on the Litex/Bosch

negotiations. In particular, these statements and actions had the effect of poisoning the market

for Litex's NTP technology and CDD™ device, diverting customer interest and also deceiving

the investing public, including Delphi's own investors, into believing that Delphi was actively

and successfully pursuing the revolutionary (and environmentally-friendly) NTP technology. On

information and belief, by continuing to make these false and misleading statements, Delphi

intended to interfere with Litex's efforts to enter into licensing agreements with Delphi's

competitors.

33.     In fact Delphi's continued pursuit of an NTP system and its 2001 public

statements alleging success in NTP development began adversely affecting Litex's ability to

license its technology and obtain investment funds in its Series D round of financing. For

example, one of Litex's potential investors/licensees was Denso, the largest Japanese automotive

parts supplier. In April 2001, Denso wrote to Litex indicating its concerns that:

> [I]f Delphi is developing CDD for diesel engines with a certain car
> maker and going to produce in 2004, they must have some
> advantages and their own patent rights about CDD for diesel. That
> means it is difficult to catch up them. Maybe Denso Japan is not
> interested in the technology for which we probably have to pay
> patent fees. (Especially for Delphi.)

34.    In late September 2001, Bosch informed Litex that it preferred to commence negotiating a nonexclusive license while conducting tests of Litex's CDD™ in diesel applications. Litex then made a proposal to Bosch for a nonexclusive license. Bosch ultimately did not accept this offer, and Litex was unable to conclude a deal with Bosch, despite ongoing discussions through the end of 2001 and into 2002.

35.    On October 16, 2001, Delphi issued yet another press release regarding its NTP technology. In this press release, Delphi's Chairman, CEO and President, J.T. Battenberg III, stated that "Delphi is developing new systems to help take the automotive industry toward the ultimate goal of removing vehicles from the environmental equation." The one specific technology discussed under the heading "Reducing Emissions" was Delphi's infringing NTP Exhaust Aftertreatment System technology. The press release falsely stated that:

> Delphi has developed an innovative aftertreatment solution, non-thermal plasma technology that works in conjunction with a catalytic converter and a particulate filter.

36.    Moreover, Delphi repeated these false assertions about its NTP Exhaust Aftertreatment System in its 2001 Annual Report, also known as the SEC Form 10-K. Delphi told the investing public:

> Responding to global demands for improved fuel efficiency and reduced exhaust emissions, Delphi offers advanced powertrain control systems such as cylinder deactivation, gasoline direct injection and non-thermal plasma (NTP) exhaust aftertreatment. (Emphasis added.)

37.    The Annual Report then alluded to Delphi's joint collaboration with PSA Peugeot relating to NTP, stating:

> Late in 2001, Delphi and PSA Peugeot Citroen debuted a Peugeot 206 Environmental Technologies Vehicle, featuring NTP exhaust aftertreatment which significantly reduces oxides of nitrogen emissions, enabling more rapid use of advanced fuel-efficient technologies.

38.    In addition, during 2002, Delphi continued to list on its website a "product profile" for Non-thermal Plasma Exhaust Aftertreatment.

51305552_1.DOC 055115-00010                   -19-

**V.    Not Until 2004, Did Delphi Finally Admit the State of its NTP Program in 2001.**

39.    These public statements were false. The truth was that in early to mid-2001,
Delphi had concluded that its NTP project was in very serious jeopardy, and Delphi had
essentially given up on the NTP technology. Indeed, as early as May 2001, Delphi seriously
doubted the future of its NTP project, and in July 2001, cut the NTP development budget in half.
Nonetheless, Delphi continued to make the public statements outlined above not only touting its
NTP technology and NTP Aftertreatment Exhaust System, but also claiming to be continually
achieving success and expecting it to continue into a commercial product.

40.    It was not until Delphi personnel were under oath at arbitration in April 2004,
however, that Delphi finally admitted the true facts about its negative conclusions in 2001
regarding the NTP technology and the NTP Exhaust Aftertreatment System. Throughout its
patent litigation with Litex in 2001-2003, and despite its ongoing discovery obligations, Delphi
never admitted that the heads of the Delphi NTP program believed in 2001 that the program
would never succeed and had reported their beliefs to Delphi's management. All Delphi
revealed, in the documents it produced and in the deposition testimony of its witnesses, was that
the NTP project started to fail in March of 2002, after Delphi's materially misleading statements
about NTP in 2001.

41.    As a result, when it proceeded to arbitrate the issue of the damages it had suffered
from Delphi's patent infringement, Litex and its expert, and for that matter Delphi's experts,
actually and reasonably relied on the Delphi positive public statements in 2001 extolling the
virtues of Delphi's NTP program.

42.    During arbitration testimony, however, Delphi's chief technologist Jean Botti and
the program manager of the Delphi NTP project Joseph Bonadies both testified that beginning in
May, 2001 they were extremely skeptical that the NTP program would ever succeed or that
Delphi would ever be able to develop a successful real-world application of the NTP technology
that would be attractive to customers. In fact, Botti testified he was prepared to terminate the

NTP project as a failure in July 2001. Both admitted reporting the conclusions of their NTP tests and their resulting negative conclusions to Delphi management.

43.    The following excerpts from the testimony of Jean Botti, Delphi's chief technologist, during arbitration revealed Delphi's true expectations for the NTP program and the timing of when Delphi knew its NTP program would likely fail:

> Q    Let me ask you this: In July, if you can focus on July of 2001, what was your level of confidence at that point in time that the nonthermal plasma exhaust aftertreatment project would ever get out of ADP?
>
> A    Very minimal at that time.
>
> Q    And why was it very minimal at that time?
>
> A    Because we're going through a phase of the disappoint with technology .. .. It was totally unacceptable even in diesel, you know, engine environment.

(Arbitration Hrng., p. 835-836, Lns. 21-22, 1-17.)

> Q    Between July of 2001 and when you canceled the project [in October 2002], had there been some additional engine testing of the product?
>
> A    From July 2001 to 2002?
>
> Q    Yes.
>
> A    Absolutely.
>
> Q    And have – have – what did that testing indicated (sic)?
>
> A    Well, they're all negative. I mean it was – I mean, a big disappointment. Like I said, we, in the labs, we're getting, you know, up to some 90 percent NO reduction in real conditions, you know, when we did the co-development with PSA and we started early to have that technology on engines and cars in real life, you know. We could only get 15 percent, which was very disappointing to us.
>
> And every time we would go and redevelop the technology, you know, the costs of the system would go up, because you had to have many other, you know, I would say tricks and devices to try to increase the efficiency, but we could never make it work.

(Arbitration Hrng., p. 844-845, Lns. 4-22, 1-3.)

> Q    So my question is – and I know your answer was that the NTP exhaust aftertreatment system worked on diesel. But by question is a little different. It's didn't – as of July 2001 –

51305552_1.DOC 055115-00010                                    -21-

A    And I want to make sure.

Q    Right

A    It never worked on diesel.

Q    Okay.

A    We could never make it work.

Q    Okay. Well, as of – that was designed to go with a diesel. Is this a better way to say it?

A    It was designed to be on diesel and lean burn engines but –

Q    And isn't it –

A    -- it didn't work.

Q    -- the case that in July -- and that as of July 2001 the company had expectations that the NTP exhaust aftertreatment system would have a synergistic effect for its business and help it to compete in the diesel business?

A    If I were to represent the company, I would say no.

Q    Okay.

A    I had no expectation right in July that this would ever work. The results I got through the PSA development were just not there.

(Arbitration Hrng., p. 890-891, Lns. 3-22, 1-6.)

Q    Right. But as of 2000 – July 2001, did the company know it wouldn't work, or was that your personal opinion?

A    No. I think – I mean, you know, like every big company there is inertia. But I already had given my opinion to my upper management that this thing was not going the way I wanted it.

(Arbitration Hrng., p. 893, Lns. 15-21.)

Q    And was there still speculation to that effect in July 2001 among some people in the company?

A    Not anymore. From my level to, uh, it was pretty clear already, you know. I told my management I was going to stop the project.

Q    Uh, did the management ever give – you had told them that as of July 2001?

A    Well, I started to, uh, update the management after we had that PSA review that will show that the results were disastrous. And, uh, you know,

I – I had to step up and tell my management that, because I was a customer interface, and there was a shared, I would say, development that I needed to update the management and say, We're not going anywhere with this.

Q    And do you recall about when that occurred?

A    Uh, PSA review, quite honestly, I – I – I don't recall, but it was – I'm sure it was before July 2001. It must have been in the spring of 2001 when we started to get those terrible results.

(Arbitration Hrng., p. 896-897, Lns. 4-22, 1-2.)

44.    Joseph Bonadies, the program manager for Delphi's NTP program testified as follows:

Q    What – what was your feeling about the likelihood of success of the Delphi NTP project after seeing the results as of May 5, 2001, of these impact tests?

A    I was very skeptical that we would come up with a system that could achieve these really high NOx efficiencies.

(Arbitration Hrng., p. 956, Lns. 5-11.)

Q    Had the Delphi NTP project been able to meet any of these requirements [for the Requirements and Concepts Gate Review] as of August 1, 2001?

A    No, not at that time.

(Arbitration Hrng., p. 962, Lns. 4-6.)

Q    Uh, as of August 1, 2001, were you optimistic that the Delphi NTP project would ever leave the advanced development phase?

A    No, I wasn't very optimistic.

(Arbitration Hrng., p. 966, Lns. 4-7.)

45.    These admissions about Delphi's true beliefs in 2001 are directly contrary to the contents of its public statements at the same time. Litex is informed and believes, and on that basis alleges, that long after it had decided to abandon the NTP technology Delphi intentionally misled the investing public including its own investors and Litex's potential investors, licensees, purchasers and customers to believe that it was developing the NTP technology and NTP Aftertreatment Exhaust Systems.

46.    As a result of these false statements, not only was the investing public, including Delphi's investors, deceived, but Litex was unable to raise capital or license its NTP technology. Litex was driven from the market by the combination of Delphi's immense market power in the market for automobile emissions control systems, combined with its unfair and fraudulent practice of making false public and private statements.  Litex thus lost not only potential capital infusions but also potential licensing revenue, the opportunity to sell the company, and the over $15 million it spent on developing and promoting its NTP technology.

47.    The net effect of Delphi's wrongful conduct is that Litex was unable to license its technology, unable to obtain further funding, and has been reduced to a shell corporation holding patents to NTP technology that it cannot exploit or market.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment that Settlement Term Sheet and Release Does Not Bar Litex's Counterclaims Due to Delphi's Fraud)

48.    Litex realleges Paragraph 1 to 47 herein.

49.    Until hearing this testimony at arbitration, however, Litex had no knowledge that the public statements Delphi made in 2001, and detailed above, were false.  As a result, prior to the arbitration, when Litex entered into the Settlement Term Sheet and Release ("Settlement") with Delphi it read and believed those 2001 public statements were true and relied to its detriment on those material statements in signing the settlement.

50.    As set forth above, Delphi knew the true negative state of its NTP program in 2001 and early 2002 when it made its positive statements directly to the contrary.  On information and belief, therefore, Delphi, as set forth above, intentionally or with knowledge made the false public statements in 2001-2002 to deceive Litex, Delphi's competitors in the automotive industry and the public.

51.    Furthermore, in November 2003 when Delphi and Litex signed the Settlement, Delphi knew that the 2001-2002 public statements were false, also knew that Litex in November

2003 was unaware that the public statements had been false, and also knew Litex was relying to its detriment on those Delphi public statements. Therefore, Delphi intentionally, or with knowledge, deceived and defrauded Litex into entering into the Settlement.

52.    Delphi also knew, or should have known, when it negotiated and signed the Settlement with Litex that Litex had read Delphi's public statements from 2001-2002. Delphi further knew or should have known, through discovery, expert disclosures and others, that when Litex signed the Settlement, Litex believed Delphi's 2001-2002 public statements were true, that those statements were material to Litex's decision to enter into the Settlement, and that Litex was relying on those statements to Litex's detriment.

53.    To the extent that any portion of the Settlement or its release would bar its counterclaims here against Delphi for tortuous interference with prospective economic relations and unfair competition and deceptive trade practices, Litex would be injured.

54.    Litex, therefore, respectfully requests that this Court order and declare that the terms of the parties' Settlement and its release do not bar Litex's remaining counterclaims due to Delphi's deceit and fraud inducing Litex into the Settlement.

## SECOND CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Relations – California Law)

55.    Litex realleges Paragraphs 1 to 54 herein.

56.    At all times relevant, Litex shared a prospective economic relationship with its potential licensees, purchasers and customers, as explained above, which contained the probability of future economic benefits to Litex. Litex planned to license and/or sell its NTP technology to potential purchasers, licensees, and customers, including, but not limited to, Bosch, Denso, PSA and Faurecia.

57.    At all times relevant, Delphi knew of the prospective economic relationships between Litex and its potential licensees, purchasers, customers, and investors.

58.    Litex is informed and believes, and on that basis alleges that, Delphi intended to, and did, disrupt the prospective economic relationship between Litex and its potential licensees,

purchasers and customers by, among other things, making false public statements about Delphi's NTP technology and NTP Aftertreatment Exhaust System.

59.    Delphi's intentionally and knowingly false public statements concerning the NTP technology and Delphi's NTP Aftertreatment Exhaust System actually interfered with Litex's prospective economic relations, and constitute intentional interference with those prospective economic relations.

60.    Litex has suffered damages as a proximate result of Delphi's disruption of its prospective economic relationships, in an amount greater than $25,000, to be proven at trial.

61.    Litex is informed and believes, and on that basis alleges that Delphi interfered with Litex's prospective economic relationships maliciously, oppressively, and/or with conscious disregard for Litex's rights, and Litex is therefore entitled to recover punitive damages against Delphi in an amount to be determined by the trier of fact.

### THIRD CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Relations -- California Law)

62.    Litex realleges Paragraphs 1 to 61 herein.

63.    At all times relevant, Litex shared a prospective economic relationship with its potential licensees, purchasers and customers, as explained above, which contained the probability of future economic benefits to Litex.  Litex planned to license and/or sell its NTP technology to potential purchasers, licensees, and customers, including, but not limited to, Bosch, Denso, PSA and Faurecia.

64.    At all times relevant, Delphi knew of the prospective economic relationships between Litex and its potential licensees, purchasers and customers.

65.    Delphi negligently disrupted the prospective economic relationship between Litex and its potential licensees, purchasers and customers by, among other things, making false public statements about Delphi's NTP technology and NTP Aftertreatment Exhaust System.  The disruption resulting from Delphi's false and disparaging statements was reasonably foreseeable by Delphi.

66.     Delphi's false public statements concerning the NTP technology and Delphi's NTP Aftertreatment Exhaust System actually interfered with Litex's prospective economic relations, and constitute negligent interference with those prospective economic relations.

67.     Litex has suffered damages as a proximate result of Delphi's disruption of its prospective economic relationships, in an amount, greater than $25,000, to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Unfair Competition Under California Bus & Prof. Code Section 17200 et seq.)

68.     Litex realleges paragraphs 1 – 67 herein.

69.     The conduct of Delphi alleged above constitutes unlawful, unfair and/or fraudulent business acts or practices under California Business and Professions Code 17200 et seq. Delphi's conduct violates the common and statutory law prohibiting interference with prospective economic relations and fraud.

70.     As a result, Litex is entitled to an injunction prohibiting Delphi's unlawful, unfair and fraudulent conduct, and to restitution of money and benefits Delphi has received or taken from Litex.

WHEREFORE, Litex respectfully requests that this Court enter an Order:

(a)     Declaring that due to Delphi's deceit and fraud the Settlement Term Sheet and Release of November 11, 2003 does not bar or in any way restrict Litex from bringing its counterclaims against Delphi for tortious or negligent interference with prospective economic relations or unfair competition or business practices and enjoining Delphi from so asserting the Settlement against Litex;

(b)     Declaring that Delphi tortiously and/or negligently interfered with Litex's prospective economic relations;

(c)     Declaring that Delphi unlawfully, unfairly and/or fraudulently competed, and that Delphi committed unlawful, unfair and/or fraudulent business acts or practices in violation of California law;

(d)     Denying Delphi the relief it seeks in its Complaint;

(e)     Awarding Litex the damages it has suffered, and restitution it is due, as a result of Delphi's conduct;

(f)     Awarding Litex punitive damages as a result of Delphi's conduct;

(g)     Awarding Litex its reasonable attorneys fees and costs resulting from Delphi's conduct; and

(h)     Such other relief as this Court may deem just and appropriate.

## JURY DEMAND

Plaintiff Litex, Inc. demands a jury trial on all issues so triable.

Respectfully submitted,

LITEX, INC.,

By its attorneys,

John T. Gutkoski (BBO #567182)
Alexandra C. Fennell (BBO #658692)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, MA  02110
Telephone: (617) 345-4600
Fax: (617) 345-4745

Francis H. Morrison III (BBO # 645515)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, CT  06103-3499
Telephone: (860) 275-0100
Fax: (203) 275-0343

April 18, 2005

51305552_1.DOC 055115-00010

-28-

## CERTIFICATE OF SERVICE

I, John T. Gutkoski, do hereby certify that I have served a true copy of the above document by causing copies to be hand delivered to H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111 on this 18th day of April, 2005.

_John T. Gutkoski_

# EXHIBIT 5



STEVEN D. ALLISON
(949) 932-3695
FAX (949) 932-3601
allison.steven@dorsey.com

March 1, 2005

**PRIVILEGED SETTLEMENT
COMMUNICATION PURSUANT TO CAL.
EVID. CODE § 1152**

**FEDERAL EXPRESS**

Logan Robinson, Esq.
Delphi Corporation
World Headquarters
5725 Delphi Drive
Troy, Michigan 48098-2815

# LITIGATION

MAR - 2 2005

Re:    Litex, Inc. / Delphi Corporation

DELPHI LEGAL STAFF

Dear Mr. Robinson:

We represent Litex, Inc. ("Litex"). The following is a good faith effort to resolve the ongoing disputes between Litex and Delphi Corporation ("Delphi").

The enclosed complaint sets forth Litex's claims, the key points of which are:

- Based on testimony under oath, Delphi made false and misleading public statements. Specifically, in 2001 and 2002, Delphi told the public, its investors and Litex in press releases and SEC filings that it "offers advanced powertrain control systems such as . . . non-thermal plasma." Delphi testified at arbitration, however, that it could never get the non-thermal plasma reactor to work in the real world, and that in mid-2001 it concluded it could not develop the technology and shelved the program.

- Delphi also disparaged Litex's NTP technology to potential licensees, purchasers and customers.

- As a result of these statements, Litex was driven from the market, unable to license or sell its technology, unable to obtain needed capital, and was fraudulently induced into signing a release with Delphi.

Before filing this suit, Litex is willing to discuss a resolution. Based on Delphi's recent patent activity, Delphi is evidently interested in NTP technology. As a result, Delphi may wish to include licensing or acquisition of Litex's patents as part of the discussions. Please contact me to discuss.

Very truly yours,

Steven D. Allison

cc:    William Cosnowski, Esq. (via Federal Express)
       Dr. Leon Ekchian
       Dr. Jack Ekchian
       David Hayes, Esq.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • **T**  949.932.3600 • **F**  949.932.3601
38 TECHNOLOGY DRIVE • IRVINE, CALIFORNIA 92618-5310
USA   CANADA   EUROPE   ASIA

311559

1   STEVEN D. ALLISON, State Bar # 174491
    CHRISTOPHER HUMPHREYS, State Bar # 229139
2   DORSEY & WHITNEY LLP
    38 Technology Drive
3   Irvine, California 92618-2301
    Telephone:   (949) 932-3600
4   Facsimile:   (949) 932-3601

5   Attorneys for Plaintiff
    LITEX, INC.

6

7

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF LOS ANGELES

10

11

12  LITEX, INC., a Delaware Corporation,          )   Case No. _____
                                                  )
13                   Plaintiff,                   )
                                                  )
14            v.                                  )   COMPLAINT FOR:
                                                  )
15  DELPHI CORPORATION, a Delaware                )   (1) INTENTIONAL INTERFERENCE
    Corporation; DELPHI AUTOMOTIVE               )       WITH PROSPECTIVE
16  SYSTEMS, INC., a Delaware Corporation;        )       ECONOMIC RELATIONS;
    and DOES 1 through 50, inclusive,             )
17                                                )   (2) NEGLIGENT INTERFERENCE
                     Defendant.                   )       WITH PROSPECTIVE
18                                                )       ECONOMIC ADVANTAGE;
                                                  )
19                                                )   (3) FRAUD;
                                                  )
20                                                )   (4) NEGLIGENT
                                                  )       MISREPRESENTATION;
21                                                )
                                                  )   (5) TRADE LIBEL; AND
22                                                )
                                                  )   (6) UNFAIR COMPETITION UNDER
                                                      BUS. & PROF. CODE § 17200

23

24  ///

25  ///

26  ///

27

28

311388V2

                              COMPLAINT

1   Plaintiff Litex, Inc. for its Complaint herein, states and alleges as follows:

2   **JURISDICTION AND VENUE**

3   1.    This Superior Court has jurisdiction over the subject matter of this action, and

4   venue is proper herein, because the amount in controversy exceeds the jurisdictional

5   minimum of this Court, the acts alleged herein occurred and the damages and injuries

6   alleged herein arose, at least in part, within the County of Los Angeles, State of California.

7   **PARTIES**

8   2.    Litex, Inc. ("Litex") is a corporation organized under the laws of the State of

9   Delaware, with its principal place of business in Sherman Oaks, California.

10  3.    Based on information and belief, Defendant Delphi Corporation is a

11  corporation organized under the laws of Delaware, with its principal place of business in

12  Troy, Michigan. In addition, based on further information and belief, Delphi Corporation

13  has been and is now actually knowingly doing business within the State of California and

14  the County of Los Angeles, by manufacturing, distributing and selling products into the

15  stream of interstate commerce, which products consequently have been and are now

16  entering and being sold, offered for sale and used, within the State of California and the

17  County of Los Angeles.

18  4.    Based on information and belief, Defendant Delphi Automotive Systems, Inc.

19  is a corporation organized under the laws of Delaware, with its principal place of business

20  in Troy, Michigan. In addition, based on further information and belief, Delphi

21  Automotive Systems, Inc. has been and is now actually knowingly doing business within

22  the State of California and the County of Los Angeles, by manufacturing, distributing and

23  selling products into the stream of interstate commerce, which products consequently have

24  been and are now entering and being sold, offered for sale and used, within the State of

25  California and the County of Los Angeles.

26  5.    Delphi Corporation and Delphi Automotive Systems, Inc. will be collectively

27  referred to as "Delphi."

28  ///

311388v2

1    6.    Based on information and belief, the fictitiously named Defendants, Does 1

2    through 50, inclusive, are responsible in some manner for the acts and omissions alleged

3    herein, whether intentionally or otherwise, and are therefore liable to Litex for all, or part,

4    of the damages alleged herein.  Litex is unaware of the true names and capacities of said

5    fictitiously named Defendants and will amend its Complaint when their names and

6    identities are ascertained.

7                    **SUMMARY OF COMPLAINT**

8    7.    Litex is a small start-up technology company that patented a revolutionary

9    technology that achieved substantial reductions in automobile emissions to the benefit of

10   both consumers and the environment.  Litex, however, was stymied in its efforts to bring

11   these benefits to the market and the public by the wrongful conduct of Delphi.  Having just

12   gained its independence from General Motors, Delphi was intent on convincing the market

13   and potential investors that it was a "technology" company.  Delphi quickly identified

14   Litex's technology as one way to throw a "technology blanket" over its otherwise staid

15   product line.  Delphi then embarked on a campaign to create the false impression that it

16   invented the technology and that it would be the "first to market" with the technology and

17   that it was ahead in developing commercial applications of the technology.  (Delphi also

18   infringed Litex's patents, which was the subject of a separate lawsuit.)  The truth was,

19   however, that Delphi did not invent the technology and it concluded early on that it could

20   not develop the technology and had shelved the program.  In fact, Delphi was never able to

21   develop a working, real world application of the technology.  Despite these conclusions,

22   Delphi continued to tell Litex, its investors and the public that it was moving forward with

23   development and commercialization of the product, while at the same time telling Litex's

24   potential licensees and customers that Litex's technology did not work or provide

25   measurable benefits.  As a result of all of these false and disparaging statements, Litex was

26   driven from the market, unable to license or sell its technology and unable to obtain needed

27   capital.

28   ///

311388v2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FACTUAL ALLEGATIONS

**I.    THE REVOLUTIONARY NON-THERMAL PLASMA TECHNOLOGY**

8.    In the early 1990s, a scientist at Lockheed Corporation, Dr. Robert Miller, discovered that pollutants in the exhaust gases of an internal combustion engine were reduced by the production of ozone in the engines pre-combustion flow stream. In December 1995, Lockheed filed a patent application directed to this discovery. In the patent application, Dr. Miller reported that utilizing an ultraviolet (UV) lamp to supply radiant energy which generated ozone from some of the oxygen in the pre-combustion flow stream of the engine, he could achieve a greater than 90 percent reduction in carbon monoxide and hydrocarbon emissions.

9.    At that time, Dr. Leon Ekchian worked at Lockheed as a business development executive. He has a Ph.D. degree in Electrical Engineering from MIT and an MBA from UCLA. His brother, Jack Ekchian, has a Ph.D. in Mechanical Engineering from MIT and has managed the Sloan Automotive Laboratories at MIT. Recognizing the potential in Dr. Miller's work, Leon obtained Lockheed's approval to have Jack evaluate Dr. Miller's technology.

10.    As a result, in early 1996, Dr. Jack Ekchian, along with Dr. Robert Caren, Lockheed's chief technology officer, arranged a series of tests of Dr. Miller's technology. As a result of these test, Drs. Ekchian and Caren made the further important discovery that it was the addition of ozone in the combustion flow stream in combination with the catalytic material that caused the reduction of pollutants.

11.    These results were reported to Lockheed, and on June 28, 1996, Lockheed filed U.S. Patent Application Serial No. 08/671,955 in the name of inventors Drs. Miller, Ekchian and Caren as a continuation-in-part of the patent application previously filed by Lockheed based on Dr. Miller's initial discovery. The invention described in this application included the concept that the ozone generator device need not be limited to the use of radiant energy, but rather could include an "electrostatic discharge device" and other devices which produce ozone. It also includes the concept that the ozone generator could

311388v2

1    be positioned in the exhaust passageway downstream from the combustion chamber but

2    upstream of the catalytic converter.

3         12.    In the meantime, Lockheed had decided to exploit its technology outside of

4    its core defense-related businesses by out-licensing such technology for development and

5    commercialization. In light of this decision by Lockheed, Dr. Leon Ekchian, along with

6    Drs. Miller, Caren and Jack Ekchian, co-founded Litex. In September 1996, Lockheed

7    granted Litex an exclusive license to the pending '698 and '955 patent applications.

8    **II.    LITEX INVESTS SUBSTANTIAL TIME AND EFFORT TO DEVELOP THE**

9    **NTP TECHNOLOGY**

10         13.    After its formation, Litex immediately set out to develop the technology.

11    Specifically, in the Fall of 1996, Dr. Caren and Dr. Jack Ekchian achieved hydrocarbon and

12    carbon monoxide reduction by injecting ozone generated remotely into the post-combustion

13    flow stream. They also documented for potential product development an electric

14    discharge type ozone generator that would be positioned in the exhaust passageway

15    upstream of the catalytic converter to generate ozone from the oxygen in the exhaust gases

16    of the internal combustion engine.

17         14.    Starting in Spring of 1997, Litex began its development efforts in full. It

18    obtained $2.4 million in a Series B round financing. It designed and built an electric

19    discharge type ozone generator, namely, a corona discharge non-thermal plasma ("NTP")

20    reactor to be positioned in the engine exhaust passageway upstream of the catalytic

21    converter.

22         15.    Given it size limitations, Litex decided to out-source the manufacture of the

23    NTP reactor. In the Summer of 1997, in an effort to find a manufacturer, Litex met with

24    and disclosed its technology to Magna International and Delphi. (At the time, Delphi was a

25    wholly-owned subsidiary of General Motors Corporation.) This initial meeting with Delphi

26    occurred in August 1997.

27    ///

28    ///

5.
COMPLAINT

16.    By early 1998, Litex had entered into an agreement with Magna, and started working with Magna towards the development and manufacture of a commercial implementation of its NTP reactor, which would be known as the Litex CDD™ Pollution Reduction System. (CDD was an abbreviation for Corona Discharge Device, referring to the corona or bluish glow created by the plasma in the gap between the electrodes of the NTP reactor.)

17.    As a result of these efforts, Litex was able to obtain more financing, as well as increase its patent portfolio. Specifically, in 1998 and 1999, JP Morgan invested $12.5 million total in Litex in a Series C round financing with an after money valuation in excess of $50 million. In addition, Litex filed two patent applications which were both continuations of the '955 application. (The end result was U.S. Patent Application 09/414,452 which was filed in October 1999, and eventually resulted in the issuance of U.S. Patent No. 6,253,544 (the "'544 patent"). Litex is also the holder of eleven more patents directed to NTP.)

18.    In the Spring of 1999, Litex changed from Magna to Saturn Electronics as its development/manufacturing partner. The focus was on the development of an NTP reactor for use in the exhaust stream of a gasoline engine; however, Litex's technology was equally applicable to diesel engines. (In fact, the claims of the '955 application filed back in June 1996 were directed to any internal combustion engine, gasoline or diesel.)

19.    In the meantime, Litex CDD™ devices manufactured by Magna and later Saturn, began to receive recognition in the industry press. For example, in October 1999, Litex's CDD™ received the Global Powertrain Congress's Powertrain Excellence Award.

III.    **DELPHI EXPLOITS LITEX'S NTP TECHNOLOGY TO CONVINCE THE INVESTING PUBLIC IT IS A "TECHNOLOGY" COMPANY**

20.    Litex, however, was not the only company receiving attention for its development of a non-thermal plasma/downstream catalysis pollution control system. Litex is informed and believes, and on that basis alleges, that in 1998 Delphi commenced its own internal project to develop non-thermal plasma technology for use in an exhaust

311388v2

1   aftertreatment system. Delphi's NTP Exhaust Aftertreatment System project practiced

2   Litex's invention by employing a catalyst in conjunction with and downstream of the NTP

3   generator.

4        21.    Delphi's entry into the non-thermal plasma emissions control market was

5   very significant. Delphi was and is the leading Tier One automotive parts manufacturer in

6   all the world, and certainly the dominant Tier One manufacturer in the United States. Prior

7   to 1999, Delphi was part of General Motors Corporation. In May 1999, however, Delphi

8   was spun-off from GM and became its own independent public company.

9        22.    As an independent company, Delphi wanted to convince the market and

10  potential shareholders that it was a "technology" company by throwing a very public "high

11  tech blanket" over the company. NTP technology was a key component to Delphi's

12  strategy in this regard. The problem, however, was that Litex owned key NTP patents and

13  technology, while Delphi was ultimately unable to successfully develop or commercialize

14  it. Nonetheless, in its zeal to convince the market and investors of its technological

15  capability, Delphi set out on a campaign of premature and false public statements about the

16  NTP technology combined with disparaging statements about Litex.

17  **IV.    DELPHI PREMATURELY TOUTS ITS NTP TECHNOLOGY**

18       23.    In the Fall of 1999, Delphi began to tout the NTP Exhaust Aftertreatment

19  System in statements to potential customers, the public and the financial community

20  including its own shareholders . By that time, Delphi had been officially spun off from

21  GM. By its own account in its 1999 Form 10-K, Delphi had an "expansive global presence

22  with a network of manufacturing sites, technical centers, sales offices and joint ventures

23  located in every major region of the world" and sales totaling in excess of $25 billion a

24  year. (Sales for 2003 totaled over $28 billion.)

25       24.    To tout its NTP Exhaust Aftertreatment System, and to drive Litex from the

26  market, Delphi began to make a series of public statements to potential customers, the

27  public and the financial community including its own shareholders.

28  ///

311388v2

1    25.    In September 1999, Delphi's NTP Exhaust Aftertreatment System received

2    the Financial Times Global Automotive Award at the Frankfurt Motor Show. A Delphi

3    press release regarding the award claimed – despite the existence of Litex and its NTP

4    patents – that this technology "was developed by Delphi to reduce oxides of nitrogen

5    ("NOx") and particulate emissions" in diesel engines. In accepting the award, the President

6    of Delphi's Energy & Engine Management, Donald Runkle, said:

7              We are very excited about the potential for our revolutionary
                Non-thermal Plasma Exhaust Aftertreatment System, with its
8              huge reduction in emissions, particularly for NOx and
                particulates, which are the biggest challenge for diesel engines.
9              We believe this technology will answer further European
                tailpipe emissions requirements, especially since this
10             technology is applicable to not only passenger and heavy-duty
                diesel engines, but also for gasoline engines. (Emphasis
11             added.)

12    26.    The press release went on to quantify the emissions reduction results

13    achieved by Delphi's system, and to announce – without a reasonable basis – Delphi's plan

14    to be the first to market such a system:

15             In steady-state testing of a diesel vehicle, the non-thermal
                plasma exhaust aftertreatment system has demonstrated greater
16             than 55 percent reduction in oxides of nitrogen emissions
                without the need to add additional hydrocarbons to the exhaust
17             stream as well as demonstrating a significant reduction in
                particulates. Delphi plans to be the first to market a non-
18             thermal plasma exhaust aftertreatment system. (Emphasis
                added.)
19

20    27.    In August 2000, Delphi also made further public statements connecting its

21    dominance in the diesel market to its ability to develop and sell its NTP Exhaust

22    Aftertreatment System. Specifically, in a press release, Delphi stated that it was "uniquely

23    positioned with a full line of diesel engine management systems to respond to the rising

24    popularity of diesel engine's worldwide." Delphi went on to state that :

25             Further exhaust particulate and NOx emission reductions will
                be possible with Delphi's comprehensive systems solutions for
26             exhaust aftertreatment. For example, Delphi is developing a
                non-thermal plasma exhaust system that will allow diesel
27             engines to meet stringent NOx emissions standards and reduce
                particulates and hydrocarbons. (Emphasis added.)
28

8.
COMPLAINT

28.     Then, in September 2000, Delphi and PSA Peugeot jointly announced a co-development contract on non-thermal plasma exhaust aftertreatment.  In the press release, Delphi again claimed that NTP "was developed by Delphi," completely ignoring Litex's efforts and patents.  As set forth above, Delphi was well aware of Litex and its technology.

29.     All of these statements contributed to the impression that Delphi developed the NTP technology and was successfully developing commercial applications for NTP. Unknown to the public, Delphi's investors and Litex, Delphi was never able to develop a working, "real world" NTP system.  Nonetheless, Delphi was more than willing to engage in puffery about their NTP system.

## V.     DELPHI'S PREMATURE AND UNFOUNDED STATEMENTS TO POTENTIAL CUSTOMERS AND POTENTIAL INVESTORS FORCED LITEX TO SWITCH STRATEGIES TO MARKET THEIR TECHNOLOGY

30.     The effect of these premature and misleading statements and deceitful actions by Delphi on Litex's business plan was monumental.  As the dominant automotive parts supplier, Delphi's premature and unfounded statements that it would be the first to market an NTP exhaust system made it virtually impossible for Litex to alone develop, sell and manufacture the Litex CDD™.  As Litex was soon to find out, these statements combined with further false statements by Delphi would ultimately drive it from the market.

31.     As a result of Delphi's aggressive statements, starting in mid-1999, potential customer interest was quashed and investors' interest in Litex was chilled.  Therefore, Litex was forced to revise its business plan from one focused exclusively on the manufacture and sale of the Litex CDD™ to one focused on a combined strategy of manufacturing and selling the CDD™ and also licensing the Litex technology.

32.     Given the strength of its technology, during the Spring of 2000, Litex's business was valued at $250 to $260 million by JP Morgan.  As a result, JP Morgan (on behalf of Litex) began contacting companies, including Tier One suppliers Delphi and Bosch, to raise further funds in a Series D round financing.  (Bosch was the second largest automotive supplier after Delphi, and a leader in diesel engine control systems.)

311388v2

1       33.    By May 2000, Bosch was engaged in long-term testing of Litex's CDD™.

2   Bosch also had indicated to Litex that it was considering an equity position in Litex and/or

3   an exclusive license to the company's technology.

4       34.    The results of Bosch's test were positive. As a result, talks with Bosch

5   continued throughout the Fall of 2000, and Bosch requested that Litex present a proposal

6   for Bosch's acquisition of the company. Litex responded with a proposal for staged

7   acquisition of the company for $200 million over three years and the receipt of an exclusive

8   license during the buyout period.

9       35.    In the meantime, Saturn still wanted to go forward with the manufacture of a

10   commercial product incorporating the Litex CDD™. But, due to Delphi's poisoning of the

11   market, Litex's Series D round had still not funded. As a result, Litex had little choice but

12   to terminate its relationship with Saturn and focus exclusively on a strategy of licensing its

13   technology.

14       36.    At about the same time, it became clear that Delphi's continued pursuit of an

15   NTP system and its public statements were adversely affecting Litex's ability to license its

16   technology and obtain investment funds in its Series D round of financing. For example,

17   one of Litex's potential investors/licensees was Denso, the largest Japanese automotive

18   parts supplier. In April 2001, Denso wrote to Litex indicating its concerns that:

19   > [I]f Delphi is developing CDD for diesel engines with a certain
20   > car maker and going to produce in 2004, they must have some
> advantages and their own patent rights about CDD for diesel.
> That means it is difficult to catch up them. Maybe Denso Japan
21   > is not interested in the technology for which we probably have
> to pay patent fees. (Especially for Delphi.) (Emphasis added.)
22   

23       37.    On July 3, 2001, despite numerous warnings to Delphi and opportunities for

24   Delphi to cease their publicly-announced infringing activities, Litex sued Delphi for

25   infringement of the '544 patent. Despite being faced with this lawsuit, Delphi neither

26   obtained a license from Litex under the '544 patent nor ceased activities relating to its NTP

27   Exhaust Aftertreatment System project. Instead, Delphi issued a press release claiming it

28   ///

311388v2

1   was "excited" about its NTP technology, despite the fact that it actually harbored serious

2   doubts about its entire NTP program, which it had never disclosed.

3   **VI.    ULTIMATELY, DELPHI'S FALSE STATEMENTS AND WRONGFUL**

4   **CONDUCT INTERFERES WITH THE BOSCH DEAL AND DRIVES LITEX**

5   **FROM THE NTP MARKET ENTIRELY**

6        38.    Despite the infringing activities of Delphi, Bosch remained interested in

7   acquiring or exclusively licensing Litex's technology. In early August 2001, Bosch

8   presented a proposal giving Bosch an option until June 20, 2002 to either acquire Litex's

9   technology or take a license to that technology.

10       39.    At the same time, however, Delphi was continuing to poison the market with

11  false public statements. On July 30, 2001, Delphi issued a press release announcing that it

12  has received the prestigious R&D 100 Award for "its role in the development of catalyst

13  materials for plasma-catalysis engine exhaust treatment." Delphi's Engineering Director,

14  Dr. Andrew Brown, Jr. stated

15       "It is truly an honor to be selected for this award for the fourth

16  consecutive year which demonstrates the ongoing innovation of

    Delphi's scientists and engineers. . . . We are extremely proud

17  of this year's award, which recognizes the potential for our

    revolutionary NTP Exhaust Aftertreatment System with its

18  significant reduction in emissions."

19  That press release referred to a joint development agreement that Delphi had the previous

20  year entered into with PSA Peugeot "to develop and study NTP exhaust aftertreatment

21  technology in application with Peugeot Citroen vehicles," further noting that:

22       In steady-state testing of a diesel vehicle, the NTP Exhaust

    Aftertreatment system has demonstrated greater than 55 percent

23  reduction in oxides of nitrogen emissions without the need to

    add additional hydrocarbons or other reductants to the exhaust

24  stream as well as demonstrating a significant reduction in

    particulates.

25

26       40.    All of these false and misleading public statements by Delphi touting the NTP

27  Exhaust Aftertreatment System and the progress of Delphi's NTP program took its intended

28  toll on the Litex/Bosch negotiations. In late September 2001, Bosch informed Litex that it

44.    In addition, during 2002, Delphi continued to list on its website a "product profile" for Non-thermal Plasma Exhaust Aftertreatment.

45.    These statements and actions had the intended effect of poisoning the market for Litex's NTP technology and CDD™ device, diverting customer interest and also deceiving the investing public, including Delphi's own investors, into believing that Delphi was actively pursuing the revolutionary (and environmentally-friendly) NTP technology.

46.    These public statements were false. The truth was that Delphi had concluded well over a year before that its NTP project was in very serious jeopardy and had essentially given up on the NTP technology. Indeed, as early as May 2001, Delphi seriously doubted the future of its NTP project, and in July 2001, Delphi cut the budget of the project in half. Nonetheless, Delphi continued to make the public statements outlined above touting not only the NTP technology, but also its specific NTP Aftertreatment Exhaust System. It was not until Delphi personnel were under oath at arbitration in April 2004, however, that Delphi finally admitted the true facts about its negative conclusions about the NTP technology and its cancellation of the NTP Exhaust Aftertreatment System. Indeed, at arbitration, Delphi admitted that it was never able to develop a working real-world application of the NTP technology. Litex is informed and believes, and on that basis alleges, that long after it had decided to abandon the NTP technology Delphi intentionally misled the investing public including its own investors and Litex's potential investors, licensees, purchasers and customers to believe that it was developing the NTP technology and NTP Aftertreatment Exhaust Systems.

47.    Not only were Delphi's false statements made publicly, they were also made privately to Litex's potential licensees, purchasers and customers. Specifically, Litex is informed and believes, and on that basis alleges, that Delphi told Litex's potential licensees, purchasers and customers, including but not limited to, PSA Peugeot and Faurecia, that Litex's NTP technology and CDD™ device were inferior to Delphi's NTP Exhaust Aftertreatment System, were unable to be commercialized, and resulted in no measurable reduction in emissions.

311388v2

48.    As a result of these false and disparaging statements, not only was the investing public, including Delphi's investors, deceived, but Litex was unable to raise capital or license its NTP technology.  Litex was driven from the market by the combination of Delphi's immense market power in the market for automobile emissions control systems, combined with its unfair and fraudulent practice of making false public and private statements.  Litex thus lost not only the potential capital infusions but also potential licensing revenue, and all of the money it spent on developing and promoting the NTP technology.  In addition, at great expense, Litex used its limited resources to pursue a patent infringement lawsuit that, if it had known that Delphi was ready to cancel its NTP program as early as May 2001, it never would have continued to pursue.

49.    The net effect of Delphi's wrongful conduct is that Litex was unable to license its technology, unable to obtain further funding, and has been reduced to a shell corporation holding patents to NTP technology that it cannot exploit or market.

### FIRST CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Relations)

50.    Litex realleges Paragraphs 7 to 49 herein.

51.    At all times relevant, Litex shared a prospective economic relationship with its potential licensees, purchasers and customers, as explained above, which contained the probability of future economic benefits.  Litex planned to license and/or sell its NTP technology to potential purchasers, licensees, and customers, including, but not limited to, Bosch and Denso.

52.    Litex is informed and believes, and on that basis alleges, at all times relevant, Delphi knew of the prospective economic relationships between Litex and its potential licensees, purchasers and customers.

53.    Delphi intended to, and did, disrupt the prospective economic relationship between Litex and its potential licensees, purchasers and customers by, among other things, making false public statements about Delphi's NTP technology and NTP Aftertreatment Exhaust System, and by falsely disparaging Litex's NTP technology and CDD™ device.

14.
COMPLAINT

311388v2

54.    Delphi's public statements concerning the NTP technology and Delphi's NTP Aftertreatment Exhaust System were independently wrongful because they were fraudulent in violation of both the common law and the statutes and regulations governing statements by a public company.  In addition, Delphi's disparaging statements about Litex's NTP technology and CDD™ device were in violation of the law prohibiting trade libel, as well as the California law of unfair competition.

55.    Litex has suffered damages as a proximate result of Delphi's disruption of its prospective economic relationships, in an amount, greater than $25,000, to be proven at trial.

56.    Delphi interfered with Litex's prospective economic relationships maliciously, oppressively, and/or with conscious disregard for Litex's rights, and Litex is therefore entitled to recover punitive damages against Delphi in an amount to be determined by the trier of fact.

### SECOND CAUSE OF ACTION
### (Negligent Interference with Prospective Economic Relations)

57.    Litex realleges Paragraphs 7 to 49 herein.

58.    At all times relevant, Litex shared a prospective economic relationship with its potential licensees, purchasers and customers, as explained above, which contained the probability of future economic benefits.  Litex planned to license and/or sell its NTP technology to potential purchasers, licensees, and customers, including, but not limited to, Bosch and Denso.

59.    Litex is informed and believes, and on that basis alleges, at all times relevant, Delphi knew of the prospective economic relationships between Litex and its potential licensees, purchasers and customers.

60.    Delphi negligently disrupted the prospective economic relationship between Litex and its potential licensees, purchasers and customers by, among other things, making false public statements about Delphi's NTP technology and NTP Aftertreatment Exhaust System, and falsely disparaging Litex's NTP technology and CDD™ device.

61.     Delphi's public statements concerning the NTP technology and Delphi's NTP Aftertreatment Exhaust System were independently wrongful because they were fraudulent in violation of both the common law and the statutes and regulations governing statements by a public company.  In addition, Delphi's disparaging statements about Litex's NTP technology and CDD™ device were in violation of the law prohibiting trade libel, as well as the California law of unfair competition.

62.     Litex has suffered damages as a proximate result of Delphi's disruption of its prospective economic relationships, in an amount, greater than $25,000, to be proven at trial.

### THIRD CAUSE OF ACTION

### (Fraud)

63.     Litex realleges paragraphs 7 – 49 herein.

64.     Throughout 2001 and into 2002, Delphi repeatedly represented to Litex and the public, as explained above, that it was actively pursuing its NTP technology and particularly the NTP Exhaust Aftertreatment System.

65.     These representations were false.  Litex is informed and believes, and on that basis alleges, that as early as May 2001, Delphi had serious doubts about the viability of its NTP technology and the NTP Exhaust Aftertreatment System.  Litex is further informed and believes, and on that basis alleges, that by July 2001 Delphi had severely cut the budget for development of the NTP System, and was highly skeptical that it would ever result in a commercial system.

66.     By making these representations, Delphi intended to induce Litex to rely on these false statements by ceasing its development activities and drastically curtail its fundraising activities.

67.     Litex did, in fact rely on Delphi's premature and false statements by, among other things, ceasing its development activities, and curtailing its fundraising activities. Litex's reliance was justifiable because Delphi repeatedly made the false statements in public fora, including in SEC disclosure documents.

311388v2

1        68.    Litex has suffered damages as a proximate result of its reliance on Delphi's

2    misrepresentations in an amount, greater than $25,000, to be proven at trial.

3        69.    Delphi made the foregoing misrepresentations maliciously, oppressively,

4    and/or with conscious disregard for Litex's rights, and Litex is therefore entitled to recover

5    punitive damages against Delphi in an amount to be determined by the trier of fact.

6    <center>**FOURTH CAUSE OF ACTION**</center>

7    <center>**(Negligent Misrepresentation)**</center>

8        70.    Litex realleges paragraphs 7 - 49 herein.

9        71.    Throughout 2001 and into 2002, Delphi repeatedly represented to Delphi and

10   the public, as explained above, that it was actively pursuing its NTP technology and

11   particularly the NTP Exhaust Aftertreatment System.

12       72.    These representations were false. Litex is informed and believes, and on that

13   basis alleges, that as early as May 2001, Delphi had serious doubts about the viability of its

14   NTP technology and the NTP Exhaust Aftertreatment System. Litex is further informed

15   and believes, and on that basis alleges, that by July 2001 Delphi had severely cut the budget

16   for development of the NTP System, and was highly skeptical that it would ever result in a

17   commercial system. At the time Delphi made these misrepresentations, it had no

18   reasonable grounds to believe they were true, and the representations were negligently

19   made and were untrue.

20       73.    By making these negligent misrepresentations, Delphi intended to induce

21   Litex to rely on these false statements by ceasing its development activities, and drastically

22   curtailing its fundraising activities.

23       74.    Litex did, in fact rely on Delphi's premature and false statements by, among

24   other things, ceasing its development activities and curtailing its fundraising activities.

25   Litex's reliance was justifiable because Delphi repeatedly made the false statements in

26   public fora, including in SEC disclosure documents.

27       75.    Litex has suffered damages as a proximate result of its reliance on Delphi's

28   misrepresentations in an amount, greater than $25,000, to be proven at trial.

<center>17.
COMPLAINT</center>

1    76.    Delphi made the foregoing misrepresentations maliciously, oppressively,

2    and/or with conscious disregard for Litex's rights, and Litex is therefore entitled to recover

3    punitive damages against Delphi in an amount to be determined by the trier of fact.

**FIFTH CAUSE OF ACTION**

**(Trade Libel)**

6    77.    Litex realleges paragraphs 7 – 49 herein.

7    78.    Starting in 1999, Delphi willfully, and without privilege, communicated to

8    Litex's potential licensees, purchasers and customers (including, but not limited to, PSA

9    Peugeot and Faurecia), statements which disparaged Litex's CDD™ device and Litex's

10    NTP technology.

11    79.    These statements disparaged Litex's CDD™ device and NTP technology in

12    that they falsely indicated that Litex's CDD™ device and NTP technology were inferior to

13    Delphi's NTP Exhaust Aftertreatment System, were unable to be commercialized and

14    resulted in no measurable reduction in emissions.

15    80.    Delphi's statements were false. Litex is informed and believes, and on that

16    basis alleges, that Delphi knew these statements were false or made them with reckless

17    disregard for their truth or falsity. Alternatively, Litex is informed and believes, and on that

18    basis alleges, that Delphi was negligent in making these statements, and with the exercise

19    of ordinary care, would have realized that the statements were false and libelous.

20    81.    As a proximate result of Delphi's disparaging statements, Litex's potential

21    licensees, purchasers and customers have been deterred from purchasing or licensing

22    Litex's technology and Litex's CDD™ device, and from otherwise dealing with Litex.

23    Litex has thereby suffered injury to its business in an amount, greater than $25,000, to be

24    proven at trial.

25    82.    Delphi made the foregoing disparaging statements maliciously, oppressively,

26    and/or with conscious disregard for Litex's rights, and Litex is therefore entitled to recover

27    punitive damages against Delphi in an amount to be determined by the trier of fact.

28    ///

311388v2

1

## SIXTH CAUSE OF ACTION

2

**(Unfair Competition Under Bus& Prof. Code Section 17200)**

3

83.    Litex realleges paragraphs 7 – 49 herein.

4

84.    The conduct of Delphi alleged above constitutes unlawful, unfair and/or

5

fraudulent business acts or practices under California Business and Professions Code 17200

6

et seq. Delphi's conducts violates the common and statutory law prohibiting interference

7

with prospective economic relations, fraud and trade libel. In addition, Delphi's false

8

public statements violated the federal statutes and regulations concerning statements by a

9

publicly-traded company.

10

85.    As a result, Litex is entitled to an injunction prohibiting Delphi's unlawful,

11

unfair and fraudulent conduct, and to restitution of money and benefits Delphi has received

12

or taken from Litex.

13

14

DATED: March ___, 2005                    DORSEY & WHITNEY LLP

15

16

By _____

17

Steven D. Allison
Attorneys for Plaintiff

18

LITEX, INC.

19

20

21

22

23

24

25

26

27

28

19.

COMPLAINT

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LITEX, INC.,                          *
            Plaintiff,                *
                                      *
                                      *
        v.                            *        Civil Action No. 01-CV-10910-JLT
                                      *
                                      *
DELPHI AUTOMOTIVE SYSTEMS             *
CORPORATION, and DELPHI               *
AUTOMOTIVE SYSTEMS LLC,               *
            Defendants.               *

## ORDER

April **2**, 2002

TAURO, J.,

The court hereby orders as follows:

(1) Plaintiff may depose Delphi Automotive Systems Corp. and Delphi Automotive Systems LLC pursuant to Fed. R. Civ. P. 30(b)(6), and may depose the following individuals: J.T. Brattenburg, Dr. Jean Botti, Galen Fischer, Donald Runkle, Craig MiMaggio, Dr. Joachim Kupe, David Goulette, and Mark David Hemingway;

(2) Defendants may depose Litex, Inc. and Arthur D. Little pursuant to Fed. R. Civ. P. 30(b)(6), and may depose the following individuals: John Ekchiam, Leon Ekchiam, Robert Caren, Robert Miller, Charles Winkler, and David Christeller;

(3) The Parties shall submit a Proposed Protective Order by 12:00 p.m. on April 4, 2002;

(4) The Parties shall produce documents pertaining to the issues of damages, validity, and infringement by May 15, 2002;

(5) All discovery, including the depositions authorized above, shall be complete by



September 30, 2002;

      (6) If Plaintiff intends to expand the Complaint beyond the scope of the eleven claims

discussed in the Second Amended Complaint, Plaintiff shall file notice with the court and

Defendants;

      (7) No further discovery is allowed without leave of court; and

      (8) The Parties shall appear for a further conference on October 16, 2002 at 10:00 a.m.

      IT IS SO ORDERED.

_____
United States District Judge

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LITEX, INC.,

         Plaintiff,

       v.

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION and DELPHI
AUTOMOTIVE SYSTEMS LLC,
         Defendants.

Delphi/Litex (37606-0004)
A. Brainerd          W. Cosnowski
K. Weed              Fred Saulo
J. Masur             Calendar
K. Ursin-Smith       File

Civil Action No. 01-CV-10910-JLT

**RECEIVED**
OCT 2 2 2002
HEWM

ORDER

October 16, 2002

TAURO, J.,

The court hereby orders as follows:

(1) Plaintiff shall be permitted to take the deposition of J.T. Battenburg for four hours on November 8, 2002 at Mr. Battenburg's office in Troy, Michigan;

(2) No further discovery is allowed without leave of court;

(3) The Parties shall submit a Joint Proposed Order setting forth their proposed schedule for claim construction by October 18, 2002;

(4) The Parties shall appear for a Markman Hearing on June 18, 2003 at 10 a.m.;

(5) The Parties shall appear for a Final Pretrial Conference on August 13, 2003 at 10 a.m.;

(6) The Parties shall appear for Trial on September 15, 2003 at 10 a.m.

IT IS SO ORDERED.

United States District Judge

# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LITEX, INC.,

                              Plaintiff,

        v.

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION and DELPHI AUTOMOTIVE
SYSTEMS LLC,

                              Defendants.

Civil Action No. 01-CV-10910-JLT

The Honorable Joseph L. Tauro

# REBUTTAL EXPERT WITNESS REPORT OF ABRAM E. HOFFMAN

## [Fed. R. Civ. P. 26(a)(2)(B)]

### Confidential - Attorney's Eyes Only Information
### Subject to Protective Order

**Delphi/Litex (37606-0004)**
A. Brainerd
K. Weed
J. Masur
K. Ursin-Smith
W. Cosnowski
Fred Saulo
Calendar
File

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

15.    In August 1997, Delphi was a wholly owned division of General Motors
Corporation ("GM").[12] Delphi had been independently developing non-thermal plasma
("NTP") emissions control technology starting around the end of 1994.

---

9

10

11

[12] 010144-010011 – 46. Evanhoff, Ted. "General Motors Turns Delphi Division Loose," Knight-Ridder
Tribune Business News: Detroit Free Press. May 29, 1999.

13

14

15

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

30.    By early 2002, Delphi was still trying to develop its NTP technology, but was having difficulty developing a suitable catalyst necessary to reduce NOx emissions for diesel engines.[58] The NTP reactor was also failing to meet the operating requirements deemed necessary to make an NTP system commercially viable. Delphi could not reduce the reactor's energy consumption, leading to a fuel economy penalty (decrease in vehicle miles per gallon) of 8 percent instead of the maximum 3 percent penalty that Delphi expected its customers would tolerate.[59] Similarly, Delphi's NTP reactor and catalyst did not provide the 90% NOx emission reduction that Delphi expected its customers to demand.[60] Moreover, the cost associated with the manufacture of the reactor, power

---

53
54
55
56
57
[58] 010144-057878-81, 010144-052921
[59] 010144-052921, 010144-049669, Deposition of J. Botti. pp. 80-81, 94
[60] Deposition of J. Kupe, pp. 326, 381; see also LIT119828 (March 2001 email from Denso to Litex targeting 90% NOx purification)

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

supply, and catalyst was too high, disadvantaging NTP relative to other alternative technologies.[61]

---

[61] 010144-052921, 010144-049669, Deposition of J. Botti. pp. 79, 94

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

32.    By April 2002 Delphi terminated its NTP catalyst development but
continued development of the NTP reactor and power supply.[67]  Its new target market
for the NTP reactor and power supply included European light-duty vehicles, as well as
European medium and heavy-duty trucks with SCR.[68]  In June 2002, Renault proposed a

[61]
[62]
[63]
[64]
[65]
[66]
[67] Deposition of J. Kupe, pp. 22-23
[68] 010144-057914

11

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

33.    By September 2002, Delphi discontinued development of the NTP reactor and power supply, as they did not meet established requirements.[72]  On October 4, 2002, Delphi's NTP reactor, catalyst, and power supply failed to pass the requirements of the Advanced Development Project,[73] and the research and development project was formally terminated after an expenditure of over $7 million since 1999.[74]  At this point, neither Delphi, nor Litex had been able to produce or sell a commercially viable NTP system.

[72] Deposition of J. Kupe, p. 244-246
[73] 010144-065987-89
[74] Deposition of J. Kupe, pp. 257-259

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

52.    As technological demands shift and potentially multiple technologies need support, suppliers such as Delphi would not pay a large fixed payment for an exclusive license to unproven technology that their OEM customers may not demand. Delphi was not at all confident about the future commercial success of its NTP product at either negotiation date given the technological and cost hurdles it had to overcome. In January 2000, Delphi's NTP technologies were in a pre-product development stage; they had just passed their Requirements Review, and were more than a year away from their first Gate Review.[96] Even in July 2001 and beyond, Delphi remained unsure that it could develop a suitable catalyst or produce an NTP system at an acceptable economic or energy cost. In April 2002, Delphi abandoned its catalyst development, and in October 2002, it abandoned its NTP project entirely. Delphi's cautious, conservative actions, which effectively spread risk among different technologies, shared risk with partners, and betrayed grave concern with the commercial viability of NTP, are flatly inconsistent with the massive risk acceptance that a large up-front license payment for rights to the patents in suit would require.

U1U144-U55537

19

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

151.    The hypothetical negotiation would have taken place on January 11, 2000 or July 3, 2001 concurrent with the issue dates of the patents. The negotiation would occur between a willing buyer and a willing seller who both had access to all the information stated above. Also, the negotiation would be for the non-exclusive rights to practice the two patents in suit only.

152.    Delphi would come to the negotiating table aware that:

- It has no current commercial product and is uncertain of the commercial viability of its NTP product.

52

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

154.    In January 2000, Litex was a new supplier interested in both manufacturing its CDD and licensing its intellectual property. Its CDD was not a commercial product at that time, and its potential demand was being eroded by the loosening in EPA regulations that allowed for sulfur purges of gasoline-engine catalysts. Delphi, on the other hand, was a large Tier 1 supplier with marketing, development, and production expertise that Litex did not have. Nevertheless, its NTP prototype was still in the testing phases and stood a strong chance of never being commercially viable. Given that the Delphi NTP prototype was designed for diesel engines, its potential demand, while limited to the smaller diesel segment, was undiminished by these relaxed emission standards.

156.    Because Delphi was uncertain whether NTP technology would ever be commercially viable, it had no definite plans for commercialization and no specific

---

[187] LIT010753-4; LIT032183

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

revenue projections for its NTP product. At this time, Litex did not even have the
valuation study subsequently performed by J.P. Morgan. Even assuming that the J.P.
Morgan valuation existed, it was unreliable and grossly overstated even the value of
Litex's subsequently abandoned product strategy, which itself vastly exceeds the royalty
stream attainable by licensing its patents; a modicum of due diligence would reveal the
document's irrelevance.

158.    The situation between Delphi and Litex changed only slightly by July
2001. At this time, Litex was even more eager to license its intellectual property and was
willing to negotiate non-exclusive licenses as evidenced by its offers to Bosch and
SAGEM. In addition, Litex was no longer planning to manufacture its CDD given the
vastly diminished demand for a gasoline NTP product[188] and it had never developed a
diesel version of the CDD. Its remaining revenue-generating option was to license its
technology. At the same time, Delphi continued testing its NTP prototype with
companies such as PSA and Renault, but it still did not have a commercial product. They
could not find a suitable catalyst and the fuel penalty was above the level that customers
would accept. If anything, Delphi was even less certain that an NTP product would
succeed.

159.    By July 2001, Delphi still did not have a complete revenue projection for
its NTP product. While at this time Litex did have the J.P. Morgan valuation and had

---

[188] Bosch, in a letter dated July 2001 stated that there was decreasing market potential for a gasoline CDD
(LIT 135060).

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

issued a proposal to Bosch, the J.P. Morgan valuation was of no relevance as it depicted a business model that was substantially different than that of Litex. The valuation was for a company that had a product, whereas the Litex of July 2001 had no product. This outdated valuation does not lend support to Litex's proposal, which contemplates an acquisition by Bosch. In addition, because Delphi did not have a commercial NTP product and was not confident that it would, it would have only wanted a license for testing purposes and possibly an option for future commercialization. The hypothetical negotiation need not consider any other patents than the two patents in suit.

56

Confidential - Attorney's Eyes Only Information
Subject to Protective Order

Executed this 18th day of April 2003, in Washington, DC.

_____
Abram E. Hoffman

58

# EXHIBIT 9

Joachim Kupe  9/5/2002

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF MASSACHUSETTS
 3
 4   LITEX, INC.,
 5
 6            Plaintiff,
 7
 8   vs          Civil Action No. CV 10910 (JLT)
 9              Hon. Joseph L. Tauro
10   DELPHI AUTOMOTIVE SYSTEMS,
11   Corporation and
12   Delphi Automotive Systems LLC,
13
14            Defendants.
15   _____/
16
17   DEPONENT:   JOACHIM KUPE
18   DATE:       Thursday, September 5, 2002
19   TIME:       9:05 a.m.
20   LOCATION:   2560 Crooks Road
21               Troy, Michigan
22   REPORTER:   Denise M. Kizy, RPR/CRR/CSR-2466
23   VIDEO:      Nancy Siemion Scott
24
25
                                              1
```

```
 1              TABLE OF CONTENTS
 2   WITNESS                              PAGE
 3   JOACHIM KUPE
 4     EXAMINATION BY MR. KORNICZKY         5
 5
 6
 7
 8
 9              EXHIBITS
10                                       PAGE
11     No. 32                             21
12     No. 33                             43
13     No. 34                             70
14     No. 35                             95
15     No. 36                            140
16
17
18
19
20
21
22
23
24
25
                                              3
```

```
 1   APPEARANCES:
 2
 3       BROBECK, PHLEGER & HARRISON LLP
 4       By:  Mr. Stephen S. Korniczky
 5       12390 El Camino Real
 6       San Diego, California 92130
 7       (858) 720-2870
 8            Appearing on behalf of the Plaintiff
 9
10       HELLER EHRMAN WHITE & McAULIFFE LLP
11       By:  Mr. Keith R. Weed
12       275 Middlefield Road
13       Menlo Park, California 94025-3506
14       (650) 324-7000
15            Appearing on behalf of the Defendants
16
17   ALSO PRESENT:  William Cosnowski, Jr.
18                  Leon Ekchian
19
20
21
22
23
24
25
                                              2
```

```
 1                  Troy, Michigan
 2                  Thursday, September 5, 2002
 3                  At about 9:05 a.m.
 4                   *   *   *
 5
 6            VIDEO OPERATOR:  We are on the
 7   record.  The time is 9:06 a.m.
 8            This is tape No. 1 of the videotaped
 9   deposition of Joachim Kupe being taken at the
10   offices of Esquire Deposition Services, 2560 Crooks
11   Road in Troy, Michigan, in the case of Litex, Inc.
12   versus Delphi Automotive Systems, United States
13   District Court, District of Massachusetts, Civil
14   Action No. CV 10910 (JLT).
15            Today is Thursday, September 5, 2002.
16   My name is Nancy Siemion Scott, video operator for
17   Esquire Deposition Services.
18            The attorneys will now introduce
19   themselves for the record and the reporter will then
20   swear in the witness.
21            MR. KORNICZKY:  Stephen Korniczky
22   representing the plaintiff Litex in this action.
23            MR. WEED:  Keith Weed of Heller,
24   Ehrman, White and McAuliffe representing defendants
25   and with me without a mike is Will Cosnowski of
                                              4
```

Joachim Kupe                                                                          9/5/2002

```
 1                                              1
 2                              ı               2
 3                                              3
 4                                              4
 5                                              5
 6                                              6
 7                                              7
 8                                              8
 9                                              9
10                                             10
11                                             11
12                                             12
13                                             13
14                                             14
15                                             15
16                                             16
17                                             17
18    ɤ----                        . .         18
19        Q.    Yes, I'm just asking with respect to the    19
20    page one, the first page of this document?    20
21              Can you tell me what this is?    21
22        A.    This is a system diagram that shows the    22
23    reactor, the control block, particulate filters, the    23
24    catalyst that deals with the deNOxing and oxidation    24
25    catalyst and shows what are the critical functions    25

                                          21                              23
```

```
 1    of the different parts.                   1
 2        Q.    And this is for the Delphi NTP exhaust    2
 3    aftertreatment system?                    3
 4        A.    The Delphi exhaust after -- NTP    4
 5    aftertreatment systems as it was still being    5
 6    followed up until April of this year.     6
 7                                              7
 8                                              8
 9                                              9
10                                             10
11                                             11
12                                             12
13                                             13
14                                             14
15                                             15
16                                             16
17                                             17
18                                             18
19                                             19
20                                             20
21                                             21
22                                             22
23                                             23
24                                             24
25                                             25

                                          22                              24
```

Joachim Kupe                                                              9/5/2002

```
 1                                    1
 2                                    2
 3                                    3
 4                                    4
 5                                    5
 6                                    6
 7                                    7
 8                                    8
 9                                    9
10                                   10
11                                   11
12                                   12
13                                   13
14                                   14
15                                   15
16                                   16
17                                   17
18                                   18
19                                   19
20                                   20
21                                   21
22                                   22
23                                   23
24                                   24
25                                   25
                              45                                   47
```

```
 1                                    1
 2                                    2
 3                                    3
 4                                    4
 5                                    5
 6                                    6
 7                                    7
 8                                    8
 9                                    9
10                                   10
11                                   11
12                                   12
13                                   13
14                                   14
15                                   15
16                                   16
17                                   17
18                                   18       Q.    So you didn't make the numbers that PSA
19                                   19   had set as an objective?
20                                   20       A.    Yes.
21                                   21       Q.    But does that mean that the system doesn't
22                                   22   work?
23                                   23       A.    Doesn't work.  If you get 15 percent NOx
24                                   24   conversion efficiency why would somebody buy from
25                                   25   you?
                              46                                   48
```

12

Joachim Kupe                                                                                    9/5/2002

```
 1                                              1
 2                                              2
 3                                              3
 4                                              4
 5                                              5
 6                                              6
 7                                              7
 8                                              8
 9                                              9
10                                             10
11                                             11
12                                             12
13                                             13
14                                             14
15                                             15
16                                             16
17                                             17
18                                             18
19                                             19
20                                             20
21                                             21
22                                          :  22
23                                             23
24                                             24
25                                             25
                                       61                                              63
```

```
 1                                              1
 2                                              2
 3                                              3
 4                                              4
 5                                              5
 6                                              6
 7                                              7
 8                                              8
 9                                              9
10                                             10
11                                             11
12                                             12
13                                             13
14                                             14
15                                             15
16                                             16
17         How do you know that Delphi has     17
18   determined that it's not going to develop a catalyst  18
19   for its NTP system?                        19
20        A.   I know it because this has been decided in  20
21   April.                                      21
22        Q.   And this was a final decision?   22
23        A.   Yes.                              23
24                                              24
25                                             25
                                       62                                              64
```

Esquire Deposition Services
619.233.0633

# CONFIDENTIAL

```
            UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS

LITEX, INC.,

            Plaintiff,

     vs          Civil Action No. CV 10910 (JLT)
                 Hon. Joseph L. Tauro

DELPHI AUTOMOTIVE SYSTEMS,

Corporation and

Delphi Automotive Systems LLC,

            Defendants.
_____/

CONFIDENTIAL ATTORNEYS' EYES ONLY

DEPONENT:    JOACHIM KUPE (VOLUME 2)

DATE:        Thursday, September 26, 2002

TIME:        9:15 a.m.

LOCATION:    2560 Crooks Road

             Troy, Michigan

REPORTER:    Denise M. Kisy, RPR/CRR/CSR-2466

VIDEO:       Patrick Murphy

                                        216
```

```
 1              TABLE OF CONTENTS
 2  WITNESS                                 PAGE
 3  JOACHIM KUPE
 4     EXAMINATION CONTINUED                 218
 5     BY MR. KORNICZKY
 6
 7
 8
 9
10                 EXHIBITS
11                                          PAGE
12     No. 119                              221
13     No. 120                              222
14     No. 121                              222
15     No. 85                               236
16     No. 95                               321
17     No. 96                               333
18     No. 97                               337
19     No. 98                               339
20     No. 100                              355
21     No. 101                              376
22     No. 87                               390
23
24
25
```

```
 1  APPEARANCES:
 2
 3     BROBECK, PHLEGER & HARRISON LLP
 4     By:  Mr. Stephen S. Korniczky
 5     12390 El Camino Real
 6     San Diego, California 92130
 7     (858) 720-2870
 8          Appearing on behalf of the Plaintiff
 9
10     HELLER EHRMAN WHITE & McAULIFFE LLP
11     By:  Mr. Keith R. Weed
12     275 Middlefield Road
13     Menlo Park, California 94025-3506
14     (650) 324-7000
15          Appearing on behalf of the Defendants
16
17  ALSO PRESENT:  Leon Ekchian (via telephone)
18
19
20
21
22
23
24
25
                                             215
```

```
 1                 Troy, Michigan
 2            Thursday, September 26, 2002
 3               At about 9:15 a.m.
 4               *    *    *
 5
 6          VIDEO OPERATOR:  We're on the record.
 7  This is tape one of volume two of the videotaped
 8  deposition of 30(b)(6) witness Doctor Joachim Kupe
 9  being taken at 2560 Crooks Road, Troy Michigan.
10          Today is Thursday, September 26,
11  2002.  The time is 9:15 a.m.
12          This is in the matter of Litex,
13  Incorporated versus Delphi Automotive Systems, Case
14  No. CV 10910 (JLT) in U.S. District Court, District
15  of Massachusetts.
16          My name is Patrick Murphy, legal
17  videographer for Esquire Deposition Services.
18          The attorneys will now introduce
19  themselves for the record.
20          MR. KORNICZKY:  Stephen Korniczky
21  representing the plaintiff Litex and with me via
22  teleconference is Doctor Leon Ekchian.
23          MR. WEED:  Keith Weed of Heller,
24  Ehrman, White and McAuliffe for defendants.
25          JOACHIM KUPE
                                             217
```

1

Joachim Kupe, Vol II          CONFIDENTIAL ATTORNEYS' EYES ONLY                    9/26/2002

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

242

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

244

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

243

1
2          So this project will not go into the
3     production phase and it has -- we have also decided
4     to shelf it.
5          Q.   Has Delphi decided to shelf the entire NTP
6     project?
7          A.   To shelf the power supply and reactor, NTP
8     reactor design, that we have achieved so far.
9          Q.   Why?
10         A.   Because the NTP power supply and reactor
11    doesn't -- first don't meet the requirement that we
12    set up for it, so with that so as of today we have
13    eight percent fuel economy, we were shooting for
14    three percent fuel economy penalty, and there is,
15    there is I guess it's very thin or if not to say
16    zero potential of realistic applications of this
17    technology as we look forward, and on the other side
18    we have project in my department like ORDS where
19    putting the resources in would lead you to have a
20    product that you can sell, that the market is hungry
21    of and asking for, same thing as hydrogen reformer.
22         So it is -- would be logical for
23    anybody doing development and business to come to
24    this conclusion and that's what we did.
25         Q.   When did Delphi decide to shelf the NTP

245

Joachim Kupe, Vol II          CONFIDENTIAL ATTORNEYS' EYES ONLY          9/26/2002

```
1   reactor and power supply?
2       A.   Beginning of September.
3       Q.   When you say shelf the project, do you
4   mean indefinitely or forever; I mean, what do you
5   mean by shelf the project?
6       A.   We're discontinuing the development.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    246
```

246

247

248

249

Esquire Deposition Services
619.233.0633

Joachim Kupe, Vol II    CONFIDENTIAL ATTORNEYS' EYES ONLY    9/26/2002

```
 1                                        1
 2                                        2
 3                                        3
 4                                        4
 5                                        5
 6                                        6
 7                                        7
 8                                        8
 9                                        9
10                                       10
11                                       11
12                                       12
13                                       13
14                                       14
15                                       15
16                                       16
17                                       17
18                                       18
19                                       19
20                                       20
21                                       21
22                                       22
23                                       23
24                                       24
25                                       25
                              274                                    276
```

```
 1                                        1
 2                                        2
 3                                        3
 4                                        4
 5                                        5
 6                                        6
 7                                        7
 8                                        8
 9                                        9
10                                       10
11                                       11
12                                       12
13                                       13
14                                       14
15                                       15
16                                       16
17                                       17
18                                       18
19                                       19
20                                       20
21                                       21            How many engineers are working on
22                                       22   Delphi's NTP project as of the time you signed this
23                                       23   declaration?
24                                       24      A.   It could be 12 or 13 at the time I signed
25                                       25   this declaration.
                              275                                    277
```

```
1    Q.   Correct.
2    A.   Yeah.
3    Q.   And what about last year?
4    A.   We were in the 20 and above.
5    Q.   Okay.  Thank you.
6    A.   25 -- I'm not quite -- I'm not positive,
7    but we had a lot, so...
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              278
```

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              280
```

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              279
```

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              281
```

17

1
2
3
4
5
6
7
8
9      Q.    Would you take a look at the section
10   Objectives and to what extent are those objectives
11   the same as the NTP exhaust aftertreatment project
12   of recent; in other words, in the last year?
13      A.    I had 90 percent and higher efficiency and
14   three percent fuel economy penalty.  Then it talk in
15   terms of two percent or five percent of engine
16   power.  So higher than 90 percent NOx, N-O-x
17   reductions, and three percent fuel economy penalty.
18   So this was changed.
19      Q.    Can you explain what the Quality, Cost,
20   Fast and Great references mean?
21            MR. WEED:  Objection.  The question
22   lacks foundation.
23            THE WITNESS:  This is the way we at
24   Delphi look at a given product, so you want -- and
25   this is, this is what your customer expect.  Your

326

1   customer will expect you to have a product of high
2   quality.  The customer expect you to have a product
3   which is competitive so a price that they can
4   afford.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

329

29

338

340

```
 1        A.   We had in March the last milestone with
 2   PSA and the results were poor, disappointing, and
 3   PSA mentioned that this concept doesn't work.  The
 4   catalyst is performing poorly, so that was it.
 5        Q.   And how was the decision made to cancel
 6   the catalyst development for the NTP project?
 7        A.   How was the decision made?
 8        Q.   Correct.
 9        A.   We had, we had a meeting to look at these
10   things again in a responsible way.  Customer say you
11   don't have a catalyst, your reactor and your power
12   supply does work reasonably, but there was high fuel
13   economy penalty and so there is no catalyst.  This
14   concept is not viable.  So we decided looking at --
15   we can't develop, we can't continue putting
16   resources and funding to develop for years for
17   catalyst to work with NTP.  So it was a responsible
18   decision to say we stop catalyst formulation
19   development.
20
21
22
23
24
25
```

339

341

```
21        Do you understand the circumstances
22   around which Delphi decided to no longer support the
23   catalyst development for the NTP project?
24        A.   Yes.
25        Q.   Can you generally explain that to me?
```

32

Joachim Kupe, Vol II          CONFIDENTIAL ATTORNEYS' EYES ONLY          9/26/2002

```
 1                                              1
 2                                              2
 3                                              3
 4                                              4
 5                                              5
 6                                              6
 7                                              7
 8                                              8        Q.   Okay.  Let me see if I understand this
 9                                              9   then.
10                                             10        You were suggesting that the goals
11                                             11   that were set were to achieve a 90 percent reduction
12                                             12   in NOx and be able to meet a three percent fuel
13                                             13   penalty; correct?
14                                             14        A.   Yeah.
15                                             15        Q.   Now Delphi determined that in order to
16                                             16   have a product that it would commercialize, it had
17                                             17   to meet those two goals?
18                                             18        A.   That two performance goals, but the thing
19                                             19   has to be durable and so on, so this is not said,
20                                             20   and be competitive and price and so on.  Those are
21                                             21   obvious requirement that everybody would know, but
22                                             22   the performance, yeah, those are the performance.
23                                             23
24                                             24
25                                             25
                                    366                                            368
```

```
 1                                              1
 2                                              2
 3                                              3
 4                                              4
 5                                              5
 6                                              6
 7                                              7
 8                                              8
 9                                              9
10                                             10
11                                             11
12                                             12
13                                             13
14                                             14
15                                             15
16                                             16
17                                             17
18                                             18
19                                             19
20                                             20
21                                             21
22                                             22
23                                             23
24                                             24
25                                             25
                                    367                                            369
```

Esquire Deposition Services
619.233.0633

Joachim Kupe, Vol II          CONFIDENTIAL ATTORNEYS' EYES ONLY                    9/26/2002

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 |
| 3 | 380 |

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23  Q.   Okay.  In the second sentence under The<br>24  Fundamentals on page three, it says:  In laboratory<br>25  testing with a simulated gas mixture representative |
| 379 | 381 |

42

```
 1   of the major gas components in diesel engine
 2   exhaust, the nonthermal plasma system achieved NOx
 3   reduction levels as high as 100 percent.
 4               Were you familiar with that?
 5       A.   I want you to read it again and I will
 6   read the sentence again loud:  In laboratory testing
 7   with a simulated gas mixture representative.
 8               So this is not a vehicle testing on a
 9   transient emission cycle.  So there's a difference
10   that you test with synthetic gas on a gas bench in a
11   laboratory, it doesn't tell you that on the vehicle,
12   under real conditions, under real manufacturing of
13   the catalyst that this will perform.
14               This is what we saw and that's why we
15   were so hopeful that this might work because in the
16   laboratory on a synthetic gas bench with
17   formulations of powder you could get that high, but
18   it did not materialize, and you read what a customer
19   of yours, copartner of yours, using the kind of
20   strong language that was in Bernard Delhaye's letter
21   to me in March, so this is reality.
22               We did develop in the laboratory
23   formulations in powder form with synthetic gases
24   that gave you up to 100 percent, but putting this on
25   a substrate, putting it on a converter, and putting
                                                  382
```

```
 1   it on the vehicle, we got 15 percent.  This is the
 2   reality.  The rest is nothing.
 3       Q.   Do you know why there was such a huge
 4   difference between what you got in the laboratory
 5   versus what you got in the actuality?
 6       A.   I don't know.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                  383
```

```
 1                                                384
```

```
 1                                                385
```

# EXHIBIT 10

Jean Botti, Ph.D.                                                               9/4/2002

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF MASSACHUSETTS
 3
 4   LITEX, INC.,
 5
 6             Plaintiff,
 7
 8       vs        Civil Action No. CV 10910 (JLT)
 9                 Hon. Joseph L. Tauro
10   DELPHI AUTOMOTIVE SYSTEMS,
11   Corporation and
12   Delphi Automotive Systems LLC,
13
14             Defendants.
15   _____/
16
17   DEPONENT:   JEAN BOTTI, Ph.D.
18   DATE:       Wednesday, September 4, 2002
19   TIME:       9:10 a.m.
20   LOCATION:   2560 Crooks Road
21               Troy, Michigan
22   REPORTER:   Denise M. Kizy, RPR/CRR/CSR-2466
23   VIDEO:      Nancy Siemion Scott
24
25
                                                 1
```

```
 1              TABLE OF CONTENTS
 2   WITNESS                              PAGE
 3   JEAN BOTTI, Ph.D.
 4       EXAMINATION BY MR. KORNICZKY        6
 5
 6
 7
 8
 9              EXHIBITS
10                                       PAGE
11       No. 1 through 9                  48
12       No. 10                          104
13       No. 11                          144
14       No. 12                          145
15       No. 13                          150
16       No. 14                          152
17       No. 15                          161
18       No. 16                          168
19       No. 17                          173
20       No. 18                          174
21       No. 19                          181
22       No. 20                          185
23       No. 21                          217
24       No. 22                          224
25       No. 23                          229
                                            3
```

```
 1   APPEARANCES:
 2
 3        BROBECK, PHLEGER & HARRISON LLP
 4        By:  Mr. Stephen S. Korniczky
 5        12390 El Camino Real
 6        San Diego, California 92130
 7        (858) 720-2870
 8            Appearing on behalf of the Plaintiff
 9
10        HELLER EHRMAN WHITE & McAULIFFE LLP
11        By:  Mr. Keith R. Weed
12        275 Middlefield Road
13        Menlo Park, California 94025-3506
14        (650) 324-7000
15            Appearing on behalf of the Defendants
16
17   ALSO PRESENT:  William Cosnowski, Jr.
18                  Leon Ekchian
19
20
21
22
23
24
25
                                              2
```

```
 1              EXHIBITS CONTINUED
 2                                       PAGE
 3        No. 24                         232
 4        No. 25                         233
 5        No. 26                         241
 6        No. 27                         252
 7        No. 28                         256
 8        No. 29                         260
 9        No. 30                         263
10        No. 31                         268
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                            4
```

Jean Botti, Ph.D.                                                    9/4/2002

| | |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3          What was the relative budget for the |
| 4 | 4  NTP project in 1998 compared to all the other |
| 5 | 5  projects in this space -- in this stage? |
| 6 | 6      A.    It was higher than today. |
| 7 | 7      Q.    How much higher? |
| 8 | 8      A.    I wouldn't know exactly, but it's |
| 9 | 9  probably -- probably was in double what it is today. |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

| | |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |

11

# EXHIBIT 11

# CONFIDENTIAL

David Goulette          CONFIDENTIAL - ATTORNEYS' EYES ONLY          9/20/2002

```
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3
 4   LITEX, INC.,
 5
 6          Plaintiff,
 7
 8      vs        Civil Action No. CV 10910 (JLT)
 9                Hon. Joseph L. Tauro
10   DELPHI AUTOMOTIVE SYSTEMS,
11   Corporation and
12   Delphi Automotive Systems LLC,
13
14          Defendants.
15   _____/
16   CONFIDENTIAL ATTORNEYS' EYES ONLY
17   DEPONENT:   DAVID A. GOULETTE
18   DATE:       Friday, September 20, 2002
19   TIME:       7:50 a.m.
20   LOCATION:   2560 Crooks Road
21               Troy, Michigan
22   REPORTER:   Denise M. Kizy, RPR/CRR/CSR-2466
23   VIDEO:      Nancy Siemion Scott
24
25
                                          1
```

```
 1                   TABLE OF CONTENTS
 2   WITNESS                              PAGE
 3   DAVID A. GOULETTE
 4     EXAMINATION BY MR. BLAYLOCK          5
 5
 6
 7
 8
 9                   EXHIBITS
10                                        PAGE
11     No. 81                              204
12     No. 82                              216
13     No. 83                              219
14     No. 84                              223
15
16
17
18
19
20
21
22
23
24
25
                                          3
```

```
 1   APPEARANCES:
 2
 3       BROBECK, PHLEGER & HARRISON LLP
 4       By: Mr. Richard Blaylock
 5       12390 El Camino Real
 6       San Diego, California 92130
 7       (858) 720-2870
 8           Appearing on behalf of the Plaintiff
 9
10       HELLER EHRMAN WHITE & McAULIFFE LLP
11       By: Mr. Keith R. Weed
12       275 Middlefield Road
13       Menlo Park, California 94025-3506
14       (650) 324-7000
15           Appearing on behalf of the Defendants
16
17
18
19
20
21
22
23
24
25
                                          2
```

```
 1                 Troy, Michigan
 2              Friday, September 20, 2002
 3              At about 7:50 a.m.
 4              *    *    *
 5
 6              VIDEO OPERATOR:  We are on the
 7   record.  The time is 7:47 a.m.
 8              This is tape No. 1 of the videotaped
 9   deposition of David A. Goulette being taken at the
10   offices of Esquire Deposition Services, 2560 Crooks
11   Road in Troy, Michigan in the case of Litex, Inc.
12   versus Delphi Automotive Systems in the United
13   States District Court, District of Massachusetts,
14   Civil Action No. 10910 (JLT).
15              Today is Friday, September 20, 2002.
16   My name is Nancy Siemion Scott and I represent
17   Esquire Deposition Services.
18              The attorneys will now introduce
19   themselves for the record and the reporter will then
20   swear in the witness.
21              MR. BLAYLOCK:  Richard Blaylock of
22   Brobeck, Phleger and Harrison for plaintiff Litex.
23              MR. WEED:  Keith Weed of Heller,
24   Ehrman, White and McAuliffe for defendants.
25              DAVID A. GOULETTE
                                          4
```

1

Esquire Deposition Services
619.233.0633

David Goulette          CONFIDENTIAL - ATTORNEYS' EYES ONLY          9/20/2002

```
 1                                         1    misstates the testimony.
 2                                         2              Go ahead.
 3                                         3              THE WITNESS:  Basically that the
 4                                         4    reactor does not make a system and that we did not
 5                                         5    have a catalyst to go along with it that would
 6                                         6    actually do NO2 conversion.
 7                                         7         Q.   (BY MR. BLAYLOCK)  What else was said
 8                                         8    about the cancellation of the last gate for the
 9                                         9    project?
10                                        10         A.   Just that the reactor would be shelved.
11                                        11         Q.   What does that mean for the reactor to be
12                                        12    shelved?
13                                        13         A.   We would not proceed with any more design.
14                                        14
15                                        15
16                                        16
17                                        17
18                                        18
19                                        19
20                                        20
21                                        21
22                                        22
23                                        23
24                                        24
25                                        25
```
53                                                                          55

```
 1                                         1
 2                                         2
 3                                         3
 4                                         4
 5                                         5
 6                                         6
 7                                         7
 8                                         8
 9                                         9
10                                        10
11                                        11
12                                        12
13                                        13
14                                        14
15         Q.   When was that last gate canceled?  15
16         A.   A couple weeks ago.                 16
17         Q.   Was it canceled in August or September? 17
18         A.   I don't know.                       18
19         Q.   How did you learn it was canceled?  19
20         A.   Through a group meeting.            20
21         Q.   What group?                         21
22         A.   Our nonthermal plasma group.        22
23         Q.   And what was said about the cancellation 23
24    of the project?                               24
25              MR. WEED:  Objection.  The question 25
```
54                                                                          56

David Goulette    CONFIDENTIAL - ATTORNEYS' EYES ONLY    9/20/2002

```
 1                                              1        Q.    Early this year in January, February or
 2                                              2    March of 2002 you tested a nonthermal plasma exhaust
 3                                              3    aftertreatment system that was configured, you know,
 4                                              4    as shown in the diagram on page three of Exhibit 79;
 5                                              5    is that correct?
 6                                              6        A.    That is correct.
 7                                              7        Q.    And when you conducted that test you
 8                                              8    measured NOx conversion efficiency; is that right?
 9                                              9        A.    That's correct.
10                                             10        Q.    And when you did that test you were using
11                                             11    a Peugeot 607 vehicle; is that right?
12                                             12        A.    Yes.
13                                             13        Q.    Do you recall what the results were of
14                                             14    your measurement of NOx conversion efficiency?
15                                             15        A.    Over the entire MVEG cycle it was roughly
16                                             16    I'd say less than 10 percent efficient.
17                                             17        Q.    Was it more than five percent?
18                                             18        A.    I don't know.
19                                             19        Q.    Was it more than zero percent?
20                                             20        A.    Yes.
21                                             21
22                                             22
23                                             23
24                                             24
25                                             25

                                   129                                                  131
```

```
 1        Q.    When was the last time you did a test of      1
 2    NOx conversion efficiency of a Delphi nonthermal       2
 3    plasma exhaust aftertreatment system that was          3
 4    configured as shown in this schematic?                 4
 5        A.    It was prior to our -- prior to March of     5
 6    this year.                                              6
 7        Q.    Prior to March of 2002?                       7
 8        A.    Yes.                                          8
 9        Q.    Was it in 2002?                               9
10        A.    Yes.                                         10
11        Q.    So it would be January or February in       11
12    2002?                                                  12
13        A.    January, February, some time into March     13
14    maybe.                                                 14
15        Q.    And what vehicle were you using during      15
16    that test?                                             16
17        A.    The Peugeot 607.                             17
18        Q.    And did you observe -- what were the        18
19    results of your measurement of NOx conversion         19
20    efficiency in your testing of this Delphi nonthermal   20
21    plasma exhaust aftertreatment system on the Peugeot    21
22    607?                                                   22
23        A.    Can you repeat the question?                 23
24             (Record repeated by Court Reporter.)          24
25        A.    I don't understand the question.             25

                                   130                                                  132
```

                                                                                         33

David Goulette                 CONFIDENTIAL - ATTORNEYS' EYES ONLY                 9/20/2002

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 |
| 137 | 139 |

```
 1    test?
 2         A.    Yes.
 3         Q.    And what were the NOx conversion
 4    efficiency results from the MVEG test of that
 5    vehicle in the fall of 2001?
 6         A.    I don't remember.
 7         Q.    Do you remember whether they were better
 8    or worse than the results you obtained in early
 9    2002?
10         A.    They were worse.
11         Q.    Do you remember if they were greater than
12    zero?
13         A.    Yes.
14         Q.    And were they greater than zero?
15         A.    Yes, they were.
16         Q.    Do you remember if they were greater than
17    five percent?
18         A.    For the total MVEG it was on the order of
19    10 percent or so, somewhere in there.
20
21
22
23
24
25
```

138                                                                                                    140

                                                                                                        35

David Goulette    CONFIDENTIAL - ATTORNEYS' EYES ONLY    9/20/2002

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              145
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15        Q.    Did you measure NOx conversion efficiency
16   under steady-state running conditions on the Peugeot
17   607 in August 2001?
18        A.    Yes.
19        Q.    Do you remember what results you observed
20   of NOx conversion efficiency in the operation of the
21   Peugeot 607 in August 2001?
22        A.    I remember the steady-state conditions use
23   very low NOx efficiencies.
24        Q.    I'm sorry?
25        A.    Very low NOx efficiencies.
                                              147
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              146
```

```
 1        Q.    How do they compare with the NOx
 2   efficiencies you observed in early 2002; were they
 3   better or worse?
 4        A.    They were worse.
 5        Q.    Do you remember what catalyst you were
 6   using in the test in August 2001?
 7        A.    No.
 8
 9
10
11
12
13
14
15
16
17
18
19             Do you recall whether they were
20   greater or less than 10 percent?
21        A.    Would you repeat the question one more
22   time?
23             (Record repeated by Court Reporter.)
24        A.    At certain operating points they were
25   greater than 10 percent, at other operating points
                                              148
```

37

Esquire Deposition Services
619.233.0633

David Goulette          CONFIDENTIAL - ATTORNEYS' EYES ONLY          9/20/2002

```
 1   they were not.
 2        Q.    Do you remember what operating points they
 3   were greater than 10 percent?
 4        A.    Low load conditions, low flow, low NOx
 5   concentrations, lots of hydrocarbons.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
149

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
151

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
150

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
152

# EXHIBIT 12

Donald Runkle

9/6/2002

```
 1              UNITED STATES DISTRICT COURT
 2              DISTRICT OF MASSACHUSETTS
 3
 4   LITEX, INC.,
 5
 6              Plaintiff,
 7
 8       vs          Civil Action No. CV 10910 (JLT)
 9                   Hon. Joseph L. Tauro
10   DELPHI AUTOMOTIVE SYSTEMS,
11   Corporation and
12   Delphi Automotive Systems LLC,
13
14              Defendants.
15   _____/
16
17   DEPONENT:   DONALD L. RUNKLE
18   DATE:       Friday, September 6, 2002
19   TIME:       8:40 a.m.
20   LOCATION:   5825 Delphi Drive
21               Troy, Michigan
22   REPORTER:   Denise M. Kizy, RPR/CRR/CSR-2466
23   VIDEO:      Patrick Murphy
24
25

                                                    1
```

```
 1                  TABLE OF CONTENTS
 2   WITNESS
 3   DONALD L. RUNKLE                        PAGE
 4      EXAMINATION BY MR. KORNICZKY            5
 5
 6
 7
 8
 9                  EXHIBITS
10                                           PAGE
11      No. 37                                15
12      No. 38                                15
13      No. 39                                89
14      No. 40                                95
15      No. 41                                99
16      No. 42                               102
17      No. 43                               107
18
19
20
21
22
23
24
25

                                                    3
```

```
 1   APPEARANCES:
 2
 3       BROBECK, PHLEGER & HARRISON LLP
 4       By:  Mr. Stephen S. Korniczky
 5       12390 El Camino Real
 6       San Diego, California 92130
 7       (858) 720-2870
 8          Appearing on behalf of the Plaintiff
 9
10       HELLER EHRMAN WHITE & McAULIFFE LLP
11       By:  Mr. Keith R. Weed
12       275 Middlefield Road
13       Menlo Park, California 94025-3506
14       (650) 324-7000
15          Appearing on behalf of the Defendants
16
17   ALSO PRESENT:  William Cosnowski, Jr.
18                  Leon Ekchian
19
20
21
22
23
24
25

                                                    2
```

```
 1                       Troy, Michigan
 2                       Friday, September 6, 2002
 3                       At about 8:40 a.m.
 4                       *     *     *
 5
 6          VIDEO OPERATOR:  We're on the record.
 7   This is tape one of the videotape
 8   deposition of Donald L. Runkle being taken at the
 9   offices of Delphi Automotive Systems, 5825 Delphi
10   Drive, Troy, Michigan.
11          Today is Friday, September 6, 2002.
12   The time is 8:38 a.m.
13          This is in the matter of Litex,
14   Incorporated versus Delphi Automotive Systems, Case
15   No. CV-10910 in U.S. District Court, District of
16   Massachusetts.
17          My name is Patrick Murphy, legal
18   videographer for Esquire Deposition Services.
19          The attorneys will now introduce
20   themselves for the record.
21          MR. KORNICZKY:  Stephen Korniczky
22   representing the plaintiff Litex Corporation.
23          MR. WEED:  Keith Weed of Heller,
24   Ehrman, White and McAuliffe for defendant and with
25   me is Will Cosnowski of Delphi.

                                                    4
```

Donald Runkle

9/6/2002

<table>
<tr><td>

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
113
</td><td>

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
115
</td></tr>
</table>

```
 1        A.   I don't know, some time probably in the
 2   first quarter.
 3        Q.   Okay.
 4        A.   I don't know actually the answer to that,
 5   but I would expect that was the timing.
 6        Q.   If you wanted to find out the exact date
 7   who would you ask?
 8        A.   Jose Avila who is the business line
 9   executive for diesel.
10        Q.   Okay.  Thank you.
11             At what point did Delphi realize it
12   was having trouble developing its NTP catalyst?
13        A.   I don't know when we realized it.  I guess
14   when I realized that it wasn't turning as we had
15   hoped probably was over the last year and a half I
16   would say when the results were not as good as we
17   thought.
18        Q.   Do you recall what your response was when
19   you realized the catalyst results were not as good
20   as Delphi had expected?
21        A.   The catalyst or the nonthermal plasma?
22        Q.   I'm sorry, the nonthermal plasma.
23        A.   The nonthermal plasma, typical response
24   would be is there any other approaches, you know,
25   how do we solve the issues that are there, is there
```
114

116

Donald Runkle                                                                    9/6/2002

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17        Q.   At what point did Delphi realize it would
18   not be releasing an NTP catalyst system in 2004,
19   2004 time frame with PSA?
20        A.   I don't know specifically, but it must
21   have been in the 2000 sort of time frame, 2001 sort
22   of time frame; otherwise, you'd never make 2004
23   anyway.
24        Q.   Do you know how that determination would
25   be made?
                                                      117
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                      119
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                      118
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                      120
```

30

# EXHIBIT 13

1                                    VOLUME II
                                     PAGES 264-561
2                                    EXHIBITS: See Index

3

4              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

5

6

7    **************************)    Civil Action
     LITEX, INC.,                )    No. 01-CV-10910-JLT
8              Plaintiff,        )
                                 )    The Honorable
9     VS.                        )    Joseph L. Tauro
                                 )
10   DELPHI AUTOMOTIVE SYSTEMS    )
     CORPORATION and DELPHI       )
11   AUTOMOTIVE SYSTEMS LLC,      )
               Defendants.       )
12   *************************)

13            CONTINUED VIDEOTAPE DEPOSITION

14   OF LEON EKCHIAN, a witness called in

15   behalf of the defendants, taken pursuant

16   to the applicable Federal Rules of Civil

17   Procedure, before Shaunna L. O'Connell,

18   Registered Professional Reporter and

19   Notary Public in and for the Commonwealth

20   of Massachusetts, at the offices of Mintz,

21   Levin, Cohn, Ferris, Clovsky & Popeo, One

22   Financial Center, Boston, Massachusetts,

23   on Wednesday, October 2, 2002, commencing

24   at 9:07 a.m.

dfea85fd-8edb-4b41-b88c-343f92bdce81

Page 297

```
1    Q.
2
3
4
5
6
7    A.
8
9
10
11   Q.
12
13
14   A.
15
16   Q.
17
18
19
20
21   A.
22
23   Q.
24
```

Page 299

```
1
2    A.
3
4
5
6    Q.
7    A.
8    Q.
9
10
11   A.
12
13
14
15
16
17
18   Q.
19
20
21
22   A.
23
24
```

Page 298

```
1    A.
2
3
4    Q.
5    A.
6    Q.
7
8
9
10
11   A.
12
13
14
15
16   Q.
17
18   A.
19
20   Q.
21   A.
22
23   Q.
24
```

Page 300

```
1
2
3
4
5
6
7
8
9
10
11
12
13   Q.  And what's the basis for that belief?  In
14       other words, I understand that Litex has
15       sued Delphi for alleged infringement on
16       one or more of its patents and therefore
17       that Litex believes that Delphi is
18       infringing one or more of its patents, but
19       my question really is focused on why do
20       you believe that whatever Delphi's
21       activities are that they have adversely
22       impacted Litex's ability to license in the
23       diesel or lean burn arena?
24   A.  It's Delphi's infringement, Delphi's very
```

10 (Pages 297 to 300)

dfea85fd-8edb-4b41-b88c-343f92bdceP

Page 301

1  active press release activities which have
2  stated that Delphi developed NTP. I
3  believe those are the words, suggesting
4  that Delphi invented NTP.
5      Delphi's total disregard for
6  Litex's existence in all the papers it has
7  published, in the patents that it has
8  filed and that have issued. Delphi's
9  statement that they will be first to
10  market with revolutionary new technology,
11  suggesting that they again are the first
12  to develop the technology.
13      I believe yesterday I mentioned
14  concerns by Denso, who is a potential --
15  who was and continues, I believe, to be a
16  potential licensee of Litex. I think I
17  referred to an e-mail that you should have
18  from a gentleman at Denso to Mr. Vic Nowak
19  expressing concern.
20      Concern was expressed by J.P.
21  Morgan about, if I recall, the Delphi
22  announcements for the Financial Times
23  Award that they won in 1999, sometime like
24  September '99 if I'm not mistaken. And

Page 302

1  J.P. Morgan was commencing their Series D
2  activities. And I should clarify. When I
3  say J.P. Morgan, I guess we need to be
4  careful of the context. J.P. Morgan is
5  both an investor in Litex Series C.
6  J.P. Morgan investment banking side
7  handled Series D. And they're two
8  unrelated groups within J.P. Morgan.
9      So the J.P. Morgan investment
10  banking group, Greg Guyette's group,
11  shared with me on a number of occasions
12  that Delphi's activities will probably
13  have an adverse effect on the interest
14  level that he can generate at potential
15  investors.
16      Ones that I recall -- and I
17  think I saw a document to that effect that
18  they had produced that they had prepared
19  for us that mentioned concerns for
20  Tenneco, and there may have been for
21  Engelhard also.
22      And again, the concern being
23  that when the largest supplier, a $30
24  billion company, says they will be first

Page 303

1  to market, no mention of Litex, they
2  developed the technology, you're asking a
3  company to invest in Litex realizing that
4  the biggest supplier, their biggest
5  competitor, is essentially ignoring the
6  patents.
7      Oh, I remembered another one.
8  Bosch was very surprised, in fact shared
9  with me personally that they could not
10  understand what Delphi was doing, that
11  they had looked at the Litex patents, they
12  found them to be very strong, and they
13  could not understand how Delphi had
14  proceeded without securing any kind of
15  license agreement with Litex.
16      And as it turned out, Bosch also
17  did not invest to date or license. There
18  may be more, but that's what I can think
19  of right now.
20  Q. Has any potential licensee or entity with
21  whom Litex was attempting to achieve some
22  kind of a commercial relationship besides
23  Denso -- and we'll get to Denso in a
24  minute -- ever told Litex to your

Page 304

1  knowledge that it was not going to enter
2  into a commercial relationship with Litex,
3  whatever it might be, because of the
4  presence of Delphi and Delphi's
5  announcement of its activities in the NTP
6  arena?
7  A. If your question is did anyone tell me
8  personally that the reason we are not
9  going forward is because Delphi -- because
10  of Delphi's activities in those words, not
11  that I can recall.
12      But they clearly hinted it.
13  They suggested it. They raised concerns
14  about Delphi in meetings.
15      Our investment bankers that are
16  very astute, they're one of the top
17  investment bankers in the automotive
18  sector. J.P. Morgan is recognized as one
19  of the premier -- that's why we went to
20  them -- investment bankers for the
21  automotive sector. They have all the
22  relationships. They're dealing at the
23  highest levels in all these companies, if
24  not at the CEO level, at the CFO level.

Page 305

1   If they're telling me that there's
2   concerns about what Delphi is doing, I put
3   a lot of credence in that.
4   Q.
5
6
7
8
9
10  A.
11
12
13
14
15
16
17  Q.
18
19
20
21
22
23
24  A.

Page 306

1
2
3
4
5
6   Q.
7
8   A.
9   Q.
10
11
12
13  A.
14  Q.
15
16
17
18
19  A.
20  Q.
21
22
23
24

Page 307

1   A.
2
3   Q.
4
5
6
7
8
9
10
11
12
13
14  A.
15
16
17  Q.
18
19
20
21
22
23  A.
24

Page 308

1   Q.
2
3   A.
4
5
6
7   Q.
8   A.
9
10
11  Q.
12
13
14  A.
15  Q.
16
17
18  A.
19
20
21
22  Q.
23
24

EYAL COURT REPORTING, INC., BOSTON, MA  (800) 322-3925

dfea85fd-8edb-4b41-b88c-343f92bdce81

Page 321

```
1
2
3
4
5
6
7
8
9
10
11    Q
12
13
14
15
16
17
18
19    A
20    Q
21
22    A
23    Q
24    A
```

Page 323

```
1
2    Q.
3
4
5
6
7
8
9
10
11
12
13    A
14
15
16
17    Q.   We'll come back to awards and some of the
18         other things you said earlier, but I'm now
19         really trying to focus on comments made to
20         you either in writing, e-mail, verbally by
21         individuals at other companies with whom
22         Litex was trying to establish a commercial
23         relationship in which they indicated in
24         some way as far as you understood it that
```

Page 322

```
1
2    Q.
3
4    A.
5    Q.
6    A.
7    Q.
8
9
10
11
12    A.
13    Q.
14
15
16
17
18    A.
19
20
21    Q.
22
23
24    A.
```

Page 324

```
1         they were not willing to proceed with a
2         commercial relationship with Litex because
3         of Delphi's presence in the NTP technology
4         arena.
5    A.   I believe that we have been told by a
6         number of different investment bankers
7         we've contacted regarding raising
8         additional funds who have told us that
9         it's very difficult to raise money from
10        private equity investors when your primary
11        asset is intellectual property and it's
12        being ignored, public statements that
13        they're invalid and you're embroiled in a
14        patent infringement suit.
15   Q.
16
17
18
19
20
21
22
23
24
```

Page 337

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17   A.
18
19
20
21
22   Q.
23
24
```

Page 338

```
 1
 2
 3
 4   A.
 5
 6
 7   Q.
 8
 9   A.
10   Q.
11
12
13
14
15   A.
16
17
18
19
20   Q.
21   A.
22
23
24
```

Page 339

```
 1
 2
 3   Q.  With all those thoughts in mind, are you
 4       able to testify on behalf of Litex as to
 5       any dollar amount of monetary loss damages
 6       that Litex has sustained or suffered as a
 7       result of Delphi's alleged infringement on
 8       one or more of Litex's patents?
 9   A.  I can give you ideas of what I personally
10       would consider to be at least damages that
11       Litex suffered.  I believe that Delphi
12       directly contributed to the failure of
13       Litex to close Series D and significant
14       damages that resulted from that.  How
15       significant is something that is
16       privileged under discussion.
17            And furthermore, we're still
18       reviewing your documents.  They're still
19       coming in.  And perhaps we will have a
20       better idea after we've completed the
21       review of all your documents that you're
22       producing.  I think there's still some
23       that came in this week.
24   Q.  So one of the areas of damage that you
```

Page 340

```
 1       believe that Litex has sustained as a
 2       result of Delphi's activities is a failure
 3       to close Series D?
 4   A.  Yes.  And all the damages that flow from
 5       that.
 6   Q.  Are there areas of damage that you have
 7       identified?
 8   A.  Negative comments made by Delphi about our
 9       product publically.
10   Q.  Any other areas of damage that you've
11       identified, putting aside for the moment
12       the quantification of the damage?
13   A.  The inaccurate press releases that were
14       made by Delphi.
15   Q.
16   A.
17
18
19
20   Q.
21   A.
22
23
24
```

20 (Pages 337 to 340)

Page 345

```
 1
 2
 3    A.
 4
 5
 6
 7
 8    Q.
 9    A.
10    Q.
11
12    A.
13
14
15
16
17    Q.
18
19
20    A.
21    Q.
22    A.
23    Q.
24
```

Page 347

```
 1
 2
 3
 4    A.
 5
 6    Q.
 7    A.
 8    Q.
 9
10    A.
11    Q.
12
13
14
15    A.
16    Q.
17
18
19
20    A.
21    Q.
22    A.
23
24    Q.
```

Page 346

```
 1
 2    A.
 3    Q.
 4
 5    A.
 6    Q.
 7    A.
 8    Q.
 9    A.
10    Q.
11
12    A.
13
14    Q.
15
16    A.
17    Q.
18
19
20
21    A.
22    Q.
23
24
```

Page 348

```
 1
 2    A.
 3    Q.
 4
 5
 6
 7
 8
 9
10
11    A.
12
13
14
15
16
17
18
19
20    Q.
21
22
23    A.
24    Q.   Other than the reference in this document
```

EYAL COURT REPORTING, INC., BOSTON, MA  (800) 322-3925

---

Page 349

1     that you alluded to, what other statements
2     has Mr. Guyette made to you at any time
3     which lead you to believe that Delphi's
4     actions in any way caused a Series D
5     financing not to take place?
6 A. I think we've covered that. I mentioned
7     issues of Tenneco, Engelhard. I don't
8     recall anything else.
9 Q. And if you testified Engelhard, I
10    apologize. I don't recall. What did he
11    say about Engelhard and Delphi?
12 A. Oh, and Delphi. I beg your pardon. I
13    think it was just the perception that it
14    hurts Litex's chances to be able to move
15    forward when there is such a large
16    company -- the largest in the business --
17    moving forward without obtaining a license
18    from Litex and stating they'll be first to
19    market and they developed NTP.
20 Q. Is this something that he said to you or
21    is this a perception that you drew from --
22 A. No. I believe he said that to me.
23 Q.
24

Page 365

1
2
3
4
5
6
7    Q.
8    A.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24    Q

Page 366

1
2
3
4
5
6
7
8    A.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 367

1
2
3    Q.
4    A.
5
6
7
8    Q.
9
10
11
12
13
14
15    A.
16
17
18
19
20
21    Q.
22
23
24    A.

Page 368

1
2
3
4    Q.
5    A.
6
7
8
9
10    Q.
11
12    A.
13    Q.
14    A.
15
16    Q.   You indicated that another area of damage
17         that you attributed to Delphi is that
18         Delphi made negative comments about the
19         Litex technology in public or they
20         disseminated comments in public.  Do you
21         recall that testimony?
22    A.   If I said public, I may have misspoken,
23         but told third parties is probably what I
24         meant.

Page 369

1   Q. All right. What actions of Delphi do you
2      have in mind by that?
3   A. I believe it was testimony by Mr. Kupe.
4   Q. And in particular what testimony did you
5      have in mind?
6   A. I can't recall his exact words, but I
7      believe he mentioned to people from -- I
8      would have to go and read the transcript --
9      from PSA, if I'm not mistaken, perhaps
10     Renault. Maybe it was Faurecia. I think
11     he mentioned General Motors, and there may
12     have been other companies he mentioned
13     that he informed or others from Delphi
14     informed that the CDD does not work based
15     on testing done at Delphi.
16  Q. First of all, do you believe that Mr. Kupe
17     was being disingenuous when he stated that
18     the Delphi tests indicated that the Litex
19     product did not work or words to that
20     effect?
21  A. I believe I know what the word
22     disingenuous means, but I don't quite
23     understand in this context what your
24     question relates to.

Page 370

1   Q. Do you think that Mr. Kupe was
2      misrepresenting to whomever he spoke of
3      the results of the Delphi tests on the
4      Litex product?
5   A. I don't believe that's a yes/no question
6      to answer.
7   Q. Well, answer it any way you can.
8   A. I believe that he was telling people the
9      results of tests that were faulty.
10  Q.
11
12  A.
13
14
15
16
17
18
19
20
21
22
23
24

Page 371

1
2
3
4
5
6
7
8
9
10
11
12  Q.
13
14
15  A.
16
17
18
19
20
21
22
23
24  Q.

Page 372

1   A.
2
3
4   Q.
5
6   A.
7
8
9
10  Q.
11
12
13
14
15  A.
16
17
18
19
20
21
22
23
24

28 (Pages 369 to 372)

dfea85fd-8edb-4b41-b88c-343f92bdce81

Page 379

1  Q.
2
3  A.
4  Q.
5
6
7
8
9  A.
10
11
12
13
14  A.
15
16
17
18
19
20  Q.  Another area of damage activity or
21     activity of Delphi that you attribute to
22     damages to Litex was what you
23     characterized as inaccurate press
24     releases.

1          The statement by Delphi that
2   they will be first to market, again not
3   mentioning at all the fact that Litex was
4   making its product available to the auto
5   industry.
6          Saturn had product that it could
7   build, as you're aware, into Phase 2 low
8   volume and we could ramp up to high
9   volume.
10         Delphi recognizes, I'm sure,
11  that Litex's corona device is a nonthermal
12  plasma device and operating in conjunction
13  with the catalyst and yet makes those
14  press releases that they will be first to
15  market. And is your question at the time
16  or now?
17  Q.  Now. In other words, if you have --
18  A.  Well, I find that now, frankly, quite
19     surprising that Delphi was making those
20     presses releases that they'll be first to
21     market being very confident in the
22     statements that it's making and now from
23     what I understand in reading some of the
24     documents -- in fact, a letter from Heller

Page 378

1  A.  Correct.
2  Q.  Can you indicate the -- I don't expect you
3     to identify it by date and publication.
4     If you can, that would be great. But can
5     you tell me what you have in mind by the
6     concept of inaccurate press releases?
7  A.  Okay. Let me try. I think I've already
8     mentioned that the first time I read a
9     press release that had the words "Delphi
10    developed NTP," I just found that to be
11    amazing the corporate public relations
12    group could have allowed that press
13    release to go out. That's a very bold
14    statement, and I just don't understand how
15    that statement could be made.
16         And I think it's confusing to
17    investors, potential investors in Litex,
18    from a financial background. They're not
19    in the auto industry, and when they see
20    such a press release, they wonder what
21    Litex has been telling them since we've
22    been talking about our technology and
23    Delphi is making a statement that they
24    developed NTP. So that is one issue.

Page 380

1   Ehrman -- stating that Delphi was being
2   overly optimistic, I find that very
3   surprising.
4          I would think that a corporation
5   would need to be more careful about
6   statements it makes, about how confident
7   they are, because it impacts other
8   companies, particularly small companies.
9          Again, investors, customers
10  reading these press releases, you know,
11  it's very difficult for Litex to try to
12  placate the concerns of potential
13  investors when there are these kind of
14  statements, very confident statements by
15  Delphi that they will be first to market
16  and they're targeting 2004, and now I'm
17  reading that maybe they were overly
18  optimistic. I find that to be
19  unreasonable and cause damage.
20  Q.
21
22
23
24      :

30 (Pages 377 to 380)

dfea85fd-8edb-4b41-b88c-343f92bdce81

Page 385

1 A.
2
3
4
5
6
7
8
9
10
11 A.
12
13
14
15
16
17
18
19
20
21
22 A.
23
24

Page 387

1    market with a product by 2004, in other
2    words, makes those overly optimistic
3    statements to get a lot of press
4    attention, attention from its investors,
5    attention of its customers, I find that
6    very troubling.
7        Either Delphi truly believed
8    that it was going to make it in 2004 and
9    there was a full-fledged effort to do so,
10    or if Delphi was sort of perhaps
11    exaggerating the press release to a lot
12    more hype than was called for, I find
13    that, as an executive, to be very, very
14    troubling.
15 Q.  Do you have any information today that
16    suggests to you that to the extent that
17    Delphi did indicate in one or more press
18    releases that it hoped to have a product
19    on the market by 2004 that it didn't
20    believe it could do so?
21 A.  Sorry.  That question I didn't follow.
22 Q.  Do you have any information as you sit
23    here today that to the extent that Delphi
24    indicated in one or more press releases

Page 386

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18 Q.  Just so I can close the door on this --
19    and maybe we're going over old ground --
20    how did Delphi's alleged overoptimism
21    contribute to damages to Litex?
22 A.  Well, if Delphi in fact when they were
23    making those press releases did not
24    believe they were going to make it to

Page 388

1    that it intended or hoped to have an NTP
2    product on the market by 2004 that it
3    didn't sincerely believe it could do so?
4 A.  I think it's more my interpretation of the
5    statement being made by Heller Ehrman
6    that -- Heller Ehrman is making the
7    statement.  I'm reading it.  It says that
8    Delphi was overly optimistic.
9        To me that means that they
10    shouldn't, perhaps, have been so
11    aggressive with their projections and
12    their statements.
13 Q.  Other than what you've read in this Heller
14    Ehrman letter, do you have any information
15    as you sit here today that would suggest
16    to you that Mr. Botti or Mr. Kupe or
17    others that were working on the NTP
18    project at Delphi didn't, when these press
19    releases were issued, believe that they
20    had a realistic opportunity of producing a
21    product by 2004?
22 A.  I think that's something that I'm still
23    trying to understand in reviewing the
24    documents with counsel, and I can't really

Page 389

```
 1    comment on our understanding, but there's
 2    a lot of conflicting statements and
 3    confusion.  Is it a program?  Isn't it a
 4    program?  Is it research?  Is it scheduled
 5    for production?
 6            You read the press release, you
 7    get a different -- you draw a different
 8    opinion.  You read some of the other
 9    recent documents.  I'm very confused,
10    frankly, and that's what we're trying to
11    understand.
12    Q.
13
14
15
16
17
18
19    A.
20
21    Q.
22    A.
23
24    Q.
```

Page 390

```
 1
 2    A.
 3    Q.
 4
 5    A.
 6    Q.
 7
 8
 9
10
11
12    A.
13    Q.
14    A.
15
16
17    Q.
18    A.
19    Q.
20    A.
21
22    Q.
23    A.
24    Q.
```

Page 391

```
 1
 2
 3
 4
 5
 6
 7
 8    A
 9
10    Q
11
12
13    A
14
15
16    Q
17
18
19
20
21
22
23
24
```

Page 392

```
 1
 2
 3
 4
 5
 6
 7    A.
 8
 9
10
11
12
13
14    Q.
15
16
17
18
19    A.
20
21
22
23
24
```

EYAL COURT REPORTING, INC., BOSTON, MA  (800) 322-3925

dfea85fd-8edb-4b41-b88c-343f92bdce81

Page 393

7  Q.  I'll even take a general comment
8       associated with the general subject matter
9       of Delphi press releases. Has somebody
10      ever indicated to you or to somebody else
11      at Litex to your knowledge that gee, I've
12      read one or more Delphi press releases,
13      and based upon what I've learned in those
14      presses releases, I'm not going to do
15      business with Litex? Are you aware of any
16      such --
17  A.  I'm glad that we talked for a few minutes
18      longer, because as we were speaking, the
19      Denso communication to Vic Nowak comes to
20      mind.
21          That is a situation -- now,
22      that's not directly Series D, but as I sit
23      here now, I'm recalling that there are
24      communication where people, your

Page 394

1       competitors -- I beg your pardon.
2       Delphi's competitors, not Heller
3       Ehrman's competitors -- are reading the
4       press releases and are drawing
5       conclusions, and Denso is an example of
6       'someone that's following the press
7       releases that Delphi was issuing.
8   Q.
9
10
11
12
13  A.
14  Q.
15
16
17
18  A.
19  Q.
20
21
22
23  A.
24

Page 395

Page 396

34 (Pages 393 to 396)

dfea85fd-8edb-4b41-b88c-343f92bdce81

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LITEX, INC., | ) |
| | ) CIVIL ACTION NO. 01-CV-10910-JLT |
| Plaintiff, | ) The Honorable Joseph L. Tauro |
| | ) |
| v. | ) CONFIDENTIAL – SUBJECT TO |
| | ) PROTECTIVE ORDER |
| DELPHI AUTOMOTIVE SYSTEMS | ) |
| CORPORATION and DELPHI | ) |
| AUTOMOTIVE SYSTEMS, LLC, | ) |
| | ) |
| Defendants. | ) |

## EXPERT REPORT OF LARRY W. EVANS
## PURSUANT TO RULE 26(a)(2)(B), FED. R. CIV. P.

Pursuant to Rule 26(a)(2)(B), Fed. R. Civ. P., Plaintiff, Litex, Inc. (Litex) submits the following report of Larry W. Evans, whom Litex intends to call as an expert witness at trial. Litex and Mr. Evans reserve the right to supplement or modify the opinions expressed herein, as well as the basis for the opinions, depending upon the nature and content of the proofs which Defendants, Delphi Automotive Systems Corporation and Delphi Automotive Systems, LLC (hereinafter collectively referred to as "Delphi"), present and depending upon any additional discovery or other information provided in this matter.

### EXPERT REPORT

### I.    ENGAGEMENT AND COMPENSATION

1.    I have been engaged by counsel for Litex to provide an expert opinion, with supporting analyses, on the subject of damages to which Litex would be entitled as compensation for Delphi's infringement of U.S. Patents Nos. 6,012, 283 (the '283 patent) and 6,253,544 (the '544 patent). I am being compensated for my time with respect to expert services provided to

44.    Because of Delphi's infringement (which may well have been willful) and its aggressive publicity telling the world (including Litex's potential investors, partners and customers) that it (Delphi) developed NTP (Depo. Exhibit 43) and that it would be first-to-market with NTP systems (Depo. Exhibits 40, 41, 57; [LIT136112]), Litex suffered considerable damage including the opportunity to further develop its patented NTP business opportunity with one infusion of funding, e.g., via the Series D proposal as well as equity participation by potential partners, such as Bosch and Denso.  Litex's business was valued, in March 2000, by its investment banker, J.P. Morgan, at $250 to 260 million (Depo. Exhibit 301; [LIT136205-222]). In January, 2001, Litex submitted a formal proposal for an acquisition by Bosch of Litex (a proposal that had been solicited by Bosch).  In this regard, Bosch viewed Litex's NTP technology as "enabling" and was interested in it "for long-range strategic reasons." See Litex Board documents relating to its June 13, 2000 board meeting wherein it is stated:

"Bosch continues to consider an equity position and/or exclusive license . . . second round of high-level management meetings slated for July." ([LIT136088]).

In similar documentation related to Litex's April 25, 2001 Board Meeting, it is stated:

"Litex presented Bosch Managing Board (Dr. Sigfried Dais) with 'staged-acquisition proposal'

"Bosch response/counterproposal is past due (expected within a few weeks)"

"Bosch is interested in our (Litex's) intellectual property and NTP know-how"

"Bosch has made a positive evaluation of our patent portfolio."

In the same April 25, 2001 Board Meeting it is stated ([LIT136174]):

"Delphi is aggressively (and publicly) developing and marketing NTP-assisted diesel emission control systems"

"Publicly announced at the Paris Auto Show the joint development of a 2004 NTP product with PSA"

"Published/presented 2004 product"

The proposal presented by Dr. Leon Ekchian to Mr. Dais of Bosch [LIT136191-193] provided the following:

22

## VII.   POSSIBLE REVISIONS OR SUPPLEMENTATION TO THIS OPINION

56.     As of today, this report represents my best opinion regarding the matters set forth above. In the event that additional information or testimony becomes available, I may find it appropriate to revise or to supplement my opinions, analyses and conclusions. I understand that I may be called upon to provide a supplemental expert report and testimony in rebuttal to any proofs adduced in this litigation.

Respectfully submitted,

_____

Larry W. Evans      23 December 2002

32

# EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

LITEX, INC.,

　　　　　　　　　Plaintiff,

　　　　v.

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION and DELPHI
AUTOMOTIVE SYSTEMS LLC,

　　　　　　　　　Defendants.

CIVIL ACTION NO. 01 CV 10910 (JLT)

The Honorable Joseph L. Tauro

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE THE EXPERT REPORT AND TESTIMONY OF LARRY W. EVANS AND
TO EXCLUDE EVIDENCE AND TESTIMONY REGARDING LITEX'S VALUE**

# FILED UNDER SEAL

Kevin C. Cain, BBO #550055
Joseph K. Scully, BBO #644014
PEABODY & ARNOLD LLP
50 Rowes Wharf
Boston, MA 02110-3342
(617) 951-2100

Berj A. Terzian, BBO #645578
John J. Lauter
Brian M. Rothery
Thomas P. Scully
PENNIE & EDMONDS LLP
1155 Avenue of the Americas
New York, New York 10036-2711
(212) 790-9090

Delphi's publicized development activities and press releases indicating its plans to market an NTP system seriously undermined Litex's efforts to license its technology, raise capital for research and development activities and enter into partnerships to fund development of its CDD™ system. (Jacobs Decl. Ex. 1, Evans Report ¶ 44.)

4

1466642.1

## VI.  CONCLUSION

For all of the reasons discussed above, Delphi's motion to exclude the expert report and testimony of Larry Evans and to exclude evidence and testimony regarding the value of Litex should be denied.

Respectfully submitted,

Date:  October 1, 2003          By:

Kevin C. Cain, BBO #550055
Joseph K. Scully, BBO #644014
PEABODY & ARNOLD LLP
50 Rowes Wharf
Boston, MA  02110-3342
(617) 951-2100


Berj A. Terzian, BBO #645578
John J. Lauter
Brian M. Rothery
Thomas P. Scully
PENNIE & EDMONDS LLP
1155 Avenue of the Americas
New York, New York 10036-2711
(212) 790-9090


Attorneys for Plaintiff Litex, Inc.

20

1466642.1

# EXHIBIT 16

**CONFIDENTIAL**

| | |
|---|---|
| LITEX, INC.,<br><br>Plaintiff,<br>v.<br><br>DELPHI AUTOMOTIVE SYSTEMS<br>CORPORATION and DELPHI<br>AUTOMOTIVE SYSTEMS LLC,<br><br>Defendants. | Arbitration Before The<br>Honorable Roderick McKelvie |

## LITEX'S PRE-ARBITRATION BRIEF

John J. Lauter
Berj A. Terzian
Pennie & Edmonds LLP
1155 Avenue of the Americas
New York, New York 10036-2711
(212) 790-6501

Attorneys for Plaintiff, Litex Inc.

Delphi's public announcements about its NTP Exhaust Aftertreatment System continued to adversely affect Litex's ability to license its technology and obtain investment funds in its Series D round financing.  For example, in April 2001 Denso wrote to Litex indicating its concern that:

> [I]f Delphi is developing CDD for diesel engines with a certain car maker and going to produce in 2004, they must have some advantages and their own patent rights about CDD for diesel.  That means it is difficult to catch up them.  *Maybe Denso Japan is not interested in the technology for which we probably have to pay patent fees.  (Especially for Delphi.)*

(PTX 135.)  Denso's concern was reported to the Litex Board of Directors. (PTX 140.)

NY2: 1492466.1

All of this extensive publicity directed to Delphi's NTP Exhaust Aftertreatment System, and the fact that Delphi did not cease its infringing activities even after being sued by Litex, took its toll on the Litex/Bosch negotiations. In late September 2001, Bosch informed Litex that in lieu of purchasing the option outlined in its draft proposal, Bosch preferred to commence negotiating a nonexclusive license while conducting tests of Litex's CDD in diesel applications. The following week Litex made a non-binding proposal to nonexclusively license its non-thermal plasma patent portfolio to Bosch for fixed payments of $1 million in year one, $1.5 million in year two, and $5 million for each subsequent year of the license term (the '544 patent had 13 years to run) and a variable payment of 12 percent of sales of licensed products. (PTX 312.) Bosch ultimately did not accept this offer.

10

- 
- 

- 

- 

- Delphi's public announcements about its NTP Exhaust Aftertreatment System in the months leading up to the time the '544 patent issued had adversely affected Litex's attempts to raise funding for its company.
- 

14

NY2: 1492466.1

## IV.    CONCLUSION

For all of the reasons discussed above, Litex submits that the evidence in this case clearly supports a reasonable royalty damage award in the range of $70 million to $200 million.

Date:    March 31, 2004                  By:    Respectfully submitted,

John J. Lanter
Berj A. Terzian
Pennie & Edmonds LLP
1155 Avenue of the Americas
New York, New York 10036-2711
(212) 790-6501

Attorneys for Plaintiff, Litex Inc.

20

# EXHIBIT 17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LITEX, INC.,               )
                            )
        Plaintiff,     )
                            )
      vs.                ) Civil Action No.
                            ) CV10910 (JLT)
DELPHI AUTOMOTIVE SYSTEMS ) Hon. Joseph Tauro
CORPORATION AND DELPHI    )
AUTOMOTIVE SYSTEMS, LLC,   )
                            )
        Defendants.   )
_____)

RECEIVED
OCT 0 4 2002
HEWM

**CERTIFIED COPY**

VIDEO DEPOSITION OF CHARLES W. WINCKLER

La Jolla, California

Monday, September 23, 2002

Reported by:
BRENDA R. COUNTZ
CSR No. 12563
Job No. 37196





ESQUIRE
DEPOSITION SERVICES
A Record Of Excellence

San Francisco
www.esquiredeposition.com
Phone: (415) 288-4280

| | | |
|---|---|---|
| 15:12:21 | 1 | Q. |
| 15:12:24 | 2 | |
| 15:12:27 | 3 | |
| 15:12:30 | 4 | |
| 15:12:35 | 5 | |
| 15:12:36 | 6 | |
| 15:12:41 | 7 | |
| 14:06:37 | 8 | |
| 15:12:43 | 9 | Q.   Are you aware of anything that Delphi |
| 15:12:44 | 10 | did or didn't do that prevented Litex from |
| 15:12:47 | 11 | bringing a product to market? |
| 15:12:53 | 12 | A.   Am I personally aware? |
| 15:12:56 | 13 | Q.   Well, start with that, yeah. |
| 15:13:10 | 14 | A.   All I know is what Leon told me. |
| 15:13:13 | 15 | Q.   This is Dr. Ekchian? |
| 15:13:16 | 16 | A.   Dr. Ekchian. |
| 15:13:17 | 17 | Q.   And what has he told you on that |
| 15:13:18 | 18 | subject? |
| 15:13:19 | 19 | A.   That Delphi, in a product development or |
| 15:13:26 | 20 | some brochure, stated that they were going to be |
| 15:13:30 | 21 | first to market with a nonthermal plasma device. |
| 15:13:34 | 22 | |
| 15:13:36 | 23 | |
| 15:13:40 | 24 | |
| 15:13:52 | 25 | A. |

182

| | | |
|---|---|---|
| 15:13:55 | 1 | Q. |
| 15:13:57 | 2 | |
| 15:13:58 | 3 | A. |
| 15:13:59 | 4 | Q. |
| 15:14:01 | 5 | |
| 15:14:04 | 6 | |
| 15:14:18 | 7 | A. |
| 15:14:22 | 8 | |
| 15:14:24 | 9 | |
| 15:14:27 | 10 | |
| 15:14:38 | 11 | |
| 15:14:38 | 12 | Q. |
| 15:14:38 | 13 | |
| 15:14:42 | 14 | |
| 15:14:42 | 15 | Did Dr. Ekchian have anything else to |
| 15:14:44 | 16 | say on this subject that we have been discussing, |
| 15:14:46 | 17 | actions that Delphi took that, in his opinion, |
| 15:14:50 | 18 | impacted the ability of Litex to bring a product |
| 15:14:53 | 19 | to market? |
| 15:15:03 | 20 | A.    They may have made some comments with |
| 15:15:05 | 21 | regards to our device in the past after they |
| 15:15:10 | 22 | purchased our prototype.  I believe they made |
| 15:15:18 | 23 | comments that it didn't work. |
| 15:15:20 | 24 | Q.    Is this something Dr. Ekchian told you? |
| 15:15:23 | 25 | A.    Yes. |

183

| | |
|---|---|
| 15:16:42 | 1 |
| 15:16:45 | 2 |
| 15:16:47 | 3 |
| 15:16:50 | 4 |
| 15:16:55 | 5 |
| 15:17:04 | 6 |
| 15:17:07 | 7 |
| 15:17:11 | 8 |
| 15:17:15 | 9 |

15:17:18    10    Q.    Has Dr. Ekchian ever indicated that

15:17:22    11    anything that Delphi did or didn't do hampered

15:17:25    12    Litex in its licensing efforts?

15:17:28    13        MR. BLAYLOCK:   Objection.   To the extent

15:17:29    14    it calls for a privileged attorney-client

15:17:32    15    communications, I instruct you not to answer to

15:17:35    16    that extent.

15:17:36    17        MR. BRAINERD:   You know, we are hiding

15:17:37    18    behind a lot of privileged communications here.

15:17:40    19        But can you answer the question?

15:17:42    20        MR. BLAYLOCK:   Counsel, I'm not hiding.

15:17:44    21    I'm merely asserting valid privilege where it

15:17:49    22    exists.

15:17:51    23        THE WITNESS:   The only thing that I'm

15:17:52    24    aware of that's not privileged may have been an

15:17:54    25    e-mail from a Japan entity which I think may have

185

| | | |
|---|---|---|
| 15:17:59 | 1 | made reference to Delphi.  But I haven't seen |
| 15:18:03 | 2 | that e-mail in quite some time. |
| 14:06:37 | 3 | BY MR. BRAINERD: |
| 15:18:05 | 4 | Q.    What Japan entity do you have in mind? |
| 15:18:08 | 5 | A.    I'd have to go back and look at the |
| 15:18:10 | 6 | exact name.  I don't know if it was NGK or Denso |
| 15:18:15 | 7 | or another Japanese affiliate. |
| 15:18:19 | 8 | |
| 15:18:21 | 9 | |
| 15:18:28 | 10 | |
| 15:18:29 | 11 | |
| 15:18:31 | 12 | |
| 15:18:33 | 13 | |
| 15:18:34 | 14 | |
| 15:18:44 | 15 | |
| 15:18:46 | 16 | |
| 15:18:48 | 17 | |
| 15:18:52 | 18 | |
| 15:19:00 | 19 | |
| 15:19:02 | 20 | |
| 15:19:06 | 21 | |
| 15:19:07 | 22 | |
| 15:19:11 | 23 | |
| 15:19:13 | 24 | |
| 15:19:16 | 25 | |

186

# EXHIBIT 18

# PENNIE & EDMONDS LLP

WASHINGTON OFFICE
1667 K STREET, N.W.
WASHINGTON, DC 20006
(202) 496-4400
FACSIMILE: (202) 496-4444

WRITER'S DIRECT DIAL:
(212) 790-6505

1155 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-2711
(212) 790-9090
FACSIMILE: (212) 869-9741/8864
MCI MAIL: 561-3768

CALIFORNIA OFFICE
3300 HILLVIEW AVENUE
PALO ALTO, CALIFORNIA 94304
(650) 493-4935
FACSIMILE: (650) 493-5556

INTERNET ADDRESS:
TERZIAN@PENNIE.COM

June 18, 2001

VIA FACSIMILE
(248) 267-5559

9059-043-999

Vincent A. Cichosz, Esq.
Delphi Automotive Systems
1450 West Long Lake Road
Troy, MI 48098

Dear Vince:

Thank you for your June 15, 2001 letter concerning our telephone conversation last Friday. As it arrived after hours, I first read your letter this morning.

I was a little surprised by your reference to factors such as no commercial production, or business in the accused products or final product design by Delphi, as reasons for believing that the Litex lawsuit was premature. In my letter to you last January 9, I pointed out that a recent Federal Circuit decision, reported at 216 F.3d 1343, made it clear that engaging in exploratory testing or other internal performance of patented subject matter does not avoid infringement liability.

I did agree to defer prosecution of the lawsuit until your response, promised early this week, to my suggestion to make a factual disclosure to determine whether we would concur in your representation that Delphi's technology development in NTP exhaust treatment does not violate valid patent rights of Litex.

**PENNIE & EDMONDS** LLP

Vincent A. Cichosz, Esq.
June 18, 2001
Page 2


       I am pleased that you are willing to undertake such an effort and look forward to receiving your proposal in the early part of this week.

       Very truly yours,

       *Berj A. Terzian* /JLT

       Berj A. Terzian

c:      Charles K. Veenstra, Esq.