# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————

DELPHI CORPORATION,

             Plaintiff,

      v.                                    Civil Action No. 05-10415 (WGY)

LITEX, INC.,

             Defendant.

———————————————————————

## LITEX'S MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
## SUPPORT OF LITEX'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

John T. Gutkoski (BBO #567182)
Alexandra C. Fennell (BBO #658692)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, MA  02110
Telephone:  (617) 345-4600
Fax:  (617) 345-4745

Francis H. Morrison III (BBO # 645515)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, CT  06103-3499
Telephone:  (860) 275-0100
Fax:  (203) 275-0343

Attorneys for Defendant Litex, Inc.

June 14, 2005

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

STATEMENT OF MATERIAL FACTS.........................................................................2

I.   DELPHI EXTOLS SUCCESS WITH ITS NTP PROGRAM ............................................3

     A.   Dephi's 2001 Statements Repeatedly Allege Success Developing NTP..............3

     B.   Throughout The Patent Litigation Delphi's Documents And Witnesses
          Echoed The 2001 Statements And Confirmed Delphi Did Not Lose
          Confidence In And Decide To Cancel NTP Until 2002 ......................................4

II.  IN 2004, WHEN IT WAS ADVANTAGEOUS FOR IT TO DO SO, AND
     AFTER OBTAINING THE RELEASE FROM LITEX, DELPHI ADMITTED
     THE TRUE STATE OF ITS NTP PROGRAM IN 2001 .................................................6

III. AS A RESULT OF DELPHI'S FRAUD, LITEX REASONABLY RELIED ON
     THE FALSE 2001 STATEMENTS AND RELATED DISCOVERY IN
     ASSESSING LITEX'S RIGHTS AND SIGNING THE RELEASE................................9

ARGUMENT ...................................................................................................10

I.   REGARDLESS OF THE LANGUAGE THEY CONTAIN, SETTLEMENT
     AGREEMENTS OBTAINED THROUGH FRAUD CANNOT BE ENFORCED ........10

     A.   The Terms Within The Release Cannot Overcome Delphi's Fraud....................10

     B.   The Timing Of Delphi's Initial Fraud Is Irrelevant ............................................11

II.  LITEX'S RELIANCE WAS REASONABLE ............................................................12

     A.   It Was Reasonable For Litex To Rely On The Substantive Claims Delphi
          Made About NTP In 2001....................................................................................12

     B.   Litex Did Not Know The 2001 Statements And Discovery Were
          Fraudulent When Litex Signed The Release.......................................................14

          1.   All Of Delphi's Quoted Testimony/Argument Concerns Who
               Owned The Technology, Not Whether It Existed....................................14

          2.   Inaccurate Claims About Ownership Of Technology Are Not
               Actionable In Tort, While Delphi's Fraud About The Technology's
               Actual Existence Gives Rise To Tortious Interference ...........................15

Page

      C.    Delphi Did Not Provide "Sufficient Information" For Litex To
Know Delphi "Had Doubts About The Success Of Its NTP Project
In 2001 ................................................................................................17

III.    LITEX IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ...............................19

CONCLUSION ..........................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

Alston v. Aetna Life Ins. Co., No. C-93-20291-RMW, 1994 U.S. Dist. LEXIS 6739
(N.D. Cal. Feb. 14, 1994)................................................................................16

Arntz Cont. Co. v. St. Paul Fire & Marine Ins. Co., 47 Cal. App. 4th 464 (1996) ......................16

Bates v. Southgate, 308 Mass. 170 (1941).................................................................10

Briggs v. Carol Cars, Inc., 407 Mass. 391 (1990) ........................................................13

Chambers v. NASCO, 501 U.S. 32 (1991) ...................................................................10

Charles C. Chapman Bldg. Co. v. Cal. Mart, 2 Cal. App. 3d 846 (1969)....................................16

Cote v. Astra USA, Inc., No. 96-25D-J, 1998 Mass. Super. LEXIS 276 (Mass. Super. Ct.
Jan. 29, 1998)...........................................................................................15

In re Cytyc Corp. Sec. Litig., No. 02-12399-NMG, 2005 U.S. Dist. LEXIS 6166 (D.
Mass. Mar. 1, 2005) .....................................................................................13

Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376 (1995)..................................16

Elias Bros. Restaurants v. Acorn Enters., Inc., 831 F. Supp. 920 (D. Mass. 1993) .......................13

Fitzer v. Sec. Dynamics Techs., 119 F. Supp. 2d 12 (D. Mass. 2000) ......................................13

G.E.E.N. Corp. v. Southeast Toyota Distribs., Inc., No. 93-632-CIV-ORL-19, 1994 U.S.
Dist. LEXIS 21553 (M.D. Fla. Aug. 31, 1994) ...........................................................12

Glassman v. Computervision Corp., 90 F.3d 617 (1st Cir. 1996)............................................13

Gopen v. American Supply Co., 10 Mass. App. Ct. 342 (1980)...............................................13

Gray v. Heritage Dental Mgmt. Corp., 1 Mass. L. Rep. 345 (1993) .....................................10, 11

Kenda Corp. v. Pot O'Gold Money League, 329 F.3d 216 (1st Cir. 2003)................................14, 19

McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704 (1990) .....................................11, 13

Mergens v. Dreyfoos, 166 F.3d 1114 (11th Cir. 1999).....................................................12

Nissan Motor Co. v. Nissan Computer Corp., No. CV99-12980, 2002 U.S. Dist. LEXIS
6365 (C.D. Cal. Jan. 7, 2002) ..........................................................................16

Northeastern Univ. v. Deutsch, No. 1998-4927-A, 2002 Mass. Super. LEXIS 100 (Mass.
Super. Ct. Mar. 21, 2002)...............................................................................15

Quela v. Payco-Gen. Am. Credits, Inc., No. 99-C-1904, 2000 U.S. Dist. LEXIS 6932
(N.D. Ill. May 17, 2000)................................................................................12

Quinn v. City of Kan., 64 F. Supp. 2d 1084 (D. Kan. 1999) ..............................................11

Rickel v. Schwinn Bicycle, Co., 144 Cal. App. 3d 648 (1983)...................................................16

Starr v. Fordham, 420 Mass. 178 (1995) .................................................................................10

Trent Partners & Assocs., Inc. v. Digital Equip. Corp., 120 F. Supp. 2d 84 (D. Mass. 1999) ..................................................................................................................13

Yorke v. Taylor, 332 Mass. 368 (1955)....................................................................................19

Zimmerman v. Kent, 31 Mass. App. Ct. 72 (1991) ....................................................................19

Zyla v. Wadsworth, 360 F.3d 243 (1st Cir. 2004) .....................................................................19

## MISCELLANEOUS

Restatement (Second) of Torts § 530 cmt. a (1977)....................................................................14

## INTRODUCTION

Not once does Delphi dispute that it lied.  Nowhere in over 100 pages of motion papers does Delphi ever assert that the statements it made in press releases, its annual report and technical papers alleging success in developing non-thermal plasma ("NTP") in 2001 ("2001 Statements") were true.  Neither can Delphi deny that it continued its fraud by lying about the true state of its 2001 NTP program in depositions given and documents produced during the prior litigation with Litex.

Instead, Delphi offers three arguments in the hope of avoiding such admissions.  Each one, however, improperly ignores essential aspects of the previous record:

1)  Delphi argues that the Court should blindly enforce the Settlement Term Sheet and Release ("Release") and not consider Delphi's fraud before and during the underlying lawsuit (see Delphi Mem., §§ III.B-C);

2) Ignoring it's affirmation of the 2001 Statements and further lies about its NTP program throughout discovery in the lawsuit, Delphi argues that its fraudulent statements back in 2001 could not have induced the 2003 Release (see id., § III.D.1); and

3)  Delphi argues that Litex could not have reasonably relied on it's fraud, either because Litex knew the 2001 Statements contained other inaccuracies, despite the fact that such other inaccuracies were not actionable as fraud, (see id. § III.D.2), or because, while Delphi did not tell the truth in discovery about its 2001 NTP program, it told Litex just enough to suggest Delphi "had doubts about" its success (see id. § III D.3).

None of these arguments can justify Delphi's fraud, support the enforcement of the Release, or prohibit Litex as a matter of law from bringing its tort claims now.

To the contrary, given Delphi's inability to deny its fraudulent conduct before and during the previous lawsuit, and the lack of any genuine dispute of the material facts that Delphi

committed such fraud and Litex justifiably relied on it in entering the Release, it is Litex that is

entitled to partial summary judgment.  The Court, therefore, should grant Litex's cross-motion

and order under the first of Litex's counterclaims that the Release was procured by fraud and

does not bar Litex's tort claims as a matter of law.

## STATEMENT OF MATERIAL FACTS

In May, 2001, Litex sued Delphi for infringement of its NTP patents.  Litex v. Delphi,

Civil Action No. 01-CV-10910 (WGY (originally JLT)).  During discovery, Delphi produced

several of its 2001 Statements in which Delphi repeatedly told the world it was successfully

developing an NTP system effective in reducing harmful automobile emissions.  Despite these

claims, Delphi never released a commercial NTP product and cancelled its NTP program in

2002.  Delphi's documents and deposition testimony, however, repeatedly and consistently stated

that Delphi in fact had experienced significant success with NTP during 2001, had identified

how it would resolve any remaining obstacles, and had only run aground in March, 2002 when

test results revealed the system would not work.  These documents and testimony reasonably led

Litex to believe Delphi had not lied in its 2001 Statements about developing NTP, because each

one was dated prior to March, 2002.

Delphi waited until after Litex signed the Release now at issue.  Then Delphi revealed

that its 2001 Statements of success had been lies.  In truth, the leaders of the Delphi NTP

program had determined as early as May, 2001 that the program would never succeed, planned

to cancel it, cut its budget, and reported their decisions to Delphi's senior management.  Delphi

only made these admissions to minimize its patent damages at arbitration, however, and only

after it believed that the Release insulated it from further action by Litex.

## I.   DELPHI EXTOLS SUCCESS WITH ITS NTP PROGRAM.

### A.   Dephi's 2001 Statements Repeatedly Allege Success Developing NTP.

Delphi had begun developing NTP as early as 1994.  On July 20, 2001, Delphi issued a

press release claiming its efforts were meeting success:

> We are excited, however, to discuss our technology.  Delphi is developing non-thermal plasma catalysis components and systems relying upon its significant technical capabilities and sound, demonstrable and credible scientific principles.

(Ekchian Decl., Ex. 1.)  On July 30, 2001, Delphi issued another press release touting its NTP

System with "significant reduction in emissions."  (Ekchian Decl., Ex. 2.)

Later in September, 2001, Delphi's CEO and President, J.T. Battenberg III, made a

presentation to an international gathering of the automotive industry.  Battenberg focused on

Delphi's highlight technologies, including its alleged development of NTP.  He said:

> Let me also mention that Delphi is the only supplier with full diesel injection and exhaust aftertreatment capability including our award-winning non-thermal plasma aftertreatment technology that helps remove nitrogen oxide to improve emissions for diesel and lean burn.

(Id., Ex. 3 p. 10.)  On October 16, 2001, Delphi issued yet another press release regarding NTP:

> Delphi has developed an innovative aftertreatment solution, non-thermal plasma technology (NTP) that works in conjunction with a catalytic converter and a particulate filter.

(Id., Ex. 4.)

Delphi continued making these assertions about NTP in its 2001 Annual Report:

> Responding to global demands for improved fuel efficiency and reduced exhaust emissions, Delphi offers advanced powertrain control systems such as cylinder deactivation, gasoline direct injection and non-thermal plasma (NTP) exhaust aftertreatment.
>                                  ***
> Late in 2001, Delphi and PSA Peugeot Citroen debuted a Peugeot 206 Environmental Technologies Vehicle, featuring NTP exhaust aftertreatment which significantly reduces oxides of nitrogen emissions, enabling more rapid use of advanced fuel-efficient technologies.

(Id., Ex. 5 (Emphasis added).)

**B.**    **Throughout The Patent Litigation Delphi's Documents And Witnesses Echoed The 2001 Statements And Confirmed Delphi Did Not Lose Confidence In And Decide To Cancel NTP Until 2002**.

Despite the NTP success claimed in the 2001 Statements detailed above, Delphi never commercialized an NTP exhaust treatment product, and then cancelled its NTP program in 2002. Throughout discovery in the underlying patent litigation, Litex sought to understand this surprising inconsistency. In response to Litex's inquiries, Delphi provided documents and testimony explaining that its NTP program actually had enjoyed the success Delphi had claimed in the 2001 Statements and had not run aground until March, 2002.

Litex specifically asked Delphi's Executive Vice-President Donald Runkle about Delphi's press releases and public statements. Runkle testified he was unaware of Delphi ever issuing an inaccurate press release, and that Delphi prided itself on the accuracy of releases such as the 2001 Statements. (Ekchian Decl., Ex. 6, Runkle Dep. p. 51, ln. 9 – p. 52, ln. 7.) When Litex asked CEO Battenberg specifically about the NTP claims in the Annual Report quoted above, Battenberg expressly confirmed that they were accurate. (Id., Ex. 7, p. 117, lns. 12-18; p. 118, lns. 18-23.)

Delphi's project documents dated in 2001 and testimony relating to 2001 depict Delphi as confident about NTP before March, 2002. For example, Delphi's August 17, 2001 status report, the NTP Interim Design Review ("IDR"), expressly stated that Delphi's NTP would reach one set of goals (the so-called Euro IV standards echoed in Delphi's "PSA" requirements) by the end the year in December. (Ekchian Decl., Ex. 8.) The IDR went further and stated that the project would meet the higher goals (the so-called Euro V, or Delphi's "ADP" requirements) of 90% NOx efficiency within another ten tests. (Id.) The IDR stated these ten tests would be complete and NTP would reach the higher 90% efficiencies in June, 2002. (Id.)

-4-

Delphi was so confident in 2001 about the NTP Program's ability to meet these deadlines that on October 30, 2001, Delphi represented to potential customer Toyota Motor Corporation that it would have NTP samples available in 2002 and was targeting overall production of NTP for 2005.  (Id., Ex. 9.)  On December 3, 2001, Delphi's NTP team made similar representations to General Motors Power Train.  (Ekchian Decl., Ex. 10, pp. 1-4 and 15 (remaining "challenges understood" with planned "resolution by March 2002").)

Delphi's documents showed and Delphi witnesses explained that everything changed in March, 2002, and not before.  The head of the NTP program Joseph Bonadies, in an April 11, 2002 internal Delphi email, placed the timing of Delphi's change of course in March, 2002:

> With the completion of the PSA milestone in March we have determined that the catalyst efficiencies are not high enough to continue to fund the catalyst development internally.

(Ekchian Decl., Ex. 11.)

In a February 21, 2002 letter, Delphi Chief Technologist Jean Botti, stated:

> Delphi Automotive Systems is very excited about [NTP] and the technology that was developed for it over the last few years.  In fact, Delphi has labeled this as one of our "Crown Jewel" technologies and we have put significant effort into developing this system to a commercial-ready product . . . .We continue to invest our R&D resources in this technology, because it has shown such promise in reducing NOx and particulate emissions in light and heavy-duty diesel engines.

(Id., Ex. 12.)  Delphi's 30(b)(6) witness Joachim Kupe confirmed throughout his deposition that it was not until March, 2002 that Delphi realized it did not have a viable technology:

> Q:    Okay.  Can you explain what this letter means in the first paragraph where it says:  In fact, Delphi has labeled this one of our crown jewel technologies?
>
> A:    I think it's we have been working hard on this technology and we were very hopeful that this will and could make a difference.  So it was a – considered as a crown jewel technology, meaning a technology that you could go and get it related to Delphi, but – and this is February, so we hit the hard reality in March and that's gone.

-5-

(Id., Ex. 23, Joachim Kupe Dep. p. 360, ln. 17 - p. 361, ln. 2.)

> Q:    (BY MR. KORNICZKY)  But in that first line it says: We have been able to develop these various components necessary to move this system to a commercial-ready product.
>
> So doesn't that mean that Delphi and PNNL have the capability today to move it to a commercial-ready product if it wanted to? . . .
>
> A:    This is written February 21st.  We're developing and we're hoping that we have a catalyst that works.  It proved not to be the case in March and that's it.  No Crown Jewel, no technology proven, no product.

(Id., 364, ln. 3 - p. 365 ln. 15.)  Each of these statements about the state of its NTP Program through 2001 and early 2002 led Litex reasonably to believe Delphi had only the greatest confidence in and highest expectations for its technology up until March, 2002.

## II.    IN 2004, WHEN IT WAS ADVANTAGEOUS FOR IT TO DO SO, AND AFTER OBTAINING THE RELEASE FROM LITEX, DELPHI ADMITTED THE TRUE STATE OF ITS NTP PROGRAM IN 2001.

The 2001 Statements were false.  Delphi's internal 2001 documents and testimony provided to Litex in discovery also were false.  The truth was that in early to mid-2001, Delphi had concluded that its NTP program was in serious jeopardy, essentially giving up on it.  It was not until Delphi personnel were under oath at arbitration in April, 2004, however, that Delphi finally admitted the true facts about NTP in 2001.  During arbitration testimony, Delphi's Chief Technologist Jean Botti and the Delphi NTP project manager Joseph Bonadies both testified that beginning in May, 2001 they realized Delphi would never be able to make NTP work or develop a successful real-world application attractive to customers.  In fact, Botti testified by July, 2001 he was prepared to terminate the NTP project as a failure:

> Q    Let me ask you this:  In July, if you can focus on July of 2001, what was your level of confidence at that point in time that the nonthermal plasma exhaust aftertreatment project would ever get out of ADP?
>
> A    Very minimal at that time.
>
> Q    And why was it very minimal at that time?

A    Because we're going through a phase of the disappoint with technology . . . . It was totally unacceptable even in diesel, you know, engine environment.

(Ekchian Decl., Ex. 14, Arb. Hrng., p. 835, ln. 21 – p. 836, 1n. 17.)

Q    So my question is – and I know your answer was that the NTP exhaust aftertreatment system worked on diesel. But my question is a little different. It's didn't – as of July 2001 –

A    And I want to make sure.

Q    Right

A    It never worked on diesel.

Q    Okay.

A    We could never make it work.

Q    Okay. Well, as of – that was designed to go with a diesel. Is this a better way to say it?

A    It was designed to be on diesel and lean burn engines but –

Q    And isn't it –

A    -- it didn't work.

Q    -- the case that in July – and that as of July 2001 the company had expectations that the NTP exhaust aftertreatment system would have a synergistic effect for its business and help it to compete in the diesel business?

A    If I were to represent the company, I would say no.

Q    Okay.

A    I had no expectation right in July that this would ever work. The results I got through the PSA development were just not there.

(Ekchian Decl., Ex. 14, Arb. Hrng., p. 890, ln. 3 – p. 891, ln. 6.)

Joseph Bonadies, the program manager for Delphi's NTP program similarly testified:

Q    What – what was your feeling about the likelihood of success of the Delphi NTP project after seeing the results as of May 5, 2001, of these impact tests?

A    I was very skeptical that we would come up with a system that could achieve these really high NOx efficiencies.

(Ekchian Decl., Ex. 14, Arb. Hrng., p. 956, lns. 5-11; see also p. 966, lns. 4-7.)

-7-

These admissions about the true state of Delphi's NTP program in 2001 are directly

contrary to the contents of its 2001 Statements and the program documents it created in 2001,

produced to Litex in discovery, and testified about during deposition.  (See, supra, § I.)

Furthermore, Mr. Botti also admitted at arbitration having reported his team's negative

conclusions about NTP to Delphi management in 2001:

> Q     Right.  But as of 2000 – July 2001, did the company know it wouldn't
> work, or was that your personal opinion?
>
> A     No.  I think – I mean, you know, like every big company there is inertia.
> But I already had given my opinion to my upper management that this
> thing was not going the way I wanted it.

(Ekchian Decl., Ex. 14, Arb. Hrng., p. 893, lns. 15-21.)

> Q     And was there still speculation to that effect in July 2001 among some
> people in the company?
>
> A     Not anymore.  From my level to, uh, it was pretty clear already, you know.
> I told my management I was going to stop the project.
>
> Q     Uh, did the management ever give – you had told them that as of July
> 2001?
>
> A     Well, I started to, uh, update the management after we had that PSA
> review that will show that the results were disastrous.  And, uh, you know,
> I – I had to step up and tell my management that, because I was a
> customer interface, and there was a shared, I would say, development that
> I needed to update the management and say, We're not going anywhere
> with this.
>
> Q     And do you recall about when that occurred?
>
> A     Uh, PSA review, quite honestly, I – I – I don't recall, but it was – I'm sure
> it was before July 2001.  It must have been in the spring of 2001 when we
> started to get those terrible results.

(Ekchian Decl., Ex. 14, Arb. Hrng., p. 896, ln. 4 – p. 897, ln. 2.)  Indeed, Delphi now concedes

that its upper management was well aware of the true negative state of the NTP program in 2001.

(Delphi Mem., at 18.)  Delphi, nonetheless, made the positive 2001 Statements to the public,

generated the false program documents telling Toyota, GM and other customers NTP would

meet the Euro IV efficiencies by the end of 2001 and even the higher 90% NOx efficiencies in June, 2002.  (See, supra, § I.)

## III.    AS A RESULT OF DELPHI'S FRAUD, LITEX REASONABLY RELIED ON THE FALSE 2001 STATEMENTS AND RELATED DISCOVERY IN ASSESSING LITEX'S RIGHTS AND SIGNING THE RELEASE.

Until hearing this testimony at arbitration, however, Litex had no knowledge that Delphi's 2001 Statements, documents and related testimony detailed above were false.  As a result, Litex reasonably relied to its detriment on them as material statements about Delphi's NTP program in deciding to enter into the Release with Delphi.  (See Answer, ¶ 49.) Furthermore, in November 2003 when Delphi and Litex signed the Release, Delphi knew that they were false, knew Litex was unaware they were false, and also knew or should have known Litex was relying to its detriment on them.  (Id., ¶ 51-2.)

Because Litex was unaware the 2001 Statements, documents and related testimony were false, Litex could not have appreciated when signing the Release the tortious interference and unfair business practice claims it has against Delphi.  Litex was led to believe that its only remedies lay in an award of damages for patent infringement.  Therefore, Litex granted the Release to Delphi in exchange for Delphi's admission of infringement, and proceeded to an arbitration on the sole question of calculating a reasonable royalty.  (Ekchian Decl., Ex. 15.)[1]

---

[1] In that arbitration, Litex premised its damages arguments on the belief that in 2001 Delphi was successfully developing NTP, and, therefore, would have willingly taken an exclusive license to Litex's patents in an arm's-length "hypothetical negotiation" in July, 2001.  (See Ekchian Decl., Ex. 16.)  Instead, Delphi ambushed Litex before the arbitrator with the truth, revealing that in 2001 Delphi had given up on NTP, despite its public and internal statements to the contrary, and, therefore, would not have taken an exclusive license at all.  (See, supra, Stat. Mat. Facts, § II.)  Confronted with this truth, and limited to the question of patent infringement damages, the arbitrator could award Litex only minimal damages for Delphi's short-lived, infringing testing activities.  (Id., Ex. 16, Award.)

Finally knowing the truth, Litex, now seeks relief from the fraudulent Release so it may pursue Delphi's actual wrongs -- not infringing Litex's patent by developing NTP, but rather misleading the world into believing that Delphi was developing NTP at all.

## ARGUMENT

### I.    REGARDLESS OF THE LANGUAGE THEY CONTAIN, SETTLEMENT AGREEMENTS OBTAINED THROUGH FRAUD CANNOT BE ENFORCED.

Fraudulently obtained settlement agreements are not proper contracts, and should be vacated.  Bates v. Southgate, 308 Mass. 170, 182 (1941); Gray v. Heritage Dental Mgmt. Corp., 1 Mass. L. Rep. 345 (1993); see also Chambers v. NASCO, 501 U.S. 32, 44 (1991)(federal courts have the power to vacate any judgments influenced by fraud).  Delphi concedes that a court may decline to enforce settlement agreements in "extraordinary circumstances."  (Delphi Mem., at 8.)  Fraud constitutes such extraordinary circumstances.  Bates, 308 Mass. at 182 ("the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it.").  Delphi's attempts to immunize its Release from its fraud are unavailing and should be denied.

### A.    The Terms Within The Release Cannot Overcome Delphi's Fraud.

Delphi's Release should not be enforced, despite Delphi's fraud, simply because the Release expressly covers "all unknown and unanticipated claims."  (See Delphi. Mem., at 9.) The terms of the Release are irrelevant; fraud undercuts an entire agreement, regardless of the terms the agreement itself uses.  Bates, 308 Mass. at 182 (fraudulently induced contracts are void even if they contain express disclaimers of any liability); Starr v. Fordham, 420 Mass. 178, 188 (1995)("An integration clause in a contract does not insulate automatically a party from liability where he induced another person to enter into a contract by misrepresentation.").  The terms of

-10-

the Release define its scope, if and only if the Release itself is enforceable. This Release, due to Delphi's fraud, is not.

**B.    The Timing Of Delphi's Initial Fraud Is Irrelevant.**

Delphi also claims the 2001 Statements cannot have fraudulently induced Litex into entering the Release because they pre-date the execution of the Release and cannot be causally connected to it. (Delphi Mem., at 11-12.) However, the timing of a fraudulent statement in relation to the consummation of a settlement agreement is irrelevant to whether the deceived party can reasonably rely on it. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 712 (1990). The question is whether the misrepresentations are "still operative" or material to the agreement. Id. (citing Broomfield v. Kosow, 349 Mass. 749 (1965)).

Delphi's fraudulent 2001 Statements were "still operative", i.e., material to the state of its 2001 NTP Program, at the time Litex signed the Release. More importantly, Delphi's argument, indeed its entire motion, wrongly presumes that Delphi's lies ended in 2001 with the 2001 Statements themselves. (See Delphi Mem., at 1-2, 11-12). As detailed above, in entering the Release, Litex reasonably relied to its detriment not only on Delphi's press releases and public statements from 2001, but also on the NTP documents Delphi authored and produced in discovery, and Delphi's deposition testimony about the NTP program in 2001.

In deciding to settle, parties properly rely on facts learned in litigation, and settlement agreements rooted in one party's reliance on fraudulent discovery and testimony should not be enforced. Quinn v. City of Kan., 64 F. Supp. 2d 1084 (D. Kan. 1999)(vacating settlement based upon fraudulent testimony); Gray, 1 Mass. L. Rep. at 345 (court could not "countenance the plaintiff's obtaining of a favorable monetary settlement in the face of such substantial evidence of his intentionally false statements under oath at his deposition."). "Our entire civil justice system is dependent on accurate and truthful discovery. Every day, litigants make settlement

-11-

decisions on the basis of information obtained during the discovery process." Quela v. Payco-Gen. Am. Credits, Inc., No. 99-C-1904, 2000 U.S. Dist. LEXIS 6932, at * 20-21 (N.D. Ill. May 17, 2000). Delphi cannot be allowed to blatantly misrepresent facts under oath to further its position, and the Release should be voided. See id.[2]

## II.    LITEX'S RELIANCE WAS REASONABLE.

### A.    It Was Reasonable For Litex To Rely On The Substantive Claims Delphi Made About NTP In 2001.

Throughout 2001 Delphi made public statements claiming Delphi -- was "developing non-thermal plasma catalysis and systems"; was the "only supplier with full diesel injection and exhaust aftertreatment capability including our award winning non-thermal plasma"; "has developed an innovative aftertreatment solution, non-thermal plasma"; and offered NTP "which significantly reduces oxides of nitrogen emissions." (See, supra, Statement of Mat. Facts, § I.A.) Delphi represented to its customers not only that its NTP system was then meeting Delphi's goals, but would also meet the Euro IV/PSA standards by December, 2001 and the Euro V/ADP 90% goals by June, 2002. (Id., at § I.B.) At deposition, Delphi's witnesses confirmed these statements about the state of the NTP program were true in 2001. (Id., at § II.)

These representations about the status of specific systems, quantifying their results, and informing customers when samples would be available are not merely statements of "general

---

[2] Delphi also claims Litex should not have trusted Delphi, because the two parties were engaged in adversarial litigation, thus their relationship was "plagued with distrust." Taken to its logical conclusion, this argument would prohibit all settlements in our adversarial system of justice. Indeed, both authorities cited by Delphi involved very specific facts not present here. See Mergens v. Dreyfoos, 166 F.3d 1114, 1118 (11th Cir. 1999) (reliance unreasonable only because the report at issue was commissioned by the defendant "to induce [the plaintiff] to sell"); G.E.E.N. Corp. v. Southeast Toyota Distribs., Inc., No. 93-632-CIV-ORL-19, 1994 U.S. Dist. LEXIS 21553, at *11 (M.D. Fla. Aug. 31, 1994) (fraudulent misrepresentation was a threat made to the plaintiff during events that resulted in litigation). Here, Delphi made misrepresentations to third parties (customers and the public) completely uninvolved in the relationship allegedly "plagued with distrust."

business goals," "trade talk," or "puffery." (<u>See</u> Delphi Mem. at 10-11.)  Specific, definite or concrete statements are likely to be material.  <u>In re Cytyc Corp. Sec. Litig.</u>, No. 02-12399-NMG, 2005 U.S. Dist. LEXIS 6166, at *72-73 (D. Mass. Mar. 1, 2005).  Even optimistic statements such as Delphi's, which describe specific products meeting specific numerical goals, become material and move "beyond the realm of 'mere optimistic corporate puffery'."  <u>Id.</u> at *74; <u>see, e.g.</u>, <u>Fitzer v. Sec. Dynamics Techs.</u>, 119 F. Supp. 2d 12, 26 (D. Mass. 2000)(finding "continued market demand" vague in part because it did not specify a market share figure).  Furthermore, companies who promote technical products and development efforts have a duty to do so accurately and not contradict their own internal information.  <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 635-36 (1st Cir. 1996)(noting duty to disclose developmental problems where company makes concrete product statements in stark contrast to its internal reports).[3]

Even if this Court views Delphi's fraudulent statements as statements of opinion, those statements are still actionable where, as here, the speaker possesses superior knowledge concerning the subject matter to which the misrepresentations related.  <u>See</u> <u>Gopen v. American Supply Co.</u>, 10 Mass. App. Ct. 342, 345 (1980); <u>Briggs v. Carol Cars, Inc.</u>, 407 Mass. 391, 396 (1990).  As the only entity with actual knowledge about the true state of its NTP Program in 2001, Delphi's opinions were viewed by its customers, the public, and Litex as material.[4]

---

[3] Delphi's specific program statements, therefore, significantly differ from those at issue in the authorities Delphi now cites.  (<u>See</u> Delphi Mem., at 10-11 (citing <u>Trent Partners & Assocs., Inc. v. Digital Equip. Corp.</u>, 120 F. Supp. 2d 84, 109 (D. Mass. 1999)(oral statements of intent to commit to a set contract term characterized as statements of "general business goals for the future" non-actionable as fraud); <u>Elias Bros. Restaurants v. Acorn Enters., Inc.</u>, 831 F. Supp. 920, 926-27 (D. Mass. 1993)(broad statements concerning the future growth of a franchise and the defendant's ability to offer competitive prices nonactionable)).)

[4] Delphi's statements are also material to the extent the Court interprets them as expressing Delphi's then present intention in 2001 to continue developing NTP.  "[S]tatements of present intention as to future conduct may be the basis for a fraud action if . . . the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage."  <u>McEvoy Travel Bureau,</u>

**B.** **Litex Did Not Know The 2001 Statements And Discovery Were**
**Fraudulent When Litex Signed The Release.**

Delphi next attacks the reasonableness of Litex's reliance on the 2001 Statements (and,

presumably, documents and testimony) by claiming Litex knew they contained inaccuracies and

complained about them in the underlying patent litigation.  Delphi blurs the facts here.  Litex did

believe, and noted in the patent litigation, that the 2001 Statements inaccurately represented who

had developed NTP technology, claiming the relevant aspects of NTP to be Delphi's rather than

crediting Litex as the true NTP inventor and owner of the technology.  In contrast, Litex had no

knowledge that, separate and apart from who had invented and owned the NTP technology,

Delphi was misrepresenting that it was successfully using the technology.  This difference,

which Delphi ignores, is both factually and legally significant.

1.    All Of Delphi's Quoted Testimony/Argument Concerns Who
Owned The Technology, Not Whether It Existed.

Each of the excerpts Delphi quotes from Litex's depositions, briefs and expert report

show Litex was aware, and concerned, that Delphi's 2001 statements inaccurately claimed as

Delphi's the NTP technology Litex had developed.  (See Delphi Mem., at 12-17.)  Litex

expressed concern that the Delphi 2001 statements had interfered with Litex's licensing efforts

by claiming Litex's technology as its own.  (See, e.g., id., at 15 (quoting Litex's expert's report

"Because of Delphi's infringement . . .and its aggressive publicity telling the world (including

Litex's potential investors, partners and customers) that it (Delphi) developed NTP . . . .").)  In

---

Inc. v. Norton Co., 408 Mass. 704, 709-710 (1990).  The state of a man's mind, or, here, the state of
Delphi's corporate mind with regard to its plans for the NTP Program, "is as much a fact as the state of
his digestion." Restatement (Second) of Torts § 530 cmt. a (1977).  In Kenda Corp., Inc. v. Pot O'Gold
Money Leagues, Inc., the First Circuit found defendant's statement that he planned to invest his own
money into Pot O'Gold "more than just a vague promise" and that plaintiff "could have believed that it
accurately expressed his intent" at the time he convinced defendant to sign the contract.  329 F.3d 216,
226-27 (1st Cir. 2003).  Litex, much like the plaintiff in Kenda, believed Delphi's various reports and
public statements accurately represented Delphi's intended plans for its NTP program in 2001.

his deposition, Litex's Dr. Leon Ekchian explained that Litex's concern at that time regarded the

ownership of the technology:

> Q    . . . but my question really is focused on why do you believe that whatever Delphi's activities are that they have adversely impacted Litex's ability to license in the diesel or lean burn area?
>
> A    It's Delphi's infringement, Delphi's very active press release activities which have stated that Delphi developed NTP.  I believe those are the words, suggesting that Delphi invented NTP.  Delphi's total disregard for Litex's existence in all the papers it has filed and that have issued. Delphi's statement that they will be the first to market with revolutionary new technology, suggesting that they again are the first to develop the technology.

(Ekchian Decl., Ex. 17, Dep. of L. Ekchian, p. 300, ln. 13 – p. 301, ln. 12.)

Litex had no knowledge until after the Release that Delphi's 2001 Statements also

misrepresented the progress Delphi was making with NTP, and Delphi has not shown otherwise.

Litex's lack of knowledge about the actual misrepresentations now at issue distinguishes it from

Delphi's cited authorities where the plaintiffs actually knew the very facts about which they later

claimed to have been misled.  See Northeastern Univ. v. Deutsch, No. 1998-4927-A, 2002 Mass.

Super. LEXIS 100 (Mass. Super. Ct. Mar. 21, 2002)(Deutsch could not have reasonably relied on

Northeastern's statement alleging no pending third-party claims given he admitted at deposition

knowing about just such a claim); Cote v. Astra USA, Inc., No. 96-25D-J, 1998 Mass. Super.

LEXIS 276, at *13 (Mass. Super. Ct. Jan. 29, 1998)(plaintiff's reliance on statement that her case

was an isolated incident was unreasonable because she knew several other employees had

complained of harassment).  Litex, in stark contrast, had *no knowledge* that Delphi had, as early

as May, 2001, essentially given up on its NTP project.

> 2.    Inaccurate Claims About Ownership Of Technology Are Not Actionable In Tort, While Delphi's Fraud About The Technology's Actual Existence Gives Rise To Tortious Interference.

Litex could not have brought claims for intentional or negligent interference against

Delphi based upon Delphi's making inaccurate but good faith claims about who owned the NTP technology. Both causes of action require Delphi to have intentionally or forseeably acted to disrupt Litex's relationships. See Alston v. Aetna Life Ins. Co., No. C-93-20291-RMW, 1994 U.S. Dist. LEXIS 6739, at *22 (N.D. Cal. Feb. 14, 1994). Moreover, both require Delphi to have engaged in conduct that was wrongful by some legal measure other than the fact of interference itself. Arntz Cont. Co. v. St. Paul Fire & Marine Ins. Co., 47 Cal. App. 4th 464, 476 (1996)(citing Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 381-93 (1995)). While Delphi eventually admitted infringement in the middle of trial, during the litigation it claimed, and apparently possessed, a good faith basis to believe it did not infringe valid patents by Litex. (See, e.g., Ekchian Decl., Ex. 18, Excerpts of Delphi's Rebuttal Expert Witness Report from John J. Coogan.) Therefore, Delphi's inaccurate but good faith representations in the 2001 Statements that it owned the NTP technology (and corresponding silence on the question of infringement) did not rise to the level of legal wrongfulness required to support a claim for tortious interference. See Rickel v. Schwinn Bicycle, Co., 144 Cal. App. 3d 648 (1983)(affirming summary judgment where plaintiff failed to show legally wrongful conduct); Charles C. Chapman Bldg. Co. v. Cal. Mart, 2 Cal. App. 3d 846 (1969)(rejecting claim where defendant made no false statements and did not engage in otherwise wrongful behavior); see also Nissan Motor Co. v. Nissan Computer Corp., No. CV99-12980, 2002 U.S. Dist. LEXIS 6365 (C.D. Cal. Jan. 7, 2002)(statements of honest, although perhaps incorrect, belief or innocently made inaccurate statements of fact are not fraudulent). In contrast, Delphi could have had no good faith basis for blatantly lying about the state of its NTP program and technology in the 2001 Statements. Therefore, such fraudulent misrepresentations, only now known to Litex, constitute the independent legal wrong required for tortious interference.

-16-

**C.     Delphi Did Not Provide "Sufficient Information" For Litex To Know
Delphi "Had Doubts About The Success Of Its NTP Project In 2001."**

Unable to claim it revealed to Litex during discovery the fraud in its 2001 Statements,

documents and testimony, Delphi now points to seven "facts" and asks the Court to "infer" from

them that Litex knew the true state of Delphi's NTP program in 2001.  (Delphi Mem., at 18-19.)

As an initial matter, asking the Court to "infer" that Delphi revealed to Litex the truth of Delphi's

NTP program in 2001 is tantamount to admitting Delphi did not reveal such truth.  More

importantly, <u>none</u> of the seven "facts" cited by Delphi provided Litex any notice about the truth

– that contrary to its 2001 Statements, related documents and testimony, Delphi had decided its

NTP program was a failure back in 2001, well before March, 2002.

The first two cited facts expressly discuss events in April and September, 2002, and

therefore tell Litex nothing about the state of the NTP program in 2001.  (<u>See</u> Delphi Mem. at

18.)  The third fact notes only that Delphi's 2001 tests showed a 15% NOx efficiency, and its

sixth fact notes that Delphi's Executive Vice-President, Mr. Runkle, knew of these results.  (<u>Id.</u>)

Neither, however, says anything about Delphi's own internal project documents detailing

Delphi's plan meet the required 90% level by mid-2002.  (<u>Compare</u> <u>id.</u> <u>with</u> Ekchian Decl., Ex.

8.)[5]  Thus, Delphi's third and sixth facts provided no notice to Litex about the true state of

Delphi's NTP program in 2001.

The fourth fact notes Delphi cut its number of engineers working in NTP citing to

deposition testimony by Delphi's Joachim Kupe.  (Delphi Mem. at 18.)  Mr. Kupe's noted

testimony concerns the number of engineers at the time he signed a declaration, August 19, 2002,

(Ekchian Decl., Ex. 13), well after Delphi encountered the problems in March, 2002 and

---

[5]  Furthermore, the Euro IV 20% emission standard did not take effect until 2005, and Euro V
90% standard is slated for 2009, so Delphi's achieving 15% in 2001 told Litex nothing about what Delphi
would achieve by the requisite times.  (<u>See</u> Ekchian Decl., Ex 19., Kupe Decl. ¶ 9.)

cancelled part of the NTP program in April, and, therefore, tells Litex nothing about the true state of the NTP program in 2001.  (<u>See</u> Cosnowski Decl., Ex. 9; Kupe Dep. pp. 277-278.)

The fifth cited fact claims Delphi admitted during discovery that in 2002 it had cut the NTP research budget in half compared to 1998 levels.  (Delphi Mem., at 18.)  First, the alleged admission again concerns 2002 and says nothing about the program in 2001.  (<u>See</u> <u>id.</u>)  Second, the cited deposition of Delphi Chief Technologist Botti actually says nothing about the actual amount of funds for NTP even in 2002, it only discusses the percentage of Delphi's overall R&D budget allocated to NTP.  (<u>See</u> Cosnowski Decl., Ex. 10; Botti Dep. p. 43, lns. 3-9.)  Third, Delphi's actual budget for NTP exemplifies the contradictions between Delphi's revelations at arbitration and the prior deposition testimony of its witnesses.  At arbitration, Mr. Botti revealed that in July, 2001, he had cut the 2002 NTP budget in half.  (Ekchian Decl., Ex. 14, Arb. Hrng., p. 840, ln. 17 - p. 841, ln. 10.)  During discovery, Kupe told Litex the opposite, that Delphi's actual NTP budget in 1999 "was around $1.5 million," in 2000 "was around $1.5 million," in 2001 "was around $1,400,000, plus around 300-350[,000]" and in 2002 "for NTP around $1,700,000."  (Ekchian Decl., Ex. 13, Kupe Dep., p. 107, ln. 6 – p. 111, ln. 24.)

The seventh "fact" cited by Delphi cites the same portions of the report by Delphi's damages expert Dr. Hoffman that Delphi details over the remaining pages of its brief.  (<u>See</u> Delphi Mem., at 18-20.)  These paragraphs in Dr. Hoffman's report simply summarize the information Dr. Hoffman believed Delphi would consider in an hypothetical negotiation with Litex.  (<u>See</u> Cosnowski Decl., Ex. 8.)  The report paragraphs cite no factual support for these "facts."  (<u>Id.</u>)  More importantly, none of the paragraphs address, let alone clarify, the state of Delphi's NTP program before March, 2002, as opposed to after.  (<u>See</u> <u>id.</u>)[6]

---

[6]  Indeed, Delphi and Dr. Hoffman repeatedly argued during arbitration that in considering a

Thus, none of the "facts" cited by Delphi put Litex on notice of the true state of Delphi's NTP program in 2001, or contradicts in any way that "Delphi failed to disclose [to Litex] its concerns over the success of the NTP project as of the Summer of 2001." (See Delphi Mem., at ¶ 20.) Lacking such notice, Litex reasonably relied on what it did know, the 2001 Statements, and related Delphi documents and testimony, in entering the Release to its detriment.[7]

## III.    LITEX IS ENTITLED TO PARTIAL SUMMARY JUDGMENT.

To demonstrate fraud in the inducement of the release Litex must and has shown (1) Delphi made knowingly false statements; (2) Delphi made those statements with the intent to deceive Litex; (3) those statements were material to Litex's decision to execute the release; (4) Litex reasonably relied on those statements; and (5) those statements injured Litex. Zyla v. Wadsworth, 360 F.3d 243, 254 (1st Cir. 2004), citing Kenda Corp., 329 F.3d at 225 (applying Massachusetts law). As demonstrated above, there is no genuine dispute of material fact as to any of these elements:

Throughout 2001, Delphi issued press releases and other detailed public statements repeatedly telling the world of its alleged ongoing success in developing an NTP system and its future plans for NTP. Delphi produced several of these statements during discovery together with additional documents and testimony that reaffirmed this fraudulent view of Delphi's NTP program in 2001. Litex reasonably relied on Delphi's 2001 Statements and the consistent and

hypothetical negotiation conducted in July, 2001 the arbitrator should take all facts that transpired afterwards (the so-called "Book of Wisdom") into account. Therefore, Delphi had Dr. Hoffman opine based upon the eventual cancellation of the NTP program, and not delineate the circumstances before and after any point in time, including March, 2002. (See Cosnowski Decl., Ex. 8.)

    [7] Nor did Litex have an obligation to discover Delphi's misrepresentation by pressing further on any of these points. "Certainly where a defendant has wilfully made false representations with intent to deceive he ought not to be relieved of liability because of his victim's lack of diligence" so long as the relied-upon statement is not "preposterous or palpably false." Yorke v. Taylor, 332 Mass. 368, 374 (1955); see also Zimmerman v. Kent, 31 Mass. App. Ct. 72, 81 (1991)(upholding finding of reasonable reliance even where falsity of statement would have been uncovered by obtaining independent estimate).

related discovery documents and testimony in assessing the material issues about Delphi's conduct and its NTP program in deciding to execute the Release.  To the extent the Release is enforced against Litex now, those fraudulent statements which induced Litex into the Release will injure Litex.  Accordingly, the court should grant Litex's Motion for Partial Summary Judgment on Litex's first counterclaim that the Release was procured by fraud and declare that the Release does not bar Litex's remaining counterclaims.

## <u>CONCLUSION</u>

For all the reasons stated above, defendant Litex, Inc. respectfully requests that this Court deny Delphi's motion, grant Litex's motion, and declare that the terms of the parties' Release do not bar Litex's remaining counterclaims due to Delphi's fraud.

Respectfully submitted,

LITEX, INC.,

By its attorneys,


_____/s/ John T. Gutkoski_____
John T. Gutkoski (BBO #567182)
Alexandra C. Fennell (BBO #658692)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, MA   02110
Telephone:  (617) 345-4600
Fax:  (617) 345-4745

Francis H. Morrison III (BBO # 645515)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, CT   06103-3499
Telephone:  (860) 275-0100
Fax:  (203) 275-0343

June 14, 2005

### CERTIFICATE OF SERVICE

I, John T. Gutkoski, do hereby certify that I filed a true copy of the within document with the Court by electronic filing.  I further certify that I served a true copy of the within document by causing a copy to be sent by the Court's electronic filing system to H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111 on June 14, 2005.

_____/s/ John T. Gutkoski_____
John T. Gutkoski