## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DELPHI CORPORATION,<br><br>    Plaintiff,<br><br>  v.<br><br>LITEX, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 05-10415 (WGY)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF LEON EKCHIAN IN SUPPORT OF LITEX'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF LITEX'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Leon Ekchian, declare as follows:

1.  I am president and Chief Executive Officer of plaintiff Litex, Inc.

2.  I earned my Bachelor of Science, Master of Science and Ph.D. degrees from Massachusetts Institute of Technology in the department of electrical engineering and computer science. My work specialized in control systems and signal processing. I subsequently obtained a Master of Business Administration degree from the University of California at Los Angeles in 1992 with concentrations in marketing, strategy, and finance. I am a member of the Institute of Electrical and Electronics Engineers and the Society of Automotive Engineers.

3.  I am a founder of Litex, which was first incubated within and then spun out from Lockheed Martin in 1996. During my tenure as president of Litex, I have managed the research, development and marketing of Litex's technology concerning the control of vehicle emissions through the use of non-thermal plasma devices and/or ozone to enhance the performance of

motor vehicle catalytic converters. In this capacity, I have become intimately familiar with the evolution of this technology and of the market for it.

4.    Attached as Exhibit 1 is a true and accurate copy of a July 20, 2001 press release issued by Delphi.

5.    Attached as Exhibit 2 is a true and accurate copy of a July 30, 2001 press release issued by Delphi.

6.    Attached as Exhibit 3 is a true and accurate copy of a presentation made by J.T. Battenberg, CEO and President of Delphi, on September 12, 2001.

7.    Attached as Exhibit 4 is a true and accurate copy of an October 16, 2001 press release issued by Delphi.

8.    Attached as Exhibit 5 is a true and accurate copy of pages from Delphi's 2001 Annual Report.

9.    Attached as Exhibit 6 is a true and accurate copy of excerpts from Donald Runkle's deposition testimony in <u>Litex, Inc. v. Delphi Automotive Systems, Corp. and Delphi Automotive Systems LLC</u>, Civil Action No. CV 10910 (WGY(formerly JLT)).

10.    Attached as Exhibit 7 is a true and accurate copy of excerpts from J.T. Battenberg, III's deposition testimony in <u>Litex, Inc. v. Delphi Automotive Systems, Corp. and Delphi Automotive Systems LLC</u>, Civil Action No. CV 10910 (WGY(formerly JLT)).

11.    Attached as Exhibit 8 is a true and accurate copy of pages from Delphi's Non-Thermal Plasma Interim Design Review (IDR) dated August 17, 2001.

12.    Attached as Exhibit 9 is a true and accurate copy of pages from Delphi's Non-Thermal Plasma Presentation to Toyota Motor Corporation dated October 30, 2001.

13.     Attached as Exhibit 10 is a true and accurate copy of pages from Delphi's "Non-Thermal Plasma Review GMPT", a presentation to General Motors dated December 3, 2001.

14.     Attached as Exhibit 11 is a true and accurate copy of an April 11, 2002 email from Joseph V. Bonadies to Edward G. Himes, Masao Kesen, Joachim Kupe, Toshio Kobayashi, Robert Lonsway, Richard J. Johnson and Ralph C. Anderson.

15.     Attached as Exhibit 12 is a true and accurate copy of a February 21, 2002 letter from Jean Botti of Delphi to Darrell R. Herling at Pacific Northwest National Library.

16.     Attached as Exhibit 13 is a true and accurate copy of excerpts from Joachim Kupe's deposition testimony in Litex, Inc. v. Delphi Automotive Systems, Corp. and Delphi Automotive Systems LLC, Civil Action No. CV 10910 (WGY(formerly JLT)).

17.     Attached as Exhibit 14 is a true and accurate copy of excerpts of testimony from the arbitration following Litex, Inc. v. Delphi Automotive Systems, Corp. and Delphi Automotive Systems LLC, Civil Action No. CV 10910 (WGY(formerly JLT)).

18.     Attached as Exhibit 15 is a true and accurate copy of the Settlement Term Sheet and Release in Litex, Inc. v. Delphi Automotive Systems, Corp. and Delphi Automotive Systems LLC, Civil Action No. CV 10910 (WGY(formerly JLT)).

19.     Attached as Exhibit 16 is a true and accurate copy of the Arbitration Decision and Award from the arbitration which followed Litex, Inc. v. Delphi Automotive Systems, Corp. and Delphi Automotive Systems LLC, Civil Action No. CV 10910 (WGY(formerly JLT)).

20.     Attached as Exhibit 17 is a true and accurate copy of excerpts from my deposition testimony in Litex, Inc. v. Delphi Automotive Systems, Corp. and Delphi Automotive Systems LLC, Civil Action No. CV 10910 (WGY(formerly JLT)).

21.     Attached as Exhibit 18 is a true and accurate copy of excerpted pages from Delphi's Rebuttal Expert Witness John J. Coogan's Report on Delphi's Noninfringement of Litex's Patent Claims in <u>Litex, Inc. v. Delphi Automotive Systems, Corp. and Delphi Automotive Systems LLC</u>, Civil Action No. CV 10910 (WGY(formerly JLT)).

22.     Attached as Exhibit 19 is a true and accurate copy of Joachim Kupe's Declaration in Support of Defendant's Emergency Motion for Reconsideration of the Court's August 15, 2002 Order Permitting Dr. Leon Ekchian Access to Delphi's "Attorneys Eyes Only Information" and Compelling the Deposition of J.T. Battenberg.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of June, 2005, at Sherman Oaks, California.

Leon Ekchian

-4-

## CERTIFICATE OF SERVICE

     I, John T. Gutkoski, do hereby certify that I served a true copy of the within Memorandum In Opposition to Plaintiff's Motion for Summary Judgment and In Support of Litex's Motion for Partial Summary Judgment by causing copies to be sent by the Court's electronic filing system on June 14, 2005 to H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111 on June 14, 2005

                                    _____/s/ John T. Gutkoski_____
                                      John T. Gutkoski

# Exhibit 1

# F I N A L

*REFER MEDIA INQUIRIES TO ALYSSE HECKER, 810.257.7725 OR CHERYL KILBORN, 810.257.7720.*

---

*JULY 20, 2001*

*SPOKESPERSON STATEMENT FOR LAWSUIT FILED BY LITEX, INC. CLAIMING PATENT INFRINGEMENT INVOLVING NON-THERMAL PLASMA (NTP) ASSISTED CATALYST PRODUCT DEVELOPMENT.*

The inclusion of an additional patent into the lawsuit by Litex was anticipated and does not change Delphi's earlier statement regarding the lack of merit in the claims being made (June 6 Delphi statement: "We have received a copy of the complaint. Delphi feels there is no merit to its claims and will resist it vigorously. We are in ongoing communication with this company regarding this issue.")

To date, Litex has chosen to provide the media with as many press releases regarding this matter as it has provided the Court with pleadings. Delphi is not so inclined to use the press to litigate this matter.

We are excited, however, to discuss our technology. Delphi is developing non-thermal plasma catalysis components and systems relying upon its significant technical capabilities and sound, demonstrable and credible scientific principles. Recognition has been given by the *Financial Times Global Automotive Award* (September 1999), singling out Delphi's technical development as demonstrating the greatest potential to improve environmental performance and by industry acceptance of Delphi's technology over other available alternatives.

010144-057196

# Exhibit 2



**DELPHI**
Automotive Systems

**news release**

Driving Tomorrow's Technology

**For Release:** July 30, 2001          **Contact:** Kelly Kennelty Sorice
Delphi Automotive Systems
(248) 813-2985

## DELPHI AWARDED PRESTIGIOUS R&D 100 AWARD
*Fourth Consecutive Year Delphi Wins for Product Ingenuity*

**TROY, Mich.** – A technology developed by Delphi Automotive Systems (NYSE: DPH) in collaboration with the Pacific Northwest National Laboratory (PNNL) has been recognized as one of the 100 most technologically significant products of the year by R&D Magazine. The publication selected Delphi as a 2001 R&D 100 Award recipient for its role in the development of catalyst materials for plasma-catalysis engine exhaust treatment.

Dr. Galen Fisher, principal research scientist at Delphi Research Labs, worked with the team at PNNL to develop the unique catalyst materials, which when combined with a non-thermal plasma (NTP), will chemically convert undesirable nitrogen oxides in diesel engine exhaust into desirable components of air. Dr. Fisher leads the catalyst team within the NTP exhaust aftertreatment project, headed by Dr. Joachim Kupe, chief engineer in Delphi's Energy & Chassis Division.

Last year Delphi and PSA Peugeot Citroen announced an innovation agreement to develop and study NTP exhaust aftertreatment technology in application with Peugeot Citroen vehicles. The NTP reactor produces energetic electrons that collide with background gas molecules, producing radicals that create more reactive gas species. The NTP catalyst is tailored to allow these species to react to form desirable gases found in air. In steady-state testing of a diesel vehicle, the NTP exhaust aftertreatment system has demonstrated greater than 55 percent reduction in oxides of nitrogen emissions without the need to add additional hydrocarbons or other reductants to the exhaust stream as well as demonstrating a significant reduction in particulates.

"It is truly an honor to be selected for this award for the fourth consecutive year, which demonstrates the ongoing innovation of Delphi's scientists and engineers," said Dr. Andrew Brown, Jr., Delphi engineering director. "We are extremely proud of this year's award, which recognizes the potential for our revolutionary NTP exhaust aftertreatment system with its significant reduction in emissions."



EXHIBIT NO. 55
9-11-02

—more—

010144-057152

DELPHI00027647

Page 2

Delphi was a recipient of the 2000 R&D 100 Award for its development of the Thermoplastic Elastomer Intumescent Fire Shield, a recyclable material invented to protect flammable objects from flames and decomposition due to high temperatures in automotive and other applications. In addition, Delphi and the Los Alamos National Laboratory received the 1999 R&D 100 Award for their joint work in developing PREDICT (Performance and Reliability Evaluation with Diverse Information Combination and Tracking). PREDICT is a set of formal, structured techniques and processes which help to estimate the performance of a product when test data are sparse or nonexistent. In 1998, Delphi received the award along with General Motors and PPG for the Solar-Ray Windshield Antenna.

R&D Magazine established the R&D 100 Award in 1963 to recognize technological advancements made by organizations, research institutions and universities to enhance everyday life.

Dr. Fisher is a resident of Bloomfield Hills, Mich. He holds a bachelor's degree in physics from Pomona College in Claremont, Calif., and a Ph.D. in solid state physics from Stanford University in Palo Alto, Calif. A co-author of more than 70 publications, Dr. Fisher received the Parravano Award for excellence in catalyst development research from the Michigan Catalysis Society in 1998.

For more information about Delphi Automotive Systems, visit Delphi's Virtual Press Room at www.delphiauto.com/vpr.

# # #

010144-057153

DELPHI00027648

Exhibit 3



FINAL SHOW VERSION

12 Sept 9 am

Version 18

**J.T. BATTENBERG**



Good morning.  I'm J.T. Battenberg III,

Chairman, CEO and president of Delphi

Automotive Systems.


PAUSE .....



Sympathies seem shallow, but our hearts

truly go to the families and the people

affected by the senseless acts of terrorism

yesterday in the United States.


In this spirit, please join me in a moment of

silence to demonstrate our respect for the

victims, their families and the loss felt by all

members of civilized society.

PAUSE - count to 30

Words cannot express our anger at such an attack, especially given the openness with which America addresses the world.

Delphi is a worldwide company.

Today, we are a company that grieves.

Not only with the Americans affected, but also with the people of other countries and nationalities whose families and lives have been affected.

This was an attack on civility, on decent people and on all societies.

The auto industry is a society unto itself, and

despite our competition, we pull together in times of crisis.

This is one of those times.

And I encourage you to find a way to contribute to the efforts to assist the victims, or to bring about the appropriate reaction from officials in your home community to ensure that all people are protected from this kind of violence.

The auto industry also has great pride, strength and determination.

While we will continue to grieve, we must not allow this act of violence to stop us from conducting our lives, and our businesses. That was the message U.S. President Bush delivered to the American people last night,

and that is our resolve, in spite of our

sadness and anger.

We planned to talk to you this morning in

great detail about our company, and Jose

Maria Alapont, president of Delphi Europe,

Middle East and Africa, was going to join me

at the podium to describe our future product

plans as displayed in the exhibit.

(ACKNOWLEDGE JOSE MARIA)

We are still continuing with our press briefing,

but because of the tragedy in the U.S., we

are limiting our comments to a few highlights

on our business and the technologies on

display, which I will deliver.

The complete text originally planned will be

available following my remarks.

What you see on our stand today is Delphi's leading technologies for supporting vehicle manufacturers as they address significant shifts in the industry.



These shifts are driving dramatic change in safety technologies, environmental technologies and overall vehicle electrical and electronics content.



A great example is our Passenger Occupant Detection System currently entering the U.S. market this year in response to requirements for advanced adaptive restraint systems.

GM, Ford and DaimlerChrysler have already selected Delphi's PODS technology and we recently booked new PODS business with a

major European OEM.



With these contracts, our revenue for PODS has potential to grow to in excess of 300 million dollars annually by 2004.

PODS is just one element of Delphi's full safety systems capability.



It is featured on Delphi's Integrated Safety System Demonstrator.

ISS is our vision for the future to help OEMs meet the need for full system solutions to occupant protection.

We are pleased to introduce our next-generation ISS concept car [MOTION TO VEHICLE], featuring current and near-term technologies.



There are 33 sensors monitoring everything

from vehicle speed and stability...

to road conditions...

to driver workload...

to passenger weight and position...

to biological parameters such as the driver's

eye movement and heart rate.



Take a closer look at the future of vehicle

safety and occupant protection in our ISS

concept car while visiting our display today.

The growth rate for safety technologies is

matched by the demand for environmental

technologies -- products that improve fuel

economy and reduce vehicle emissions.

JT190-01.pct



Today, we are showcasing solutions on our Environmental demonstrator concept car.

This vehicle is being showcased thanks to our partnership with PSA Peugeot Citroën. (MOTION TO CAR)



One of the most significant technologies is Delphi's common rail diesel system, launched earlier this year.

The second-generation system is even more refined with exceptionally compact injectors that ensure precise opening and closing - even at high pressures.

This contributes to a greater reduction in fuel consumption and more improved emissions.



In preparation for significant demand for common rail diesel fuel injection, we plan to boost our production capability in Europe from a capacity of half a million systems per year to two million systems per year by 2003.



Our common rail system was launched on the Ford Focus and Renault Clio earlier this year.

And we are happy to announce a contract with PSA Peugeot Citroën to supply common rail technology for their 1.4- and 1.6-liter engines as well as a contract with Kia for the KJ 2.9 engine.



JT505-03.pct



Let me also mention that Delphi is the only supplier with full diesel injection and exhaust aftertreatment capability including our award-winning non-thermal plasma aftertreatment technology that helps remove nitrogen oxide to improve emissions for diesel and lean burn.



I also encourage you to experience our numerous engine management, fuel efficient chassis and emissions aftertreatment technologies on our environmental demonstrator car.

JT560-01.pct



Now, let's look at an area that is arguably the most significant trend in the automotive industry....

Increased electronics content in terms of connectivity, convenience and the rapid

conversion from traditional mechanical to electro-mechanical vehicle systems.

Our Mobile MultiMedia demonstrator [MOTION TO CAR] showcases our ability to bring connectivity into the vehicle.

Importantly, this car is operating on a Media Oriented Systems Transport communications bus structure... called MOST.



JT570-00.pct

MOST allows open interfaces for full integration of a variety of advanced systems such as integrated cellular telephone, television receiver, digital video disc player, compact disc player and more.





Delphi has the potential to capture a significant amount of this growth with products, such as telematics, satellite digital audio radio, in-vehicle entertainment systems, navigation systems and MP3 playback.



We are already the world's leading supplier of telematics hardware with over one million units sold to GM, Toyota and Honda. And last month we announced that we would start supplying Subaru with telematics systems for the Outback models.

We have also started development programs for European customers.

Yet we haven't forgotten about the future and we are working on next-generation digital telematics that will offer added benefits such as location-based information, commerce and entertainment.

JT282-03.pct



Our mobile multimedia business group is launching 18 new products during 2001 and 2002.

This includes the smart radio system featured in the new Cadillac CTS on display in Hall 8 in the Cadillac exhibit.

Electronics systems are more than telematics and entertainment, though.

They are changing many other vehicle systems from body and convenience

features, to vehicle control.



Specifically, we are extremely excited about our support of the new Fiat Stilo being launched here.

Delphi has significant content on this new compact vehicle.


JT310-01.pct



Our keyless go system allows Stilo drivers to enter the vehicle without using a key or activating a remote key fob and to then start the car with the push of a button.

This is all accomplished with the use of a pocket -sized module that is carried in the pocket or purse.



In addition, Delphi's sophisticated Mechatronic switches system for the steering

wheel controls that operate the radio, telephone and Selesspeed gearbox, where available, are all integral to the Stilo.



As we support OEMs, Delphi is also bringing new products that deliver big benefits to European consumers.

One great example is the power sliding door.

This vehicle feature is quickly becoming mainstream... and automakers are looking to Delphi to help them meet the demand.



Interest in power products is growing around the world, with Delphi's bookings increasing more than 240 percent in the U.S. last year... and we anticipate rapid growth in Europe, too.

Today, we are proud to announce that we have signed two agreements with European automakers worth 54 million dollars over the life of the contracts for the power sliding door technology.

The first application for this product in Europe will be in 2002.



JT530-04.pct

Beyond body electronics systems, Delphi is developing X-By-Wire systems designed to offer a wide array of advantages to OEMs... including environmental benefits from reduced mass as well as improved ride and handling and enhanced safety.



Specifically, Delphi and BMW have been

working for the past two years to develop

Steer- and Brake-By-Wire systems.

As a result, Delphi recently combined

development efforts on Steer-By-Wire and

Brake-By-Wire to more effectively serve

these emerging needs.



PAUSE

These are a few points highlighting the many

new programs and technologies being

introduced by Delphi.

Thank you for visiting us today.

There are several Delphi executives who are

available to give you more detail about what you see here.

They are:

Jose Maria Alapont.... President Delphi Europe, Middle East and Africa.... and a Delphi Vice President.

Rodney O'Neal ... executive vice president of Delphi and president of the Safety, Thermal and Electrical Architecture sector...

Don Runkle ... executive vice president of Delphi and president of the Dynamics and Propulsion sector...

Dave Wohleen ... executive vice president of Delphi and president of the Electronics and Mobile Communications sector...

Ron Pirtle ... president of Delphi Harrison
Thermal Systems ...

Jim Spencer ... president of Delphi Packard
Electric Systems ...

Paul Tosch ... president of Delphi Saginaw
Steering Systems...

And of course, the European executive team,
too ...

Thank you for coming.  Copies of the speech
and our press packs are available from a
Delphi representative at the reception desk.
Enjoy the show.

# Exhibit 4



**DELPHI**
Automotive Systems

**news release**

Driving Tomorrow's Technology

For release: Tuesday, October 16, 2001

Contact: Kelly Sorice
(248) 813-2985

## DELPHI HELPS TO REMOVE THE VEHICLE
## FROM THE ENVIRONMENTAL EQUATION

**TOKYO** – Delphi Automotive Systems (NYSE:DPH) is committed to protecting the environment. From ensuring that its manufacturing operations meet the latest environmental standards to developing energy-saving technologies for vehicles, Delphi is always conscious of the need to reduce waste and pollutants, conserve resources and recycle materials.

"From design to production to product end-of-life, Delphi is developing new systems to help take the automotive industry toward the ultimate goal of removing vehicles from the environmental equation," said J.T. Battenberg III, chairman, CEO and president, Delphi Automotive Systems. "Emissions reduction, fuel economy and the need to preserve resources are universal concerns in the automotive arena. We are working in partnership with many of our global customers to research, design and develop environmentally friendly technology."

**Reducing Emissions**

Delphi has developed an innovative after-treatment solution, non-thermal plasma technology (NTP) that works in conjunction with a catalytic converter and particulate filter. The NTP devices produce energetic electrons that collide with the background gas molecules producing chemically reactive free radicals (O, N). Free radicals promote selective partial oxidation of NO to $NO_2$. This $NO_2$ can be used to greatly enhance $NO_x$ reduction when combined with reducing catalyst technologies. In addition, $NO_2$ enables continuous particulate filter regeneration.

Tests made independently in Delphi laboratories show that the NTP device can reduce $NO_x$ more than 70 percent and particulates more than 30 percent. The objective of this concept is to reduce $NO_x$ emissions of new-generation diesel engines, to be in compliance with future international emissions regulations.

-- more --

*Battenberg*
**EXHIBIT NO.** 56
9-11-02

010144-057149

DELPHI00027644

-- page 2 --

## Increasing Efficiency

Delphi has helped vehicle manufacturers make tremendous recent advances in engine efficiency and emissions. Many of Delphi's technologies are not visible to the consumer, but deliver significant performance and fuel savings benefits. These technologies can add 5-15 percent in fuel economy, depending upon the vehicle application.

- Delphi's efficient and refined second-generation diesel common rail direct injection system with Accelerometer Pilot Control and exceptionally compact solenoid injectors ensures precise opening and closing even at high pressures up to 1600 bar. With its higher injection performance, this second generation of common rail further reduces fuel consumption and emissions on new direct injection diesel engines.

- Direct Injection Gasoline improves air/fuel combustion efficiency in the engine and reduces pumping loses. To maximize fuel economy benefits, injectors are mounted in the center of the combustion chamber. Gasoline is injected directly into the combustion chamber, resulting in fuel economy savings of up to 15 percent.

- Delphi's Energen 5 stop-start system will automatically stop the engine when the vehicle idles and restart it almost instantaneously when the accelerator or clutch pedal is pressed. The system uses a combined starter/alternator in the conventional generator position and is expected to increase fuel economy by more than 5 percent in an ECE standard urban cycle. Compared with conventional in-line stop-start solutions, Energen 5 is quieter, weighs less, has fewer components and requires almost no additional packaging volume.

- Delphi's E•STEER™ electric power steering will typically improve fuel consumption by 4 percent. Unlike a conventional power steering pump, it draws energy only when it is actually providing assistance. By eliminating the steering pump, hoses, hydraulic fluid, and drive belt and pulley, E•STEER™ also improves packaging, assembly and end-of-life recycling. No fluid also means the elimination of fluid disposal issues.

- Cylinder deactivation deactivates engine cylinders during low-load conditions for improved fuel economy. For example, the engine controller directs the engine to generate power from only four of eight cylinders when idling in traffic. When in the four-cylinder mode, fuel and spark is not delivered to half of the cylinders, resulting in improved fuel economy.

-- more --

010144-057150

DELPHI00027645

-- page 3 --

- With its Compact Variable Compressor at the heart of the technology, Delphi is developing an Energy-Efficient Air Conditioning System. This system represents a package of innovative approaches that includes various control methods and sensor sets to minimize the energy required to condition the vehicle's interior to the desired temperature. Newly developed compressor control algorithms and microprocessor-driven air inlet mixture control strategies are coupled to create a system that offers fuel economy improvement as high as 10 percent when the air conditioning is operational, while also offering a reduction in vehicle emissions and enhancing passenger comfort.

**Reducing Materials Usage**

The reduction in materials used in a vehicle equates to an environmental savings for the supplier, manufacturer and end consumer.

- Delphi is developing a brake-by-wire system composed of four electro-mechanical brake calipers and an integrated electric parking brake. The use of such calipers completely eliminates the need for hydraulic fluid and hoses, considerably simplifying both vehicle manufacture and end-of-life recycling and eliminating fluid disposal issues. The system also improves fuel efficiency by eliminating mechanical drag and improves packaging by eliminating the brake servo and ABS module.
- As previously mentioned, Delphi's E•STEER™ also contributed to reducing usage of materials by eliminating all steering system hydraulic fluids and pumps.
- Delphi's INTELLEK™ Oil Condition and Level Sensor (OCLS) integrates sensing, electronics and software into a system that alerts drivers when oil changes are needed. Unlike other oil condition warning systems, OCLS measures actual oil characteristics rather than simply predicting degradation. The system will typically extend oil change intervals by 50 to 70 percent, greatly reducing volumes of oil for disposal.

For additional information about Delphi Automotive Systems, visit www.delphiauto.com/vpr.

# # #

010144-057151

DELPHI00027646

# Exhibit 5

driving
tomorrow's
technology

**01**_Annual Report

DELPHI

# **innovation**_one company, many minds



THOMAS H. WYMAN RETIRING >>

*As Delphi's lead director since October 1998, Thomas H. Wyman has helped to guide the company during our first years as an independent public company. He will retire from our Board of Directors in May 2002. Tom is a renowned global leader who has chaired and directed companies in the automotive, telecommunications, banking, consumer-products and electronics industries. His depth of experience has been invaluable to Team Delphi, from our spin-off from General Motors to the important transformation we are undergoing today. His role, and that of the Delphi Board of Directors, is currently being chronicled in a Harvard Business School case study. We are grateful for his wisdom, insight, humor, candor, and unflagging faith in our vision. We will miss his leadership.*

Change is evident within the company too, where we continue to transform Delphi away from traditional, low-margin, mostly mechanical businesses toward high-technology, electronically enhanced and higher margin products and systems. In 2001, we divested or closed 17 product lines, businesses and facilities, and we made significant progress in improving the performance of several businesses in our portfolio. These actions are helping us to reduce our operating costs and improve our earnings power. At the same time, we brought growth businesses into our portfolio. We acquired Eaton's Vehicle Switch & Electronics Division to strengthen our switch and electronics portfolio and broaden our solutions capability. We bought Automotive Technical Resources, Inc. (ATRi) to further develop comprehensive service support and share our electronics expertise with automotive technicians and repair facilities. Already one of the top suppliers of automotive connection systems, we purchased Specialty Electronics to expand our reach into new markets for connectors and connection systems. Now we are working intensely to seamlessly integrate these acquisitions into Delphi to maximize the gain from these investments.

We are proud of our achievements during 2001 and I'm eager for you to become better acquainted with the people, the products and the pride that make up Team Delphi. In a challenging economic year in which even some of the strongest corporations faced difficulties, we are currently operating with strong cash flow, a healthy balance sheet, and favorable investment-grade bond ratings from key financial institutions. Delphi CFO Alan Dawes clearly details additional important financial information on

03

**experience**_one legacy, countless applications

page 24 of this report. We continue to share this information regularly with industry and Wall Street analysts, the media, our employees, and with you, the owners of Delphi. It is important to me that you fully understand *our* business.

I want to personally assure you that we are tackling our challenges and opportunities with a passion that you have come to expect from Delphi. Our *knowledge* of the automotive industry is validated in the gains we have made in growing our customer base. Our 100-plus years of *innovation* are reflected in the increased business we have seen from customers in non-automotive and new markets. And our *leadership* is acknowledged by the numerous customer, community and other awards bestowed on our employees and company.

*Knowledge. Innovation. Leadership.* . . and a *passion* to deliver. By themselves, they are tremendous tools for *any* company. A look inside the pages of this report will deliver proof we are thriving at Delphi. In our markets, no other company has our global reach and our breadth of knowledge. No other competitor has our 16,000 engineers and our experience for innovation. No other company has our legacy and our leadership.

Infused with the spirit of Team Delphi and the desire to succeed for our customers and our shareholders, we are very excited about our future. We are honored with the trust you've placed in us, and we are committed to providing a solid return on your investment.

Regards,

J.T. Battenberg III
*Chairman, CEO and President*

Applied science and detailed attention to market changes strengthen Delphi's position as we accelerate our product portfolio shift toward high-tech electronic and electronically enhanced mechanical products and link our high-tech products to drivers of consumer decision — security, flexibility, time, choice, information and communications.



From safety to connectivity to the environment, examples of Delphi's differentiating solutions are:

> To improve the driving experience and let drivers and passengers stay informed and entertained, Delphi offers connectivity through mobile multimedia products such as satellite radio, integrated navigation radio systems and rear seat audio video entertainment systems.

> To enhance occupant safety, Delphi was first to market with its Recognition™ brand of passive occupant detection systems. This system uses a seat-based sensor providing information to the airbag computer so that it can tailor airbag deployment based on a passenger's weight. Recognition™ gained rapid acceptance from leading global automakers seeking to meet U.S. safety standards for tailored airbag deployment. Delphi also offers the Integrated Safety System (ISS). ISS helps to reduce the probability of an accident and helps to lessen the effects if one occurs.

> To provide added convenience, Delphi pioneered the power sliding door in 1993 and recently transferred this technology to new applications – power liftgates, power decklids and a power tonneau cover.

> Responding to global demands for improved fuel efficiency and reduced exhaust emissions, Delphi offers advanced powertrain control systems such as cylinder deactivation, gasoline direct injection and non-thermal plasma (NTP) exhaust aftertreatment. Late in 2001, Delphi and PSA Peugeot Citroën debuted a Peugeot 206 Environmental Technologies Vehicle, featuring NTP exhaust aftertreatment which significantly reduces oxides of nitrogen emissions, enabling more rapid use of advanced fuel-efficient engine technologies.

> To improve vehicle ride quality and handling, Delphi provides a full line of advanced chassis control systems. Delphi was first to market in 2001 with QUADRASTEER™, a fully automatic four-wheel steering system, introduced on the 2002 GMC Sierra Denali pickup.

> Outside the automotive industry, Delphi is providing innovative connectivity and mechatronic solutions for customers. Delphi provides products such as fiber optic data links, flex circuits and other connection systems for various military applications. Furthermore, Delphi recently signed a contract to provide electronic control assemblies for a major North American appliance manufacturer.

> Delphi is especially proud of its involvement with Dean Kamen, renowned inventor and entrepreneur, and his latest revolutionary product, the Segway™ Human Transporter (HT). Delphi assisted in the development and also provided expertise in component engineering, sourcing, testing and manufacturing process development for the HT, a self-balancing electric-powered transportation system.

17

# Exhibit 6

```
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3
 4   LITEX, INC.,
 5
 6              Plaintiff,
 7
 8     vs        Civil Action No. CV 10910 (JLT)
 9              Hon. Joseph L. Tauro
10   DELPHI AUTOMOTIVE SYSTEMS,
11   Corporation and
12   Delphi Automotive Systems LLC,
13
14              Defendants.
15   _____/
16
17   DEPONENT:   DONALD L. RUNKLE
18   DATE:       Friday, September 6, 2002
19   TIME:       8:40 a.m.
20   LOCATION:   5825 Delphi Drive
21              Troy, Michigan
22   REPORTER:   Denise M. Kizy, RPR/CRR/CSR-2466
23   VIDEO:      Patrick Murphy
24
25
                                              1
```

```
 1                  TABLE OF CONTENTS
 2   WITNESS                              PAGE
 3   DONALD L. RUNKLE
 4      EXAMINATION BY MR. KORNICZKY         5
 5
 6
 7
 8
 9                    EXHIBITS
10                                       PAGE
11   No. 37                               15
12   No. 38                               15
13   No. 39                               89
14   No. 40                               95
15   No. 41                               99
16   No. 42                              102
17   No. 43                              107
18
19
20
21
22
23
24
25
                                              3
```

```
 1   APPEARANCES:
 2
 3     BROBECK, PHLEGER & HARRISON LLP
 4     By:  Mr. Stephen S. Korniczky
 5     12390 El Camino Real
 6     San Diego, California 92130
 7     (858) 720-2870
 8         Appearing on behalf of the Plaintiff
 9
10     HELLER EHRMAN WHITE & McAULIFFE LLP
11     By:  Mr. Keith R. Weed
12     275 Middlefield Road
13     Menlo Park, California 94025-3506
14     (650) 324-7000
15         Appearing on behalf of the Defendants
16
17   ALSO PRESENT:  William Cosnowski, Jr.
18                  Leon Ekchian
19
20
21
22
23
24
25
                                              2
```

```
 1                  Troy, Michigan
 2                  Friday, September 6, 2002
 3                  At about 8:40 a.m.
 4                    *   *   *
 5
 6          VIDEO OPERATOR:  We're on the record.
 7      This is tape one of the videotape
 8   deposition of Donald L. Runkle being taken at the
 9   offices of Delphi Automotive Systems, 5825 Delphi
10   Drive, Troy, Michigan.
11          Today is Friday, September 6, 2002.
12   The time is 8:38 a.m.
13          This is in the matter of Litex,
14   Incorporated versus Delphi Automotive Systems, Case
15   No. CV-10910 in U.S. District Court, District of
16   Massachusetts.
17          My name is Patrick Murphy, legal
18   videographer for Esquire Deposition Services.
19          The attorneys will now introduce
20   themselves for the record.
21          MR. KORNICZKY:  Stephen Korniczky
22   representing the plaintiff Litex Corporation.
23          MR. WEED:  Keith Weed of Heller,
24   Ehrman, White and McAuliffe for defendant and with
25   me is Will Cosnowski of Delphi.
                                              4
```

```
 1              And --
 2      A.   I don't know if that's a fact.  I never
 3  did an analysis to see if that's all true, but it
 4  seems that way.
 5      Q.   Okay.  Thank you.
 6              And what are the general reasons that
 7  Delphi issues press releases?
 8      A.   Positive image for the company and tell
 9  customers that something good happened at Delphi.
10      Q.   Would one of the reasons for issuing press
11  releases is to share news at Delphi with its
12  shareholders?
13      A.   Yeah, I would say when you put a press
14  release out you don't know who is going to read it.
15              My own feeling is press releases are
16  primarily there for other customers to see that
17  progress on health, safety, quality, technology,
18  various characteristics of a company is being made
19  at Delphi and this is a good company to do business
20  with.  I would say that would be mostly my feeling
21  on what press releases are for, but investors read
22  it, consumers read them, lots of people read them.
23      Q.   A lot of these -- or press releases -- let
24  me rephrase the question.
25              Some of Delphi's press releases you
                                                       49
```

```
 1  indicated are issued preceding events like
 2  conferences or I guess technology shows and the
 3  like?
 4      A.   Yeah.
 5      Q.   Correct?
 6      A.   Primarily automotive shows.  Next week is
 7  a commercial vehicle show in Hanover, Germany, so I
 8  don't know, but my guess is we'd put out a press
 9  release or two about some activity, some award,
10  something in the commercial vehicle arena, so that
11  when we're there we might stimulate follow-up
12  questions from the press.
13              Typically the press is writing about
14  the auto industry, commercial vehicle industry, and
15  the people we're hoping read is other customers that
16  says if customer A bought this from Delphi or is
17  involved with this, maybe we should be involved with
18  Delphi on that.  So it's to stimulate other
19  business.
20      Q.   Would press releases also be used to send
21  information about what Delphi is doing to
22  competitors?
23      A.   We'd rather them not read our press
24  releases.  We've had a tough time getting them to
25  not do that.
                                                       50
```

```
 1      Q.   Why is that?
 2      A.   Why would we not want our competitors
 3  knowing what we're doing?  Because we don't want our
 4  competitors to know what we're doing, but, you know,
 5  when you go public you're public, so you need to
 6  take a measured response in what you put in a press
 7  release, but if you don't want your competitor to
 8  know it, you better not do a press release.
 9      Q.   Sure, sure.
10              Are you aware of whether Delphi has
11  ever issued an inaccurate press release?
12      A.   No, I don't know that we have that I know
13  of.  We obviously try to not issue inaccurate press
14  releases, documents, or anything.  We pride
15  ourselves on accuracy, timeliness, so forth.
16      Q.   Is there a policy or procedure to follow
17  if an inaccurate press release is discovered by
18  Delphi?
19      A.   I don't know what it is, but I'm certain
20  if someone brings in an inaccurate press release to
21  our attention that we would try to fix it some way.
22  I don't -- it would be unbelievable to me to
23  think -- or that we would not have some way to do
24  that because we follow information that is put out
25  in the press that involves us and if it's inaccurate
                                                       51
```

```
 1  we call the writer of that piece of press and try to
 2  correct it.
 3              So since we're so aggressive on that
 4  we want to have accurate information about us and we
 5  want our information whether it's financial
 6  documents or technology pronouncements or awards to
 7  be accurate.
 8      Q.   I may have misunderstood what you said.
 9              When you said you would follow up
10  with people who wrote these press releases or
11  reporters --
12      A.   No, if there was a press -- if there was
13  an article written about Delphi or let's say if
14  there was an article written that Delphi was in and
15  we felt it was inaccurate our PR department would
16  call those writers and discuss the inaccuracies and
17  try to make sure that first it was clear what is
18  accurate and in some cases ask for a restatement or
19  what have you on the facts.
20      Q.   I understand.
21      A.   And I'm saying we do that with stuff that
22  is written about us in whatever documents, and I
23  would say if we ever, I don't know of any, but if we
24  ever issued something that was inaccurate where we
25  made a mistake we would absolutely correct it.
                                                       52
```

# Exhibit 7

```
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3
 4   LITEX, INC.,
 5
 6            Plaintiff,
 7
 8       vs          Civil Action No. CV 10910 (JLT)
 9                   Hon. Joseph L. Tauro
10   DELPHI AUTOMOTIVE SYSTEMS,
11   Corporation and
12   Delphi Automotive Systems LLC,
13
14            Defendants.
15   _____/
16
17   DEPONENT:   J.T. BATTENBERG, III (VOLUME 2)
18   DATE:       Friday, November 8, 2002
19   TIME:       7:30 a.m.
20   LOCATION:   5725 Delphi Drive
21               Troy, Michigan
22   REPORTER:   Denise M. Kizy, RPR/CRR/CSR-2466
23   VIDEO:      Patrick Murphy
24
25
                                              110
```

```
 1              TABLE OF CONTENTS
 2   WITNESS                                PAGE
 3   J.T. BATTENBERG, III
 4     EXAMINATION CONTINUED BY MR. OLSON    114
 5
 6
 7
 8
 9              EXHIBITS
10                                         PAGE
11     No. 140                              115
12     No. 141                              140
13     No. 142                              186
14     No. 143                              194
15     No. 144                              225
16
17
18
19
20
21
22
23
24
25
                                              112
```

```
 1   APPEARANCES:
 2
 3       BROBECK, PHLEGER & HARRISON LLP
 4       By:  Mr. Douglas E. Olson
 5       12390 El Camino Real
 6       San Diego, California 92130
 7       (858) 720-3700
 8            Appearing on behalf of the Plaintiff
 9
10       HELLER EHRMAN WHITE & McAULIFFE LLP
11       By:  Mr. Alexander Brainerd
12       275 Middlefield Road
13       Menlo Park, California 94025-3506
14       (650) 324-7000
15            Appearing on behalf of the Defendants
16
17   ALSO PRESENT:  William Cosnowski, Jr.
18                  Leon Ekchian (via telephone
19                  in p.m. only)
20
21
22
23
24
25
                                              111
```

```
 1                    Troy, Michigan
 2                    Friday, November 8, 2002
 3                    At about 7:30 a.m.
 4
 5            VIDEO OPERATOR:  We're on the record.
 6   This is tape one of volume two of the
 7   videotape deposition of J.T. Battenberg, III, being
 8   taken at 5725 Delphi Drive, Troy, Michigan.
 9       Today is Friday, November 8, 2002.
10   The time is 7:33 a.m.
11            This is the matter of Litex,
12   Incorporated versus Delphi Automotive Systems, Case
13   No. CV-10910, in U.S. District Court, District of
14   Massachusetts.
15       My name is Patrick Murphy, legal
16   videographer for Esquire Deposition Services.
17       The attorneys will now introduce
18   themselves for the record.
19            MR. OLSON:  Doug Olson from Brobeck
20   for the plaintiff Litex.
21            MR. BRAINERD:  Lex Brainerd of Heller
22   Ehrman appearing on behalf of the Delphi entities.
23            MR. COSNOWSKI:  And William Cosnowski
24   on behalf of Delphi Corporation.
25            J.T. BATTENBERG, III
                                              113
```

1

J.T. Battenberg, III  Vol 2        CONFIDENTIAL ATTORNEYS' EYES ONLY        11/8/2002

```
 1   was thereupon called as a witness herein, and after
 2   having been first duly sworn to tell the truth, the
 3   whole truth, and nothing but the truth, was examined
 4   and testified as follows:
 5            VIDEO OPERATOR:  Please proceed.
 6            EXAMINATION CONTINUED
 7   BY MR. OLSON:
 8       Q.  Mr. Battenberg, do you recall that your
 9   previous deposition session was on September 11th of
10   this year?
11       A.  Yes.
12       Q.  Okay.  And that was a -- I'm sorry.
13            That was a Wednesday, and do you
14   recall that you told me the first time you heard
15   about this case was on the Monday preceding that
16   deposition?
17       A.  Yes.
18       Q.  Had anybody talked to you about scheduling
19   your deposition in this case before the Monday when
20   you said you first heard about it?
21       A.  I don't recall.
22       Q.  Had anybody talked to you about producing
23   documents in this case before the Monday preceding
24   your September 11th deposition?
25       A.  No.
                                                    114
```

```
 1       A.  Yes, I did.
 2       Q.  Did you have any part in preparing the
 3   report before actually reading the final version?
 4       A.  No, it's prepared by a number of different
 5   groups in the organization.
 6       Q.  Did you have an opportunity to take part
 7   in the decision as to the types of material that
 8   would be included in the report before it was
 9   prepared?
10       A.  No.
11       Q.  So the first time you knew what was in the
12   report was when you read it and signed it; is that
13   correct?
14       A.  That's correct.
15       Q.  And approximately when was that?
16       A.  I don't recall the exact date that I
17   signed it.  Again, it would be probably in
18   February/March time frame '02, but we'll get you the
19   date.  I just don't know it.
20       Q.  Okay.  Can you identify with a little more
21   particularity the people who participated in the
22   preparation; who was primarily responsible for the
23   preparation?
24       A.  We hire an outside firm to do the report.
25       Q.  What firm is that?
                                                    116
```

```
 1       Q.  Let's mark as Exhibit 140 a document
 2   bearing the title Driving Tomorrow's Technology,
 3   '01, Annual Report, Delphi.
 4            (Marked for identification Deposition
 5            Exhibit No. 140.)
 6       Q.  Let me show you Exhibit 140.
 7       Can you identify that, please?
 8       A.  It's an '01 Delphi annual report.
 9       Q.  When was that published; in other words,
10   when was it made available to the public?
11       A.  In the first couple months of '02.  I
12   don't know the exact date.
13       Q.  Somewhere in January or February, to the
14   best of your knowledge?
15       A.  Probably February/March time frame.  We
16   could get you an exact date.
17       Q.  Okay.  I'd like that.
18            Who is the annual report prepared
19   for?
20       A.  It has multiple constituencies; our
21   investors, the institutions who cover us, our
22   employees, our customers, the U.S. Government, the
23   SEC.  It has many constituencies.
24       Q.  Did you read this report before -- well,
25   let's -- before you signed it?
                                                    115
```

```
 1       A.  I don't recall the name.
 2       Q.  And who in the company is primarily
 3   responsible for seeing to what's in the report?
 4       A.  The vice president of communications.
 5       Q.  And who is that?
 6       A.  Ms. Karen Healy.
 7       Q.  And does she work with a committee?
 8       A.  Yes.
 9       Q.  And who is on that committee?
10       A.  It's a large committee.  I don't know
11   who's on the committee.
12       Q.  To your knowledge, is there anything in
13   the report that is not correct?
14       A.  No, to the best of my knowledge it's a
15   correct report.
16       Q.  And to the best of your knowledge, is it
17   accurate?
18       A.  Yes, sir.
19       Q.  I'd like to direct your attention to page
20   17 of the report.  Starting at the bottom of the
21   left-hand column, there's a little point there.
22            It says:  Responding to global
23   demands for improved fuel efficiency and reduced
24   exhaust emissions, Delphi offers advanced powertrain
25   control systems such as cylinder deactivation,
                                                    117
```

2

1   gasoline direct injection and nonthermal plasma
2   (NTP) exhaust aftertreatment.
3          Did you read that at the time you
4   reviewed this report?
5      A.   Yes, I did.
6      Q.   And what did you mean by saying that
7   Delphi offered nonthermal plasma (NTP) exhaust
8   aftertreatment?
9          MR. BRAINERD:  Object to the question
10  as vague.
11         Go ahead.
12         THE WITNESS:  Well, as it says in the
13  next sentence that Delphi and Peugeot debuted an
14  environmental technology vehicle featuring NTP
15  exhaust aftertreatment.
16         So we have a technology vehicle which
17  is an R&D platform which we identified here.
18     Q.   (BY MR. OLSON) And it says:  Which
19  significantly reduces oxides of nitrogen emissions.
20         Is that true?
21     A.   To the best of my knowledge it is true.
22  It's in a research and development environment of
23  course, but I believe that's a true statement.
24     Q.   How is it that you can say that you offer
25  something if it's only in a research and development

                                              118

1   into the annual report?
2          MR. BRAINERD:  Been asked and
3   answered.
4          Go ahead.
5          THE WITNESS:  Well, as I said several
6   times before, the nature of this industry is such
7   that it's three- to four- to five-year lead times
8   and many technologies are put on research and
9   development vehicles years in advance because it
10  takes hundreds of thousands of miles of research and
11  development to find out if they're going to work.
12     Q.   (BY MR. OLSON)  All right.  And is it your
13  practice to describe research activities that you
14  don't know if they're going to work or not --
15     A.   Absolutely.
16     Q.   -- in an annual report?
17     A.   Yes.
18     Q.   Why would you want to describe something
19  in an annual report if you didn't know if it was
20  going to work?
21     A.   Well, as I've said several times before,
22  the nature of the industry is such that you have to
23  have three to four to five years of experimentation
24  and development.
25         It's a very technical industry and it

                                              120

1   stage?
2      A.   Well, it's quite common.  Many of the
3   items on this page are in research and development.
4   That's the nature of the business we're in.  With
5   four-year lead times we have to put technologies on
6   platforms and experimental technology vehicles for
7   three, four, five years at a time before they're
8   accepted in the marketplace.  It's common practice.
9      Q.   To the best of your knowledge, is it still
10  true today that Delphi offers nonthermal plasma
11  exhaust aftertreatment?
12         MR. BRAINERD:  Object to the question
13  as vague and ambiguous.
14         THE WITNESS:  We still have
15  environmentally technology vehicle platforms that
16  we're doing research development on, yes.
17     Q.   (BY MR. OLSON) Does Delphi still offer
18  nonthermal plasma exhaust aftertreatment to the
19  extent that it did when you read and signed this
20  report?
21     A.   I'm not familiar with the particular
22  details, but I would presume that we still would try
23  and productionize that type of aftertreatment.
24     Q.   Why did you put something that you
25  considered to be in a research or development stage

                                              119

1   requires long lead times.  Many customers have
2   research and development vehicles with suppliers and
3   like to test technology in various environments.
4   It's common practice.
5      Q.   Is there anything in this report that
6   indicates that you'll have a lead time of three to
7   four years with regard to nonthermal plasma?
8          MR. BRAINERD:  Object to the question
9   as argumentative and the report is the best evidence
10  of what it says.
11     Q.   (BY MR. OLSON)  Can you answer that,
12  please?
13     A.   The question again, please.
14     Q.   Yeah.
15         MR. OLSON:  Can you read it back?
16         (Record repeated by Court Reporter.)
17         THE WITNESS:  No.
18     Q.   (BY MR. OLSON)  At the time you signed
19  this annual report were you aware of this present
20  lawsuit?
21     A.   No.
22     Q.   Was anyone aware of this lawsuit when the
23  annual report was prepared?
24         MR. BRAINERD:  Object to the
25  question.  It calls for speculation.

                                              121

                                              3

# Exhibit 8



# Non-Thermal Plasma
# Interim Design Review
# (IDR)

## August 17, 2001

ATTORNEYS' EYES ONLY

010144-059093



# Risk Assessment
## Comments

◆ **PSA goals are achievable (100% Euro IV) by December 2001 with "one-off" catalysts and prototype power supply.**

   – Will not be to the level of product development required by ADP

◆ **Power supply is technically on the right track**

   – Power supply timing will delay the overall NTP Project timing by 5 months

      · "Estimated" Cost 50% above target

      · Confirmation Testing in Flint to be complete 09MY02

◆ **Resources are insufficient to comply with the ADP Tasks necessary to exit the entire NTP subsystem from ADP**

ATTORNEYS' EYES ONLY

010144-059195

*Non-Thermal Plasma*

*Delphi Energy & Chassis Systems*



◆ **Catalyst development has been lagging**

– **Favorable gas bench results did not translate to vehicle testing**

  • **Recognized gap between catalyst formulation and catalyst coating capabilities**

  • **Plan now being implemented to increase the number of catalysts formulated and shorten the iteration time from powders to coated monoliths to approximately one month per iteration**

    – Formulate & Test Powders - 4 days
    – Core Sample Prep & Testing - 2 days
    – Characterize Catalyst - 1 week (parallel)
    – Slip Stream Testing - 1 day
    – Full Scale Monolith Coating - 1 week
    – Vehicle Testing - 1 week

  • **Anticipate 10 NOx catalyst iterations to achieve 90% efficiency**

ATTORNEYS' EYES ONLY

*Non-Thermal Plasma*

*Delphi Energy & Chassis Systems*

010144-059196



Risk Assessment
Comments

Catalyst development:
- No Process Engineering resources were available until 01AU01
  - Were not able to do concurrent product & process engineering
  - Steve Halliday will consult, however, CSC will need to provide funding for 1/2 Process Engineer and 1/2 Technician in Tulsa (included in 2002 budget projection)
- Much Process Engineering activities and $ needed to scale-up laboratory catalysts to production feasible coating processes (included in 2002 budget projection)
- Estimate June 2002 for Confirmation Testing of catalyst to be completed due to the expected catalyst iterations (10) required to achieve 80-90% NOx efficiencies

ATTORNEYS' EYES ONLY

*Non-Thermal Plasma*

*Delphi Energy & Chassis Systems*

010144-059197

# Exhibit 9



# Non-Thermal Plasma Presentation to Toyota Motor Corporation

## October 30, 2001

ATTORNEYS' EYES ONLY

# Delphi Automotive Systems, Flint, MI

010144-050363

DELPHI00016029



# Purpose of Video Conference

◆ To determine how the Delphi NTP reactor could benefit the Toyota DPNR system for diesel emission reduction.

010144-050364

DELPHI00016030

ATTORNEYS' EYES ONLY

Non-Thermal Plasma 30OC01



Energy & Chassis Systems

# DELPHI
### Automotive Systems

# Summary

- ◆ 15 % NOx system efficiency over MVEG cycle
  - − 25 % ECE, 5% EUDC
  - − NOx adsorption and desorption affecting catalyst efficiencies
- ◆ Greater than 70% HC & CO efficiencies with low temperature oxidation catalyst as rear brick
- ◆ Reactor exhibits good NO->$NO_2$ conversion at steady state operating points
- ◆ Diesel post injection calibration improved reactor efficiency
- ◆ Modest power levels are seen at low speed/load steady state operating points
- ◆ Transient control of hydrocarbons dramatically reduces NO->$NO_2$ conversion during accelerations

ATTORNEYS EYES ONLY

010144-050375

DELPHI00016041

Non-Thermal Plasma 30OC01



Energy & Chassis Systems



# Future Direction

◆ **Improve reactor and catalyst transient and high speed/load performance**

 – Better power control (Next generation power supply/software)
 – Post injection control software modifications
 – Reduce NOx desorption without reduction
 – Increase HC & CO efficiencies with increased cell density substrate

ATTORNEYS' EYES ONLY

010144-050376

DELPHI00016042

**Non-Thermal Plasma 30OC01**



Energy & Chassis Systems

# DELPHI
### Automotive Systems

# Future Work

◆ Timing
   – Target Production 2005
   – Samples and application available 2nd quarter 2002



Current Program Status

Durability testing begins here

Non-Thermal Plasma 30OC01

Energy & Chassis Systems

010144-050377    ATTORNEYS' EYES ONLY

DELPHI0016043

# Exhibit 10



# Delphi Non-Thermal Plasma Review
## GMPT

## 03DE01



010144-049673

Slide 1

 **Automotive Systems**                    # NTP Project Goals

◆ 100% Euro IV with respect to HC, CO, NOx for diesel as well as direct injection gasoline application using NTP exhaust aftertreatment system

◆ Demonstrate a minimum of 50% NOx reduction during MVEG

◆ Demonstrate continuous regeneration of DPF without using Cerium additive while maintaining initial particulate level of 0.005 g/km



010144-049674

Slide 2

# Project Milestones



- ◆ Milestone 1:

  – Perform technical feasibility study and possibly adjust project goals.
  ☑Complete

- ◆ Milestone 2:

  – Complete short term action plan
  – Establish NOx emissions baseline with Gen I hardware / software
  – Define methodology to evaluate continuous regeneration of DPF using NTP
  ☑Completed

- ◆ Milestone 3:

  – Demonstrate minimum 50% Euro IV in NOx with Gen II hardware / software
  – Evaluate DPF continuous regeneration as defined under Milestone 2
  ☑Completed

- ◆ Milestone 4:   Diesel Application
  – Demonstrate 80% Euro IV NOx
  – Demonstrate DPF continuous regeneration
    *Using engine dyno
    *Strong emphasis
  –Discuss preliminary cost estimation
  ☑Completed March 2001 using secondary propene injection



ATTORNEYS' EYES ONLY

010144-049675

Slide 3

# Project Milestones



◆ **Milestone 5:**      Diesel Application

– Demonstrate 80% Euro IV in NOx with Gen IV system for direct injection diesel using diesel post injection

– Demonstrate DPF continuous regeneration using NTP while maintaining the initial emissions level of 0.005 g/km PM

– Completed May 2001 - not successful

◆ **Milestone 6:**       Diesel Application

– Demonstrate 80% Euro IV in NOx with Gen IV system for direct injection diesel using diesel post injection

– Demonstrate DPF continuous regeneration using NTP while maintaining the initial emissions level of 0.005 g/km PM

– Completed October 17, 2001

Gasoline Application

– Baseline Emissions MVEG

– Completed November 14, 2001



ATTORNEYS' EYES ONLY

010144-049676

Slide 4

# Diesel Vehicle Emission Summary



◆ **HC & CO catalyst performed very well**
  – further improvements expected with 600 cpsi substrate

◆ **NOx catalyst challenges understood**
  – Plan developed to focus on resolution by March 2002

◆ **Diesel post injection vs. particulate formation requires further development**
  – Optimize calibration for NO to $NO_2$ conversion with low soot generation



010144-049687

Slide 15

# Exhibit 11

| From: | Bonadies, Joseph V |
|---|---|
| Sent: | Thursday, April 11, 2002 1:51 PM |
| To: | Himes, Edward G; Kesen, Masao; Kupe, Joachim |
| Cc: | Kobayashi, Toshio; Lonsway, Robert; Johnson, Richard J.; Anderson, Ralph C. |
| Subject: | RE: Non-Thermal Plasma(NTP)?? |

Ed,

With the completion of the PSA milestone in March we have determined that the catalyst efficiencies are not high enough to continue to fund the catalyst development internally.  The best we were able to attain was 22 % tailpipe NOx efficiency on the MVEG.  The NTP NO to NO2 conversion through the reactor was good, however.

We have had requests from PSA, Renault, and Audi to supply reactors and power supplies and they will pursue the catalyst development themselves.  Evidently, they see a potential for plasma.  Tulsa, on the other hand, does not believe a lean NOx catalyst solution exists for NTP.

We plan to complete the reactor and power supply development this year, as planned, but without the lean NOx catalyst.

I'll complete a general update presentation by the end of April 2002 for you to share with your customers, as well as the specifics for the Isuzu follow-up.

Regards,

Joe

-----Original Message-----
From: Himes, Edward G
Sent: Tuesday, April 09, 2002 2:05 AM
To: Kesen, Masao; Bonadies, Joseph V; Kupe, Joachim
Cc: Kobayashi, Toshio; Lonsway, Robert; Johnson, Richard J.; Anderson, Ralph C.
Subject: Re: Non-Thermal Plasma(NTP)??



Kesen-san,

Attached is some NTP material prepared for Isuzu in March.  This info could be shared with MMC.

(See attached file: Isuzu NTP Review 01MAR02_v2.zip)

I am forwarding a copy of this mail to J. Bonadies (NTP CSC project manager) as well to get his input on your request.

Regarding prototype hardware, the latest plan is to have samples available some time in 4th quarter of 2002.  However, application of this hardware requires significant engineering support from Delphi.  It would require a co-development agreement with MMC for vehicle integration resulting in engineering fees to be paid by MMC.  At this time we do not have engineering resource at TCT to support this.

ATTORNEYS' EYES ONLY

1

The CSC team in Flint would need to approve any co-development plans as well as supply/support prototype hardware and provide application training for TCT.

My recommendation is give MMC the engineering info.  At a later date (some time this year), when additional test data is available proving the performance of NTP on the vehicle, we can follow-up with them and determine how to proceed.


Regards,
    Ed




Masao Kesen
04/09/2002 02:28 PM

To:   Edward G Himes/jp/delphiauto@DELPHI_JP
cc:

Subject:  Non-Thermal Plasma(NTP)の件

Ed,

I have heard that your the right person to address the above subject.
Please let me know whether you can support MMC's request regarding NTP.

Regards - M. Kesen
------------------------ Forwarded by Masao Kesen/jp/delphiauto on 2002/04/09
14:25 -------------------------


Masao Kesen
2002/03/31 10:59

To:   Robert Lonsway/jp/delphiauto@DELPHI_JP
cc:   Shinobu Miyaura/jp/delphiauto@DELPHI_JP

Subject:  Non-Thermal Plasma(NTP)の件

Bob,

I got a request from MMC Truck & Bus for engineering information onNTP, and also
prototype sample.
Please advise if we have engineering resource, and you can support this request.
I personally feel I am not able to handle this due to other project like diesel
common rail, Nox adsorber, PHC etc.


ATTORNEYS' EYES ONLY

010144-061317

Regards - M. Kesen

---------------------- Forwarded by Masao Kesen/jp/delphiauto on 2002/03/31
10:56 ----------------------

eiichi_hiruma@fuso.mitsubishi-motors.co.jp on 2002/03/28 19:55:02

To:   Masao Kesen/jp/delphiauto@DELPHI_JP
cc:   k-kodama@fuso.mitsubishi-motors.co.jp

Subject:  Non-Thermal  Plasma(NTP)の件


日本デルファイ・オートモーティブ・システムズ
　エネルギー＆シャシー・システムズ
　　カスタマーマネージャー
　　　気仙　様


三菱自動車　エンジン研究部　昼間と申します。
突然のメールにて失礼させていただきます。

以前, 御社のプレゼンにて拝見致しました首記後処理装置
について伺わせて戴きます。
当方できれば試作, 試験とまで進みたいと考えておりますが,
何ぶんプレゼンの資料どまりの情報なので判断し難い状況にあります。
つきましては, その後の進捗状況, 試作の可否, 試作日数, 試作費等
ご回答をお願いしたいと存じます。
以上よろしくお願い致します。

    =============================================
    三菱自動車工業株式会社
    　三菱ふそうトラック・バスカンパニー
    　トラック・バス開発本部
    　エンジン研究部　エンジン研究グループ　　昼間　栄一

    〒329-1411　栃木県塩谷郡喜連川町大字鷲宿4300番地
    TEL 028-686-3264 FAX 028-686-3447
    E-Mail eiichi_hiruma@fuso.mitsubishi-motors.co.jp
    =============================================


ATTORNEYS' EYES ONLY

3

010144-061318

# Exhibit 12

# DELPHI
### Automotive Systems

February 21, 2002

Darrell R Herling
Senior Development Engineer
Pacific Northwest National Laboratory
902 Battelle Blvd, MS: P8-35
Richland, WA 99352

Dear Mr. Herling:

I am writing this letter in support of the R&D100 Award nomination submitted by Delphi Automotive Systems and the Pacific Northwest National Laboratory for the development and application of the Non-Thermal Plasma Exhaust Aftertreatment System for Emissions Reduction. Delphi Automotive Systems is very excited about this new product and the technology that was developed for it over the last few years. In fact, Delphi has labeled this as one for our "Crown Jewel" technologies and we have put significant effort into developing this system to a commercial-ready product. We are continually receiving inquiries from our customers worldwide about this product and how it can be applied to their line of vehicles to meet near-future emissions regulations.

*CROWN JEWEL*

Through our involvement with the Pacific Northwest National Laboratory we have been able to develop the various plasma processing, catalysis, and control systems technologies necessary to move this system to a commercial-ready product. The development of this system has evolved over several years and through various domestic and foreign OEM collaborations, including our work with the Pacific Northwest National Laboratory and our Cooperative Research and Development Agreement sponsored by the Department of Energy's Office of Transportation Technologies. We continue to invest our R&D resources in this technology, because it has shown such promise in reducing NOx and particulate emissions in light- and heavy-duty diesel engines.

As we continue to collaborate with the Pacific Northwest National Laboratory on improving this technology, I am hopeful that the enhancements and further developments we're pursuing will lead to a system that can meet the longest-term emissions regulations beyond the 2005 and 2007 model year vehicles, which is an immediate concern of our customers.

We are grateful for the opportunity by R&D Magazine to have this technology considered for one of their coveted R&D100 Awards, and for them taking the time to recognize new technologies that will have a positive impact on the world around us. This non-thermal plasma exhaust aftertreatment system and the technology behind it will play a critical role for vehicle manufactures in meeting lower emissions standards, and providing for a cleaner and healthier environment for all of us to live in. As such, I feel that this technology is deserving of recognition from the R&D100 Award program.

Sincerely,

**ATTORNEYS' EYES ONLY**

Jean Botti

010144-058568

# Exhibit 13

```
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3
 4   LITEX, INC.,
 5
 6              Plaintiff,
 7
 8    vs          Civil Action No. CV 10910 (JLT)
 9                Hon. Joseph L. Tauro
10   DELPHI AUTOMOTIVE SYSTEMS,
11   Corporation and
12   Delphi Automotive Systems LLC,
13
14              Defendants.
15   _____/
16
17   DEPONENT:  JOACHIM KUPE
18   DATE:      Thursday, September 5, 2002
19   TIME:      9:05 a.m.
20   LOCATION:  2560 Crooks Road
21              Troy, Michigan
22   REPORTER:  Denise M. Kizy, RPR/CRR/CSR-2466
23   VIDEO:     Nancy Siemion Scott
24
25
                                              1
```

```
 1   APPEARANCES:
 2
 3       BROBECK, PHLEGER & HARRISON LLP
 4       By:  Mr. Stephen S. Korniczky
 5       12390 El Camino Real
 6       San Diego, California 92130
 7       (858) 720-2870
 8          Appearing on behalf of the Plaintiff
 9
10       HELLER EHRMAN WHITE & McAULIFFE LLP
11       By:  Mr. Keith R. Weed
12       275 Middlefield Road
13       Menlo Park, California 94025-3506
14       (650) 324-7000
15          Appearing on behalf of the Defendants
16
17   ALSO PRESENT:  William Cosnowski, Jr.
18                  Leon Ekchian
19
20
21
22
23
24
25
                                              2
```

```
 1                TABLE OF CONTENTS
 2   WITNESS                                 PAGE
 3   JOACHIM KUPE
 4      EXAMINATION BY MR. KORNICZKY           5
 5
 6
 7
 8
 9                  EXHIBITS
10                                          PAGE
11      No. 32                                21
12      No. 33                                43
13      No. 34                                70
14      No. 35                                95
15      No. 36                               140
16
17
18
19
20
21
22
23
24
25
                                              3
```

```
 1              Troy, Michigan
 2              Thursday, September 5, 2002
 3              At about 9:05 a.m.
 4                 *   *   *
 5
 6          VIDEO OPERATOR:  We are on the
 7   record.  The time is 9:06 a.m.
 8          This is tape No. 1 of the videotaped
 9   deposition of Joachim Kupe being taken at the
10   offices of Esquire Deposition Services, 2560 Crooks
11   Road in Troy, Michigan, in the case of Litex, Inc.
12   versus Delphi Automotive Systems, United States
13   District Court, District of Massachusetts, Civil
14   Action No. CV 10910 (JLT).
15          Today is Thursday, September 5, 2002.
16   My name is Nancy Siemion Scott, video operator for
17   Esquire Deposition Services.
18          The attorneys will now introduce
19   themselves for the record and the reporter will then
20   swear in the witness.
21          MR. KORNICZKY:  Stephen Korniczky
22   representing the plaintiff Litex in this action.
23          MR. WEED:  Keith Weed of Heller,
24   Ehrman, White and McAuliffe representing defendants
25   and with me without a mike is Will Cosnowski of
                                              4
```

| | |
|---|---|
| 1  A.  Everybody's comments was exactly the same. | 1  A.  Yeah. |
| 2  We are doing something totally different than what | 2  Q.  And Joseph Bonadies is also not on the |
| 3  he's claiming in this patent and what we're doing is | 3  team? |
| 4  something -- it's not something new and has been | 4  A.  Joe is the program manager, so he's the |
| 5  published and has been patented earlier. | 5  team leader. |
| 6  MR. WEED:  Counsel, are you at a | 6  Q.  Okay.  Can you tell me what the budget for |
| 7  breaking point? | 7  the NTP project was in 2001? |
| 8  MR. KORNICZKY:  Yes, let's take a | 8  A.  For Joe's group was around 1,400,000, plus |
| 9  break. | 9  around 300 -- 350 at DRL, so to cover the DRL work, |
| 10  Off the record. | 10  Delphi Research lab. |
| 11  VIDEO OPERATOR:  Off the record.  The | 11  Q.  DRL is what you said? |
| 12  time is 2:30. | 12  A.  Delphi Research lab where Galen Fisher and |
| 13  (Brief recess.) | 13  Craig DiMaggio are part of. |
| 14  VIDEO OPERATOR:  We are back on the | 14  Q.  Excuse me you said Craig Fisher and -- |
| 15  record.  The time is 2:51 p.m. | 15  A.  No, Galen Fisher and Craig DiMaggio. |
| 16  This is tape No. 3 in the videotaped | 16  Q.  Are both with the DRL group? |
| 17  deposition of Joachim Kupe. | 17  A.  Delphi's Research Lab, yes. |
| 18  Please continue. | 18  Q.  Thank you.  And do you know what the -- |
| 19  Q.  (BY MR. KORNICZKY)  Mr. Kupe, turning your | 19  I'm sorry. |
| 20  attention back to Exhibit 35 on the first page, can | 20  A.  No, go ahead. |
| 21  you tell me who on this list is on the NTP project | 21  Q.  Was there more to the budget than the 1.4 |
| 22  team? | 22  million and the 350,000? |
| 23  A.  Joe Bonadies, Mark Hemingway, Dave Nelson, | 23  A.  Plus revenue that we got from PSA. |
| 24  Tom Silvis, Galen Fisher, Dave Goulette, Bob Lee, | 24  Q.  And what was that revenue? |
| 25  Pertrice Auguste, Bill Labarge, Robert Johnson, | 25  A.  I don't remember the exact numbers, but |
| 105 | 107 |

| | |
|---|---|
| 1  Rachel Tanner was, so she's no longer with us and | 1  Joe would be the person who can give me that. |
| 2  Pertrice Auguste too, Craig DiMaggio, Gene Ripley. | 2  Q.  Okay.  But approximately how much was |
| 3  Q.  What was the last name? | 3  that? |
| 4  A.  Ripley. | 4  A.  Could be four to five -- 450 maybe for |
| 5  Suresh Baskaran, Darrell Berling, Del | 5  2001. |
| 6  Lessor and Monty Smith.  Eric Mathias is in Europe. | 6  Q.  I'm sorry, was it four to 500,000 or four |
| 7  Q.  And how many of these people are still | 7  to five million? |
| 8  currently on the NTP project team? | 8  A.  Four to 500,000. |
| 9  A.  Mark Hemingway, Dave Nelson, Dave | 9  Q.  And do you know if this budget includes |
| 10  Goulette, Bob Lee, Craig DiMaggio and Galen Fisher | 10  salaries for the team members? |
| 11  finishing the work with PSA, Gene Ripley, and from | 11  A.  Yes. |
| 12  time to time with respect to the modeling of the | 12  Q.  Okay.  Do you know what the budget was in |
| 13  reactor, Del Lessor. | 13  2000? |
| 14  Q.  I'm sorry, what does Del Lessor do on the | 14  A.  In 2000 it was around 1.5 million. |
| 15  team? | 15  Q.  And was that the total budget? |
| 16  A.  From time to time modeling of the -- help | 16  A.  That's also on the group and then 400,000 |
| 17  the understanding of the reactor. | 17  at DRL, and revenue for -- and codevelopment |
| 18  Q.  And at the top of the page of course | 18  contribution from PSA too, so -- and I don't have |
| 19  yourself and Joseph Bonadies are on the team too? | 19  the number. |
| 20  A.  I'm not on the team and Joe is the program | 20  Q.  Okay.  I'm not looking for an exact |
| 21  manager. | 21  number.  You know, generally what do you recall it |
| 22  Q.  So you're not on the team? | 22  is? |
| 23  A.  No, I'm not.  I'm the chief engineer for | 23  A.  Could be in the 150.  I'm not quite |
| 24  all different other projects too. | 24  positive on that. |
| 25  Q.  And this was in 2001? | 25  Q.  Okay. |
| 106 | 108 |

27

Joachim Kupe                                                                    9/5/2002

1      A.   And on 2001 we had also some revenue from
2  California Energy Commission, so -- and I don't have
3  the number with me in my head.
4      Q.   Is it the California Energy --
5      A.   -- Commission, yes.
6      Q.   Okay.  And whatever that number was.
7           Is the California Energy Commission
8  the same organization that is referred to in Exhibit
9  34?
10     A.   Yeah.
11     Q.   And would that document provide us with
12  the budget that you're referring to?
13     A.   This was for the total program, so this
14  did continue payment until spring of this year.  So
15  I don't know the exact numbers that we got from CEC
16  in 2001.
17     Q.   Okay.  I guess let me see if this is the
18  answer.  I'm trying to understand the document on
19  page 23756.
20          Could you tell me if those are the --
21  would this be the way the budget was divided?
22          MR. WEED:  Objection.  The question
23  is ambiguous.
24     Q.   (BY MR. KORNICZKY)  Would the information
25  on page 23756 help you to recollect what the

                                                    109

1  California Energy Commission contribution was to
2  Delphi's NTP project for 2001?
3      A.   No.
4      Q.   No.
5           Do you know what this chart is
6  explaining on page 23756?
7      A.   It's explaining the technical person's
8  salary, travel, equipment, materials, direct cost
9  and everything that you would need to develop the --
10 to accomplish the task that was described.  Mark
11 Harvey, the accountant, could give you a better
12 explanation.
13     Q.   Okay.  We'll follow up with him.
14          What about 1999, do you know what the
15 budget is for the NTP program or the NTP project
16 that year?
17     A.   It was around 1.5 million.
18     Q.   And would there be any contributions from
19 DRL or PSA?
20     A.   I've already included the DRL in that, and
21 PSA we didn't have the codevelopment by then.
22     Q.   Okay.  And do you know the --
23     A.   The CEC wasn't part of that neither.
24     Q.   Okay.  What about the budget then for
25 1998?

                                                    110

1      A.   I don't know.  I wasn't here.
2      Q.   Okay.
3      A.   I wasn't part of the project.
4      Q.   And I guess you wouldn't know the budget
5  then for '97 either?
6      A.   No.
7      Q.   Okay.  Thank you.
8      A.   You're welcome.
9      Q.   And do you know the budget for this year?
10     A.   Yes.
11     Q.   What is that?
12     A.   For NTP around 1,700,000.
13     Q.   And are there any contributions from DRL?
14     A.   For DRL, that's 200,000.
15     Q.   And what about from revenue from PSA?
16     A.   From PSA, what I could say is the total
17 we've got from PSA up-to-date is around $720,000 for
18 the -- since we got the codevelopment program.
19     Q.   So as I understand it then last year the
20 revenue from PSA was approximately four to 500,000
21 and then combined with 2001 and 2002 it's
22 approximately 720,000 combined?
23     A.   Yes.
24     Q.   Okay.  Thank you.
25     A.   You're welcome.

                                                    111

1      Q.   And did you say there was any contribution
2  from the California Energy Commission?
3      A.   Yeah, the total that we got from CEC, the
4  total of project -- well, the funding was over, was
5  around 220 -- 23 or $33,000.
6      Q.   I'm sorry, could you repeat that, was
7  around 23?
8      A.   223 or 33, so that's I'm not quite sure
9  about the two last digits, but that's what we got
10 from CEC.
11     Q.   Is it 23,000 or 33,000 or 2300?
12     A.   223,000 or 233,000, so I'm not quite sure
13 about the 23,000 or 33,000.
14     Q.   Okay.  Very good.  Thank you.
15     A.   You're welcome.
16     Q.   Before the break one of the things that
17 you mentioned was or you had said words to the
18 effect that what Delphi is doing on its NTP device
19 is totally different from the Litex concept.
20          Can you explain that again, the
21 difference?
22     A.   The Litex patent claim is an ozone
23 generator off-line and inject ozone in front of a
24 catalyst and make this catalyst working better, or
25 put this ozone generator partially, at least

                                                    112

                                                    28

Joachim Kupe, Vol II          CONFIDENTIAL ATTORNEYS' EYES ONLY                    9/26/2002

```
 1  at the GPC.  We've been publishing at the DEER
 2  conference, yes.
 3       Q.   So much of this work has been published;
 4  correct?
 5            MR. WEED:  Objection.  The question
 6  is vague.
 7            THE WITNESS:  The concept and the
 8  results have been published, but how you -- what --
 9  what the reactor is and how it's big, no.  You
10  can't -- well, you're a patent attorney, so you know
11  what we're talking about.  You publish what people
12  can learn and know, but you don't disclose what you
13  think you have as an edge compared to in the
14  industry in the public papers.
15            Is that new to you?  No, I don't
16  think so.
17            MR. WEED:  No.
18       Q.   (BY MR. KORNICZKY)  Let me rephrase.  Let
19  me sort of ask the question a different way.
20            The work that was done eight years
21  ago is well known today; correct?
22            MR. WEED:  Objection.  The question
23  is vague.
24            THE WITNESS:  Let me answer like
25  this:
```

                                            274

```
 1  efficient and economical system necessary for a
 2  potentially viable commercial product.
 3       A.   Mm-hmm.
 4       Q.   What sort of resources does it take to
 5  accomplish that goal?
 6            MR. WEED:  Objection.  The question
 7  is hopelessly vague.
 8            THE WITNESS:  Could you be precise
 9  what you mean by type of resources?
10       Q.   (BY MR. KORNICZKY)  Manpower, money,
11  codevelopment partnerships, what's required to
12  accomplish that sort of a goal?
13            MR. WEED:  Objection.  The question
14  is still vague.
15            THE WITNESS:  This is, this is a
16  general question, so, and I can't give you any
17  specific.
18            You need a lot of resources, human
19  resources, test infrastructure, test development
20  equipment, partners and money.  You need all of
21  that, so I can't give you any specific.
22            This, look at history of everything
23  that last been developed from car to bike to
24  telephone to TV and so on, you will see what it
25  takes to get from a concept to a product, and the
```

                                            276

```
 1            A development process takes time,
 2  okay.  It's not like magic, you initiate a project
 3  today and tomorrow you have a product.
 4            So there has been effort put in
 5  developing this, the reactor, the power supply and
 6  the catalyst, and this effort started end of '94 and
 7  the project started then in May '95.  So there have
 8  been effort put in developing and this has been
 9  ongoing until now that we shelf it.
10            So it's an ongoing effort and that's
11  development.  So it's not miracle.
12       Q.   (BY MR. KORNICZKY)  Then explain to me
13  what type of information Delphi does publish in
14  articles or at conferences relating to the NTP
15  project.
16       A.   You talk about things that you think will
17  not disclose anything that you want to have secret.
18  That's it.
19       Q.   What type of information is Delphi not
20  concerned about having public?
21       A.   I have papers, you have papers, where we
22  have presented results.
23       Q.   At the end of the paragraph you talk about
24  overcoming numerous difficult technical and business
25  hurdles to develop a durable, high quality, energy
```

                                            275

```
 1  rule is you will have to sell to car manufacturers
 2  who will put it on a vehicle and sell it to
 3  customers and all of this has to be taken into
 4  account.
 5            The point that we're making here,
 6  durable, high quality, energy efficient, economical,
 7  you have to be able to sell it, so those are all
 8  criteria that need to be fulfilled for you to be
 9  able to sell anything to customers and until -- a
10  lot of resources and I can't be specific on any of
11  them.
12       Q.   Okay.  And, I'm sorry, I wasn't trying to
13  get specific.  I guess I was trying to get a general
14  idea.  It's certainly going to take millions of
15  dollars; correct?
16            MR. WEED:  Objection, vague.
17            THE WITNESS:  I can't answer this
18  question the way you ask it.  This is speculation.
19       Q.   (BY MR. KORNICZKY)  Well, let me ask you
20  this then:
21            How many engineers are working on
22  Delphi's NTP project as of the time you signed this
23  declaration?
24       A.   It could be 12 or 13 at the time I signed
25  this declaration.
```

                                            277

                                                                    16

Joachim Kupe, Vol II          CONFIDENTIAL ATTORNEYS' EYES ONLY                 9/26/2002

| | |
|---|---|
| 1    Q.   Correct.<br>2    A.   Yeah.<br>3    Q.   And what about last year?<br>4    A.   We were in the 20 and above.<br>5    Q.   Okay. Thank you.<br>6    A.   25 -- I'm not quite -- I'm not positive,<br>7 but we had a lot, so...<br>8    Q.   And in your declaration you stated that<br>9 Delphi dedicated over seven million dollars to the<br>10 NTP project; correct?<br>11    A.   Mm-hmm.<br>12    Q.   To get the project to completion, assuming<br>13 Delphi did not shelf the product, it would certainly<br>14 take at least that amount; correct?<br>15    A.   That's speculative and I don't know.<br>16    Q.   Okay. To what extent is it necessary to<br>17 have codevelopment partners to achieve the goal of<br>18 developing a durable, high quality, energy efficient<br>19 and economical system necessary for potentially<br>20 viable commercial product?<br>21    MR. WEED: Objection. The question<br>22 is vague and calls for speculation.<br>23    THE WITNESS: To me there is no<br>24 general rule, okay. There is no general rule.<br>25 Experience does show that developing with a customer<br><br><div align="center">278</div> | 1 when you said that it's spurred by emission control<br>2 regulations?<br>3    A.   Mm-hmm.<br>4    We have different regulations here,<br>5 so we have in Europe what we call Euro 4 and then<br>6 what we call Euro 5.<br>7    Here in the U.S. it's a '07<br>8 regulations coming and then the question is as you<br>9 develop a technology what are the kind of technology<br>10 that will help you meeting the emission regulations<br>11 that has been here regulated.<br>12    Now in Europe Euro 4 you wouldn't<br>13 need -- for small cars, for smaller cars you would<br>14 not need any -- you would not need any after -- NOx<br>15 aftertreatment device for passenger cars.<br>16    For Euro 5 you might need, you might<br>17 need it, and maybe also no because probably diesel<br>18 particulate filter will be used and the car<br>19 manufacturer will do everything to tune the engine<br>20 so that you make more particulate and lot less NOx<br>21 and you could meet that with -- so you could use<br>22 then particulate filter and avoid using a NOx<br>23 aftertreatment device, but for the -- and then on<br>24 the heavy-duty side they have in Europe they have<br>25 settled already up on using -- almost settle up to<br><br><div align="center">280</div> |
| 1 will help you to be more focused and to meet<br>2 requirement as they are expected in the reality as<br>3 developing something on your own and then try to hit<br>4 the market afterward. So this is experience.<br>5 That's what I -- I can -- there is no general rule,<br>6 but that's what experience teach me.<br>7    MR. KORNICZKY: Can we go off the<br>8 record?<br>9    VIDEO OPERATOR: This completes tape<br>10 one. Off the record 11:07 a.m.<br>11    (Brief recess.)<br>12    VIDEO OPERATOR: This is tape two of<br>13 the deposition of Doctor Joachim Kupe. We're on the<br>14 record at 11:14.<br>15    Please continue.<br>16    Q.   (BY MR. KORNICZKY) Mr. Kupe, in paragraph<br>17 nine of your declaration you state: Since<br>18 automotive manufacturers' demand for exhaust<br>19 aftertreatment technology is spurred by emission<br>20 control regulations, demand for an NTP exhaust<br>21 treatment product is not anticipated until at least<br>22 2009 when it may have limited application to assist<br>23 automotive manufacturers in fully complying with<br>24 more stringent emission standards.<br>25    Can you explain to me what you meant<br><br><div align="center">279</div> | 1 using SCR that I explained earlier, so, and you know<br>2 what kind of conversion efficiency they would need<br>3 to meet those kind of regulations.<br>4    Here in the U.S. we only have<br>5 heavy-duty who is diesel, light-duty or passenger<br>6 cars are questionable, who knows, but then there is<br>7 also a -- there is a regulation which is tough, but<br>8 they don't need to meet that by '07.<br>9    So there is room for -- how do you<br>10 say that? -- to transition from where they would be<br>11 to this most stringent emissions regulations and<br>12 this will probably be the transition time might go<br>13 from '07 to '010. So when they would really need a<br>14 high conversion efficiency is by '010 be it here or<br>15 in Europe, and that's where if you were to use SCR<br>16 maybe to help it increase the performance you might<br>17 need an NTP reactor to help it, but this is '010,<br>18 it's eight years from now. You don't know what<br>19 technology will come out tomorrow and make all these<br>20 things obsolete or whatsoever.<br>21    So those are the kind of things that<br>22 it's almost entailed here.<br>23    Q.   So if a technology came out tomorrow that<br>24 could meet stricter emissions requirements, do you<br>25 think that the government would then make the<br><br><div align="center">281</div> |

<div align="right">17</div>

1  referring specifically to the language you just
2  read:
3            We need to provide examples that this
4  technology is currently available or that Delphi is
5  actively marketing this product to companies.
6  Marketing brochures and the like are a good way to
7  do this.
8            Why was it important to seek out this
9  information?
10      A.   This is not me talking, so this is
11  probably what the R&D -- R&D 100 award submissions
12  or the R&D 100 award committee look at in the
13  dossier or the submissions for candidate applying
14  for this prize.
15      Q.   So that type of information would increase
16  the chances that Delphi could win this award?
17      A.   That was not Delphi.  That's PNNL and
18  Delphi.
19      Q.   Correct.  So this type of information that
20  was being sought would increase Delphi and PNNL's
21  chances of winning this award?
22      A.   This is part of the document that they
23  request for being considered.
24      Q.   Was this technology currently available at
25  this time?

                                                  358

1      A.   The technology of plasma catalysis is
2  there.  The concept is there so -- and I give you an
3  example.  They look at the innovativity -- my kids
4  laugh about this -- innovativeness of what is being
5  proposed.  Technology does not have to have
6  necessarily a product or something in production.
7  It is the technology.
8            Last year PNNL, Ford -- or the LEP
9  and people did get an R&D 100 award just for the
10  innovativeness that was included in the new
11  materials of the catalyst that was tested in the
12  past.  So it doesn't mean that you have to have a
13  product or you have a technology that has been
14  proven to be implemented and so on, and then this is
15  a good example that the LEP CRADA did get, and among
16  this one of my guy who was part of this in the past,
17  they got the R&D 100 award prize for the new
18  catalyst that they did develop that we know nobody
19  has the catalyst that works with NTP yet, but this
20  has been awarded.
21      Q.   So the technology that's being referred to
22  in this e-mail is strictly a catalyst?  Explain that
23  for me.
24      A.   The technology that we want to go after
25  here was plasma-assisted catalysis, so reactor --

                                                  359

1  power supply, reactor and catalyst, and I don't
2  remember whether we had also a DPF, diesel
3  particulate filter, in it.  It's the idea, the
4  novelty of the idea.
5      Q.   And did Delphi and PNNL win this
6  particular award?
7      A.   No, we did not.
8      Q.   Okay.
9      A.   You would have seen that in a press
10  release if we were -- if we would have won that.
11      Q.   In the -- on the next page of this
12  exhibit is a letter from Darrell Herling -- I'm
13  sorry, to Darrell Herling from Jean Botti.
14           Do you know if is the letter that
15  actually went out?
16      A.   Yes.
17      Q.   Okay.  Can you explain what this letter
18  means in the first paragraph where it says:  In
19  fact, Delphi has labeled this as one of our crown
20  jewel technologies?
21      A.   I think it's we have been working hard on
22  this technology and we were very hopeful that this
23  will and could make a difference.  So it was a --
24  considered as a crown jewel technology, meaning a
25  technology that you could go and get it related to

                                                  360

1  Delphi, but -- and this is February, so we hit the
2  hard reality in March and that's gone.
3      Q.   That same sentence says:  We have put
4  significant effort into developing this system to a
5  commercial-ready product.
6            Did Delphi have a commercial-ready
7  product at the time of this letter?
8      A.   No.
9      Q.   The next sentence says:  We are
10  continually reaching inquiries from our customers
11  worldwide about this product and how it can be
12  applied to their line of vehicles to meet
13  near-future emissions regulations.
14           You know, what sort of inquiries is
15  Delphi receiving?
16      A.   Inquiry to give presentation, how far are
17  you, do you have the parts that can be tested and
18  these kind of things.
19      Q.   Do you know what sort of marketing of this
20  catalyst has been done by Delphi?
21      A.   Again, define for me catalyst.
22      Q.   I'm sorry, of the -- I'm referring to the
23  technology that is being submitted for this award.
24      A.   The technology that was submitted here is
25  this system; a reactor, power supply and catalyst

                                                  361

                                                  37

```
 1   for sure.  I don't remember whether we had also the
 2   particulate filter in it since like I mentioned last
 3   year the catalyst part did go.  There was already an
 4   R&D award on just the catalyst.
 5       Q.   So in 2002 the invention -- the idea that
 6   was being submitted or the technology that was being
 7   submitted was the NTP system?
 8       A.   Was the total system, yes.
 9       Q.   I understand.
10            Now it says that Delphi has labeled
11   this as one of our crown jewel technologies.
12            Do you know who at Delphi came up
13   with the term or the concept that this NTP system
14   was a crown jewel?
15       A.   Crown jewel, I don't know who came up with
16   the term crown jewel.
17       Q.   Do you agree with this statement that the
18   Delphi NTP system at least at the time of this
19   letter was one of Delphi's crown jewels?
20            MR. WEED:  Objection.  The question
21   is vague.
22            THE WITNESS:  The letter says it.
23       Q.   (BY MR. KORNICZKY)  So you agree with the
24   letter?
25       A.   Yes.
```
                                              362

```
 1       Q.   Okay.  Thank you.
 2            The next paragraph says:  Through our
 3   involvement with the Pacific Northwest National
 4   Laboratory, we have been able to develop the various
 5   plasma processing catalysts.
 6            And the sentence goes on.
 7            Are you claiming -- well, that
 8   sentence is written in the past tense.  At the time
 9   of this letter did Delphi and PNNL develop a plasma
10   processing catalyst?
11       A.   No, you aren't reading right.  So there is
12   a comma after processing and catalysis.  So the
13   letter reads:  Through our involvement with the
14   Pacific Northwest National Laboratory, we have been
15   able to develop the various plasma processing,
16   catalysis and control system technologies.
17            So that's how it reads.
18       Q.   I see.  And then continuing on:  Control
19   system technologies necessary to move this system to
20   a commercial-ready product?
21       A.   Right.
22       Q.   So did Delphi have a commercial-ready
23   product?
24       A.   No.
25       Q.   In your view doesn't this sentence state
```
                                              363

```
 1   that Delphi has a commercial-ready product?
 2            MR. WEED:  Objection.
 3            THE WITNESS:  No.
 4       Q.   (BY MR. KORNICZKY)  Can you explain to me
 5   why it does not?
 6            MR. WEED:  Objection.  The document
 7   speaks for itself.  The question, therefore, lacks
 8   foundation and is argumentative.
 9            You may answer if you can.
10            THE WITNESS:  Well, that's just an
11   English sentence, so you should be able to
12   understand it.
13       Q.   (BY MR. KORNICZKY)  And I would like to
14   understand your understanding of why it doesn't
15   state that Delphi has developed a commercial-ready
16   product?
17            MR. WEED:  Objection.  The question
18   lacks foundation and is argumentative.
19            THE WITNESS:  We have been developing
20   to move towards.
21            We were not there yet and we are not
22   there yet and that's why we stop it.  To move.
23       Q.   (BY MR. KORNICZKY)  But in that first line
24   it says:  We have been able to develop these various
25   components necessary to move this system to a
```
                                              364

```
 1   commercial-ready product.
 2            So doesn't that mean that Delphi and
 3   PNNL have the capability today to move it to a
 4   commercial-ready product if it wanted to?
 5            MR. WEED:  Objection.  The question
 6   lacks foundation and is --
 7            THE WITNESS:  This is --
 8            MR. WEED:  Please.
 9            And is argumentative.
10            Answer the question if you can.
11            THE WITNESS:  This is written
12   February 21st.  We're developing and we're hoping
13   that we have a catalyst that works.  It proved not
14   to be the case in March and that's it.  No crown
15   jewel, no technology proven, no product.
16       Q.   (BY MR. KORNICZKY)  So Delphi and PNNL
17   applied for this award which you referred to as a
18   Nobel Prize in the industry, but it didn't even have
19   a product?
20            MR. WEED:  Objection.  The question
21   is argumentative.
22       Q.   (BY MR. KORNICZKY)  A commercial-ready
23   product?
24            MR. WEED:  Argumentative.
25            THE WITNESS:  I explained it to you
```
                                              365

                                              38

# Exhibit 14

# Transcript of the Testimony of

**Date:** April 7, 2004
**Volume:**

**Case:** Litex Inc. v. Delphi Automotive Systems Corp.

Printed On: April 22, 2004

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

- April 7, 2004
Litex Inc. v. Delphi Automotive Systems Corp.

Page 835

1  supervision or jurisdiction?
2      A   April 1997.
3      Q   And at that time where, um, was it in this
4  development phase we've been talking about?
5      A   It was in the TDP phase, Technology
6  Development Process.
7      Q   And we know at some point in time it moved
8  from TDP to ADP.  Correct?
9      A   Yes.
10     Q   And when did that occur?
11     A   That was end of October 1999.
12     Q   All right.  So starting -- starting
13  roughly in November of 1999, the NTP product moved
14  in -- moved into ADP; is that correct?
15     A   That's correct.
16     Q   Uh, Did it ever leave ADP?
17     A   Never.
18     Q   We'll get to that in a minute.  Because
19  the project has been cancelled?
20     A   Yes.
21     Q   Let me ask you this:  In July, if you can
22  focus on July of 2001, what was your level of

Page 836

1  confidence at that point in time that the nonthermal
2  plasma exhaust aftertreatment project would ever get
3  out of ADP?
4      A   Very minimal at that time.
5      Q   And why was it very minimal at that time?
6      A   Because we're going through a phase of the
7  disappoint with the technology.  Uh, if you look at
8  the system, you know, you have three main components
9  of the system.  You have the parts supply, you know,
10  the electronics.  And that basically gives, you know,
11  the frequency and the current necessary for the
12  device to work at.  So it was -- the device involved
13  was not working.  It was consuming a lot of fuel.
14  You know we had a goal of less than 3 percent.  And
15  were at 8 percent through consumption.  It was
16  totally unacceptable even in diesel, you know, engine
17  environment.
18      So that's what was a big -- a big problem.
19  The second one was we had such good results with
20  synthetic gas in the labs --
21     Q   Is this the bench testing?
22     A   Yes.

Page 837

1      Q   Go ahead.
2      A   Bench testing, synthetic gas.  You know,
3  we had that unit that we had constructed.  And, you
4  know, we could never replicate the results in the
5  real world.  And so it was taking not only a lot of
6  fuel consumption, you know, 1 kilowatt per
7  consumption, and -- and so which translated more than
8  8 percent fuel consumption.
9      And on the other, the catalyst, we could
10  never match the reactor with the catalyst.  And we
11  had tried so many combinations that I was getting
12  very skeptical about the technology at that time.
13      On top of that, after you say that, I was,
14  you know, developing technologies that showed a lot
15  more promises, you know, in terms of I would say
16  results.  In particular, one of them was the hydrogen
17  enrichment technology --
18     Q   What is hydrogen enrichment technology?
19     A   Basically it's a reformer that we started
20  to develop during our fuel cell project that
21  generates, takes out of gasoline or diesel, generates
22  hydrogen and that hydrogen and CO -- it's also

Page 838

1  generic CO -- is an excellent reductor for a
2  particulate, you know, particulates in the
3  particulate filter and also it's an excellent
4  reductor for NO.
5      So that was a device that we could apply
6  for very low emissions, both on gasoline and diesel.
7  And we had -- we were starting to have excellent
8  feedback from that technology.
9      Q   All right.  I want to shift gears a bit.
10  We were talking a little bit about budgets before,
11  but I want to go back and pick up on that subject.
12  All right?
13     A   Yes.
14     Q   Um, focussing on the body of let's say
15  1999 through 2001.
16     A   Yes.
17     Q   You were still the director of the
18  Customer Solutions Center --
19     A   Yes.
20     Q   -- when you had moved to the Innovation
21  Center.  Yes?
22     A   Yes.

41 (Pages 835 to 838)

- April 7, 2004
Litex Inc. v. Delphi Automotive Systems Corp.

Page 839

1    Q    What was your overall budget, if you can,
2    for each of those years approximately?
3        A    Concerning the -- the NTP product?
4        Q    No, the total budget.
5        A    The total budget at that time was around
6    $60 million per year.
7        Q    And focusing on the years 1999, 2000, and
8    2001 what was your approximate budget for the NTP
9    project?
10       A    Approximately, it was between 2 and
11   $2.5 million, depending on the year, but that was the
12   annual amount that I had available there for that
13   project.
14       Q    All right.  And I think you became the
15   director or the chief technologist of the Innovation
16   center sometime in 2000.
17       A    In 2002.
18       Q    Excuse me 2002.
19       A    January 2002.
20       Q    Right.
21       A    And --
22       Q    What was the overall budget for the

Page 840

1    Innovation Center let's say in 2002?
2        A    100 million.
3        Q    Now, did you have to set the budget for
4    each of the project a under your direction?
5        A    Absolutely.
6        Q    And, uh, did you have to set a budget for
7    2003 for the NTP program?
8        A    Yes.
9        Q    And when did you first start doing that?
10       A    Well, we usually do that in the summer
11   periods, so it goes starting, you know, from
12   June until probably August, so that we can set the
13   next fiscal, you know, I would say budget, this peer
14   budget, right at the beginning of January.
15           So my work, we prepared a budget that goes
16   from June until I will say the end of August.
17       Q    And what was the budget that you
18   established for the NTP project in the summer of 2001
19   for 2002?
20       A    I cut by half basically.  I was, you know,
21   I gave my folks around $1 million to play with.
22       Q    And why did you cut the budget in half at

Page 841

1    that time?
2        A    Because, as I said, I knew I was going to
3    make a tough decision.  I knew that I was going to
4    cancel that project.  And I needed to assign more
5    money to more departments in performance and
6    technology like hydrogen enrichment.  And, you know,
7    the finger Steve needed to carry on was the
8    predevelopment research contract that I had with PSA,
9    so I could finish my books, you know, on the right --
10   in the right way.
11       Q    I think you may have answered this
12   question.  But given your pessimism about the project
13   in the summer of 2001, why didn't you just cancel it
14   at that point in time?
15       A    Well, when -- when you work with customers
16   and you have, you know, co-development agreements,
17   you want to make sure that you close it, you know,
18   the right way.  I could have done it the next day,
19   but I felt I hold, you know, the last tests that we
20   needed to have just to confirm that the science was
21   not there for that technology.
22           And I told my -- my team, uh, you're going

Page 842

1    to pursue and close the books.  And that's why we
2    didn't even go through a, you know, the last gate;
3    that we only finished at the DD gates, you know,
4    which is, uh, the gate just before confirmation and
5    transfer because I said that's where we need to stop
6    it at that point.
7        Q    Now, uh, was there sort of a project
8    manager for NTP -- well, let me ask you this question
9    and I'll withdraw that.
10           Dr. Kupe reported to you?
11       A    Yes.
12       Q    And I think he testified was the chief
13   engineer on the NTP project.
14       A    Yes.
15       Q    And was there, in essence, somebody who
16   had the day-today management of the project, a
17   project manager at that time?
18       A    Yes, you had two, uh, yes.  Um --
19       Q    Is that Mr. Bonadies, Joe Bonadies?
20       A    Mr. Bonadies was the -- the -- the -- the-
21   the manager I would say of the project.
22       Q    And at some point in time after you had

42 (Pages 839 to 842)

- April 7, 2004
Litex Inc. v. Delphi Automotive Systems Corp.

---

Page 887

1   So at that time in 2001 uh, we had that
2   206 PSA Peugeot that was going around the United
3   States. We have a particulate filter. And, uh, to
4   show that, you know, you could have low diesel
5   emissions, but it was a concept car.
6      Q   Right.
7      A   And, quite honestly, uh, if you go to the
8   shows and you get concept cars, most of them don't
9   work. And it happened that the filter was working
10  because it was less production but the nonthermal
11  plasma was not inactive.
12     Q   So --
13     A   It was not working.
14     Q   Okay.
15     A   But it was -- it was one of the -- the --
16  it was one of the technologies that we were, you
17  know, really doing R and D on. It was part of what
18  we call our crown jewels. And it was reported as
19  such here. But I -- I don't work in those reports
20  quite frankly, so I don't know how this --
21     Q   Well, let me -- let me just ask you this
22  question. It says featuring -- the vehicle featured

---

Page 888

1   NTP exhaust aftertreatment. And then it says which
2   significantly reduces oxides of nitrogen emissions --
3      A   Uh-huh.
4      Q   -- enabling more rapid use of advance fuel
5   efficient energy technologies.
6         Now, is that an accurate statement?
7      A   Uh, if it were into to a bench or
8   synthetic gas, yes.
9         (Counsel briefly confers with co-counsel.)
10        BY MR. LAUTER:
11     Q   Well, is the state -- so for the
12  Peugeot 206 vehicle that featured NTP the NTP didn't
13  significantly reduce the -- the NOx?
14     A   Correct.
15     Q   Uh, around this time, um, around the end
16  of that, I guess -- by this time, uh, Delphi had made
17  a diesel business purchase and -- and -- and what was
18  doing a lot of that common fuel rail injection system
19  type of work. Correct?
20     A   Correct.
21     Q   Uh, is it the case that --
22     A   Not a lot.

---

Page 889

1      Q   Not a lot?
2      A   Because it's the starting point of the
3   rail --
4      Q   Is the case --
5      A   -- you know, the common rail.
6      Q   Is it the case that the NTP technology
7   made it into the annual report in 2001 partly
8   because the company was hoping, expecting that the
9   nonthermal plasma exhaust aftertreatment system would
10  enhance, uh, uh, you know, the pollution -- would --
11  would decrease emissions in diesel engines and --
12  and -- and have a synergistic effect with Delphi's
13  attempt to build up its diesel business at that time?
14     A   Well, it was, you know, that the R and D
15  developments we've had, this one was a technology
16  aimed at that.
17     Q   And, uh, and that was strategically an
18  important business for the company to grow at the
19  time. Correct?
20        MR. WEED:  The diesel?
21        THE WITNESS:  The diesel?
22        BY MR. LAUTER:

---

Page 890

1      Q   The diesel business.
2      A   The diesel business, yes.
3      Q   So my question is -- and I know your
4   answer was that the NTP exhaust aftertreatment system
5   worked on diesel. But by question is a little
6   different. It's didn't -- as of July 2001 --
7      A   And I want to make sure.
8      Q   Right.
9      A   It never worked on diesel.
10     Q   Okay.
11     A   We could never make it work.
12     Q   Okay. Well, as of -- that was designed to
13  go with a diesel. Is that a better way to say it?
14     A   It was designed to be on diesel and lean
15  burn engines but --
16     Q   And isn't it --
17     A   -- it didn't work.
18     Q   -- the case that in July -- and that as of
19  July 2001 the company had expectations that the NTP
20  exhaust aftertreatment system would have a
21  synergistic effect for its business and help it to
22  compete in the diesel business?

---

54 (Pages 887 to 890)

Page 891

1    A   If I were to represent the company, I
2 would say no.
3    Q   Okay.
4    A   I had no expectation right in July that
5 this would ever work.  The results I got through the
6 PSA development were just not there.
7    Q   Would you turn, sir, to PTX -- it's in the
8 ones under the tab with Mr. Runkle's name on it, but
9 it's PTX 51.
10       This is an August 1 -- PTX 51.  It's the
11 August 1, 2000 press release --
12       MR. BRAINERD:  I'm sorry, Jack.  What was
13 that number again?
14       MR. LAUTER:  PTX 51.
15       MR. BRAINERD:  Thank you.
16       BY MR. LAUTER:
17    Q   In August 1, 2000, Delphi press release.
18 The title indicates that Delphi has won 800 million
19 in its diesel common rail injection business.
20       Do you see that?
21    A   Correct.
22    Q   It refers to the companies recent diesel

Page 892

1 business acquisition.
2    A   Correct.
3    Q   And at the time who was Delphi's major
4 competitor in diesel?
5    A   Bosch was the main competitor.
6    Q   Uh, Did Delphi have expectations as of the
7 summer of 2001 that if the NTP project passed through
8 all the gates and they did made to commercial -- I
9 know it didn't -- but if it did, it would, uh,
10 enhance Delphi's ability to compete with Bosch in the
11 diesel business?
12    A   In the aftertreatment diesel --
13    Q   Right.
14    A   -- because it's not obvious that you will
15 have the -- the diesel capability and fuel injection.
16 More and more, in fact, is you find out that most of
17 the OEMs separate exhaust from fuel injection.
18    Q   Okay.  So my question then -- I'll amend
19 it.  In the aftertreatment system business was that
20 the company's hope and expectation that NTP, the NTP
21 exhaust aftertreatment system, would enhance their
22 ability to compete against Bosch for that business,

Page 893

1 the exhaust -- the diesel exhaust aftertreatment?
2       MR. BRAINERD:  In what time frame?  The
3 time of this --
4       BY MR. LAUTER:
5    Q   July 2001.
6    A   In July 2001.  But I said that's when I
7 started to download it, so I don't think it was an
8 expectations there.
9       Now, if you ask the question, would NTP --
10 he has the fact of Ekchian to penetrate
11 aftertreatment technology.  These, I would say, yes.
12 That's the reason why we constructed it.  But since
13 it didn't work, there was no penetration to be
14 expected.
15    Q   Right.  But as of 2000 -- July 2001, did
16 the company know it wouldn't work, or was that your
17 personal opinion?
18    A   No.  I think -- I mean, you know, like
19 every big company there is inertia.  But I already
20 had given my opinion to my upper management that this
21 thing was not going the way I wanted it.
22    Q   Now, and just to close the loop on -- on

Page 894

1 the synergistic effect it might have in diesel
2 exhaust aftertreatment.  If you go to the bottom of
3 PTX 501 -- 50 -- PTX 51 at the bottom of that first
4 page.  There's a statement there --
5    A   Yes.
6    Q   -- further exhaust particulate and NOx
7 emission reductions will be possible with Delphi's
8 comprehensive system solutions for exhaust
9 aftertreatment.  For example, Delphi is developing a
10 nonthermal plasma exhaust system that will allow
11 diesel engines to meet stringent NOx emission
12 standards and reduce particulates and hydrocarbons.
13       And then Mr. Hachey's comment --
14 H-A-C-H-E-Y -- is then quoted.  Who is Mr. Hachey?
15    A   He is the president of the Division of
16 Energy and Chassis.
17    Q   And he's quoted as saying, we are very
18 excited about the potential for a revolutionary
19 nonthermal plasma exhaust system with its huge
20 reduction in emissions, particular for NO and
21 particulates, which are the biggest challenges for
22 diesel engines?

55 (Pages 891 to 894)

Page 895

1    A   Uh-huh.

2    Q   And my question to you, sir, is: Didn't
3  the company have a realization at the time that they,
4  uh, purchased the diesel business, made the diesel
5  business acquisition, that the best way to compete
6  against Bosch, increase their market share and
7  leverage in the business was to focus on exhaust
8  aftertreatment because there they thought they could
9  get an advantage over Bosch that because they might
10  have a leave?

11    A   Not necessarily. Because, uh, as you can
12  see here, Mr. Hachey says, Potential. So it's still
13  very hypothetical. In fact, when you look at the
14  date of the release, this was 2000. So we're still
15  way up in TDP. And, obviously, that could only have
16  been speculation.

17    Q   Okay.

18    A   It could not have been built into a -- a
19  real solid case.

20    Q   Well, was there speculation like that
21  about the company, let's say, in August of 2000 when
22  this was -- when this press release went out?

Page 896

1    A   Like every hour in the projects yes, I
2  would say that was part of the things. Like I said
3  at that time, it was part of our crown jewels.

4    Q   And was there still speculation to that
5  effect in July 2001 among some people in the company?

6    A   Not anymore. From my level to, uh, it was
7  pretty clear already, you know. I told my management
8  I was going to stop the project.

9    Q   Uh, did the management ever give -- you
10  had told them that as of July 2001?

11    A   Well, I started to, uh, update the
12  management after we had that PSA review that will
13  show that the results were disastrous. And, uh, you
14  know, I -- I had to step up and tell my management
15  that, because I was a customer interface, and there
16  was a shared, I would say, development that I needed
17  to update the management and say, We're not going
18  anywhere with this.

19    Q   And do you recall about when that
20  occurred?

21    A   Uh, PSA review, quite honestly, I -- I --
22  I don't recall, but it was -- I'm sure it was before

Page 897

1  July 2001. It must have been in the spring of 2001
2  when we started to get those terrible results.

3    Q   You mentioned that one of the problems had
4  to do with the power supply and all of things that
5  that required. And then there was -- also you
6  mentioned the catalyst.

7    A   Yes.

8    Q   Uh, but fast forwarding to 2002, the, uh,
9  catalyst portion of the program was cancelled before
10  the power supply; is that correct?

11    A   The catalyst portion?

12    Q   Right.

13    A   Yes.

14    Q   And the NTP reactor portion of the program
15  was cancelled in the fall of 2002?

16    A   Yes.

17    Q   Now, the cancellation of the NTP project
18  occurred I think you said in October?

19    A   October.

20    Q   And was it -- it was only a few days
21  after, uh, the deposition of -- of one or two of your
22  higher level people in -- in -- at Delphi, whether

Page 898

1  the technical side or otherwise. Was there -- was
2  that a total coincidence or was there any connection
3  between the cancellation and the policy and the
4  lawsuit?

5    A   Total coincidence. Because, uh, our
6  schedules are pretty set, you know, in term of
7  reviews. So I -- that was not in relationship to
8  that.

9    Q   Well, the --

10    A   No.

11    Q   There was not -- you will agree with me
12  that in terms of the cancellation of the NTP portion
13  of the project there was not a lot of documentation
14  associated with that as you'd expect to see in a big
15  company, was there?

16    A   You mean before or after? After the DD
17  review or before?

18    Q   I mean, in the fall of 2002 when the
19  project was quote/unquote shelved. I think I saw
20  that word in one of the depositions.

21    MR. BRAINERD: Your Honor, he testified as
22  cancelled.

56 (Pages 895 to 898)

- April 7, 2004
Litex Inc. v. Delphi Automotive Systems Corp.

Page 955

1   A   Uh, sometime, uh, before May 4, 2001.
2   Q   Would you skip to page 447 of the
3   document.
4   A   Okay.
5   Q   You got that one?
6   A   Yep.
7   Q   In general, what is shown on this page?
8   A   It's a summary of the results that we
9   obtained.
10  Q   And results obtained as of when?
11  A   Uh, as of May 4, 2001.
12  Q   And what is set forth in the fifth bullet
13  point here? Could you just tell me, in general, what
14  is shown in the fifth bullet point.
15  A   The fifth bullet point just states that
16  we, uh, we got 12 percent reduction of NO on the MVEG
17  test. UC plus UDC that's the two parts of the MVEG
18  test using diesel fuel post-injection.
19  Q   And --
20  A   Basically stating our results.
21  Q   -- were the -- were -- and, again, the ADP
22  requirement was 80 percent?

Page 956

1   A   Right.
2   Q   Did you get any better results not using
3   diesel fuel post-injection?
4   A   No. The results were worse.
5   Q   What -- what was your feeling about the
6   likelihood of success of the Delphi NTP project after
7   seeing the results as of May 5, 2001, of these impact
8   tests?
9   A   I was very skeptical that we would come up
10  with a system that could achieve these really high
11  NOx efficiencies.
12  Q   Uh, let's look at Exhibit MZ in the
13  same -- actually, another question I forgot about.
14      Were the results and conclusions set forth
15  in Exhibit KZ as to the test results achieved by
16  May 4, 2001, made known to anybody in Delphi's
17  management?
18  A   I assume they were. Yes, I'm sure they
19  were.
20  Q   Were they made known to Dr. Kupe?
21  A   Oh, yes, definitely.
22  Q   Do -- do you know if they went higher

Page 957

1   than --
2   A   I'm -- I'm sure Jean Botti was aware of it
3   too.
4   Q   Could we now look at Exhibit MZ in the
5   same binder.
6       (Off-the-record discussion.)
7       BY MR. WEED:
8   Q   Um, Exhibit MZ is entitled NTP No Exit of
9   ADP. Do you want to tell me what Exhibit MZ is?
10  A   This was a -- a presentation that I put
11  together, uh, for a review with management to
12  describe why we weren't going to be able to exit the
13  ADP in December of 2001.
14  Q   Now, had -- had it been scheduled that the
15  NTP project would exit the advanced development phase
16  in December of 2001?
17  A   Yes, it was. That was established early
18  in the program.
19  Q   Uh, had there been -- was there an even
20  earlier anticipated exit date than December 2001?
21  A   The initial timing showed an exit date of
22  2000, December 2000.

Page 958

1   Q   All right. So at some point in time
2   before August 2001 the expected date in which the --
3   at which the NTP project would leave the advanced
4   development phase and go on to the next phase had,
5   uh, moved back one year?
6   A   Right.
7   Q   And as of August 2001 it was scheduled to
8   leave ADP in December 2001?
9   A   That's right.
10  Q   Why did you write what -- excuse me. Let
11  me back up.
12      Did you write Exhibit MZ?
13  A   Yes, I did.
14  Q   And why?
15  A   Uh, it -- it was put together so that we
16  would not have any surprises for management when we
17  got to the December time frame. Uh, we really owed
18  it to them to -- to let them know if they're going to
19  be problems or delay in exiting, we had to let them
20  know as soon as possible.
21  Q   What, uh, what led you to conclude that
22  the ADP project would not, in fact, be ready to leave

71 (Pages 955 to 958)

Page 959

1  the advance development phase in December 2001?
2      A  Uh, looking at all the tasks involved for
3  existing ADP, and there were numerous tasks, not jus,
4  uh, meeting the technical requirements, but being
5  able to -- to manufacturer this.  There are -- there
6  are just a number of tasks that you have to get
7  through.  And we just didn't see any way we were
8  going to be able to do it by December 2001.
9          In addition, we had really poorly results
10  on the vehicle and it just gave us further indication
11  that there was much more work to do on the catalyst.
12      Q  Okay.  As of August 2001 were you, uh,
13  optimistic that the project would ever leave the
14  advanced development phase.
15      A  No, I wasn't.
16      Q  Were you pessimistic.
17      A  I was skeptical, uh, hopeful, but still,
18  uh, really skeptical that we were going to be able to
19  turn the, you know, the 10 or 12 percent NOx
20  efficiencies into 80 and 90 NOx efficiencies.
21      Q  Did you make that effort?
22      A  Yes, we did.

Page 960

1      Q  I'll go there in just a second.  But let
2  me ask you about a few things in this document.
3          Could you turn to the second page of
4  Exhibit MZ.  And it is page 870.
5      A  Timing?
6      Q  Yeah.
7      A  Yeah.
8      Q  Is this the timing of the -- or scheduled
9  timing of the project before August 1, 2001?
10      A  Yes, this the official timing.
11      Q  And, uh, when you spoke about the project
12  not being able to leave the advanced development
13  phase in December '01, which of the milestones on the
14  second page of this exhibit were you referring to?
15      A  Uh, the -- the exit, the CT, uh, Gate
16  Review targeted for 12/01 was the -- the milestone.
17      Q  Okay.  So was that the -- milestone
18  that you did not believe was going to be met?
19      A  Yes.
20      Q  Uh, on the bottom of this document or
21  there are a series of letters and phases.  Catalyst
22  development is here.  Power --

Page 961

1      A  Uh-huh.
2      Q  -- supply is here and reactor is here.
3          What's the -- the significance of those?
4      A  Okay.  This shows, uh, three of the major,
5  uh, subcomponents of the nonthermal plasma system.
6  And, uh, it shows where they are relative to the
7  overall product development cycle.
8      Q  And was there a -- was there a portion of
9  the system that was behind the other portions of the
10  system --
11      A  Yeah.
12      Q  -- in progress?
13      A  Yes.  Uh, the power supply was behind the
14  reactor.  And then the catalyst was even further
15  behind that.
16      Q  Now, could you turn to page 873 of the
17  document.  It's about four -- four more pages in.
18      A  Okay.
19      Q  Now, this is entitled Requirement Summary.
20      A  Uh-huh.
21      Q  Are these the same requirements that we
22  sought -- saw were set or rather established in

Page 962

1  the -- excuse me -- for Requirements and Concepts
2  Gate Review?
3      A  Uh, yes.
4      Q  Had the Delphi NTP project been able to
5  meet any of these requirements as of August 1, 2001?
6      A  No, not at that time.
7      Q  Okay.  Could you turn to page 875.
8      A  Okay.
9      Q  Page 875 and 876 are entitled No Exit
10  comments.
11      A  Right.
12      Q  As, indeed, is page 874.
13          What are the no exit comments?  What are
14  those?
15      A  It's -- it -- comments that really the
16  reasons why we weren't going to exist.
17      Q  All right.
18      A  Getting into the details.
19      Q  And on this page, 875, the heading is --
20  the first bullet point --
21      A  Yeah.
22      Q  -- excuse me -- is catalyst development

- April 7, 2004
Litex Inc. v. Delphi Automotive Systems Corp.

Page 963

1  has been lagging. What does that refer to?
2      A   Well, it -- it -- it basically says that
3  the catalyst is not as far along as every other
4  component. And, uh, and based on the data that --
5  that we were getting from the vehicle.
6      Q   And then the next lines says, Favorable
7  gas bench results did not translate to vehicle
8  testing. What does that refer to?
9      A   We had seen, uh, really high NOx
10  efficiencies from the gas bench, you know, 70 to
11  90 percent over a broad range of temperatures. And
12  then when we put on the vehicle in the real world
13  type driving condition, we got 10 to 12 percent. So
14  just really, really terrible NOx efficiencies.
15      Q   All right. Let's, uh, let's define a few
16  terms. What is a gas bench test?
17      A   A gas bench test is something that's done
18  in a laboratory where, uh, you have, uh, a small, uh,
19  scaled down system, the reactor, and the catalysts.
20  And then you run gases through it, uh, and measure
21  the NO efficiency.
22      Q   In a bench test -- let me back -- try it

Page 964

1  this way. Does a bench test use exhausts?
2      A   No.
3      Q   Where -- what is the source of gases for
4  the bench test?
5      A   Uh, bottle gas.
6      Q   What gases did Delphi use in its bench
7  test?
8      A   Uh, we -- we would have used NO. We would
9  have used propane, C386 for the hydrocarbon, um, some
10  water, uh, oxygen, maybe some CO2. I don't know.
11      Q   Now, this may be obvious, but in a bench
12  test is there an engine?
13      A   No.
14      Q   Is there a combustion?
15      A   No.
16      Q   Is there exhaust?
17      A   No.
18      Q   Uh, was the, um, I think you said is the
19  reactor -- the reactor, by that, I mean the
20  nonthermal plasma reactor used in a bench test
21  different than the nonthermal plasma reactor used in
22  a vehicle test.

Page 965

1      A   It's different, yeah. It's a smaller
2  scale, yeah.
3      Q   Now, let's -- you started talking about --
4  rather you did talk about the second half of this
5  sentence vehicle testing.
6      A   Uh-huh.
7      Q   Again, what does that refer to?
8      A   It refers to the MVEG tests that we did on
9  the vehicle.
10      Q   And in those tests is there an engine
11  running?
12      A   Yes.
13      Q   In those tests is there exhausts?
14      A   Yes.
15      Q   And in those tests are there, uh,
16  transient conditions, speeding up, slowing down?
17      A   Yes.
18      Q   Did -- in the lab tests are there
19  transient conditions, speeding up and slowing down?
20      A   No. Those are done at steady state.
21      Q   So, uh, in August of 2001, were you
22  surprised that Delphi favorable gas bench test did

Page 966

1  not translate into the vehicle testing?
2      A   Um, surprised, uh, but -- and
3  disappointed.
4      Q   Uh, as of August 1, 2001, were you
5  optimistic that the Delphi NTP project would ever
6  leave the advanced development phase?
7      A   No, I wasn't very optimistic.
8      Q   Now, could you look at Exhibit MY. Before
9  I leave there, could you look back at Exhibit MZ.
10      A   Uh-huh.
11      Q   To whom did you make the presentation set
12  forth in Exhibit MZ?
13      A   To Jean Botti.
14      Q   Was Dr. Kupe, uh, either present or made
15  aware of that document?
16      A   Yeah, he was present.
17      Q   All right. So was it presented in a
18  meeting of some sort?
19      A   Yeah. Informal sitdown in a conference
20  type.
21      Q   And who was there then?
22      A   Uh, Jean Botti, myself, and Dr. Kupe.

73 (Pages 963 to 966)

# Exhibit 15

## SETTLEMENT TERM SHEET

WHEREAS, the parties to Litex, Inc. v. Delphi Automotive Systems, et. al. Civil Action No. CV 10910 ("the Lawsuit"), have agreed to settle the Lawsuit, have entered into this term sheet to record the principal, binding terms of the settlement and, having determined that there is a wide divergence of opinion with respect to the appropriate measure and amount of damages in the Lawsuit, have agreed to submit to binding arbitration the issue of damages only, as set forth below,

THEREFORE, Litex, Inc. ("Litex") and Delphi Corporation ("Delphi") agree as follows:

1. The parties have settled the Lawsuit in whole. This Settlement Term Sheet is binding on the parties and enforceable.  This Settlement Term Sheet is not an admission of liability by either side.

2. On November 12, 2003, Litex, Inc. ("Litex") will dismiss the Lawsuit with prejudice and Delphi Corporation ("Delphi") will dismiss its counterclaims with prejudice. On November 11, 2003, each party will execute a general release in favor of the opposing party and its affiliates, predecessors, successors, assigns, subsidiaries, officers, directors, and employees, of all claims, including claims for patent infringement or any other claim, made in the Lawsuit or not, then existing, known or unknown.  Such releases will not extend to future acts, including acts of alleged patent infringement.

3. Litex and Delphi Corporation ("Delphi") will submit the damage issues of the Lawsuit for factual findings in a confidential, binding, nonappealable arbitration in front of a single arbitrator, knowledgeable in the patent law, to be agreed upon by the parties, or if the parties cannot agree, the arbitrator shall be selected by Robert J. Muldoon, Jr. of Sherin and Lodgen LLP, Boston, MA.

4. Only witnesses on the parties' Trial Witness lists may testify at the arbitration. Only documents on the parties respective trial exhibit lists may be used in direct examination at the arbitration. Testimony at the arbitration will be presented live or by depositions already taken in the Lawsuit and not by written statement, and all witnesses will be subject to cross-examination. Any expert witness who testifies at the arbitration shall be bound by the opinions and bases therefor contained in his or her expert report, previously served during the Lawsuit, but may rely on any document on either party's trial exhibit list. The protective order entered in the Lawsuit will remain in force during the arbitration.

5. The arbitrator will be bound by the Federal patent law, including the law of patent infringement damages, as interpreted by the Federal Circuit.  For the purposes of this arbitration only, the parties will not litigate issues of liability, but will only submit the issue of damages for findings by the arbitrator. The arbitrator shall therefore assume that claims 47, 53, 82, 114, 195, and 224 of U.S. Patent No. 6,253,544 are valid and that at least one such claim was infringed by Delphi after the issuance date of the patent. Any and all issues related to patent infringement damages, including but not limited to the nature and extent of any assumed infringing acts, may be arbitrated. The only question to be submitted to the arbitrator for findings is: Assuming that Delphi infringed one or more of claims 47, 53, 82, 114, 195, and 224 of U.S. Patent No. 6,253,544, what were the resulting damages to Litex from such patent infringement?  The

arbitrator shall issue a confidential written report setting forth the arbitrator's findings concerning Litex's damages, including the factual and legal basis for the finding of damages.

6.  In the event that Lockheed Martin Corporation or its assigns sues Delphi for alleged infringement of any of the patents covered by the Patent License Agreement between Lockheed Martin Corporation and Litex Inc. dated September 5, 1996 ("the License") based upon acts of Delphi before November 11, 2003, and Lockheed Martin Corporation does not dismiss such suit with prejudice within 60 days, Litex shall immediately grant Delphi and its subsidiaries a nonexclusive sublicense, without additional consideration, retroactively licensing Delphi and its subsidiaries under such patents for any such acts of Delphi occurring before November 11, 2003, other than the sale of "Licensed Products" as defined in the License.

7.  The parties shall make best efforts to commence the arbitration no later than February 10, 2004.

8.  The arbitrator's fees and costs of arbitration shall be split equally between the parties.

9.  This agreement incorporates by reference Exhibits A and B hereto. This agreement is entire and complete and represents the entire agreement between the parties. Any modifications hereto shall be in writing and executed by both parties.

10. The arbitrator shall be given the instructions set forth in Exhibit A. If the arbitrator finds that Litex's damages resulting from Delphi's assumed infringement are in excess of $25 million, Delphi shall pay Litex only $25 million. If the arbitrator finds that Litex's damages resulting from Delphi's assumed infringement are $25 million or less, Delphi shall pay Litex the amount of the arbitrator's finding. Any payment by Delphi under this paragraph shall be in full and complete settlement of the Lawsuit, and shall be paid within 30 days of the arbitrator's report.

11. The undersigned have authority to enter into this settlement and term sheet on behalf of their respective employers. The terms of this settlement will be kept confidential, except as necessary for internal and external reporting requirements. The parties will jointly request that the United States District Court for the District of Massachusetts retain jurisdiction over this settlement and the protective order previously entered in the Lawsuit.

Date: November 11, 2003                    Litex, Inc.

                                           By: _____

                                           Its _President & CEO_

Date: November 11, 2003                    Delphi Corporation

                                           By: _____

                                           Its: _VICE PRESIDENT & GENERAL COUNSEL_

2

Approved as to form:

Heller Ehrman White & McAuliffe LLP

By: _____

Attorneys for Defendants


Pennie & Edmonds

By: _____

Attorneys for Plaintiff

**EXHIBIT A**
**ARBITRATOR'S INSTRUCTIONS**

Litex, Inc. and Delphi Corporation have agreed to settle Civil Action No. 01 CV 10910 (D. Mass.) ("the Lawsuit") by entering into binding arbitration as set forth herein, and by giving these instructions to the arbitrator.

1. Only witnesses on the parties' Trial Witness lists may testify at the arbitration. Only documents on the parties respective trial exhibit lists may be used in direct examination at the arbitration. Testimony at the arbitration will be presented live or by depositions already taken in the Lawsuit and not by written statement, and all witnesses will be subject to cross-examination. Any expert witness who testifies at the arbitration shall be bound by the opinions and bases therefor contained in his or her expert report, previously served during the Lawsuit, but may rely on any document on either party's trial exhibit list. The protective order entered in the Lawsuit will remain in force during the arbitration.

2. The arbitrator will be bound by the Federal patent law, including the law of patent infringement damages, as interpreted by the Federal Circuit. For the purposes of this arbitration only, the parties will not litigate issues of liability, but will only submit the issue of damages for findings by the arbitrator. The arbitrator shall therefore assume that claims 47, 53, 82, 114, 195, and 224 of U.S. Patent No. 6,253,544 are valid and that at least one such claim was infringed by Delphi after the issuance date of the patent. Any and all issues related to patent infringement damages, including but not limited to the nature and extent of any assumed infringing acts, may be arbitrated. The only question to be submitted to the arbitrator for findings is: Assuming that Delphi infringed one or more of claims 47, 53, 82, 114, 195, and 224 of U.S. Patent No. 6,253,544, what were the resulting damages to Litex from such patent infringement? The arbitrator shall issue a written report setting forth the arbitrator's findings concerning Litex's damages, including the factual and legal basis for the finding of damages.

3. The parties shall make best efforts to commence the arbitration no later than February 10, 2004.

4. The arbitrator's fees and costs of arbitration shall be split equally between the parties.

5. The terms of this settlement, the arbitration, and the arbitrator's findings will be kept confidential, except as necessary for internal and external reporting requirements.

NY2: 1479687.1

**EXHIBIT B**
**RELEASES**

These RELEASES ("Releases") are executed by and between Litex, Inc. ("Litex") and Delphi Corporation, Delphi Automotive Systems Corporation and Delphi Automotive Systems LLC ("Delphi") (collectively the "Parties").

**WHEREAS**, the Parties seek an amicable resolution and settlement of any and all claims and counterclaims which have been asserted in Civil Action No. 01-CV-10910, filed in the United States District Court, District of Massachusetts (the "Lawsuit"), on the terms and conditions set forth in the Settlement Term Sheet;

**WHEREAS**, Paragraph 2 of the Settlement Term Sheet calls for the Parties to execute full and complete Releases;

**NOW, THEREFORE**, the Parties agree as follows:

**1.0     RELEASE AND DISCHARGE BY LITEX**

**1.1     RELEASE AND DISCHARGE OF DELPHI**

In consideration of the Settlement Term Sheet executed by the Parties on November 11, 2003, Litex hereby completely **RELEASES, ACQUITS AND FOREVER DISCHARGES** Delphi and their present or former officers, directors, employees, agents, attorneys, heirs, executors, administrators, predecessors, successors, reorganized successors, beneficiaries, assigns, subsidiaries, affiliates, parents, representatives, divisions, and any and all other persons or entities acting in their behalf from any and all claims, demands, obligations, actions, liabilities or causes of action, under the patent laws, in tort, or otherwise in any jurisdiction including the claims for patent infringement in the Lawsuit, known or unknown, anticipated or unanticipated, regardless of whether such could have or could not have been brought in the Lawsuit, whether legal or equitable in nature and damages related to such any and all claims, demands, obligations, actions, liabilities or causes of action including attorneys fees, costs, interest, and all other expenses.  Such release shall not extend to future acts, including acts of alleged patent infringement.

**1.2     RELEASE AND DISCHARGE OF DELPHI'S CUSTOMERS**

In consideration of the Settlement Term Sheet executed by the Parties on November 11, 2003, Litex hereby completely **RELEASES, ACQUITS AND FOREVER DISCHARGES** any person who heretofore received any component of the Delphi Nonthermal Plasma Aftertreatment System from Delphi and their present or former officers, directors, employees from any and all claims for patent infringement grounded on any component of the Delphi Nonthermal Plasma Aftertreatment System, known or unknown, anticipated or unanticipated, regardless of whether such could have or could not have been brought in the Lawsuit, whether legal or equitable in nature and damages related to such any and all claims, demands, obligations, actions, liabilities or causes of action including attorneys fees, costs, interest, and all other expenses.  Such release shall not extend to future acts, including acts of alleged patent infringement.

1

**2.0   RELEASE AND DISCHARGE BY DELPHI**

In consideration of the Settlement Terms executed by the Parties on November 11, 2003, Delphi hereby completely **RELEASES, ACQUITS AND FOREVER DISCHARGES** Litex and their present or former officers, directors, employees, agents, attorneys, heirs, executors, administrators, predecessors, successors, reorganized successors, beneficiaries, assigns, subsidiaries, affiliates, parents, representatives, divisions, and any and all other persons or entities acting in their behalf from any and all claims, demands, obligations, actions, liabilities or causes of action, under the patent laws, in tort, or otherwise in any jurisdiction including the claims for patent infringement in the Lawsuit, known or unknown, anticipated or unanticipated, regardless of whether such could have or could not have been brought in the Lawsuit, whether legal or equitable in nature and damages related to such any and all claims, demands, obligations, actions, liabilities or causes of action including attorneys fees, costs, interest, and all other expenses. Such release shall not extend to future acts.

**3.0   DEFINITION OF "AFFILIATE"**

For purposes of the Releases in Section 1 and 2 above, the term "Affiliates" shall mean any company or entity directly or indirectly controlling or controlled by the Party. A company or entity is controlled by (a) ownership of at least fifty percent (50%) of the stock entitled to vote for directors or persons performing a function similar to that of directors, or (b) ownership that controls the Board of Directors or ultimate governing body of the company.

Date: November 11, 2003          Litex, Inc.

                                 By: _____

                                 Its: President & CEO

Date: November 11, 2003          Delphi Corporation

                                 By: _____

                                 Its: VICE PRESIDENT & GENERAL COUNSEL

Approved as to form:             Heller Ehrman White & McAuliffe LLP

                                 By: _____

                                 Attorneys for Defendants


                                 Pennie & Edmonds

                                 By: _____

                                 Attorneys for Plaintiff

- 2 -

1479687.1

Exhibit 16

## ARBITRATION

| | |
|---|---|
| LITEX INC.,<br><br>       *Plaintiff,*<br><br>v.<br><br>DELPHI AUTOMOTIVE SYSTEMS<br>CORPORATION and DELPHI<br>AUTOMOTIVE SYSTEMS LLC,<br><br>       *Defendants.* | )<br>)<br>)<br>)<br>)    The Honorable Roderick R. McKelvie<br>)    Arbitrator<br>)<br>)<br>)<br>)<br>)<br>) |

## DECISION

    This is a patent infringement dispute involving automotive technology. The plaintiff is

Litex, Inc. The defendants are Delphi Automotive Systems Corporation and Delphi Automotive

Systems, LLC (collectively, "Delphi"). Litex alleges that Delphi has infringed its U.S. Patent

No. 6,253,544 ("the '544 patent") and that the proper quantum of damages owed due to Delphi's

infringement is an amount within the range of $70 million to $200 million.

    The parties have agreed to settle the case[1] and submit to arbitration the issue of patent

damages — namely, the amount and structure of a reasonable royalty. Both parties submitted

pre-hearing briefs. They presented evidence on these issues during a five-day hearing in

Washington, D.C. on Monday, April 5, Tuesday, April 6, Wednesday, April 7, Thursday, April

8, and Friday April 9, 2004. They have now submitted post-hearing briefs and this is the

Arbitrator's decision on the matters in dispute.

---

[1] Litex Inc. v. Delphi Automotive Systems Corporation and Delphi Automotive Systems LLC,
Civil Action No. 01 CV 10910.

# I.     FACTUAL BACKGROUND

## A.     Litex

Litex was formed in August of 1996, by Dr. Leon Ekchian and others, for the purpose of commercializing certain technologies initially developed by Lockheed Corporation. Shortly after Litex was formed, Lockheed agreed to make Litex the exclusive licensee of two applications, which eventually matured, through continuations and continuations-in-part, into the '544 patent. Under the terms of that license, Litex agreed to pay Lockheed an up-front payment of $10,000 and a running royalty of 3% for the first $5 million in sales, 2.5% for the next $5 million, and 2% thereafter.

After an initial input of $500,000 in seed capital, mostly from Brentwood Venture Capital, Litex successfully raised $2.4 million in Series B round financing in 1997 and $11.25 million in Series C round financing in 1998 and 1999. It does not appear that Litex has obtained additional financing.

As Litex raised funds, it also sought the assistance of various automotive industry players to develop and commercialize the non-thermal plasma ("NTP") technologies described in the '544 patent. In the summer of 1997, Litex disclosed its technology to Magna International and Delphi. By early 1998, Litex had entered into an agreement with Magna, under which the two companies worked jointly to develop a commercial implementation of Litex's NTP reactor. This research led to the issuance of the '544 patent, which is the subject of this arbitration.

In the spring of 1999, Litex partnered with Saturn Electronics to continue development of its NTP reactor. Based on that work, Litex received the Global Powertrain Congress's Powertrain Excellence Award in 1999. However, although Magna had funded portions of Litex's earlier development project, Litex was forced to pay Saturn for its development activities. Time was of the essence, and Litex was concerned that it might not meet its

2

objectives. In fact, according to the testimony of Dr. Leon Ekchian, Litex only had enough funding to survive approximately four or five more months at its then-current burn rate.

In need of additional funding, Litex engaged JP Morgan to compile a corporate valuation and portfolio for Series D round financing. JP Morgan's valuation, which was based on Litex's internal sales projections, placed the company's worth at $250 million.

In March 2000, Litex began meeting regularly with Bosch, a German Tier 1 manufacturer, to discuss possible financing and/or licensing. These meetings continued through at least July of 2000. By October 2000, Litex's board of directors was looking for an exit strategy and decided that the time was right to consider the sale of the company. At that time, Litex ceased all in-house development efforts. In total, Litex never sold or gave away more than fifty of its corona discharge devices; the total revenue derived from the sale of these devices was approximately $150,000–$200,000.

Bosch eventually requested that Litex formulate a proposal for the sale of Litex to Bosch. Dr. Leon Ekchian testified that he was surprised by this type of interest, which he perceived as more valuable than the $20 million license he had previously anticipated. Over the next few months, Litex developed figures and put together a proposal. On January 25, 2001, Dr. Leon Ekchian delivered a proposal to Bosch, whereby Litex offered to be purchased for $200 million in a series of three stages.

Shortly, thereafter, Sagem offered to take a non-exclusive license to Litex's technology based on a 3% royalty structure. Litex initially rebuffed Sagem's offer, citing its pending acquisition offer to Bosch. However, Litex later returned to Sagem, offering a non-exclusive license based on a 10% royalty structure.

In August 2001, Bosch returned to Litex with a counter-offer. In a brief proposal, Bosch indicated interest in a ten-month option to acquire Litex, pending further testing of Litex's

3

technology, or, in the alternative, a non-exclusive license. By September 2001, Bosch invited Litex to propose terms for a non-exclusive license to Litex's technology. In response, Litex offered Bosch a non-exclusive license for 12% of net sales, in addition to a series of scheduled payments; Bosch refused.

Unfortunately, none of Litex's licensing efforts panned out. Indeed, as of the date of the hearing of this arbitration, no one had ever taken a sublicense to the '544 patent.

**B    Delphi**

Delphi is a tier one supplier to the automotive industry. Indeed, by the fall of 1999, Delphi was the largest Tier One supplier of automotive parts in the world. Delphi's interest in non-thermal plasma technologies was not new. Since 1994 — prior to its meeting with Litex in 1997 — Delphi worked closely with a consortium of companies to explore the use of NTP reactors to treat automotive exhaust and reduce harmful emissions.

By the fall of 1999, Delphi had developed an NTP Exhaust Aftertreatment System, which had become public. Delphi published its results in various press releases and in its annual report, and won multiple awards.

By mid-2001, Delphi had grown pessimistic about the prospects for future success of its NTP project. At that time, Dr. Botti cut the budget for Delphi's NTP project in half, to approximately $1 million.

Despite the budget cut, however, Delphi proceeded to move its tests from the laboratory into a vehicle environment. Specifically, Delphi engaged in assumed infringing testing activities from October 5, 2001, until March 18, 2002, a total of thirty experiments. Eventually, Delphi's tests failed to achieve the results Delphi desired; Delphi stopped work on its catalyst in April 2002 and abandoned its research efforts entirely in October 2002.

4

## II.    DISCUSSION

Due to the peculiar nature of the facts now at issue, it is not surprising that the parties entered this arbitration with divergent positions. Specifically, Litex argues that it is entitled to a lump sum payment of $200 million or, in the alternative, $70 million. Delphi, on the other hand, argues that a properly constructed hypothetical negotiation would result in quarterly payments of $25,000 to $50,000 over two quarters of testing — a total of $50,000 to $100,000. These numbers were determined based on a variety of complex factors, of which I will address those that remain significant to this dispute.

### A.    The Date of First Infringement

The foundation of a reasonable royalty analysis is a hypothetical negotiation between the patentee and the accused infringer at the time the infringement began. *See Rite-Hite Corp.* v. *Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc).

Delphi argues, and Litex does not dispute, that the acts that are assumed to infringe one or more of the six method claims currently at issue were Delphi's tests of an NTP exhaust after-treatment system using an engine and a catalyst. These assumed infringing tests were performed between October 5, 2001, and March 4, 2002.

Litex, however, argues that July 3, 2001, the date on which the '544 patent issued, should be used as the date of the hypothetical negotiation. To support its position, Litex suggests that Delphi's press releases may qualify as offers for sale. Because no commercial product was then or ever ready for market, and because Delphi was not then or ever accepting orders for a commercial product, Litex's position is untenable.

Alternatively, Litex has offered evidence of Delphi's other research and development activities, thereby suggesting ongoing infringement by Delphi. Specifically, Litex argues that

5

Delphi should not be able to avoid three months of royalty payments simply because of a brief hiatus in its activities. This argument also fails.

As a general matter, courts have been extremely reluctant to set the date of a hypothetical negotiation prior to the first date of actual infringement. Where, as here, the circumstances are not such as would require the finding of an earlier date, I decline to do so. Therefore, upon consideration of the arguments and testimony, I find that the hypothetical negotiation would have taken place on or about October 5, 2001.

Even Litex's date, however, would not likely change the structure of the reasonable royalty; it would merely incrementally increase the final damages figure.

**B.     The Structure of a Reasonable Royalty**

The parties do not dispute that the assumed infringing activity in this case consisted of research and development activities. The point at which an invention's value dramatically increases — commercialization — was never reached.

At the most basic level, however, the parties disagree about whether a hypothetical negotiation would result in a lump sum paid-up exclusive license from Litex to Delphi; or a non-exclusive license requiring a series of scheduled payments prior to commercialization, followed by a running royalty on any future sales.

Mr. Evans testified that a lump sum payment of $200 million would have been appropriate, given the mindset of both parties at the time. Of particular import to his determination, Mr. Evans considered J.P. Morgan's draft valuation of Litex, which valued the company at approximately $250 million in mid-2000. Through various testimony, including that of Mr. Evans on cross-examination, it was revealed that this valuation of Litex was based primarily on figures provided to J.P. Morgan by Litex management. Moreover, the figures used by J.P. Morgan assumed that Litex was continuing to pursue the development and

6

commercialization of its technology. As of October 2000, however, this was no longer the case. Indeed, Mr. Evans admitted that as of the date of the hypothetical negotiation the J.P. Morgan valuation was no longer accurate. Assuming full omniscience of both parties, neither Litex nor Delphi would have considered the J.P. Morgan valuation during a hypothetical negotiation in October 2001 (or even July 2001).

Mr. Evans also considered Litex's proposal to Bosch for the full sale of the company for $200 million in arriving at his opinion. Mr. Evans testified that the parties would have known about the proposal to Bosch, and Litex would have been unwilling to license the '544 patent to Delphi while that proposal was outstanding. Additionally, according to Mr. Evans, Delphi would have agreed to pay $200 million for the opportunity to lock Bosch out of the industry and thereby solidify its position in the diesel market. I am not persuaded, for at least the following reasons:

- The $200 million proposal was an initial proposal from Litex to Bosch, not vice versa.

- Although the parties disagree strongly about the meaning of the exhibit, notes taken by Mr. Balles suggest that, at least by June 2001, Litex expected that Bosch would not accept its proposal and had shifted its efforts to developing terms for a non-exclusive license.

- By the date of the hypothetical negotiation, Bosch had sent Litex its counter-offer, identifying three courses of action, including the possibility that Bosch might accept a non-exclusive license.

- According to the testimony of both Mr. Bonadies and Dr. Botti, Delphi seriously doubted the future of its NTP project by May 2001.

7

- Drs. Kupe and Botti both testified about a number of non-infringing alternatives. Although Dr. Kupe admitted that none of the alternatives he listed met the stringent requirements laid out by Delphi for its NTP project, he further testified that the NTP project did not meet those requirements either. Indeed, Dr. Botti testified that by mid-2001 he was turning his group's focus away from the NTP project to other emissions and particulate reduction projects.

- Dr. Kupe also testified that Delphi could easily take its testing to Europe and thereby avoid the U.S. patent laws.

- Prior to the hypothetical negotiation, Litex had extended to Sagem an offer of a non-exclusive license.

As an alternative damages theory, Mr. Evans testified that a lump sum payment of $70 million would be the result of a hypothetical negotiation. To arrive at this figure, Mr. Evans considered the total potential market for an NTP exhaust after-treatment system through the remaining life of the '544 patent, based on a Delphi market analysis from the spring of 2001; assumed a profit margin of 15%; applied a discount factor of 15% to determine the net present value of Delphi's profits over that time period; and awarded Litex a 25% royalty.

The potential market for an unproven technology, for which no comparable products exist in the market, is highly speculative. I thus do not grant any credence to this alternative damages theory. Even if I were to consider Delphi's market analysis to be an appropriate basis, Mr. Evans's calculations are suspect.

First, Mr. Evans testified that he assumed Delphi was well on its way to commercialization of the NTP product. Mr. Evans further assumed that the NTP technology was a "proven" technology. However, Dr. Kupe and others testified that Delphi's NTP project never even advanced to the product development phase.

8

Second, Mr. Evans testified that the discount rate he chose was selected from a range; higher-risk investments would merit a higher (e.g. 30%) discount rate.

Third and finally, Mr. Evans admitted on cross-examination that the percentages he selected were not tailored to the segment of the automotive industry involved in this dispute. As a general matter, Mr. Goldscheider testified that profit margins in the automotive industry are uncommonly low. Mr. Mansour testified that Delphi ordinarily realizes net profit margins on the order of 2–3% of net sales. As read into the record from her deposition transcript, Ms. Gargi Mirle testified that in her market forecasts, she plans in profit margins of between ten and twenty percent. I thus do not find Mr. Evans's alternative theory to be persuasive or reliable.

On the other hand, Mr. Goldscheider and Dr. Hoffman testified convincingly that a number of factors militate towards a non-exclusive license structure with small periodic payments and a running royalty. Mr. Goldscheider testified that, in the automotive industry, patent licenses are typically non-exclusive, with royalties based on the sale of licensed products. Dr. Hoffman offered an economic motivation for this result, explaining that, in the case of an unproven technology, "[t]he inventor who clearly is optimistic about the technology is the one that should bear the risk of its technological failure, and someone who brings something else to the process, the production facilities, access to the markets, et cetera, should have a return on those assets but should not be asked to bear initially the risk, the vast majority of the risk of the technological failure[,] unless there's some compensating shifting of the reward. . . . Running royalty is the way that normally one shares those risks and returns between the inventor and the commercial licensee." Although Mr. Evans argued that Litex would never grant a non-exclusive license to a large Tier One corporation, such as Delphi, Litex's offers of a non-exclusive license to Sagem and later to Bosch belie this position.

9

The question then becomes the quantum of scheduled payments and running royalties to which the parties would have agreed during a hypothetical negotiation. On this issue, Mr. Evans has not offered any substantive guidance. I must, therefore, rely on the testimony of Mr. Goldscheider and Dr. Hoffman and the exhibits offered during the arbitration.

The documents suggest that Litex would have offered a non-exclusive license with an up-front payment of between $500,000 and $1 million. Given the budget of Delphi's NTP development team, it is unlikely agreement would have been reached at such a high figure. Mr. Goldscheider testified that, during the research and development phase, agreement would have been reached at a rate of $25,000 per quarter. Dr. Hoffman offered a somewhat higher number: $50,000 per quarter. Given the relative circumstances of the parties and the detail of Dr. Hoffman's economic analysis, I agree that $50,000 per quarter is an appropriate figure. These payments would continue until either (a) Delphi successfully commercialized a product; or (b) Delphi cancelled its project. In this case, Delphi cancelled the NTP project in October 2002, five quarters after the date of the hypothetical negotiation. During this time, Delphi would have paid Litex $250,000.

The parties also disagree about the rate of a running royalty and the amount of scheduled payments during commercialization. Because no product is now commercially available, and because Delphi has no intention of bringing such a product to market during the life of the '544 patent, I find this issue to be moot.

C.    Pre-Judgment Interest

Finally, I have considered Litex's claim for pre-judgment interest at a rate of 4.66%, which Litex contends represents the average prime rate from June 2001 through April 2004. Because Delphi does not appear to dispute this methodology, I have recalculated the average prime rate for the period beginning October 5, 2001, arriving at 4.43%. Therefore, I find that

10

pre-judgment interest, as measured from October 2001 through the date of this decision, compounded on a simple monthly basis and rounded to the nearest dollar, totals $28,229.

## III.    SUMMARY AND CONCLUSION

This dispute raises a complex issue: what quantum of damages is appropriate where no product has been commercialized and no comparable market exists. Moreover, the pattern of facts suggests an element of intent, facts that would spur a competitor to seek a remedy. And more significantly for me and the conclusions I reach, once one digs deeper into these facts, one sees that what appears to be wrongful, is not, and what appears to be a sizable loss caused by the wrongful acts of another, also is not. Litex naturally feels it has been cut out of an industry — first by Delphi's independent efforts; later by Delphi's partnership with PSA (Peugeot). As the parties agreed, however, I have limited my consideration of the issues and my award of damages to that which is appropriate under the patent laws and a determination of a reasonably royalty. Based on these principles, I have arrived at $250,000, plus $28,229 in pre-judgment interest.

In this decision I have addressed a number of facts and arguments the parties have set out in their papers and at the hearing. While I have not addressed each fact or argument the parties may believe is significant, I have attempted to address those that I find significant to the dispute. I have not seen or heard other arguments that would change my conclusions.

Dated: this ⸻ day of September 2004

09-10-04   11:35am   From-Fish & Neave        2023032600        T-080  P.013/015  F-927

Copies to:

John J. Lanter
Berj A. Terzian
PENNIE & EDMONDS LLP
1155 Avenue of the Americas
New York, NY 10036-2711
Phone: 212-790-6501

**Attorneys for Plaintiff Litex, Inc.**


Alexander L. Brainerd
Keith R. Weed
Joshua M. Masur
HELLER EHRMAN WHITE & MCAULIFFE LLP
275 Middlefield Road
Menlo Park, CA 94025-3506
Phone: 650-324-7000

William Cosnowski, Jr.
Delphi Corporation
5825 Delphi Drive, M/C 480-410-254
Troy, MI 48098
Phone: 248-813-3309

**Attorneys for Defendants**
**Delphi Automotive Systems Corp.**
**Delphi Automotive Systems LLC**

09/10/2004  FRI  08:49  [TX/RX NO 9189]  ⌀013

## ARBITRATION

| | |
|---|---|
| LITEX INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| DELPHI AUTOMOTIVE SYSTEMS | ) |
| CORPORATION and DELPHI | ) |
| AUTOMOTIVE SYSTEMS LLC, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

The Honorable Roderick R. McKelvie
Arbitrator

## AWARD

For the reasons set out in the decision of this date, I find that the damages owed

by Defendants to Plaintiff as a reasonable royalty for the assumed infringing activities total

$250,000, plus $28,229 in pre-judgment interest.


The Honorable Roderick R. McKelvie
Arbitrator


Dated: this **7** day of September 2004

Copies to:


John J. Lanter
Berj A. Terzian
PENNIE & EDMONDS LLP
1155 Avenue of the Americas
New York, NY 10036-2711
Phone: 212-790-6501

*faxed to David Hayes 9/10/04*

**Attorneys for Plaintiff Litex, Inc.**

Alexander L. Brainerd
Keith R. Weed
Joshua M. Masur
HELLER EHRMAN WHITE & MCAULIFFE LLP
275 Middlefield Road
Menlo Park, CA 94025-3506
Phone: 650-324-7000

William Cosnowski, Jr.
Delphi Corporation
5825 Delphi Drive, M/C 480-410-254
Troy, MI 48098
Phone: 248-813-3309

**Attorneys for Defendants**
**Delphi Automotive Systems Corp.**
**Delphi Automotive Systems LLC**

# Exhibit 17

1                                    VOLUME II
                                     PAGES 264-561
2                                    EXHIBITS: See Index
3
4            UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
5
6
7    ***************************)    Civil Action
     LITEX, INC.,                )   No. 01-CV-10910-JLT
8               Plaintiff,       )
                                 )   The Honorable
9      VS.                       )   Joseph L. Tauro
                                 )
10   DELPHI AUTOMOTIVE SYSTEMS   )
     CORPORATION and DELPHI      )
11   AUTOMOTIVE SYSTEMS LLC,     )
                Defendants.      )
12   ***************************)
13              CONTINUED VIDEOTAPE DEPOSITION
14   OF LEON EKCHIAN, a witness called in
15   behalf of the defendants, taken pursuant
16   to the applicable Federal Rules of Civil
17   Procedure, before Shaunna L. O'Connell,
18   Registered Professional Reporter and
19   Notary Public in and for the Commonwealth
20   of Massachusetts, at the offices of Mintz,
21   Levin, Cohn, Ferris, Clovsky & Popeo, One
22   Financial Center, Boston, Massachusetts,
23   on Wednesday, October 2, 2002, commencing
24   at 9:07 a.m.

Page 297

1    Q. And was this sort of, for want of a better
2    word, kind of a road show presentation
3    where you were present and Mr. Guyette and
4    perhaps others and that you indicated you
5    interacted with the CEO and CFO? Was this
6    the occasion that that took place?
7    A. Yes. There was another gentleman from
8    J.P. Morgan if I recall correctly.
9    Besides myself, there was Jack Ekchian,
10   Eric Balles, Vic Nowak.
11   Q. And is it your understanding that sometime
12   shortly after that meeting, Ford blocked
13   any further Engelhard-Litex interaction?
14   A. Yes. I believe Ford suppressed any
15   further interaction.
16   Q. When approximately is the last time you
17   spoke with anybody from Engelhard about
18   the possibility of some kind of a
19   commercial relationship between your
20   company -- Litex -- and Engelhard?
21   A. I have not spoken to anybody from
22   Engelhard since that date.
23   Q. So roughly the end of January 2000
24   approximately?

Page 298

1    A. Correct. But Eric has and it was clear
2    that there was no interest to have any
3    further discussions.
4    Q. Let's move to --
5    A. Should I continue looking at it?
6    Q. I really was more interested in the date,
7    but why don't you just thumb through the
8    document and confirm for me that that was
9    at least a portion of the presentation made
10   to Engelhard on or about January 26th, 2000.
11   A. I'd be happy to. (The witness reviewed
12   the document.) It looks familiar. As I
13   mentioned, we have ADL data that we are
14   summarizing, we have Ford Towncar data
15   that was generated by Ford.
16   Q. Would you identify for me the page numbers
17   on which you find the Ford data?
18   A. The pulse burner data that was generated
19   by Ford in December or so 1998 --
20   Q. What's the page number?
21   A. -- is page number LIT032248 and also
22   LIT032250.
23   Q. What about the last page? What's the
24   source of the information on the last

Page 299

1    page, if you know?
2    A. Jack would remember this one better. It's
3    either -- no. It's not Hitachi. Hitachi
4    was Buick. So I believe this was testing
5    that was done at Arthur D. Little.
6    Q. Thank you.
7    A. You're welcome.
8    Q. How about Degussa? Was there efforts to
9    enter into some sort of relationship with
10   Degussa made by Litex?
11   A. Degussa was focused more on discussions
12   regarding their potential licensing, and
13   if I'm not mistaken, Eric also felt that
14   there was a good relationship between
15   Degussa and Bosch that they may have been
16   collaborating behind the scenes with
17   regards to the Litex CDD.
18   Q. And did anybody ever advise you as to any
19   particular reason why Litex was not able
20   to enter into a licensing arrangement with
21   Degussa?
22   A. I think the reason is all the same, that
23   the market evaporated for the CDD for
24   stoichiometric. Diesel, there continued

Page 300

1    to be interest. There still is interest
2    today. And today I think it's -- you know
3    what our belief is for why there is no
4    licensing activity.
5    Q. Well, we're going to get to that in a
6    minute. Well, as long as we're on that
7    subject, what is the reason as far as
8    you're concerned, as far as Litex is
9    concerned, as to why there's no licensing
10   activity in the lean burn or diesel arena?
11   A. The primary reason I believe is Delphi's
12   infringement.
13   Q. And what's the basis for that belief? In
14   other words, I understand that Litex has
15   sued Delphi for alleged infringement on
16   one or more of its patents and therefore
17   that Litex believes that Delphi is
18   infringing one or more of its patents, but
19   my question really is focused on why do
20   you believe that whatever Delphi's
21   activities are that they have adversely
22   impacted Litex's ability to license in the
23   diesel or lean burn arena?
24   A. It's Delphi's infringement, Delphi's very

10 (Pages 297 to 300)

Page 301

1   active press release activities which have
2   stated that Delphi developed NTP. I
3   believe those are the words, suggesting
4   that Delphi invented NTP.
5        Delphi's total disregard for
6   Litex's existence in all the papers it has
7   published, in the patents that it has
8   filed and that have issued. Delphi's
9   statement that they will be first to
10  market with revolutionary new technology,
11  suggesting that they again are the first
12  to develop the technology.
13       I believe yesterday I mentioned
14  concerns by Denso, who is a potential --
15  who was and continues, I believe, to be a
16  potential licensee of Litex. I think I
17  referred to an e-mail that you should have
18  from a gentleman at Denso to Mr. Vic Nowak
19  expressing concern.
20       Concern was expressed by J.P.
21  Morgan about, if I recall, the Delphi
22  announcements for the Financial Times
23  Award that they won in 1999, sometime like
24  September '99 if I'm not mistaken. And

Page 302

1   J.P. Morgan was commencing their Series D
2   activities. And I should clarify. When I
3   say J.P. Morgan, I guess we need to be
4   careful of the context. J.P. Morgan is
5   both an investor in Litex Series C.
6   J.P. Morgan investment banking side
7   handled Series D. And they're two
8   unrelated groups within J.P. Morgan.
9        So the J.P. Morgan investment
10  banking group, Greg Guyette's group,
11  shared with me on a number of occasions
12  that Delphi's activities will probably
13  have an adverse effect on the interest
14  level that he can generate at potential
15  investors.
16       Ones that I recall -- and I
17  think I saw a document to that effect that
18  they had produced that they had prepared
19  for us that mentioned concerns for
20  Tenneco, and there may have been for
21  Engelhard also.
22       And again, the concern being
23  that when the largest supplier, a $30
24  billion company, says they will be first

Page 303

1   to market, no mention of Litex, they
2   developed the technology, you're asking a
3   company to invest in Litex realizing that
4   the biggest supplier, their biggest
5   competitor, is essentially ignoring the
6   patents.
7        Oh, I remembered another one.
8   Bosch was very surprised, in fact shared
9   with me personally that they could not
10  understand what Delphi was doing, that
11  they had looked at the Litex patents, they
12  found them to be very strong, and they
13  could not understand how Delphi had
14  proceeded without securing any kind of
15  license agreement with Litex.
16       And as it turned out, Bosch also
17  did not invest to date or license. There
18  may be more, but that's what I can think
19  of right now.
20  Q.  Has any potential licensee or entity with
21  whom Litex was attempting to achieve some
22  kind of a commercial relationship besides
23  Denso -- and we'll get to Denso in a
24  minute -- ever told Litex to your

Page 304

1   knowledge that it was not going to enter
2   into a commercial relationship with Litex,
3   whatever it might be, because of the
4   presence of Delphi and Delphi's
5   announcement of its activities in the NTP
6   arena?
7   A.  If your question is did anyone tell me
8   personally that the reason we are not
9   going forward is because Delphi -- because
10  of Delphi's activities in those words, not
11  that I can recall.
12       But they clearly hinted it.
13  They suggested it. They raised concerns
14  about Delphi in meetings.
15       Our investment bankers that are
16  very astute, they're one of the top
17  investment bankers in the automotive
18  sector. J.P. Morgan is recognized as one
19  of the premier -- that's why we went to
20  them -- investment bankers for the
21  automotive sector. They have all the
22  relationships. They're dealing at the
23  highest levels in all these companies, if
24  not at the CEO level, at the CFO level.

11 (Pages 301 to 304)

dfea85fd-8edb-4b41-b88c-343f92bdce81

# Exhibit 18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LITEX, INC.,

                    Plaintiff,

    v.

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION and DELPHI AUTOMOTIVE
SYSTEMS LLC,

                    Defendants.

Civil Action No. 01-CV-10910-JLT

The Honorable Joseph L. Tauro

**REBUTTAL EXPERT WITNESS REPORT OF JOHN J. COOGAN REGARDING
DEFENDANTS DELPHI AUTOMOTIVE SYSTEMS CORPORATION AND DELPHI
AUTOMOTIVE SYSTEMS LLC'S NONINFRINGEMENT OF CLAIMS 21, 22, 23, 36,
38, AND 40 OF U.S. PATENT NO. 6,012,283 AND CLAIMS 16, 17, 22, 24, 47, 53, 75, 78,
82, 110, 114, 119, 144, 145, 195, 224, 247, 253, AND 282 OF U.S. PATENT NO. 6,253,544**

**[ Fed. R. Civ. P. 26(a)(2)(B) ]**

**CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

## I.    Introduction

1.    I have been retained as an expert and asked to testify at trial on behalf of Delphi Automotive Systems Corporation and Delphi Automotive Systems LLC (collectively, "Delphi") regarding claims 21, 22, 23, 36, 38, and 40 of U.S. Patent No. 6,012,283 (the "'283 patent") and claims 16, 17, 22, 24, 47, 53, 75, 78, 82, 110, 114, 119, 144, 145, 195, 224, 247, 253, and 282 of U.S. Patent No. 6,253,544 (the "'544 patent") (collectively, the "asserted claims" of the "patents-in-suit"), which claims I am informed are asserted by plaintiff Litex, Inc. ("Litex") against Delphi. I am familiar with the asserted claims and the specifications of the patents-in-suit. A copy of my resume is attached as Exhibit 1, a copy of the '283 patent is attached as Exhibit 2, and a copy of the '544 patent is attached as Exhibit 3.

2.    I have been asked to evaluate whether the methods and devices of Delphi's non-thermal plasma exhaust aftertreatment system infringe the asserted claims of the patents-in-suit. By the "Delphi non-thermal plasma exhaust aftertreatment system," I refer to the combination of a power supply, a non-thermal plasma (NTP) reactor, a catalytic convertor, and/or a diesel particulate filter. (DPF). I also may provide testimony in this case on the background of the technology that is at issue in this litigation and on the validity of the patents-in-suit.

## II.    Summary of Opinions

3.    In my opinion, use of the Delphi non-thermal plasma system does not infringe any of the asserted claims of the Litex patents.    I state the detailed reasons for my opinion throughout this report. But in summary, the Delphi non-thermal plasma exhaust aftertreatment system is fundamentally different, in both its electro-mechanical design and theory of operation, than the emission reduction system disclosed and claimed in the Litex patents.

4.    First, the Litex patents are based on the supposed beneficial effects of the

1

*introduction of ozone*, generated by an ultraviolet lamp from air, into the intake manifold of an automobile engine. On the other hand, the Delphi system uses a non-thermal plasma discharge reactor to generate nitrogen dioxide and partially oxidized hydrocarbons from diesel exhaust in ways that *minimize the generation of ozone*. The Delphi system does not use ultraviolet light. Additionally, not only is the Delphi NTP reactor not an ozonizer, but many of the specific design characteristics of the Delphi system directed at NO to $NO_2$ conversion are antagonistic to the production of ozone.

5.     Second, the Litex patents rely on the supposed ability of ozone to make a standard catalytic convertor better able to decrease a particular pollutant. The Delphi system instead uses non-thermal plasma to alter the mix of pollutants fed into a specialized catalytic convertor designed to handle the new mix of pollutants. In the Delphi system, the non-thermal plasma does not make a catalytic convertor better able to decrease any particular pollutants.

6.     Third, the Litex patents call for a power supply which supplies a high frequency alternating current whenever the engine is running. The Delphi power supply instead supplies a very specialized pulsed current made up of a single waveform (current), followed by a period of idle time (no current), followed by another single waveform (current), specifically developed to maximize the conversion of NO to $NO_2$. The power supplied to the non-thermal plasma reactor is regulated by a power controller that dynamically alters the length of the idle time between current pulses, when no current is supplied, based on conditions in the engine and the exhaust. In the Delphi power supply, there is no single frequency, high or low, that describes the applied current.

7.     Finally, the Litex patents call for a low powered ozone generator or discharge device, giving as an example an ultraviolet lamp powered by an automobile battery. Although

2

"low power" is an indefinite term, it certainly does not describe the Delphi non-thermal plasma reactor that used hundreds of watts of power.

8.     In preparing this report, I have reviewed the patents-in-suit, their file histories, and the expert reports of Cynthia Friend and Bruce R. Locke and the materials listed in Exhibit 4. To the extent that Litex attempts to assert additional claims against Delphi, I reserve the right to supplement the analysis contained in this report. I also reserve the right to supplement the analysis contained in this report with a supplemental report, and to alter or supplement my opinions at deposition or trial. I also reserve the right to alter or supplement my report after the Court interprets the claims of the patents in suit.

9.     I have been informed that the effective filing date of the patents-in-suit is no earlier than the filing date of application No. 08/671,955, June 28, 1996.

10.     In my opinion, on the effective filing date of the patents-in-suit, a person of ordinary skill in the art of exhaust aftertreatment would be either someone with a Bachelors degree in chemical engineering, electrical engineering, physics, or chemistry and 5 years of experience in exhaust aftertreatment, or someone with a Masters degree in chemical engineering, electrical engineering, engineering, physics, or chemistry who had taken courses in exhaust treatment technology.

III.    **Expert Qualifications**

11.     I am currently employed by the University of Dallas, (Irving, TX). My job title is Assistant Professor of Physics.

12.     In 1983, I earned a BA in Philosophy from the University of Dallas. In 1985, 1987 and 1989 I earned, respectively, a BS (with honors), a MS, and the PhD in Physics from the University of Texas. I was a University of California postdoctoral fellow while at Los Alamos

3

increase the conversion efficiency of the catalytic converter.

178.    The specification states that "The conversion efficiency of the catalytic converter is a function of many parameters including temperature, stoichiometry, the presence of any catalysts' poisons, the type of catalyst and the residence time of the exhaust gases within the catalytic converter." These parameters appropriately describe factors that effect how the catalytic converter operates, not the gases input to the catalytic converter. Catalytic converters are designed to promote chemical reactions that result in the treatment of specific gas streams. These reactions occur at different rates and are dependent on the conditions present in the converter.

179.    It is my opinion that the Delphi NTP reactor does not effect the reactions which take place in the catalytic convertor. While the conversion of NO to $NO_2$ does effect which catalytic converter is best suited for the application, it does not effect how any catalytic converter operates. Therefore, it is my opinion that the increase in NOx removal observed using the Delphi process is not a result of any change in the catalytic converter efficiency, but a result of the use of a more appropriate catalytic converter. That is, Delphi has not found a way to make an existing converter work better; they have found a catalytic converter that works better.

180.    It is my opinion that the Delphi system does not provide a method for improving the efficiency of a catalytic converter and therefore operates substantially differently than the systems described in the '283 and '544 patents.

181.    It is my opinion that the Delphi system does not rely on ozone addition and therefore operates substantially differently than the systems described in the '283 and '544 patents.

182.    In my opinion, the Delphi non-thermal plasma exhaust aftertreatment system is so

55

far changed in principle from the apparatus and methods set forth in the '283 and '544 patents that it performs the same function, the reduction of pollutants in engine exhaust, in a completely different way. Therefore, in my opinion, for this reason as well as those reasons set forth above, Delphi's activities in conjunction with its non-thermal plasma exhaust aftertreatment system did not infringe any of claims 21, 22, 23, 36, 38, and 40 of U.S. Patent No. 6,012,283 or claims 16, 17, 22, 24, 47, 53, 75, 78, 82, 110, 114, 119, 144, 145, 195, 224, 247, 253, and 282 of U.S. Patent No. 6,253,544.

Executed this 21st day of April 2003, in Bedford, Texas.

John J. Coogan, Ph.D.

56

TOTAL P.58

# Exhibit 19

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Litex, Inc.,

                                    Plaintiff,

        v.

Delphi Automotive Systems Corporation and
Delphi Automotive Systems LLC,

                                    Defendants.

Civil Action No. 01 CV 10910 (JLT)

Judge Joseph L. Tauro

**DECLARATION OF JOACHIM KUPE IN SUPPORT OF DEFENDANTS'
EMERGENCY MOTION FOR RECONSIDERATION OF THE COURT'S
AUGUST 15, 2002 ORDER PERMITTING DR. LEON EKCHIAN ACCESS TO
DEFENDANTS' "ATTORNEYS EYES ONLY INFORMATION" AND
COMPELLING THE DEPOSITION OF J.T. BATTENBERG**

        1.      I, Joachim Kupe, am over the age of eighteen and an employee of Delphi

Automotive Systems, LLC, one of the Defendants in this action, and could competently

testify to the following if called upon to do so at trial.

        2.      I serve as chief engineer for Delphi's advanced exhaust after treatment

programs.  One of my programs is Delphi's non-thermal plasma (NTP) project, the

program I understand that Plaintiff Litex, Inc. has accused of infringing its patents in the

above-identified action.

        3.      I lead a team of engineers and scientists at Delphi conducting research and

development for the NTP project and planning for its potential commercialization.

        4.      NTP is a new name for an old science.  For decades, NTP related

technology has been used to treat, decontaminate, and sterilize pollutants from various

types of waste fluid streams, including exhaust from internal combustion engines.  NTP

is nothing more than the application of an electrical discharge reactor that generates a

highly localized electrical field to accelerate electrons to high velocities.  These electrons

*Kupe*

**EXHIBIT NO.** 85

9-26-02

collide with exhaust gas molecules causing reactions that lead to the chemical breakdown of pollutants in the exhaust gas.

5.    Moreover, it has been known for at least a decade that NTP technology can be used to treat automotive exhaust gas. For the past eight years, Delphi has committed significant resources and efforts to improve upon this well-known science and technology in an attempt to develop a durable, high quality, energy efficient and economical system to be employed in future commercial motor vehicles. Since 1999 alone, Delphi has dedicated over $7 million dollars to the research and development of this technology.

6.    Contrary to Litex's contention, Delphi does not, nor has it ever, manufactured or sold any commercial NTP products. Delphi has only developed a few prototype reactors for experimental testing purposes. Although Delphi has developed concepts related to NTP applications, these concepts have not yet evolved into fully commercial products, requiring additional design experimentation and testing and the completion of the development of necessary manufacturing processes. If at all, Delphi does not anticipate commercialization for NTP applications in the automotive industry at this time until 2009.

7.    I requested that Delphi's technical research and development information and related business information regarding Delphi's efforts to seek co-development partners for the NTP project be placed under the "Attorneys' Eyes Only" designation of the Court's Protective Order prior to production to Litex. These documents included research notes, internal technology presentations, testing records, business and commercialization plans, performance data, technical team meeting minutes, engineering drawings and schematics, competitive assessments and numerous miscellaneous documents that address the structural, functional, and operational parameters relating to Delphi's NTP technology and applications.

8.     Because Delphi does not manufacture or sell a commercial product nor does it have such plans for many years in the future, all information relating to the research, development, and potential commercialization of Delphi's NTP technology constitutes trade secrets known only to Delphi and its co-development partners. Access to Delphi's research and development information would provide a competitor with an eight-year jump-start to overcome numerous, difficult, technical and business hurdles to develop a durable, high quality, energy efficient and economical system necessary for a potentially viable commercial product.

9.     Since automotive manufacturers' demand for exhaust after treatment technology is spurred by emission control regulations, demand for a NTP exhaust treatment product is not anticipated until at least 2009 when it may have limited application to assist automotive manufacturers in fully complying with more stringent emission standards. Litex's access now to Delphi's NTP trade secrets would provide it more than ample time to digest Delphi's research and development information and roll it into its next generation products to compete with Delphi for business by 2009. Moreover, with access to Delphi's trade secret information, Litex will learn of the pitfalls to avoid developing this technology, saving Litex significant time and research and development costs that Delphi had to endure.

10.    Well over 10,000 pages of the documents that Delphi produced to Litex under the Attorneys' Eyes Only confidentiality designation were documents that contained information owned, at least in part, by other third parties with whom Delphi has engaged in research and development activities concerning the NTP project over the past eight years. These parties include the Low Emission Partnership (a consortium of General Motors, Ford Motor Company, Daimler Chrysler and Pacific Northwest National Laboratories), General Motors Corporation, Pacific Northwest National Laboratories, and PSA. Delphi owes each of these parties a duty of confidentiality to protect their research information and trade secrets developed relating to the NTP project. These parties

3

understood that their confidential information would be designated under the "Attorneys' Eyes Only" designation of the Court's protective order that would prevent access of these documents to any Litex employees.

11.    I understand that Litex now contends that it is not a competitor of Delphi. That simply is not true. First Litex, unlike Delphi, is already offering a competitive product, which it calls its "Corona Discharge Device" or "CDD." Attached as Exhibits 1 through 3 are true and correct copies of web pages and datasheets currently available from Litex's website. Exhibit 1, a Litex web page titled "Litex – Corona Discharge Device," claims that its CDD product "significantly reduces hazardous emissions generated by gasoline-powered automobile engines." At the top of Exhibit 2, Litex's "homepage," Litex offers the CDD product for sale in bright yellow type on a bright red background. Exhibit 3 contains product sales datasheets for Litex's CDD, for installation in a vehicle and for use in a laboratory environment.

12.    Second, I also know from my knowledge of the industry, Litex has attempted to sell or sold its CDD product to automobile manufacturers and suppliers, including Ford Motor Company, General Motors Corp., PSA, Faurecia, and Johnson Matthey. Delphi has attempted to engage some of these same companies as co-development partners for its NTP project. Moreover, Delphi, ultimately, would potentially look to sell its NTP technology to these same companies in the future.

13.    Third, information on Litex's website about its CDD device publicly states that Litex is continuing to test and develop its competitive product. Exhibit 1, the Litex web page titled "Litex – Corona Discharge Device," states, "The product [CDD] has been undergoing extensive testing since 1997 in the laboratories of Arthur D. Little, Inc. of Cambridge, Massachusetts, a renowned research and development firm. Additional testing is being conducted by international automobile manufacturers and component suppliers."

4

14.     Next, Litex is a competitor for it desires, through this action, to stop or
enjoin Delphi's research, experimentation, and development of NTP technology years
before Delphi has any plans to introduce a commercial product.  Obviously, Litex is
attempting to use its patents to prevent entry to its competitors to the marketplace so that
it will be better able to promote and sell its CDD product and/or future products.

15.     I understand that Litex has an abundance of funds to support its litigation
activities in this lawsuit.  Litex has flaunted the fact that it has secured a $5 million
litigation patent enforcement policy from Lloyd's of London.  A true and correct copy of
the Litex press release about this insurance policy, downloaded from its website, is
attached as Exhibit 4.

I declare under penalty of perjury under the laws of the United States of America
that the foregoing statements are true and correct.


Executed August 19, 2002 in Troy, Michigan.



_____
Joachim Kupe




I hereby certify that a true copy of the
above document was served upon the
attorney of record for each party by
mail/hand on   8/19/02
H. Joseph Hameline

fax/overnight

5