## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DELPHI CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LITEX, INC., | ) |
| | ) |
| Defendant. | ) |

Civil Action No. 05-10415 (WGY)

### DELPHI'S OPPOSITION TO LITEX'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND REPLY MEMORANDUM IN FURTHER SUPPORT OF DELPHI'S MOTION FOR SUMMARY JUDGMENT

H. Joseph Hameline, BBO # 218710
Matthew C. Hurley, BBO # 643638
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

*Attorneys for Plaintiff Delphi Corporation*

Dated:  June 27, 2005

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 5

I.    Litex's Cross-Motion for Summary Judgment Should be Denied ................................ 5

    A.    Delphi's Press Releases Are True and Accurately Reflect The State of Delphi's NTP Project At The Time of Their Issuance. ...................................... 6

        1.    Delphi's July 20, 2001 "Spokesperson Statement" is true ................... 6

        2.    Delphi's July 30, 2001 press release is true ........................................... 6

        3.    The comments on NTP in Delphi's September 12, 2001 speech are true ...................................................................................................... 7

        4.    Comments on NTP in Delphi's October 16, 2001 press release are true ...................................................................................................... 7

        5.    Delphi's comments on NTP in its Annual Report Magazine are true ...................................................................................................... 8

        6.    The arbitration testimony of certain Delphi witnesses in 2004 fails to show that Delphi knowingly issued false press releases in 2001 ........... 8

        7.    At most, Delphi's press releases constitute puffery and trade talk ........ 9

    B.    Delphi Did Not Make Public Statements In 2001 With The Intent To Induce Litex To Sign A Settlement Agreement And Release in 2003. ......................... 11

        1.    The August 17, 2001 Interim Design Review (IDR) Report ................. 12

        2.    The October 30, 2001 presentation ....................................................... 13

        3.    The December 3, 2001 presentation ...................................................... 13

        4.    The April 11, 2002 e-mail ..................................................................... 13

    C.    The 2001 Press Releases Were Not Material To Litex's Decision To Execute The Settlement Term Sheet & Release .............................................. 14

    D.    Litex Did Not Reasonably Rely on Delphi's Statements ................................... 15

1.    Litex's questioning of Delphi's press releases during *Litex I* was not confined to ownership issues ................................................................. 15

2.    Litex possessed sufficient evidence during *Litex I* to know that Delphi doubted the success of its NTP project in 2001, thereby making Litex's reliance on Delphi's press releases unreasonable......... 17

D.    Litex Has Failed to Show That Delphi's 2001 Press Releases Caused It To Suffer Injury ........................................................................................ 18

II.    Summary Judgment In Delphi's Favor Is Appropriate Because The Settlement Term Sheet & Release Is Unambiguous And It Clearly Bars The Claims Litex Has Asserted ......................................................................................................... 19

CONCLUSION............................................................................................................. 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Boston Tech., Inc. Securities Litigation,*
8 F. Supp.2d 43 (D. Mass. 1998) ..................................................................................................10

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).................................................................................................5, 6, 7, 8

*Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.,*
831 F. Supp. 920 (D. Mass. 1993) ..................................................................................................10

*Flebotte v. Dow Jones & Co., Inc.,*
2001 U.S. Dist. LEXIS 21327 (D. Mass. 2001) .................................................................19, 20

*Zyla v. Wadsworth,*
360 F.3d 243 (1st Cir. 2004)..................................................................................................5

*New Hampshire v. Maine,*
532 U.S. 742 (2001)..................................................................................................9

*Quela v. Payco-General American Credits, Inc.,*
2000 U.S. Dist. LEXIS 6932 (N.D. Ill. 2000) .................................................................14, 15, 16

*Quinn v. City of Kansas City,*
64 F. Supp.2d 1084 (D. Kan. 1999)..................................................................................................14

*Trent Partners and Associates, Inc. v. Digital Equipment Corp.,*
120 F.Supp.2d 84 (D. Mass. 1999) ..................................................................................................5

*Van Ormer v. Aspen Tech., Inc.,*
145 F. Supp.2d 101 (D. Mass. 2000) ..................................................................................................10

## STATE CASES

*Broomfield v. Kosow,*
349 Mass 749 (1965) ..................................................................................................11

*Gray v. Heritage Dental Management Corp.,*
1 Mass. L. Rep. 345 (1993)..................................................................................................14

*McEvoy Travel Bureau, Inv. v. Norton Co.,*
408 Mass. 704 (1990) ..................................................................................................11

*Willett v. Herrick*,
258 Mass. 585 (1927) ..................................................................................................................11

## MISCELLANEOUS

Restatement (Second) of Judgments §§ 17, 27 ...........................................................................17

## INTRODUCTION

This dispute involves research and development programs that never achieved commercialization. Although both Litex and Delphi initially expressed optimism about their respective NTP research projects, neither party was able to commercialize and market an NTP product or license its technology to another company. Such is the nature of R&D projects – many of them never pan out, even when early research results look promising.

Even though Litex's assessment of its own NTP project later proved to be way off the mark, Litex claims that Delphi knowingly issued false public statements about the potential of Delphi's award-winning NTP research. Even more surprisingly, Litex claims that Delphi made these allegedly false statements in 2001 with the intent to induce Litex to sign a settlement agreement and release in 2003. Litex now seeks extraordinary relief to void the release and set aside the parties' settlement agreement. But Litex's fraudulent inducement claim has no merit and cannot survive summary judgment because Litex has failed to establish each of the five elements of its cause of action:

1.    ***Delphi did not knowingly make false statements of material facts.*** Delphi's press releases were not false – let alone knowingly false – but instead accurately reflected the state of Delphi's NTP project at the time of their issuance. Contrary to Litex's suggestion, the press releases did not claim or predict ultimate commercial viability or success for Delphi's NTP project. Ekchian Decl. Exs. 1-5.[1] Rather, the statements correctly indicated that Delphi was conducting research regarding NTP for exhaust treatment applications and at best indicated that some of Delphi's laboratory tests looked promising. *Id.*; *see also* SMF ¶¶ 1, 2, 4, 7, 12 and 14

---

[1] "Ekchian Decl. Ex. __" refers to an exhibit accompanying the Declaration of Leon Ekchian filed by Litex on June 14, 2005.

(all admitted); SMF ¶ 6 (denied in part).[2] Delphi was not the only entity that felt that Delphi's research looked interesting. Indeed, one of the allegedly false press releases cited by Litex concerns an award that *R&D Magazine* presented to Delphi in July 2001 for its NTP research. Ekchian Decl. Ex. 2. Furthermore, given that Litex has already collected an arbitration award based on its claim that Delphi's NTP research activities in *late 2001 and early 2002* infringed Litex's '544 patent, Litex should be estopped from now claiming that Delphi's NTP project was effectively dead at the time Delphi issued the 2001 statements. SMF ¶¶ 44-46 (admitted); Ekchian Decl. Ex. 16.

2. ***Delphi did not make public statements in 2001 with the intent to induce Litex to sign a settlement agreement and release in 2003.*** Delphi issued the press releases in 2001 – more than two years before the parties executed the Settlement Term Sheet & Release. Ekchian Decl. Exs. 1-5. Delphi did not direct these statements at Litex or make them to induce Litex to sign the Release. SMF ¶¶ 41-42 (admitted). Instead, Delphi issued the statements to inform the public about the status of its NTP research at that time. As a result, the record fails to establish the required causal connection between the alleged misrepresentations and the execution of the Settlement Term Sheet & Release.

3. ***The 2001 press releases were not material to Litex's decision to execute the settlement agreement and release.*** Litex has failed to show that two-year-old press releases about Delphi's early research results were material to its decision to execute the Settlement Term Sheet & Release. This is hardly surprising, given that the parties never even discussed the press releases during settlement negotiations. SMF ¶¶ 41-42 (admitted).

---

[2] "SMF ¶___" refers to the Statement of Undisputed Materials Facts In Support of Delphi Corporation's Motion for Summary Judgment filed on May 31, 2005. The phrase "admitted" following a citation to "SMF ¶___" notes that Litex admitted this fact in Litex's Response to Delphi Corporation's Statement of Undisputed Material Facts filed on June 14, 2005.

4.    *Litex did not reasonably rely on Delphi's statements.*  Throughout *Litex I*, Litex asserted the same claim that it now seeks to revive in this action – that is, that Delphi's 2001 press releases were inaccurate and interfered with Litex's potential business relationships.  SMF ¶¶ 22, 24-25, 27-31 (all admitted).  In addition, Litex obtained information during *Litex I* indicating that at least some Delphi personnel expressed skepticism about Delphi's NTP project in 2001.  SMF ¶¶ 9-13 (admitted).  And at the time it executed the Settlement Term Sheet & Release in November 2003, Litex knew that Delphi had completely terminated its NTP program in 2002, which would lead a reasonable party to conclude that Delphi may have doubted the commercial success of the project in the months leading up to that significant decision.  SMF ¶¶ 15-17 (admitted).

For the reasons discussed throughout this brief, Litex's fraud claim is without merit.  Just because Delphi ultimately decided that its NTP program was not *commercially* viable does not mean that its previous statements about its laboratory research were knowingly false.  But to the extent a claim exists at all, Litex was well aware of the "facts" underlying its claim at the time it executed the Settlement Term Sheet & Release, and it has therefore failed to show that it reasonably relied on Delphi's 2001 press releases in executing that document.

5.    *Litex has failed to show that Delphi's 2001 statements caused it to suffer injury.*

In its brief, Litex states in conclusory fashion that "[t]o the extent the Release is enforced against Litex now, those fraudulent statements which induced Litex into the Release will injure Litex."  Opp. at 20.[3]  But Litex never sets forth any facts establishing its injury.  The reason for this omission is clear: Litex has not been injured.  Indeed, as part of the "fraudulently induced" settlement agreement, the parties agreed to an arbitration that resulted in an award in Litex's

---

[3]  "Opp. at ___" refers to Litex's Memorandum of Law in Opposition to Plaintiff's Motion For Summary Judgment and in Support of Litex's Cross-Motion for Partial Summary Judgment filed on June 14, 2005.

favor. SMF ¶¶ 34, 44-46 (admitted). Litex has not offered to return that award or otherwise rescind that aspect of the parties' agreement, which clearly conferred a benefit on Litex. In addition, to the extent Litex is rehashing its argument that Delphi's actions prevented it from capitalizing on other business opportunities – an argument that the arbitrator has already considered and rejected – Litex has failed to show that such opportunities ever truly existed outside of its own fertile imagination. Ekchian Decl. Ex. 16. The fact remains that no company – including Litex – has been able to develop a commercially viable NTP product. Litex has failed to show that it has suffered any damage whatsoever.

Despite their conflicting claims, the parties do agree on one thing: this matter is now ripe for summary judgment. Litex does not claim that the Settlement Term Sheet & Release is in any way ambiguous or that genuine issues of material fact otherwise preclude summary judgment in Delphi's favor. Instead, it has staked its entire case on its fraudulent inducement claim, which Litex admits is ready for immediate adjudication since it has filed a cross-motion for summary judgment. But the undisputed facts of this matter demonstrate that Litex's fraud claim must fail as a matter of law. As a result, the Settlement Term Sheet & Release – which unambiguously bars the claims Litex has asserted in its Counterclaim – should be enforced as written. Litex's counterclaims should be dismissed with prejudice and summary judgment should be entered in Delphi's favor on Count I of its Complaint.

**ARGUMENT**

I.  **LITEX'S CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED.**

The parties agree that Litex bears the heavy burden of proving all five elements of its fraudulent inducement claim. Opp. at 19. To obtain summary judgment on that claim, Litex must establish that: (1) Delphi knowingly made false statements of material facts; (2) Delphi made those statements with the intent to induce Litex to sign the Settlement Term Sheet & Release; (3) those statements were material to Litex's decision to execute the Settlement Term Sheet & Release; (4) Litex reasonably relied on those statements; and (5) those statements injured Litex. *Id.*; *see also Zyla v. Wadsworth*, 360 F.3d 243, 254 (1st Cir. 2004); *Trent Partners and Associates, Inc. v. Digital Equipment Corp.*, 120 F.Supp.2d 84, 109 (D. Mass. 1999); Opp. at 19.

Because the burden of persuasion rests with Litex on its counterclaim, Litex must first advance at least some sufficiently probative evidence supporting each element of its claim in order to prevail. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324-36 (1986). Litex has failed to do so, and therefore its cross-motion for summary judgment must be denied. Additionally, given that Litex does not dispute the validity and terms of the Settlement Term Sheet & Release and has instead staked its entire case on its fraudulent inducement claim, the absence of evidence supporting Litex's fraud claim also requires that summary judgment enter in Delphi's favor on Count I of its Complaint. *Id.* ("If proof is absent or insufficient regarding any necessary element of a claim, the claimant cannot win at trial and trial is therefore unnecessary."); SMF ¶¶ 35-38 (admitted).

5

**A.    Delphi's Press Releases Are True and Accurately Reflect The State of Delphi's NTP Project At The Time of Their Issuance.**

Contrary to Litex's rhetoric, the evidence shows that Delphi's press statements are true, and Delphi has never suggested otherwise.

### 1.    Delphi's July 20, 2001 "Spokesperson Statement" is true.

Litex claims that the first allegedly false statement comes from a spokesperson statement dated July 20, 2001.[4] The relevant portion of the statement reads: "We are excited, however, to discuss our technology. Delphi is developing non-thermal plasma catalysis components and systems relying upon its significant technical capabilities and sound, demonstrable and credible scientific principles." Exchian Decl., Ex. 1. This statement is true. As of July 2001, Delphi was researching NTP, and this research was based on sound technical and scientific principles. SMF ¶ 14. Nowhere in this statement does Delphi claim that its NTP program would achieve commercial viability or ultimate commercial success, as Litex misleadingly suggests.

### 2.    Delphi's July 30, 2001 press release is true.

Litex next claims that Delphi's use of the phrase "significant reduction in emissions" in a press release dated July 30, 2001 was fraudulent. Ekchian Decl., Ex. 2. But Delphi's statement is true. The press release at issue announced an award that *R&D Magazine* presented to Delphi for its NTP catalyst research. The sentence at issue actually reads: "We are extremely proud of this year's award, which recognizes the *potential* for our revolutionary NTP exhaust aftertreatment system with its significant reduction in emissions." *Id.* (emphasis added). The phrase "significant reduction in emissions" refers to an earlier section of the press release, in which Delphi accurately stated: "In steady-state testing of a diesel vehicle, the NTP exhaust

---

[4] This statement is not a press release. It is a statement prepared by Delphi to address public inquiries regarding the *Litex I* lawsuit. Litex offers no evidence that Delphi ever publicly disseminated this statement.

aftertreatement system demonstrated greater than 55 percent reduction in oxides . . . " *Id.*  Again, this statement never claims ultimate commercial viability or success of NTP.

### 3. The comments on NTP in Delphi's September 12, 2001 speech are true.

For the third allegedly false statement, Litex points to a single sentence from a speech given by Delphi's president in France on September 12, 2001.  This sentence states "let me also mention that Delphi is the only supplier with full diesel injection and exhaust aftertreatment capability, including our award-winning non-thermal plasma aftertreatment technology that helps remove nitrogen oxide to improve emissions for diesel and lean burn." Ekchian Decl., Ex. 3.  In 2001, Delphi was the only automotive supplier that provided both diesel injection and exhaust treatment capabilities.  It is also undisputed that in September 2001, Delphi continued to pursue research on NTP intended to remove NOx to improve diesel exhaust emissions.  SMF ¶¶ 2, 14 (both admitted).  Litex has failed to offer any evidence to the contrary.  Again, there is nothing untrue regarding this statement, nor does the statement make any claims regarding the ultimate commercial viability or success of NTP.

### 4. Comments on NTP in Delphi's October 16, 2001 press release are true.

Litex next relies upon a single sentence in Delphi's October 16, 2001 press release: "Delphi has developed an innovative after-treatment solution, non-thermal plasma technology (NTP) that works in conjunction with a catalytic converter and particulate filter." Ekchian Decl., Ex. 4.  The press release goes on to discuss Delphi's NTP research laboratory results, thereby placing the statement at issue in the proper context.  *Id.*  Once again, this statement is true and Litex has offered no evidence to the contrary.  Indeed, Litex has admitted that "Delphi's research focused on combining a reactor that generated NTP with a specially designed catalyst to remove

nitrogen oxide pollutants (NOx) from diesel engine exhaust." SMF ¶ 2 (admitted).  Moreover, as with all other statements identified by Litex, this statement does not claim that Delphi's NTP program would achieve commercial viability or success.

> ### 5.    Delphi's comments on NTP in its Annual Report Magazine are true.

Litex also complains about two statements in Delphi's 2001 Annual Report magazine.[5] Opp. at 3.  The first statement indicates that Delphi was investigating NTP technology to treat exhaust emissions.  *Id.*  The second statement refers to the inclusion of NTP on the PSA Environmental Technology vehicle, a concept car built by PSA as a demonstration vehicle of potential future vehicle technologies directed to environmental related technologies.  *Id.*  These statements are true, and Litex has failed to show otherwise.  SMF ¶¶ 1, 2, 12 and 14 (all admitted).  In early 2002, when the Annual Report magazine was published, Delphi was continuing its work on NTP, as Litex admits.  SMF ¶¶ 12, 14 (both admitted).  And as the statement accurately states, PSA chose to include this technology on its concept vehicle.  Again, despite its burden to do so, Litex offers no evidence to the contrary.  Like the other statements at issue, Delphi's statements in the 2001 Annual Report magazine do not address the ultimate commercial viability or success of NTP.

> ### 6.    The arbitration testimony of certain Delphi witnesses in 2004 fails to show that Delphi knowingly issued false press releases in 2001.

In an attempt to show that Delphi's 2001 press releases were knowingly false, Litex relies on 43 lines of testimony from a five-day arbitration hearing that generated 1671 pages or approximately 36,700 lines of testimony.  Opp. at 6-7.  But even the snippets of testimony relied upon by Litex fall far short of demonstrating that Delphi knowingly issued false press releases in

---

[5] Litex's suggests that the annual report is Delphi's 2001 10-Q filing to the U.S. Securities & Exchange Commission.  This is not the case.  Rather, it is a separate promotional magazine about the company sent annually to shareholders.

2001. Nor does this testimony establish that Delphi actually terminated its NTP project in 2001 or knew in 2001 that the project would never commercially succeed, as Litex now contends. Opp. at 2, 6, 10, 15. At best, the testimony cited by Litex shows that those individual witnesses were skeptical about the ultimate commercial success of the NTP program as early as 2001. The personal opinions of those witnesses do not show, however, that Delphi as an institution *knew* in 2001 that its NTP program would never achieve commercial viability. To the contrary, Delphi continued to pursue its NTP program into 2002 – an undisputed fact that completely undermines Litex's contention that Delphi's NTP program was effectively dead in 2001. SMF ¶¶ 12, 14 (both admitted).

Indeed, in *Litex I*, Litex claimed that Delphi infringed Litex's patent rights by engaging in NTP research in *late 2001 and early 2002*, and Litex collected an arbitration award from Delphi based on that claim. SMF ¶¶ 44-46 (admitted). Under these circumstances, Litex should be estopped from now claiming that Delphi's NTP project was dead in the water in 2001. *See, e.g., New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.") (citations and quotations omitted).

### 7.    At most, Delphi's press releases constitute puffery and trade talk.

The allegedly fraudulent statements made by Delphi merely indicate that Delphi was pursuing research and development of NTP. Litex failed to identify a single statement in which Delphi claimed that its NTP technology was commercially viable. Under these circumstances, and given the entire context of Delphi's statements, such statements constitute nothing more than

"puffery" or "trade talk" and cannot possibly give rise to a fraud claim. *See Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F. Supp. 920, 926-927 (D. Mass. 1993).

Citing numerous security fraud cases, Litex argues that optimistic statements about specific products that are contradicted by internal information do not qualify as puffery. Litex's reliance on these cases is misplaced. Cases applying federal securities law – to the extent they are even relevant to Litex's common law fraud claim – define "puffery" broadly. *See, e.g., In re Boston Tech., Inc. Securities Litigation*, 8 F. Supp.2d 43, 54 (D. Mass. 1998) ("Exaggerated, vague, or loosely optimistic statements about a company are not actionable…"). Moreover, courts in this District have held that there is no duty to disclose unresolved technical problems in a new product. *Id.* at 62; *Van Ormer v. Aspen Tech., Inc.,* 145 F. Supp.2d 101, 105 (D. Mass. 2000).

Here, each of the Delphi statements cited by Litex merely indicated that Delphi was researching and developing NTP for exhaust treatment applications. Such statements are not strongly optimistic, concrete or definite. The project's unresolved technical problems, moreover, did not require disclosure and did not render Delphi's statements fraudulent. As any reasonable party – especially a sophisticated industry participant like Litex – knows, research and development projects commonly encounter several problems along the way, and Delphi's NTP project was no exception. In sum, the Delphi statements at issue constitute at best puffery about an ongoing R&D project.[6]

---

[6] It is ironic that Litex has accused Delphi of knowingly make false statements about NTP technology in 2001 when Litex's website *to this day* describes its own NTP project as a "promising new technology solution in the fight against harmful automobile emissions and air pollution." *See* www.litexcorp.com. Litex's website also claims: "[N]ew technology is needed to provide substantial emissions reductions with fuels that will be available over the next decade. No such technology has surfaced until now." *Id.* Litex has never sold a commercial NTP product or licensed any patents in its nine years of promoting this technology.

**B.      Delphi Did Not Make Public Statements In 2001 With The Intent To Induce Litex To Sign A Settlement Agreement And Release in 2003.**

It is undisputed that Delphi made the statements at issue more than two years before Litex signed the Settlement Term Sheet & Release.  It is also undisputed that Delphi issued the statements to the public, as opposed to directing them at Litex.  Opp. at 12, n.2.  And Litex admits that the parties never even discussed the 2001 press releases or Delphi's position on the success or commercial viability of NTP as of 2001 during the negotiations leading to the execution of the Settlement Term Sheet & Release.  SMF ¶¶ 41, 42 (both admitted).  Under these circumstances, there is not even a shred of evidence – other than Litex's unsupported allegations – that Delphi intentionally made false statements in order to induce Litex to sign the Settlement Term Sheet & Release.  Without this crucial link, Litex's claim must fail as a matter of law.  *See Willett v. Herrick*, 258 Mass. 585, 596-97 (1927) (requiring a causal relationship between the making of the misrepresentation and the giving of the release).[7]

In an attempt to fill this obvious gap in its argument, Litex argues that Delphi essentially confirmed the press releases throughout discovery in *Litex I* by providing information showing Delphi's unwavering confidence in its NTP program throughout 2001.  Nothing could be further from the truth.  The internal documents provided by Delphi in discovery showed its growing concern about unsuccessful project testing in 2001 and documented Delphi's efforts to overcome

---

[7] The cases cited by Litex on this point actually support Delphi's position that a causal relationship or "nexus" must exist between the alleged false statement and the fraudulently procured agreement for the requisite "inducement" to exist.  *See McEvoy Travel Bureau, Inv. v. Norton Co.*, 408 Mass. 704, 709 (1990) (the defendant falsely stated that it would not enforce a termination provision in the contract and that misrepresentation lead the plaintiff to execute the contract); *Broomfield v. Kosow*, 349 Mass. 749, 758-59 (1965).

the technical issues that threatened – and ultimately killed – the commercial viability of the project.[8]

### 1.    The August 17, 2001 Interim Design Review (IDR) Report.

The August 17, 2001 IDR report that Delphi produced to Litex in discovery during *Litex I* expressly indicated that the NTP project was not achieving certain requirements:

- "[NTP] will not be to the level of product development required by ADP." *See* Ekchian Decl, Ex. 8, p. 010144-059195 (first diamond).

- "Catalyst development has been lagging." *Id.* at 010144-059196 (first diamond).

- "Favorable gas bench results did not translate to vehicle testing." *Id.* at 010144-059196 (first dash).

The IDR report also confirms Delphi's plans for further testing and catalyst development in an attempt to overcome the technical issues. *Id.* at 010144-059195 (first and second diamond); 010144-059196 (bullets 1-3); 010144-059197 (third dash).[9]  These plans for further testing and development further contradict Litex's unsupported contention that Delphi abandoned or terminated the NTP project in 2001.  At the same time, by reviewing the IDR report during *Litex I*, Litex had sufficient information to know that Delphi's NTP project was having difficulty achieving necessary performance levels and targeted project goals in 2001 that reasonably threatened its success.

---

[8] Litex also suggests that Delphi fraudulently failed to provide discovery during *Litex I*. Opp. at 1. However, nowhere in Litex's Opposition and Cross-Motion does Litex identify a document not produced, a deposition question not answered or arbitration testimony of a witness that had changed from the witness' deposition testimony from *Litex I*.

[9] Litex reads this document as suggesting that only ten more tests will be necessary for the project to achieve 90% efficiencies. Opp. at 4. But this document says nothing of the sort. Instead, it anticipates the need to develop (or invent) ten new catalyst iterations to potentially achieve 90% efficiency.

### 2.    The October 30, 2001 presentation.

Similarly, Delphi's October 30, 2001 technology presentation to Toyota confirms Delphi's cautious attitude. It again identifies the limited performance milestones achieved by Delphi's NTP project. Ekchian Decl. Ex. 9, 010144-050375 (diamonds 1, 3, 5). The presentation indicates the same points consistently expressed by Delphi during this time frame: that it was achieving good laboratory results ("steady-state"), but that these results did not necessarily translate into good results in vehicle ("MVEG") testing. SMF ¶¶ 4 (admitted), 6 (denied in part). Nowhere does this document reflect Delphi's unconditional confidence about its NTP program, as alleged by Litex. Opp. at 5.

### 3.    The December 3, 2001 presentation.

Similarly, the December 3, 2001 presentation simply described Delphi's NTP project goals and its future research plans. Ekchian Decl. Ex. 10. This document offers no evidence of the commercial viability of NTP, as suggested by Litex.

### 4.    The April 11, 2002 e-mail.

 Delphi's April 11, 2002 email merely confirms the undisputed fact that Delphi abandoned its catalyst development in March 2002 because of poor performance. SMF ¶ 15 (admitted).

Despite Litex's allegation to the contrary, the discovery produced by Delphi in *Litex I* showed the true state of Delphi's NTP project in 2001: Delphi remained committed to the project and continued to pursue it through March 2002, but the promising results that Delphi first saw in the laboratory were not being duplicated in vehicle testing. SMF ¶¶ 1, 2, 4, 7, 12 and 14 (all admitted); SMF ¶ 6 (denied in part). Litex's argument that it was somehow lead to believe that Delphi never had any doubts about the commercial viability of the NTP project until the bottom

dropped out overnight in March 2002 flies in the face of common sense and is contradicted by the discovery produced during *Litex I*. That discovery revealed an evolving process that began with promising laboratory results but ran into technical difficulties as vehicle testing resulted in performance levels that did not meet required project goals. SMF ¶¶ 4 (admitted), 6 (denied in part). When those problems persisted despite Delphi's best efforts to overcome them, Delphi made the decision in March 2002 to cancel the project based on all the available facts. SMF ¶¶ 14-16 (admitted). Litex was well aware of these facts, and thus should not be heard to complain that it did not learn about any problems with Delphi's NTP program in 2001 until the arbitration hearing.

### C.    The 2001 Press Releases Were Not Material To Litex's Decision To Execute The Settlement Term Sheet & Release.

Litex has failed to demonstrate that the 2001 press releases were material to its decision to execute the Settlement Term Sheet & Release. By Litex's own admission, the parties never even discussed the statements during their settlement negotiations, and the parties' agreement makes no mention of them. SMF ¶¶ 41-42 (admitted). Beyond the insufficient allegations of its counterclaims, Litex offers no evidence to prove this element. *See* Fed. R. Civ. P. 56(e). Litex has failed to meet its burden on the materiality element of its claim.[10]

---

[10] The cases that Litex cites to support its materiality argument are also distinguishable. In both *Quinn v. City of Kansas City*, 64 F. Supp.2d 1084 (D. Kan. 1999) and *Gray v. Heritage Dental Management Corp.*, 1 Mass. L. Rep. 345 (1993), the court found that the defendant intentionally testified falsely at a deposition and that this false testimony was material to the plaintiff's decision to settle the action. In contrast, Litex fails to identify any false deposition testimony, let alone any evidence that the testimony was material to its decision to execute the Settlement Term Sheet & Release. Litex also cites *Quela v. Payco-General American Credits, Inc.*, 2000 U.S. Dist. LEXIS 6932 (N.D. Ill. 2000). That case does not involve a fraudulent inducement claim. Instead, it concerns witness tampering, and is therefore inapplicable.

**D.    Litex Did Not Reasonably Rely On Delphi's Statements.**

Litex also argues that it had no knowledge of the allegations underlying its fraud claim during *Litex I* and therefore reasonably relied on Delphi's press releases. Opp. at 9, 14-15. But this argument ignores the substantial evidence supplied by Delphi in connection with its motion for summary judgment, which conclusively demonstrates that during *Litex I*, Litex believed that Delphi's 2001 press releases and other activities were inaccurate and damaged Litex's licensing and business relationships. SMF ¶¶ 22 (admitted), 23, 24-25 (admitted), 26, 27-31 (admitted).

**1.    Litex's questioning of Delphi's press releases during *Litex I* was not confined to ownership issues.**

Litex attempts to distinguish its prior testimony regarding Delphi's alleged false press releases as comments directed exclusively to inventorship or ownership issues. *See* Opp. at 14-16. This argument ignores Litex's prior testimony in an attempt to create a distinction that does not exist.[11]

During *Litex I*, Litex clearly believed that Delphi's "overly optimistic" public statements regarding NTP were false and caused Litex to suffer harm, as evidenced by the deposition testimony of Litex's CEO:

---

[11] Litex also ignores the scope of its claims against Delphi in this current action. Litex's counterclaims expressly assert that Delphi's statements regarding who invented or developed NTP were false statements for which it seeks damages. Specifically, Litex counterclaims state:

> At the same time, Delphi embarked on a campaign to create the false impression that *it had invented the technology,* was successfully developing the technology, would be the "first to market" with the technology, and was ahead in developing commercial applications of the technology.

Cosnowski Decl. Ex. 4, Counterclaim, ¶5 (emphasis added); *see also id.* ¶¶ 17, 21. "Cosnowski Decl." refers to the Declaration of William Cosnowski, Jr. filed in Support of Delphi's Motion for Summary Judgment on May 31, 2005.

15

Q.    [B]ut can you tell me what you have in mind by the concept of inaccurate press releases?

. . .

A.    Well, I find that now, frankly, quite surprising that Delphi was making those presses releases that they'll be *first to market being very confident* in the statement that its making and now from what I understand in reading some of the documents… stating that *Delphi was being overly optimistic,* I find that very surprising.  I would think that a corporation would need to be more careful about statements it makes, about how confident they are, because it impacts other companies, particularly small companies.  Again, investors, customers reading these press releases, you know, it's very difficult for Litex to try to placate the concerns of potential investors when there are these kind of statements, *very confident statements by Delphi that they will be first to market and they're targeting 2004, and now I'm reading that maybe they were overly optimistic.*  I find that to be unreasonable and cause damage.

Cosnowski Decl., Ex. 13, Ekchian Dep. pp. 378:4-380:19 (emphasis added).  In the same

manner, Litex's CEO testified that Delphi's "overly optimistic" press releases damaged Litex:

Q.    Just so I can close the door on this… how did Delphi's alleged over optimism contribute to damages to Litex?

A.    Well, if Delphi in fact when they were making those press releases did not believe they were going to make it to market with a product by 2004, in other words, *makes those overly optimistic statements* to get a lot of press attention, attention from investors, attention of its customers, I find that very troubling….

*Id.,* Ekchian Dep. pp. 386:18-387:6 (emphasis added).  During *Litex I,* Litex did not limit is

attack on Delphi's press statements to inventorship issues:

Because of Delphi's infringement …*and its aggressive publicity* telling the world (including Litex's potential investors, partners, and customers) that it (Delphi) … would be first-to-market with NTP systems …Litex suffered considerable damage including the opportunity to further develop its patented NTP business opportunity with one infusion of funding….

Delphi's publicized development activities and press releases indicating its plans to market and NTP system seriously undermined Litex's efforts to license its technologies, raise capital for research and development activities and enter into partnerships to fund development of its CDD$^{TM}$ system.

16

SMF ¶¶ 27, 28 (both admitted) (emphasis added); *see also* SMF ¶¶ 29, 30 (admitted). Likewise, Litex's CEO testified in *Litex I* that Delphi allegedly interfered with Litex's relationships with potential customers, including PSA, Renault, General Motors and Faurecia, by making private statements critical of Litex's product.[12]  Cosnowski Decl., Ex. 13, Ekchian Dep. pp. 368:16-370:9.

These facts, among others, confirm that during *Litex I*, Litex believed and asserted that Delphi's "overly optimistic" press releases regarding its NTP program, including Delphi's statement that it planned to be "first-to-market" with NTP, harmed Litex by interfering with its licensing, financing, and business relationships. Nevertheless, Litex executed the Settlement Term Sheet & Release, knowing full well that it was releasing Delphi from any claims arising out of those allegations. Litex cannot now claim that it reasonably relied on Delphi's press releases when it was questioning them all along.[13]

### 2. Litex possessed sufficient evidence during *Litex I* to know that Delphi doubted the success of its NTP project in 2001, thereby making Litex's reliance on Delphi's press releases unreasonable.

During *Litex I*, Litex had more than enough information to conclude that Delphi had some doubts about the ultimate commercial success of its NTP project in 2001. Indeed, Delphi's expert stated in *Litex I* that as of July 2001, Delphi was "unsure" and "not confident" that it could develop a commercial NTP product. SMF ¶¶ 10-13 (admitted). Similarly, Delphi's vice

---

[12] Likewise, Litex's counterclaims do not limit its allegations exclusively to select press releases addressed in its Opposition. Litex alleges that Litex has been damaged by Delphi's "unfair and fraudulent practice of making false public and *private statements*." Cosnowski Decl. Ex. 4, Counterclaims ¶46 (emphasis added).

[13] By the same token, the doctrines of claim preclusion and issue preclusion also prevent Litex from relitigating the same claims and facts in this action that it litigated in *Litex I* and the subsequent arbitration. *See* Restatement (Second) of Judgments §§ 17, 27, pp. 148, 250 (1980).

president testified on September 6, 2002 – over a year *before* Litex executed the Settlement Term

Sheet & Release – that Delphi had concerns about its NTP program in 2001:

> Q.    At what point did Delphi realize it was having trouble developing its NTP catalyst?
>
> A.    I don't know when we realized it. I guess when I realized that it wasn't turning [out] as we had hoped probably was over the last year and a half I would say when the results were not as good as we thought.

Cosnowski Decl., Ex. 12, Runkle Dep. p. 114:11-17; *see also* SMF ¶ 9 (admitted). In light of

this undisputed evidence, Litex cannot seriously contend that it first learned at the arbitration that

Delphi had some doubts in 2001 about the success or commercial viability of its NTP program.

The record assembled during *Litex I* amply demonstrated that Delphi encountered

technical problems in the months leading up to its decision to terminate the project. Indeed,

common sense suggests that Delphi did not suddenly "throw in the towel" in early 2002, but

instead reached that important decision after many months of analysis. The *Litex I* record

confirms that because the NTP project was not meeting its required benchmarks, some personnel

at Delphi were growing concerned about the project's ultimate commercial success, even as they

tried to correct the problems. As a result, it is absurd for Litex to now claim that it was ignorant

that Delphi had concerns about the ultimate commercial success of its NTP project in 2001.

### E.    Litex Has Failed To Show That Delphi's 2001 Press Releases Caused It To Suffer Injury.

Litex states in conclusory fashion that "[t]o the extent the Release is enforced against

Litex now, those fraudulent statements which induced Litex into the Release will injure Litex."

Opp. at 20. But Litex never sets forth any facts establishing its injury. The simple explanation

for this devastating omission is that Litex has not been injured. In fact, as part of the settlement

agreement that Litex now seeks to set aside, the parties agreed to an arbitration that resulted in an

18

award in Litex's favor and Delphi has paid the award in full. SMF ¶¶ 44-46 (admitted). Litex

has not offered to return that award or otherwise rescind that aspect of the parties' agreement,

which clearly conferred a benefit on Litex. In addition, to the extent Litex is rehashing its

argument that Delphi's actions prevented it from capitalizing on other business opportunities –

an argument that the arbitrator has already considered and rejected – Litex has failed to show that

such opportunities ever really existed. Ekchian Decl. Ex. 16. The fact remains that no company

– including Litex – has been able to develop a commercially viable NTP product. *Id.* Under

these circumstances, Litex has not and cannot demonstrate that it has suffered any harm

whatsoever.

**II.    Summary Judgment In Delphi's Favor Is Appropriate Because The Settlement
Term Sheet & Release Is Unambiguous And It Clearly Bars The Claims Litex Has
Asserted.**

A party may avoid its obligations under a settlement agreement only in the most

extraordinary of circumstances. *See, e.g., Flebotte v. Dow Jones & Co., Inc.*, 2001 U.S. Dist.

LEXIS 21327 (D. Mass. 2001) at *9. No such extraordinary circumstances are present here, as

Litex has fallen far short of satisfying the exacting standard applicable to a claim for fraudulent

inducement. Because Litex admits that the Settlement Term Sheet & Release is clear and

unambiguous, there exists no impediment to its enforcement at the summary judgment stage.

SMF ¶ 50 (admitted). As part of the deal between the parties to settle their dispute, Litex – a

company run by sophisticated businessman and investors, and represented by prominent law

firms – executed the Release, which expressly discharges Delphi from all claims, known or

unknown, anticipated or unanticipated, including claims sounding in tort. The Settlement Term

Sheet & Release should be summarily enforced to bar the tort claims that Litex has asserted in its

Counterclaim. *Flebotte*, 2001 U.S. Dist. LEXIS 21327 at *9.

## CONCLUSION

For the reasons discussed above, Litex's fraudulent inducement claim must fail as a matter of law and there is no genuine dispute of material fact that the Settlement Term Sheet & Release is enforceable.  As a result, Delphi respectfully requests that the Court grant summary judgment to Delphi on Count I of its Complaint, deny Litex's Cross-Motion for summary judgment, and dismiss Litex's counterclaims and affirmative defenses with prejudice.

Respectfully submitted,

**DELPHI CORPORATION**

By its attorneys,

H. Joseph Hameline, BBO # 218716
Matthew C. Hurley, BBO # 643638
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

Dated:  June 27, 2005

## CERTIFICATE OF SERVICE

I, Matthew C. Hurley, do hereby certify that on June 27, 2005, I electronically filed a true copy of this document with the Court.  I further certify that counsel for Litex, Inc. is registered to receive a copy of this document by operation of the Court's electronic filing system.

LIT 1528915v1

20