# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DELPHI CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Civil Action No. 05-10415 (WGY) |
| | ) |
| | ) |
| LITEX, INC., | ) |
| | ) |
| Defendant. | ) |

## LITEX'S REPLY BRIEF IN FURTHER SUPPORT OF ITS
## CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

John T. Gutkoski (BBO #567182)
Alexandra C. Fennell (BBO #658692)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, MA   02110
Telephone:  (617) 345-4600
Fax:  (617) 345-4745

Francis H. Morrison III (BBO # 645515)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, CT   06103-3499
Telephone:  (860) 275-0100
Fax:  (203) 275-0343

Attorneys for the Defendant

July 15, 2005

# TABLE OF CONTENTS

**Page**

I.  DELPHI CONTINUES ITS WRONGFUL PRACTICE OF
    REPEATEDLY CHANGING ITS STORY ...................................................................1

    A.  Delphi Cannot Escape From The Admissions Its Senior
        Employees Made,  And On Which Delphi Relied, At Arbitration............ .........1

    B.  Delphi's 2001 Statements Repeatedly Alleging Success With NTP
        Were False And Material ........................................................................ .........3

II. THE 2001 STATEMENTS, AND CONFIRMING DISCOVERY
    DOCUMENTS AND DEPOSITION TESTIMONY, WERE MATERIAL
    TO LITEX'S DECISION TO EXECUTE THE RELEASE ...........................................5

III. DELPHI CANNOT SHOW LITEX KNEW DELPHI'S 2001
     STATEMENTS WERE ACTIONABLE FRAUD BEFORE SIGNING
     THE RELEASE ...........................................................................................................6

IV. LITEX WILL BE INJURED IF THE FRAUDULENTLY OBTAINED
    RELEASE BARS ITS CURRENT CLAIMS ...............................................................7

CONCLUSION .........................................................................................................................8

**I.    DELPHI CONTINUES ITS WRONGFUL PRACTICE OF REPEATEDLY
CHANGING ITS STORY.**

**A.    Delphi Cannot Escape From The Admissions Its Senior Employees Made,
And On Which Delphi Relied, At Arbitration.**

This case centers on Delphi's willingness to repeatedly change its story and say whatever
serves its purposes at a particular point in time.  In 2001 Delphi, in its public statements, claimed
to be vigorously and successfully pursuing its NTP program.  (Litex Mem., at 3.)  Late in 2002,
in its discovery documents and testimony, Delphi confirmed this positive state of affairs existed
in 2001 and insisted that its NTP program did not change until March, 2002.  (Id., at 4-6.)
However, after obtaining the Release from Litex, at a private arbitration in 2004 Delphi told a
completely different story, ambushing Litex with admissions by both its Chief Technologist and
its NTP Project Manager that the NTP program in 2001 was a failure that they were ready to
cancel.  (Id., at 6-9.)  Forced to explain this dramatic inconsistency, Delphi now attempts to
retreat to its initial position that its 2001 Statements, and their positive descriptions about
Delphi's NTP program, were true.  (Delphi Opp., at 8-9.)  To do so, Delphi tries to distance itself
from the testimony of its own arbitration witnesses, arguing that their testimony was only
"personal opinion" that does not show Delphi's institutional knowledge.  (Delphi Opp., at 9.)
This incredible attempt is legally, factually and procedurally erroneous.

As a matter of law, the knowledge of high ranking employees, such as the people at
Delphi most knowledgeable about NTP, is imputable to Delphi itself.  See United States v. Bank
of New England, N.A., 821 F.2d 844, 856 (1st Cir. 1987) (imputing the aggregate of corporate
employees' knowledge of particular operation to corporation); Nat'l Credit Union Admin. v.
Ticor Title Ins. Co., 873 F. Supp. 718 (D. Mass. 1995) (knowledge of matters within the scope of
employees agency or employment is imputed to corporation); Guthrie v. J. J. Newbury, Co., 297
Mass. 245, 248-49 (1937).  As a matter of record fact, any possible doubt that Delphi itself was

- 1 -

aware of the knowledge, conclusions and intentions of Chief Technologist Botti and the Delphi

NTP team is eliminated by Dr. Botti's admission that he reported the information and intentions

to Delphi's management in the middle of 2001. (Litex Mem., at 8.) Thus, Delphi cannot

separate its corporate knowledge from that of its employees.

Even if Delphi could somehow separate itself, it should not be allowed to do so. Delphi

itself elicited this testimony on direct examination. (See Ekchian Decl., Ex. 14.) Delphi also

expressly relied on this testimony in arguing to Judge McKelvie in its closing arbitration brief in

April 2004 that

> In the summer and fall of 2001, Delphi's engineers and management were
> skeptical that the NTP system would ever result in a commercial product.

(See Delphi Post-Arbitration Letter Brief, copy attached here as Ex. 1, Proposed Findings, ¶3.)

Indeed, Judge McKelvie relied on this testimony, noting it as one of the key reasons he rejected

the opinions of Litex's damages expert.

> According to the testimony of both Mr. Bonadies and Dr. Botti, Delphi seriously
> doubted the future of its NTP project by May 2001.

(Ekchian Decl., Ex. 16 at 7.)

> My mid-2001, Delphi had grown pessimistic about the prospects for future
> success of its NTP project. At that time, Dr. Botti cut the budget for Delphi's
> NTP project in half, to approximately $1 million.

(Id., at 4.) Having successfully elicited and relied upon this arbitration testimony to prove

Delphi's knowledge and state of mind in 2001, Delphi is prohibited from disclaiming that

testimony now, as Delphi's own cited authority holds. (See Delphi Opp., at 9 (citing New

Hampshire v. Maine, 532 U.S. 742, 749 (2001)).)

Indeed, if this Court were to accept Delphi's new claim that the arbitration testimony did

not represent the views of Delphi the corporate entity, then Delphi improperly relied on that

testimony at arbitration. By claiming Dr. Botti's and Mr. Bonadies's "personal opinions" were

those of the corporation, Delphi misled Judge McKelvie into finding that in 2001 Delphi had already concluded that its NTP program would never succeed, and thus was only willing to pay a very minimal royalty.  Were this the case, Litex would be entitled and would ask this Court to vacate the arbitration decision, order a new arbitration, and award Litex its legal fees and costs for the arbitration tainted by Delphi's fraud.  Delphi cannot have it both ways -- telling one story to Judge McKelvie and a completely opposite one to this Court.

**B.     Delphi's 2001 Statements Repeatedly Alleging Success With NTP Were False And Material.**

Delphi also attempts to minimize the disparities between its 2001 Statements and its 2004 arbitration testimony by both rewriting the Statements (Delphi Opp., at 6-8), and by claiming they were "not strongly optimistic, concrete or definite," (id., at 9-10).  Both attempts are erroneous and should be rejected.

At arbitration, Dr. Botti and Mr. Bonadies confessed that in 2001 they had "very minimal confidence" in the NTP project, "could never make it work," "had no expectation right in July that [NTP] would ever work," were "very skeptical," and told management they were "going to stop the project."  (Litex Mem., at 6-8.)  In direct and stark contrast, Delphi repeatedly told the public in 2001 that it was developing NTP components and systems based upon "sound, demonstrable and credible" principles, that its NTP system had "significant reductions in emissions," that it had and was the only supplier to have an NTP system "that helps remove nitrogen oxide to improve emissions," that it "ha[d] developed" NTP and, that Delphi "offers advanced power train control systems such as . . . non-thermal plasma."  (Id., at 3.)  These diametrically opposed positions cannot be reconciled.[1]

---

[1] Delphi's transparent effort to rewrite many of these 2001 Statements is also unavailing.  (See, e.g., Delphi Opp. at 6 (recasting "Delphi is developing" to "Delphi was researching"), and at 8 (arguing that the 2001 Annual Report statement that Delphi "offers" NTP really just "indicates that Delphi was

The issue is not that the 2001 Statements claimed "ultimate commercial viability or success of NTP." (See Delphi Opp., at 6-8.) Rather, the 2001 Statements are false because they specifically and concretely alleged Delphi "ha[d] developed" a working NTP system achieving reductions in emissions that Delphi found "significant," as opposed to a failed project Delphi "could never make work" and was "going to stop." (Compare Litex Mem. at 3 with 6-8.)

Delphi's 2001 Statements also extend beyond mere "puffery" or "trade talk". Delphi claimed to be developing NTP based on "sound, demonstrable and credible, scientific principles" while at the very same time its Chief Technologist had "no expectation" that the NTP system would ever work. (Id.) Further, Delphi spoke about the positive state of its NTP program in the present and even past tense, not in a merely predictive or optimistic sense. Delphi did not merely say it hoped to develop NTP or was optimistic about its development efforts, but that it "ha[d] developed" NTP. (Id.) Such specific and concrete statements about the status of Delphi's NTP program throughout 2001 surpass mere optimistic "puffery" and are material. See In re Cytyc Corp. Sec. Litig., No. 02-12399-NMG, 2005 U.S. Dist. LEXIS 6166, at *72-73 (D. Mass. Mar. 1, 2005)(specific, definite statements likely to be material).[2]

---

investigating NTP technology").) That Delphi is relegated to rewriting its 2001 Statements to show their "truth" further evidences that the Statements are, in fact, false.

[2] The law Delphi now cites for the alternate position is inapposite. The statements at issue in Van Ormer v. Aspen Tech., Inc., were not specific misrepresentations about the state of the underlying product but allegedly baseless revenue projections. 145 F. Supp. 2d 101, 105-106 (D. Mass. 2000). Likewise, at issue in In re Boston Tech. Sec. Litig. was defendant's use of R&D expenses to explain a decline in stock value, not a representation about the R&D process, the status of the development effort or the technological merit of the new product. 8 F. Supp. 2d 43, 62 (D. Mass. 1998).

II.    **THE 2001 STATEMENTS, AND CONFIRMING DISCOVERY DOCUMENTS AND DEPOSITION TESTIMONY, WERE MATERIAL TO LITEX'S DECISION TO EXECUTE THE RELEASE**.

Delphi cannot sever its fraudulent 2001 Statements from being material to the parties' 2003 Release, because Delphi continued to affirm the positive content about NTP contained in the 2001 Statements throughout discovery leading up to the Release. (Litex Mem., at 4-6.) In response, Delphi claims Litex has failed to identify any false testimony or evidence in that discovery. (Delphi Opp. at 14 and n.10.) The record refutes Delphi's claim. For example, at deposition Delphi's Rule 30(b)(6) designee Joachim Kupe testified Delphi was "very hopeful" about NTP throughout 2001 and up until March 2002, when new test results changed their thinking about NTP. (Litex Mem. at 5-6.) Yet, Mr. Kupe's immediate superiors, Dr. Botti and Mr. Bonadies, confessed at arbitration that NTP was a known failure in 2001. (See, supra, at § I.A..) Also, Mr. Kupe testified at his deposition that Delphi's funding for NTP remained relatively constant in 2001 and 2002, but Dr. Botti at arbitration confessed that in July 2001 he had cut the 2001 NTP budget in half. (Litex Mem., at 18.) Again, Delphi cannot have it both ways.

Litex relied on the 2001 Statements because Delphi repeatedly told Litex in discovery that the NTP program did not begin to fail until March, 2002. (Litex Mem., at 4-6, 9.) After scouring that entire underlying record, Delphi points to a single answer to a single deposition question from which, Delphi argues, Litex should have known the truth – that Delphi knew NTP was a failure in 2001. (See Delphi Opp., at 18.) In this one answer, however, Delphi's Vice-President Runkle states he does not know when Delphi realized NTP was failing, and "guess[es]" that it "probably" was over the course of a year and a half of test results that "were not as good" as we thought." (Id.) Mr. Runkle's denials, and then guesses at probabilities, stand in stark contrast to Delphi's corporate Rule 30(b)(6) testimony about NTP that unequivocally

-5-

placed the change in the NTP program in March, 2002 and not before.  (See Litex Mem., at 4-6.)

Mr. Runkle's equivocal and contradicted testimony did not put Litex on notice that Delphi was

lying or render Litex's continued reliance on the 2001 Statements unreasonable.

### III.    DELPHI CANNOT SHOW LITEX KNEW DELPHI'S 2001 STATEMENTS WERE ACTIONABLE FRAUD BEFORE SIGNING THE RELEASE.

When it signed the Release, Litex was unaware that Delphi's 2001 Statements contained

fraudulent representations actionable as tortious interference.  Delphi cannot show otherwise.

As an initial matter, Litex did not assert claims in *Litex I*, and received no recovery, for

any interference with its actual or potential business relationships.  Litex's prior claims were

limited to damages for patent infringement, which as a matter of law cannot, and did not, include

indirect or consequential damages components.  See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d

1538, 1565 (Fed. Cir. 1995).  Furthermore, the parties' agreement to arbitrate limited Judge

McKelvie to deciding the sole question of reasonable royalty patent damages, and he assiduously

followed his mandate.  (See Award, Ekchian Decl., Ex. 16 at 11.)  ("As the parties agreed,

however, I have limited my consideration of the issues and my award of damages to that which is

appropriate under the patent laws and a determination of a reasonable royalty.")  Therefore,

Delphi's arguments concerning a double recovery (Delphi Opp., at 2, 19), and asserting claim

and issue preclusion (id. at 17 n.13), are misplaced.

To support its assertions that Litex knew the truth when it signed the Release, Delphi

points only to the speculation of Litex's CEO during his deposition that Delphi's 2001

Statements may have been "overly optimistic."  (Delphi Opp., at 15-16.)  As previously

explained, Dr. Ekchian's speculation and concern was based upon his belief that Delphi's 2001

Statements inaccurately described Delphi as having invented NTP.  (See Litex Mem., at 14-15.)

He also expressed his concerns that Delphi's 2001 Statements apparently were "overly

optimistic" about Delphi's alleged success with NTP given that Delphi cancelled its NTP program in 2002. (See Delphi Mem., at 15-16.) Litex asked about this very inconsistency during discovery and was repeatedly told that Delphi had success with NTP in 2001 and expected more, but that everything changed in March 2002. (See Litex Mem., at 4-6.) As a result, Litex was led to believe that, while they ended up being "overly optimistic," at the time they were made the 2001 Statements were not knowingly false. (Id.) Nothing in the testimony Delphi quotes shows that Dr. Ekchian or Litex knew that the 2001 Statements were fraudulent and, therefore, actionable as tortious interference. (See Delphi Opp., at 15-16.)

## IV.    LITEX WILL BE INJURED IF THE FRAUDULENTLY OBTAINED RELEASE BARS ITS CURRENT CLAIMS.

Delphi's claim that Litex has failed to state facts establishing any injury also lacks merit. (See Delphi Opp., at 18-19.) Delphi's fraud in making the 2001 Statements and not telling the truth during discovery about its NTP program induced Litex into the Release. If the Release bars Litex from pursuing its claims against Delphi now that Litex knows the truth, then Litex will be injured. Litex does not need to prove its tortious interference claims on the merits in order to proceed with these claims now, and Delphi provides no authority or rationale for requiring Litex to do so.

## CONCLUSION

For all these reasons, and those in its previously filed papers, Litex requests the Court to

deny Delphi's motion and grant Litex's.

Respectfully submitted,

LITEX, INC.,

By its attorneys,

_____/s/ John T. Gutkoski_____
John T. Gutkoski (BBO #567182)
Alexandra C. Fennell (BBO #658692)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, MA   02110
Telephone:  (617) 345-4600
Fax:  (617) 345-4745

Francis H. Morrison III (BBO # 645515)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, CT   06103-3499
Telephone:  (860) 275-0100
July 15, 2005                                          Fax:  (203) 275-0343

## CERTIFICATE OF SERVICE

I, John T. Gutkoski, do hereby certify that on this 15th day of July, 2005, I filed a true
copy of the within document with the Court by electronic filing.  I further certify that I served a
true copy of the within document by causing a copy to be sent by the Court's electronic filing
system to H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One
Financial Center, Boston, MA 02111.

_____/s/ John T. Gutkoski_____
John T. Gutkoski

- 8 -

# Exhibit 1

Exhibit 1

-----Original Message-----
**From:** Weed, Keith R. [mailto:KWeed@HEWM.com]
**Sent:** Mon 4/26/2004 8:07 PM
**To:** rmckelvie@fishneave.com
**Cc:** John Lauter
**Subject:** Delphi's Post-Arbitration Submissions

<<Revised Legal Submission.DOC>> <<Revised Factual Submission.DOC>>
Dear Mr. McKelvie:
Delphi Corporation ("Delphi") hereby submits for your consideration a two page document containing Proposed Findings and Conclusions and a two page letter brief on certain legal issues which arose during the arbitration of this matter. Unfortunately, we were unable to keep the Proposed Findings and Conclusions to the requested length of one page because of citations to the transcript. Accordingly, we request that you consider Delphi's submissions in their entirety.

The complete transcript of the arbitration will be sent to you under separate cover.

Very truly yours,

**Keith R. Weed** | Attorney | **HellerEhrman** | 2775 Sand Hill Road | Menlo Park, CA 94025
tel: 650-324-7000 | fax: 650-324-0638 | email: kweed@hewm.com | web: www.hewm.com
Heller Ehrman White & McAuliffe LLP

The information contained in this email message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please notify the sender by reply email and delete the message and any attachments.

************************************************************
THIS ELECTRONIC MAIL MESSAGE AND ANY ATTACHMENT IS CONFIDENTIAL AND MAY CONTAIN ATTORNEY PRIVILEGED INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR INDIVIDUALS NAMED ABOVE.

If the reader is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please reply to the sender to notify us of the error and delete the original message. Thank You.
************************************************************

1.    **Events Subsequent to the Hypothetical Negotiation Should Be Considered.**
Section G(1)(b) of Defendants' Opening Arbitration Brief, p. 15, sets forth clear authority that a
trier of fact should consider events subsequent to the hypothetical negotiation.  During the
arbitration, Litex's damages expert Mr. Evans asserted that the only subsequent events that should
be considered were those favorable to Litex, the licensor in the hypothetical negotiation.  In fact, no
Court has ever held that.  Indeed, in several reasonable royalty cases the Federal Circuit considered
events subsequent to the hypothetical negotiation which were favorable to the hypothetical licensee.
*See, e.g., Studiengesellschaft Kohle m.b.H. v. Dart. Indus., Inc.*, 862 F.2d 1565, 1570-71 (Fed. Cir.
1988) (holding trial court properly considered a settlement occurring ten years after hypothetical
negotiation in reducing a royalty rate); *see also, e.g., Am. Original Corp. v. Jenkins Food Corp.*,
774 F.2d 459, 464 (Fed. Cir. 1985) (affirming $300 per week royalty based in part upon post-
infringement licenses to similar product; disregarding patentee's self-serving $500 per week offer
which was never accepted); *Lindemann Maschinefabrik* v. *American Hoist & Derrick Co.*, 895 F.2d
1403 (Fed. Cir. 1990)(considering actual net profits in approving reasonable royalty).

2.    **The Reasonable Royalty May Not be Increased Because Infringement and
Validity are Assumed.**  The reasonable royalty calculation does not include a punitive factor—a
court may not "enhance a damages award . . . without meeting the statutory standards for
enhancement and fees." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1581 (Fed. Cir. 1996).  Thus,
the measure of damages is a reasonable royalty—what Litex would have obtained in the
hypothetical negotiation. *Beatrice Foods Co. v. new England Printing & Lith. Co.*, 923 F.2d 1576,
1579 (Fed. Cir. 1991) ("Damages cannot be enhanced to award the patentee additional
compensation to rectify what the district court views as an inadequacy in the actual damages
awarded.").  Mr. Evans' assertion that the arbitration agreement somehow changed this fundamental
law is without basis—Delphi agreed to have the arbitrator *assume* infringement, but there has been
no adjudication of infringement.  Similarly, Mr. Evans' assertion that assumed infringement and
validity somehow alter the ground rules of the hypothetical negotiation is flawed; infringement and
validity are *always* assumed for purposes of the hypothetical negotiation. *See, e.g., Mobil Oil Corp.
v. Amoco Chem. Corp.*, 915 F. Supp. 1333, 1352-53 (D. Del. 1994).  Finally, Mr. Evans' use of the
assumption of infringement to justify economically unrealistic conclusions—using a discount rate
applicable to commercial products for a high risk R& D project, not considering the actual useful
life of NTP technology and placing all of the risk of the failure of NTP technology on Delphi— is
absolutely incorrect. *See, Evans 1600:11-1602:6.  See, e.g., Unisplay, S.A. v. American
Electronicsign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995)(reasonable royalty must be supported by
relevant record evidence).

3.    **Extrapolations from Projections are Speculative**.  A reasonable royalty must be
"reasonable", and not be based upon "speculation." *Dow Chem. Co. v. U.S.*, 226 F.3d 1334, 1348
(Fed. Cir. 2000).  Mr. Evans, however, took Delphi's "Market Analysis" out of context, ignored its
intended use, and extrapolated its three years' of projections for an additional 8 years.  Litex has not
cited any case in which a reasonable royalty determination was based upon extrapolating sales
projections beyond the period covered in the projections.  Such a determination would be the
essence of speculation. *See, e.g., McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 356-57 (9th Cir.
1996) (chastising expert and reversing jury's royalty award based upon expert's testimony which
extrapolated defendant's internal market projection by adding additional years to the projection.).

4.    **The Parties Did Not Stipulate to the Hypothetical Negotiation Date.**  Under well
established law, the hypothetical negotiation date is the first date after the issuance of the '544

patent on which Delphi performed the tests assumed to infringe the method claims at issue. *See* Def's Opening Arbitration Brief at 15. The proof at the arbitration established that date as October 5, 2001. Exhibit BBW; Goulette 1107-08.

However, Litex now argues that in the Arbitrator's Instructions, Delphi stipulated that July 3, 2001 was the date of the hypothetical negotiation. Litex is wrong for several reasons. First, the Arbitrator's Instructions contain *no* stipulation to the hypothetical negotiation date. Indeed, under the Arbitrator's Instructions, the date of first infringement is an issue to be arbitrated: "Any and all issues related to patent infringement damages, including but not limited to *the nature and extent of any assumed infringing acts*, may be arbitrated." Arbitrator's Instructions ¶ 5 (emphasis added). Second, the date of first infringement—and therefore the date of the hypothetical negotiation—is an issue of fact to be determined by the trier of fact, not an issue of expert opinion (and particularly not the *damages* experts). Thus when the experts wrote their reports they had to assume the date of first infringement without knowing which claims would be asserted or proved at trial. Litex's later statutory disclaimer of all asserted claims except six method claims thereby rendered both experts' assumed hypothetical negotiation dates, as well as other aspects of their expert reports, incorrect.[1] Third, Delphi's position was always that the hypothetical negotiation date was the first date after the patent issued on which Delphi tested an NTP system involving a catalyst and an engine—October, 2001.[2]

    **4.    The August 2, 2001 Bosch Proposal would not have prevented Litex from offering a nonexclusive license.** Litex made at least two incorrect arguments concerning Bosch's unaccepted August 2, 2001 Proposal (Ex. 128 or Ex. ATF). First, Litex incorrectly argued that the Proposal would have given Bosch the option to buy Litex, when in fact it only concerned an option to buy its intellectual property. *Id.* ¶¶ 2.3.1-2.3.3. Second, Litex incorrectly argued that the Proposal would have restricted Litex's offer of sublicenses pending Bosch's exercise of its option. In fact, the Proposal would not have restricted Litex's sublicensing at all until such time as Bosch exercised one of its three options (up until June 30, 2002.). *Id.* ¶ 2.4 ("Litex will, *upon receipt* of Bosch's written notice [to exercise an option] . . . refrain from any actions or omissions . . . which may restrict Litex from granting the rights requested by Bosch.") (emphasis added). Indeed, in August 2001, Litex continued to maintain its non-exclusive sublicense offer to Sagem, which if accepted would have prevented Litex from granting exclusive rights to any subsequent sublicensee.

---

[1] Obviously, the experts' opinions to the trier of fact are to be based on the evidence of record. As a result, both parties' experts' opinions changed at the arbitration over those submitted in their expert reports. For example, Mr. Evans' arbitration opinions as to the impact of various reasonable royalty factors and the amount of the royalty significantly changed from his opinions set forth in his now stale expert report prepared 16 months earlier.

[2] *See e.g., Delphi's Trial Opening Statement* ("And Delphi ran a series of tests from roughly October of 2001 until April of 2002, approximately 20 hours of testing. They either put it on a car in the lab or an engine in a lab, and what they found at the end of the day was that they could not make this technology work in the environment of the diesel engine or a diesel car."); *Delphi's Brief on Jury Instructions*, p. 16 ("Therefore, the appropriate time for the hypothetical negotiation, if any, is on or about the date of first proved infringement, not the date on which Delphi's R&D activities began"); and Delphi's trial questions to Litex's infringement expert: ("Q. So, therefore, do you understand that the only possible infringement by Delphi in this case of the claims at issue would be the performance of a test involving an engine after July 3, 2001? A. That would seem to be the sum of the answers I just gave, yes."* * * "Q. All right. We will do that exactly in just a moment. Is it correct then that your report in this case did not identify any specific tests performed by Delphi on an engine after July 2001 that you felt infringed any of the claims at issue? A. My report had more breadth. As you know, there was another patent in the case so that my report actually—which is now not in this case—so my report actually dealt with a very wide time range because of the other patent that was in there."

## I.    Proposed Findings

1.    The acts that are assumed to infringe one or more of method claims 47, 53, 82, 114, 195, and 224 of the '544 patent were Delphi's tests of a non-thermal plasma (NTP) exhaust aftertreatment system using an engine and a catalyst. Delphi performed a total of 30 assumed infringing tests between October 5, 2001 and March 4, 2002, lasting a total of 10 hours. *Ex. BBW, p. 3; Goulette 1107:16-1108:20.*

2.    In March 2001, Delphi established firm requirements for the NTP project, including 80% minimum NOx efficiency and 3% maximum fuel economy penalty. *Ex. NN, p. 055541; Kupe 594:8-15; Bonadies 939:2-940:2.* At the same time, Delphi classified the NTP project as "High Risk." *Ex. NN, p. 055565; Bonadies 944:2-21.*

3.    Delphi's tests of its NTP system in spring through fall of 2001 demonstrated that the NTP system could not meet the project requirements because the system achieved no better than 15% NOx efficiency and 8% fuel economy penalty. *Ex. KZ, p. 049407, Bonadies 947:8-956:4 (May 2001); Bonadies 961:16-962:6 (August 2001); Ex. MG, p.052483, Bonadies 976:14-977:4 (October 2001); Ex. ME, p. 052343, Bonadies 979:5-980:16 (Dec. 2001).* In the summer and fall of 2001, Delphi's engineers and management were skeptical that the NTP system would ever result in a commercial product. *Botti 835:21-836:4, 896:4-897:2; Bonadies 956:5-11, 959:12-20; 966:4-7.* In August, 2001, the NTP project failed to advance to the next scheduled phase of development and the project was put on hold. *Ex. MY, Ex. MZ; Bonadies 957:8-959:11, 968:17-970:5.* In the summer of 2001, Delphi also halved the budget for the NTP program because of pessimism about the test results. *Botti 840:17-841:10.* In March of 2002, Delphi canceled all further work to develop a specialized catalyst as part of its NTP system. *Bonadies 988:14-20; Kupe 604:4-13.* In October of 2002, Delphi cancelled the remainder of the NTP project because it did not meet project requirements. *Ex. WI; Botti 843:10-844:3; Bonadies 997:2-998:4.* Delphi never completed development of its NTP system, offered it for sale or sold it commercially. *Kupe 605:18-606:12.*

4.    In the summer and fall of 2001, Delphi possessed non-infringing alternatives to researching NTP including research and development of lean NOx catalyst, NOx Adsorber and SCR, and its commercially available common rail engine system, several of which were providing greater NOx reduction than NTP as of the time of the assumed infringement. *Exhibit MN, p.052905-6; Kupe 615:14-622:5, 725:13-727:12, 801:2-811:16.* Additionally, Delphi had the non-infringing alternative of transferring its U.S. based NTP research to its Luxembourg Technical Center where Delphi was concurrently researching NTP. *Kupe 630:15-632:5.*

5.    Litex's business plan was to develop and sell a Corona Discharge Device (CDD) for gasoline engines. *L. Ekchian 232:20-233:10.* This business plan was destroyed by regulatory changes involving sulfur fuel content and testing. *L. Ekchian 237:11-16, 240:7-10, 242:15-21.* As of October 2000, Litex abandoned all product development and sales efforts. *L. Ekchian 246:10-247:18.* Litex never completed development of the CDD and sold only a few prototype units. *L. Ekchian 248:10-17.* Delphi tested a prototype Litex CDD and found that it had no beneficial effect. *Botti 859:20-860:20; Goulette 1112:5-1115:20.*

6.      The Lockheed/Litex License Agreement (*Ex. 130*), the only license that covers the '544 Patent, required running royalties on the sales of products of 2% to 3% and further required that any sublicense granted by Litex also require a running royalty. *Id.* §§ 3.1.2, 3.3.

7.      Litex made extensive efforts to sublicense others under the '544 patent. No one other than Litex's manufacturing partners took a sublicense under the '544 patent. *J. Ekchian 82:11-16; L. Ekchian 251:21-252:14.* In June and September 2001, respectively, Litex offered nonexclusive sublicenses to Sagem and Bosch on terms including periodic payments during research and development and running royalties on any subsequent actual sales. *Exhibits AQF and ATB.* The September 2001 offer to Bosch provides for termination upon the licensee's cessation of license payments. *Ex. ATB.*

II.      Proposed Conclusions.

1.      The date of the hypothetical negotiation is on or about October 5, 2001.

2.      The March 2001 Market Analysis (*Ex. NN and Ex. 114, p. 055544*) is not a reliable basis to assess damages in this case because (a) it analyzed the potential overall market for NTP technology and was not a projection of Delphi's revenues and (b) by the date of the hypothetical negotiation, the analysis was outdated and Delphi had become skeptical that there would ever be an NTP product. *Mansour 916:15-918:18, 925:6-16; Botti: 903:15-907:2; Kupe 606:17-607:21; Hoffman 1454:13-1468:5.*

3.      The J.P. Morgan valuation (*Ex. 129*) is not a reliable basis to assess damages in this case because (a) it is based on Litex's product development plans which were abandoned before the date of the hypothetical negotiation and (b) Litex's value as a company is not relevant to '544 patent infringement damages. *L. Ekchian 352:20-353:9; Hoffman 1468:6-1482:10.*

4.      Litex's offer to Bosch to be purchased (*Ex. 141*) is not a reliable basis to assess damages in this case because (a) it is not credible evidence of the value of Litex, (b) Litex's value as a company is not relevant to '544 patent infringement damages and (c) Bosch never indicated agreement with Litex's offer and rejected it by lack of action and counteroffer before the date of the hypothetical negotiation. *Hoffman 1431:19-1438:19.*

5.      Litex's licensing efforts and history are a reliable basis for assessment of damages in this case. Litex's lack of prior success in licensing the '544 patent, its switch to a licensing business model and its offers of nonexclusive licenses to Sagem and Bosch in June and September 2001 indicate that in the hypothetical negotiation Litex would have been willing to agree to a nonexclusive license with periodic payments during pre-commercial research followed by a running royalty for actual sales. *Hoffman 1362:22-1376:14, 1438:20-1442:17; Goldscheider 1236:16-1238:10.*

6.      Delphi's poor NTP system test results, its skepticism about the success of NTP technology, and its non-infringing alternatives are reliable bases for the assessment of damages in this case. These factors indicate that Delphi would not have agreed to anything other than a nonexclusive license with periodic payments during pre-commercial research followed by a running royalty for actual sales. *Hoffman 1356:6-1357:21, 1442:128-1444:11; Goldscheider 1219:5-1221:6.*

2

7.     The hypothetical negotiation in this case would not have resulted in a paid-up exclusive license because a paid-up exclusive license would have shifted all the technical and commercial risk of NTP technology to Delphi. Instead, the running royalty structure of the Lockheed-Litex license reflects the likely allocation of risk between Litex and Delphi in the hypothetical negotiation. *Hoffman 1362-1376, 1446:10-1448:9.* Thus, the parties to the hypothetical negotiation would have agreed to a non-exclusive license under the '544 patent with a periodic payment during the period of testing and, if Delphi's testing was successful, a running royalty based on the actual sales of Delphi's products. *Hoffman 1353:19-1355:19, 1445:2-11, 1448:10-1450:6; Goldscheider 1201:8-1204:7.*

8.     The reasonable royalty for Delphi's assumed infringement of at least one of claims 47, 53, 82, 114, 195, 224 of the '544 Patent is a periodic payment of $50,000 per quarter of assumed infringing testing. *Hoffman 1357:22-1358:17, 1445:2-1450:6.* The assumed infringing testing occurred during two quarters. Therefore, I find that the resulting damages to Litex from Delphi's assumed infringement of at least one of claims 47, 53, 82, 114, 195, 224 of the '544 Patent are $ 100,000.

3