## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DELPHI CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.         ) | Civil Action No. 05-10415 (WGY) |
| ) | |
| LITEX, INC., ) | |
| ) | |
| Defendant. ) | |

### LITEX'S SUPPLEMENTAL MEMORANDUM OF LAW

Following the Court's July 20, 2005 Hearing, at which the parties agreed to treat the case

as stated in regard to Delphi's Count I and Litex's First Counterclaim, Litex submits this

Supplemental Memorandum to address some of the key issues raised during closing arguments.

**I.    THE CHRONOLOGY OF THIS MATTER HIGHLIGHTS HOW DELPHI HAS REPEATEDLY CHANGED ITS STORY ABOUT THE STATE OF ITS 2001 NTP PROGRAM.**

Delphi first claimed and continued to maintain publicly and under oath up until

arbitration that its NTP Program in 2001 was a robust success, then claimed at arbitration for the

first time that the 2001 Program was a dismal failure, and has now attempted to retreat and claim

again that the 2001 Program was a great success, changing its story back and forth depending on

how it suited Delphi's purposes:

**1997:** Litex introduces Delphi to Litex's Non-Thermal Plasma ("NTP") catalyst technology. (Counterclaims, at ¶ 10.)

**1998:** Rather than partner with Litex, Delphi begins its own development of NTP catalysts. (Id., ¶ 14.)

**2000-2001:** JP Morgan begins contacting companies to secure a Series D round financing for Litex and its NTP technology. At the same time, Bosch is actively

considering an equity position in Litex, acquiring Litex, and/or taking an exclusive license to the company's technology. Negotiations with Bosch are ongoing, as are Litex's negotiations with Denso. (Id., at ¶ 22-24.)

**May, 2001:** Litex sues Delphi for infringing its NTP patents.

**July-December 2001:** Well aware of Litex's efforts, Delphi issues the latest in a series of press releases and public statements claiming Delphi's own efforts with NTP were meeting success (Ekchian Decl., Ex. 1.) and achieving "significant reduction in emissions." (Id., Ex. 2.; see also id., Ex. 3, p. 10.)

**February, 2002:** Delphi proclaims in its 2001 Annual Report that Delphi "offers" non-thermal plasma exhaust aftertreatment and that its NTP exhaust aftertreatment "significantly reduces oxides of nitrogen emissions . . . ." (Id., Ex. 5.)

**2001 - 2002:** As a direct result of Delphi's Statements boasting success with NTP (which were later revealed to be false), investor interest in Litex evaporated. (Counterclaims, at ¶ 32-34.)

**March, 2002:** Delphi cancels the catalyst portion of its NTP Program, and cancels the Program completely by year's end, but the damage to Litex has already been done. (Id., at ¶ 46-47.)

**Throughout discovery in 2002:** Delphi produces documents supporting the 2001 Statements and confirming Delphi did not lose confidence in and decide to cancel NTP until March, 2002. Specifically, Delphi's August 17, 2001 status report, the NTP Interim Design Review, as well as a presentation made by Delphi to Toyota Motor Corporation, depict Delphi as confident about NTP up until March, 2002. (Id., Ex. 8 and 9.)

**September, 2002:** Delphi's designated 30(b)(6) witness, Joachim Kupe, testifies at deposition that Delphi has now in 2002 cancelled its NTP Program, but that Delphi's positive statements about NTP in 2001 were accurate because it was not until March, 2002 that Delphi realized it could not make NTP work and did not have a viable technology. (Id., Ex. 13, p. 360, ln. 17 – p. 361, ln. 2.)

**September 6, 2002:** Delphi's Executive Vice-President Donald Runkle testifies at deposition he was unaware of Delphi ever issuing an inaccurate press release, and that Delphi prided itself on the accuracy of releases such as the 2001 Statements about the success of NTP. (Id., Ex. 6, Runkle Dep. p. 51, ln. 9 – p. 52, ln. 7.)

**November 8, 2002:** Delphi's CEO Battenberg confirms in his deposition testimony that the NTP claims in the Annual Report were accurate. (Id., Ex. 7, p. 117, lns. 12-18; p. 118, lns. 18-23.)

**November 11, 2003:** After a week of trial, Litex and Delphi execute the Settlement Agreement and General Release ("Release") in which Delphi stipulates to infringement, and the parties agree to arbitrate the sole issue of calculating the amount of reasonable royalty patent infringement damages. By the terms of the Release, the parties are

restricted in the arbitration to positions contained in their damages experts' reports, which are themselves based upon the documents and deposition testimony in the case. (Id., at Ex. 15.)

**April 7, 2004:** Delphi's Chief Technologist Jean Botti testifies at arbitration that by July, 2001 he was prepared to terminate the NTP project as a failure, that at that time had "no expectation" that NTP would ever work, (Id., Ex. 14, Arb. Hrng., p. 890 ln. 3 – p. 891 ln. 6.) and that he reported his team's negative conclusions about NTP to Delphi management in 2001. (Id., p. 893, lns. 15-21 and p. 896 ln. 4 – p. 897 ln. 2)(emphasis added.)  Delphi's NTP program manager, Joseph Bonadies, confirms Botti's statements at arbitration, testifying that as early as May 5, 2001 he was "very skeptical" Delphi would "come up with a system to achieve these really high NOx efficiencies."  (Id., p. 956, lns. 5-11; see also p. 966, lns. 4-7.)  This is the first time Litex learns that when Delphi made the 2001 Statements proclaiming ongoing success with NTP Delphi and its management *knew* their NTP system was a failure and, thus, the 2001 Statements and subsequent Delphi deposition testimony and documents were knowingly false.

**September 7, 2004:**  Relying on this surprising testimony by Messrs. Botti and Bonadies, Judge McKelvie issues his arbitration Award providing Litex only $250,000 of damages, rather than the millions it was claiming, because he finds Delphi would not have paid for an exclusive license in 2001 for NTP if Delphi had in fact already decided to cancel its NTP Program.  He also expressly reaffirms that he is considering only reasonable royalty damages for patent infringement.  (Ekchian Decl. Ex. 16.)

**June, 2005:**  In its papers filed with this Court Delphi changes its story yet again trying to revert to its initial position that the 2001 statements identified above were true. (Delphi Opp., at 8-9.)  Further, in an attempt to reconcile the purported "truth" of the 2001 public statements with Delphi's testimony under oath at arbitration, Delphi argues that the testimony of its arbitration witnesses was merely "personal opinion" and not representative of Delphi's institutional knowledge.  (Id.)

## II.    RATHER THAN REVEAL THE TRUTH ABOUT ITS 2001 NTP PROGRAM, DELPHI CONTINUED ITS FRAUD THROUGHOUT THE PATENT LITIGATION, AND ATTEMPTS TO RESUME IT TODAY.

Delphi's arguments in its briefs and at the Hearing that Litex should have known by the time of signing the Release in 2003 that Delphi's 2001 Statements were false is belied by the simple fact that Delphi's fraud did not end with the 2001 Statements.  Instead, it continued throughout 2002 and 2003 up to and after the parties signed the Release.  Indeed, Delphi has now resumed its fraudulent position, and continues to maintain it even today, by arguing before this Court that the 2001 Statements and subsequent discovery responses accurately stated that in

2001 Delphi believed its NTP was highly successful and achieving significant results.  (See Delphi Reply at 6-8, 12-14.)   This position stands in direct, irreconcilable conflict with the admissions by Delphi's Chief Technologist Botti and NTP Program Manager Bonadies at Arbitration in 2004 that in 2001 Delphi had no confidence in their NTP system, believed it would fail, and had already cut its budget.  (Litex Reply at 3.)

Unable to reconcile two diametrically opposed positions, Delphi now attempts to retreat to its initial view that the 2001 Statements were accurate, and that when it made the statements in 2001 Delphi believed in, supported and was achieving ongoing success with its NTP system. (Delphi Reply at 6-8.)  To do so, Delphi attempts to distance itself from the very arbitration testimony it elicited from its officials, and on which it successfully relied in minimizing Litex's claims for patent infringement reasonable royalty damages, claiming that those officials spoke only individually and not on Delphi's behalf.  (See id. at 9.)  As previously explained, as a matter of law, fact, and procedural fairness Delphi cannot recant or abandon this damning testimony to escape liability now.  (Litex Reply at 1.)

## III.   AS A RESULT OF DELPHI'S ONGOING FRAUD, LITEX DID NOT KNOW THE TRUTH ABOUT DELPHI'S 2001 NTP PROGRAM WHEN THE PARTIES SIGNED THE RELEASE IN 2003.

It is true that during discovery Delphi cancelled its NTP Program and divulged that fact to Litex.  The fact that Delphi cancelled the Program in March, 2002, however, and Litex's eventual awarness of that fact are red herrings.  Standing alone, Delphi's initiation and subsequent cancellation of its Program were not actionable.  Aside from infringement issues, Delphi had a right to try and enter the NTP market, regardless of the effect it would have on competitors including Litex.  Delphi did not have the right, however, to interfere with that market by lying about the state of its own efforts.  Litex did not know that Delphi had

misrepresented its success developing NTP and thus its ability to enter that market, which caused investors to withdraw interest in Litex in 2001, until Delphi revealed the truth at arbitration after the parties had signed the Release. Therefore, despite Delphi's argument at the Hearing to the contrary, Litex did not have a "full opportunity" to assert the claims it is now seeking to bring here. (See Hrng. Trnscpt. at 7-8.) Litex was not aware that such claims even existed until Delphi's arbitration admissions.[1]

As previously detailed, Delphi repeatedly insisted through the documents it produced in discovery and the deposition testimony of its corporate designee and senior management officials, that Delphi had told the truth in the 2001 Statements because Delphi had believed in NTP throughout 2001 and up until March 2002 when it received final bad test results. (Litex Mem. at 4-6.) As a result, at the time it went to trial and then signed the Release, and until Delphi's admissions at arbitration in 2004, Litex never knew the key operative fact -- that when Delphi made the 2001 Statements Delphi knew those Statements were false. Litex, therefore, never knew until the arbitration that Delphi's knowingly false 2001 Statements were actionable, as tortious interference or otherwise. (Id. at 9-10.) Nothing Delphi produced or its witnesses testified to in discovery put Litex on notice to the contrary.

The documents Delphi produced in discovery during the prior litigation showed Delphi being positively upbeat about NTP and consistently expecting to overcome any remaining technical obstacles during the same time it made the 2001 Statements and up until March, 2002.

---

[1] At the Hearing, the Court summed up Delphi's argument as follows: "[the parties] took the certainty of a settlement agreement as opposed to the uncertainty of the litigation process whether by arbitration or before this Court." (Hrng Trnscpt. at 10.) While it is true that Litex chose the certainty of the settlement with respect to its patent claims, with Delphi conceding infringement and the parties leaving the calculation of patent damages to arbitration, Litex did not have a similar choice with regard to any tort claims it now seeks to assert. At the time of the settlement, despite its knowledge that Delphi had already cancelled NTP, Litex did not recognize, and due to Delphi's fraud could not have recognized, that it even possessed any tort claims to be bargained away in exchange for the certainty of patent liability.

(Id. at 4-6.)   Delphi, in its Reply and at the Hearing, could not identify a single document it had produced that revealed Delphi had no confidence in its NTP system in 2001 and was prepared to cancel it then.   (See generally Delphi Reply; Hrng. Trnscpt.)

Litex, however, did not rely solely on Delphi's produced documents.  Instead, Litex interrogated Delphi's designated witness on the subject, who again explained that at the time the 2001 Statements were made Delphi believed NTP was successful and only changed its mind in March, 2002 after the 2001 Statements had been made.  (Litex Reply at 5-6; Ekchian Decl., Ex. 13, Kupe Dep. at p. 360 ln. 17 – p.361 ln. 2.)  At the Hearing, Delphi attempted to recast its Rule 30(b)(6) designee's testimony as directed to different types of NTP tests rather than the stark line of demarcation actually drawn by Mr. Kupe at the deposition.  (See Hrng Trnscpt. at 13-14.) Having chosen Mr. Kupe as its designated witness on the NTP Program, Delphi cannot now recast his testimony or the facts he recited.  See, e.g., Rainey v. American Forest and Paper Assoc., Inc., 26 F. Supp. 2d 82, 94 (D.D.C. 1998)(holding Rule 30(b)(6) prohibits a party from arguing theory of facts that differ from its designated representative).  More tellingly, Mr. Kupe's misstatements in the 30(b)(6) deposition testimony about Delphi's budget for NTP went completely unaddressed by Delphi in its briefs and at the Hearing.  Mr. Kupe testified at deposition that Delphi level funded NTP in 2000, 2001 and 2002.  (Litex Mem. at 18.)  At arbitration, Delphi's witnesses revealed that in 2001, at the same time Delphi was making the pro-NTP 2001 Statements, it had cut the 2002 budget in half.  (Id.)

As a result of Delphi's documents and deposition testimony, Litex did not know when it signed the Release that Delphi knew its NTP system was a failure at the exact same time Delphi was extolling its virtues in 2001, which was when Litex was negotiating with potential investors and, thus, when the damage to Litex was done.  Litex was prohibited from learning that truth by

Delphi's persistent and ongoing fraud in refusing to admit the truth throughout discovery and trial in the underlying case right up to the execution of the Release.  Litex relied on Delphi's fraudulent story, as set forth in the 2001 Statements, in Delphi's own documents, and by Delphi's own witnesses, without any knowledge of the truth.  Therefore, Litex's reliance was objectively reasonable as a matter of law.  See Gray v. Heritage Dental Mgmnt. Corp., 1 Mass. L. Rep. 345 (1993)(court could not countenance plaintiff's favorable settlement given false statements under oath at deposition).

## IV.    LITEX'S MINIMAL ARBITRATION AWARD FOR DELPHI'S PATENT INFRINGEMENT IS COMPLETELY UNRELATED TO ITS CURRENT DAMAGES.

Finally, Delphi argued at the hearing that Litex could not prove it had been damaged by any of Delphi's fraud because the arbitrator had fully adjudicated the issue of damages between the parties.  (See Hrng. Trnscpt. at 10-12.)  Delphi's argument lacks all merit for two reasons. First, the arbitration was limited by the parties' agreement to the sole issue of calculating reasonable royalty patent damages.  (Litex Reply at 6; Ekchian Decl. Ex. 16, Award at 11.)  As a matter of that agreement, and as a matter of patent law, the Award did not and could not include any recovery for the tortious interference claims Litex now knows exist and wishes to bring against Delphi.  (Id.)  While Delphi's revelations about both the true state of its NTP system in 2001 and Delphi's knowledge of that true state worked to limit the arbitrator's determination of the amount of royalties Delphi would have paid in a hypothetical negotiation in 2001, that figure included only infringement damages.  (Id.)

Second, the measure of damages Litex will prove it suffered from Delphi's tortious interference after a trial on the merits of those claims is not the relevant issue of damages now before the Court.  Rather, as an element of fraud in the inducement, Litex must show it has been

damaged by the fraudulently obtained Release.  To the extent that Release, as Delphi argues, bars Litex's ability to bring its valid state-law claims, Litex is and will continue to be irreparably damaged.  (Litex Reply, at 7.)

## CONCLUSION

At bottom, Delphi implausibly argues two diametrically opposed positions – that its 2001 Statements and subsequent documents and testimony were all true, but that somehow Litex should have known they were false.  Delphi should not be permitted to use such conveniently vacillating arguments to avoid liability for the millions of dollars of damages it has caused to Litex.  Litex has shown that it is entitled to prove its right to those damages at trial.  For these, and all of the reasons described above, the Court should reject Delphi's arguments and enter judgment for Litex on both Delphi's Count I and Litex's First Counterclaim.

Respectfully submitted,

LITEX, INC.,

By its attorneys,


_____/s/ John T. Gutkoski_____
John T. Gutkoski (BBO #567182)
Alexandra C. Fennell (BBO #658692)
DAY, BERRY & HOWARD LLP
260 Franklin Street
Boston, MA   02110
Telephone:  (617) 345-4600
Fax:  (617) 345-4745

Francis H. Morrison III (BBO # 645515)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, CT   06103-3499
Telephone:  (860) 275-0100
Fax:  (203) 275-0343


August 1, 2005

## <u>CERTIFICATE OF SERVICE</u>

I, John T. Gutkoski, do hereby certify that I filed a true copy of the within document with the Court by electronic filing.  I further certify that I served a true copy of the within document by causing a copy to be sent by the Court's electronic filing system to H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111 on August 1, 2005.

_____/s/ John T. Gutkoski_____
John T. Gutkoski