**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| DELPHI CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-10415 (WGY) |
| | ) | |
| LITEX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DELPHI'S POST-HEARING MEMORANDUM

### INTRODUCTION

The critical issue to Litex's fraudulent inducement claim, but completely ignored by Litex, is *what did Litex know in November 2003 when it signed the Settlement Term Sheet & Release?* The undisputed facts show that Litex knew a lot.

First, Litex knew of Delphi's press releases initially touting the NTP technology, which were consistent with Litex's own press releases about the potential for the technology. Delphi then informed Litex that it had encountered problems with the on-car viability of its award-winning NTP research program. Those difficulties raised significant concerns about the commercial viability of the technology. SMF ¶¶ 9-13 (admitted), 6 (denied in part). Litex knew that Delphi cancelled the program in 2002 because of its inability to commercialize the technology. SMF ¶¶ 15-16 (admitted). Moreover, in Delphi's expert report in *Litex I*, served on Litex on April 18, 2003 - seven months before the Release - Delphi unambiguously explained this chronology and these facts to Litex:

¶ 52    Even in July 2001 and beyond, Delphi remained unsure that it could develop a suitable catalyst or produce an NTP system at an acceptable economic or energy cost. In April

2002, Delphi abandoned its catalyst development and in October 2002, it abandoned its NTP project entirely.

¶ 158    [After July 2001] Delphi continued testing its NTP prototype with companies such as PSA [Peugeot] and Renault, but it still did not have a commercial product.  They could not find a suitable catalyst and the fuel penalty was above the level that consumers would accept. If anything, Delphi was less certain that an NTP product would succeed.

SMF ¶¶ 11, 12 (admitted).

Second, during *Litex I*, Litex argued that Delphi's press releases were inaccurate and misleading, interfered with Litex's business and financing efforts and caused it considerable damage.  In fact, Litex was so critical of these press releases that it made them a part of its case in *Litex I*. SMF ¶¶ 22, 24, 25, 27-31 (admitted), ¶¶ 23, 26 (denied in part).  The deposition testimony of Litex's president, Leon Ekchian, on October 2, 2002 - thirteen months before the Release - makes Litex's position unambiguously clear:

> Q.    Are there areas of damage that you have identified?
> A.    Negative comments made by Delphi about our product publicly.
> Q.    Any other areas of damage that you've identified. putting aside for the moment the quantification of damage?
> A.    <u>The inaccurate press releases that were made by Delphi.</u> [emphasis added]

SMF ¶ 22 (admitted).

In light of these undisputed facts, it is a patently disingenuous for Litex to claim it was "ambushed" with evidence at the arbitration that now gives rise to new claims that it never before believed existed.  No such ambush occurred.  Its fraudulent inducement counterclaim is nothing but a ruse to attempt to resurrect claims that Litex knowingly waived when it executed the Release.  Delphi's position has been consistent throughout, and the tortious interference and unfair competition torts Litex now seeks to assert are nothing more than a regurgitation of the same issues raised by Litex before it signed the Release.

Third, Litex cannot make any claim for damages as a result of its signing the release and proceeding to arbitration. The claim in the Federal Court litigation in *Litex I* was for patent infringement damages. The claim in the arbitration was for patent infringement damages (based on presumed infringement), and Litex obtained a sizeable recovery in that arbitration. Because its entire present tort claims would have been merged into any judgment from *Litex I,* Litex was not harmed in any fashion by signing the limited release and proceeding to arbitration instead.

### ARGUMENT

In order to obtain the extraordinary relief it seeks, Litex must establish ***each*** of the five elements of its fraudulent inducement claim. If it fails to establish any one of them, Litex's claim must fail and the Release must be enforced. *Cote v. Astra USA, Inc.,* 1998 Mass. Super. LEXIS 276, *13 (1998)*. Rather than establishing all of the elements of its claim, Litex has failed to establish any of them, and therefore judgment should be entered in Delphi's favor. Given the frivolous and abusive nature of Litex's claim, Delphi respectfully requests that the judgment include an award of attorneys' fees and costs.

## I.    Litex Has Failed To Demonstrate That Delphi Knowingly Made False Statements.

Litex must first demonstrate that Delphi knowingly made false statements of fact when it issued the 2001 press releases. *See Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F. Supp. 920, 922 (D. Mass. 1993). Litex has fallen far short of satisfying its burden. In an attempt to satisfy this element, Litex argued at oral argument:

> The point was we relied, your Honor, on the correctness of those, of those statements. We relied on the fact that the things Litex (sic) [Delphi] said to the marketplace, that they developed the product, that it worked, that they put it on a Peugeot automobile, you know, to work on the exhaust. Ex. A, Hearing Trans. p. 17:17-21.

But nowhere does Litex prove that these statements were false. Quite the contrary! First, Litex admitted that Delphi had been researching and developing NTP since 1994. SMF ¶¶ 1-2. Second, the record establishes that Delphi's NTP system did technically "work" – it removed NOx from exhaust both in the laboratory and in vehicle testing. SMF ¶¶ 4, 5, 14 (admitted), ¶ 6 (denied in part). The fact that Delphi concluded that it just didn't work well enough for the commercial market does not diminish the value that Delphi's research contributed to the science.[1] Third, Delphi's NTP system was one of many technologies that Peugeot placed on its Environmental Technologies Vehicle, a "concept" vehicle that displayed potential future technologies. Litex knows that "concept" vehicles are not production vehicles and show "what might be in the future" and not "what is state of the art."

Delphi's press releases should be viewed in light of the important distinction between laboratory research and ultimate commercial viability. Many R&D projects show promise in the laboratory and then never make it to the market. That does not mean, however, that a company's statements about its promising research results are inaccurate when it later turns out that the research does not lead to a commercial product. There is absolutely nothing inconsistent – much less fraudulent – about a company issuing press releases about promising (and award-winning) research results when there is doubt that the research will ever overcome the long odds necessary to achieve commercialization.

Moreover, the arbitration testimony of Delphi's witnesses, Dr. Botti and Mr. Bonadies, expressing their skepticism as of 2001 about the ultimate commercial success of the NTP, is not inconsistent with the press releases. This testimony was quite Even the statement by Dr. Botti,

---

[1] Litex must know statements like those at issue here are not fraudulent. Otherwise, it certainly would not publish the statements currently contained on its own website, which describes its Corona Discharge Device "as a promising new technology solution in the fight against harmful automobile emissions and air pollution" – even though it too has failed to sell its product in the marketplace. *See* Litex's website at **www.litexcorp.com.**

that he did not expect NTP to work, is a fair and considered opinion (and one that turned out to be accurate). Dr. Botti's expectation was directed to the ultimate commercialization of Delphi's NTP system and not at the positive research and contribution that Delphi made to the science. Moreover, Dr. Botti's skepticism was his opinion. Others at Delphi, including Dr. Kupe, the project's chief engineer and Delphi's 30(b)(6) witness during *Litex I*, were "very hopeful," as he testified, that he and his engineering team could overcome the technical hurdles to make NTP an attractive commercial product. Dr. Botti's and Dr. Kupe's differing opinions about their ability to make NTP a success are hardly fraudulent. More importantly, Dr. Botti's opinion about NTP does not change Delphi's undisputed corporate decision to continue to research NTP for over another year and invest another million dollars to attempt to make NTP a commercially viable product. SMF ¶ 14 (admitted). Indeed, it was this continued research in the fall of 2001 and spring of 2002 that constituted Delphi's "infringing" acts upon which Litex was awarded a sizable judgment at the arbitration. Unfortunately by mid 2002, it became clear that there efforts would not succeed, and Delphi terminated the program.

Importantly, in all the papers it has filed in this matter, Litex has failed to even allege – let alone demonstrate – that a single Delphi witness ever intentionally provided false information, either in depositions during *Litex I* or during the arbitration hearing. Instead, Litex argues, without any support, that Delphi's arbitration witnesses testified in a manner that was inconsistent with earlier discovery provided by Delphi.

Litex's claim that Delphi's arbitration witnesses, namely Botti and Bonadies, were inconsistent with earlier statements by Delphi is simply untrue. This testimony is quite consistent with the facts set forth in the Hoffman expert report. SMF ¶¶ 10-13 (admitted). Moreover, although Litex spent an entire day deposing Dr. Botti on September 4, 2002, Litex

cites no deposition testimony of Dr. Botti that contradicts his arbitration testimony. Litex did not even take the deposition of Mr. Bonadies even though Delphi identified him has the NTP project leader in its Fed. R. Civ. P 26(a) disclosure in *Litex I*. In the same vein, Litex cites no arbitration testimony from Dr. Kupe that he had changed his testimony. Overall, although Litex took depositions of ten Delphi witnesses in *Litex I*, it decided to not question Delphi's witnesses on the problems encountered with the NTP research in 2001 and the skepticism of NTP's commercial viability, presumably because that testimony would undermine its theory of that case.[2]

## II.    Litex Has Failed To Demonstrate That Delphi Made Public Statements In 2001 With The Intent To Induce Litex To Sign A Settlement Agreement And Release in 2003.

Litex has also failed to satisfy its burden on the second element of its claim, which requires Litex to show that Delphi made the 2001 Statements with the ***intent to induce*** Litex to sign the Settlement Term Sheet & Release in 2003. *See Elias Brothers*, 831 F. Supp. at 922. Litex advances a completely ridiculous position that Delphi's statements to the general public in 2001 were made with the intent to induce Litex to sign a Release two years later.

To establish the requisite intent, Massachusetts's law requires that Litex establish a causal connection or nexus between the alleged false statement and the giving of the release. *Willett v. Herrick*, 258 Mass. 585, 596-97 (1927). Litex offers no evidence of such a connection to satisfy is burden and in fact admits that the parties never discussed the 2001 press releases at

---

[2] Litex turned a blind eye to this evidence during *Litex I*, probably because this evidence did not fit Litex's damages theory in the patent infringement case. During *Litex I*, Litex took the ridiculous position that in a hypothetical negotiation in 2001, Delphi would have paid an upfront fee of $200 million for a license to Litex's NTP technology. Litex therefore chose to ignore evidence that Delphi was losing confidence in the commercial success of its NTP program in 2001, as stated most clearly in Dr. Hoffman's expert report. After receiving less than 1/1000th of its demand in the arbitration, Litex has suddenly become interested in that evidence as it continues its quixotic quest for a huge payday on research that never even reached commercialization.

any time during the negotiation and execution of the Settlement Term Sheet and Release.[3]  SMF

¶¶ 41, 42 (admitted).

### III.    Litex Has Failed To Demonstrate That The 2001 Statements Were Material To Its Decision To Execute The Release.

Litex has also failed to meet its burden of showing that the 2001 Statements were

material to its decision to execute the Release.  *See Elias Brothers*, 831 F. Supp. at 922.  Litex

agreed to have the Court treat the parties' cross-motions for summary judgment as a "case

stated," meaning that the record is now closed.  The record before the Court does not contain a

single shred of evidence indicating that the 2001 Statements were ***material*** to Litex's decision to

sign the Release.  Incredibly, Litex has not offered an affidavit on this point, nor has it pointed to

a single deposition or document in which someone from Litex states that the 2001 press releases

were important to its decision to execute the Settlement Term Sheet & Release.  Instead, Litex

offers only the argument of its own counsel, which, of course, is not evidence in this case.  Litex

must establish materiality; this element of the claim is not presumed.  Furthermore, Litex admits

that the parties never even discussed the 2001 press releases during their settlement negotiations

in 2003.  SMF ¶¶ 41, 42 (admitted).  The record is therefore completely devoid of any evidence

demonstrating that the 2001 Statements were material to Litex's decision to sign the Release.

---

[3] This case thus stands in sharp contrast to the *McEvoy* case upon which Litex relies, in which the defendant specifically told the plaintiff that it would not enforce a termination provision in the parties' contract in order to induce the plaintiff to sign the contract, and then sought to enforce that very same provision a short time later. *McEvoy Travel Bureau v. Norton Co.*, 408 Mass. 704, 708-10 (1990).  In *McEvoy*, the requisite causal connection is obvious.  In the current action, no such connection exists.  Delphi did not engage in conduct even remotely similar to the conduct at issue in *McEvoy*.  Instead, Delphi simply released accurate information to the general public about its award-winning NTP research project.

**IV.    Litex Has Failed To Demonstrate That It Reasonably Relied on Delphi's 2001 Press Releases.**

Litex has also fallen far short of establishing that it relied on Delphi's 2001 press releases in executing the Release or that its reliance was reasonable. *See Elias Brothers*, 831 F. Supp. at 922. Litex has not submitted an affidavit or any other competent evidence demonstrating that it actually *relied* on the 2001 statements in entering into the Release, and thus has failed to submit any evidence on another critical aspect of its case. Again, this element is not presumed, and Litex's attorneys' argument on this point cannot constitute evidence to satisfy Litex's burden.

Even if the record did contain evidence that Litex relied on the 2001 statements, there is no evidence that its reliance was reasonable. The unreasonableness of reliance is a complete defense. *Cote*, 1998 Mass. Super. LEXIS 276 at *13. Litex claims that it signed the Release based on its reasonable belief that Delphi's NTP program was not experiencing any problems in 2001 and therefore that Litex had no reason to doubt the 2001 statements when it signed the Release. But that incredible assertion is directly contradicted by the following information, all of which Litex knew *before* it signed the Release:

- In his expert report dated April 18, 2003, Dr. Hoffman clearly stated: "Even in July 2001 and beyond, Delphi remained unsure that it could develop a suitable catalyst or produce an NTP system at an acceptable economic or energy cost." *See* Cosnowski Aff., Ex. 8, Hoffman Report ¶52; SMF ¶ 11 (admitted).[4]

- In that same report, Dr. Hoffman stated that in July 2001, Delphi was "uncertain of the commercial viability of its NTP product." *See* Hoffman Report ¶ 152

- Dr. Hoffman further stated that in July 2001, "Delphi continued testing its NTP prototype with companies such as PSA and Renault, but it still did not have a commercial product. They could not find a suitable catalyst and the fuel penalty was above the level that customers would accept. If anything, Delphi was even less certain that an NTP product would succeed." Hoffman Rpt. ¶ 158; SMF ¶12 (admitted)

---

[4] Delphi produced the Hoffman Expert Report pursuant to Fed. R. Civ. P. 26(a)(2)(B), which requires that "The report shall contain a complete statement of all opinions to be expressed and basis and reasons therefore; the data or other information considered by the witness in forming the opinions;…."

- In a deposition dated September 6, 2002 – over one year *before* Litex released Delphi from all tort claims – Delphi's Executive Vice President Donald Runkle testified that Delphi's NTP program was not producing desired results since 2001. *See* Cosnowski Aff., Ex. 12 at 114.

As such, Litex was undeniably aware that Delphi doubted the ultimate commercial success of NTP, thereby making its alleged reliance to the contrary unreasonable.

Additionally, Litex's representation that it did not previously believe it had any claims against Delphi's press releases is baldly false. Ex. A., Hearing Trans. p. 21:11-15. Litex asserted these same arguments against Delphi on account of its press releases *before* it signed the Release. At his deposition in *Litex I,* Litex's president testified that Delphi's press releases were inaccurate, interfered with Litex's business prospects and financing, and had damaged Litex. SMF ¶¶ 22, 24, 25 (admitted), ¶¶ 23, 26 (denied in part). In support of Litex's claim for damages, Mr. Ekchian believed that the falsity of Delphi's press releases stemmed from Delphi's misplaced over optimism:

> Well, if Delphi in fact when they were making those press releases did not believe they were going to make it to market with a product by 2004, in other words, makes those overly optimistic statements to get a lot of press attention, attention from its investors, attention of its customers, I find that very troubling . . . To me that means that they shouldn't, perhaps, have been so aggressive with their projections and their statements.

*See* Cosnowski Aff., Ex. 13 at 386-88. Echoing the same claims and harm caused by Delphi's press releases, Litex's damage expert in his December 23, 2002 expert report further charged Delphi's press releases as interfering with Litex's business:

> Because of Delphi's infringement (which may well have been willful) **and its aggressive publicity telling the world (including Litex's potential investors, partners, and customers) that it (Delphi) developed NTP** (Depo. Exhibit 43) **and that its would be first-to-market with NTP systems** (Depo. Exhibits 40,41, 57; [LIT1366112]), **Litex suffered considerable damage** including the opportunity to further develop its patented NTP business opportunity with one infusion of funding, e.g. via the Series D proposal as well as equity participation by potential partners, such as Bosch and Denso.

SMF ¶ 27 (admitted) (emphasis added).  Similarly, on October 1, 2003, less than six weeks

before executing the Settlement Term Sheet & Release, Litex again complained in an opposition

brief that Delphi's press releases damaged Litex's business efforts:

> Delphi's publicized development activities and press releases indicating its
> plans to market and NTP system seriously undermined Litex's efforts to
> license its technologies, raise capital for research and development
> activities and enter into partnerships to fund development of its CDD[TM]
> system.

SMF ¶ 28 (admitted).[5]  These statements confirm that Litex believed and in fact advocated that

Delphi's press releases were false, interfered with Litex's business, and caused it considerable

damage.  Accordingly, there can be no dispute that Litex actually believed, based on the facts in

*Litex I,* that potential claims and damages, akin to the tort counterclaims now asserted in this

action, existed long before it signed the Settlement Term Sheet & Release.   Therefore, no matter

how Litex twists the select arbitration testimony of Delphi's witnesses, this testimony did not

first give rise to any unknown claims related to Delphi's press release because Litex believed

that such claims always existed.  Therefore, Litex's execution of the Settlement Term Sheet &

Release constituted a deliberate decision on its part to waive any claims that it possessed against

Delphi connected to the press releases.

The undisputed record in this case demonstrates that when Litex signed the Release, it

knew that Delphi's NTP program was far from problem-free in 2001 (SMF ¶¶ 9-16 (admitted),

SMF ¶ 6 (denied in part)), and it believed that Delphi's press releases were inaccurate, overly

optimistic, aggressive, and caused Litex damage.  SMF ¶¶ 22, 24, 25, 27-31 (admitted), ¶¶ 23, 26

(denied in part).  But Litex signed the Release anyway.  As a result, it gave up whatever claims it

---

[5] Litex's damages theory at the arbitration also focused on the harm to Litex caused by Delphi's statements.  SMF ¶¶ 30-31 (admitted).

may have had arising from those press releases, and its purported claim of reliance today is a sham.

**IV.    Litex Has Failed To Demonstrate That It Has Suffered Any Injury.**

Finally, Litex has failed to show that it suffered any injury as a result of Delphi's alleged conduct.  *See Elias Brothers*, 831 F. Supp. at 922.  As part of the "fraudulently induced" settlement agreement, the parties agreed to an arbitration that resulted in a sizable award in Litex's favor.  SMF ¶¶ 45-46 (admitted).  Litex has not offered to return that award, which clearly conferred a benefit on Litex.

In addition, if Litex had not entered into the Settlement Term Sheet & Release and had instead pressed ahead with its trial in *Litex I*, it would not have been able to collect on the claims it now asserts because it never asserted a tort claim against Delphi in *Litex I*.  Simply, the doctrine of claim preclusion or merger would have prevented Litex from asserting its tort claims against Delphi after the conclusion of *Litex I*.  In the First Circuit, a final judgment on the merits "extinguishes any further rights of the plaintiff to remedies against the [same] defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the [earlier] action arose."  *See United States v. American Heart Research Foundation, Inc.*, 996 F.2d 7, 11 (1st Cir. 1993) (quotations and citations omitted); *Manego v. Orleans Board of Trade*, 773 F.2d 1, 5 (1st Cir. 1985).

The doctrine of claim preclusion applies here because there can be no question that the claims Litex seeks to revive in this action arose out of the same set of operative facts and transactions as the claims it asserted in *Litex I*.  Undisputedly, Litex made Delphi's press releases a central element of that case.  SMF ¶¶ 22, 24, 25, 27-31 (admitted), ¶¶ 23, 26 (denied in part).  Because the doctrine of claim preclusion would stand as an effective release of all other related

11

claims at the conclusion of the trial, the execution of the Release resulted in no prejudice to Litex.  Therefore, the burden rests with Litex to prove damage; a burden for which that it fails to advance any support.

### CONCLUSION

As the Court has recognized, Litex has a very long road to hoe in this matter.  The facts clearly demonstrate that Litex has failed to carry its substantial burden on *any* of the required elements of its fraud claim.  Delphi is entitled to the repose to which the parties agreed and for which Delphi has already paid substantial consideration.  As a result, Delphi respectfully requests that the court enter judgment in Delphi's favor on Count I of its Complaint and dismiss Litex's Counterclaims with prejudice.  In fact, Litex's fraud claim is so completely at odds with the factual record and so devoid of legal merit, that Delphi respectfully requests that the judgment in Delphi's favor include an award of attorneys' fees and costs to cover its expenses to enforce the Settlement Term Sheet & Release.

Respectfully submitted,

**DELPHI CORPORATION**
**by its attorneys:**


    /s/ H. Joseph Hameline
H. Joseph Hameline, BBO # 218710
Matthew C. Hurley, BBO # 643638
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

Dated:  August 1, 2005


LIT 1535026v1

072005m11.txt

1

1                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2
                                          Civil Action
3                                         No.
05-10415-WGY

4

5        * * * * * * * * * * * * * * * *
                                        *
6        DELPHI CORPORATION,            *
                                        *
7                    Plaintiff,         *
                                        *
8        v.                             *    HEARING
                                        *
9        LITEX, INC.,                   *
                                        *
10                   Defendant.         *
                                        *
11       * * * * * * * * * * * * * * * *

12

13                   BEFORE:   The Honorable William G. Young,
                              District Judge

14

15       APPEARANCES:

16

17                   MINTZ, LEVIN, COHN, FERRIS, GLOVSKY &
             POPEO, P.C.  (By Matthew C. Hurley, Esq. and    H.
18           Joseph Hameline, Esq.), One Financial Center,
             Boston,  Massachusetts 02111, on behalf of the
19           Plaintiff

20                   DAY, BERRY & HOWARD, LLP (By John T.
             Gutkoski, Esq. and Alexandra C. Fennell, Esq.),
21           260 Franklin Street, Boston, Massachusetts 02110
                             - and -
22                   DAY, BERRY & HOWARD, LLP (By Francis H.
             Morrison, Esq.), CityPlace I, Hartford,
23           Connecticut 06103-3499, on behalf of the Defendant

24                                        1 Courthouse Way
                                          Boston, Massachusetts

Page 1

072005m11.txt

25                                          July 20, 2005

☐

                                                              2

1                    THE CLERK:  Civil Action 05-10415, Delphi Corp.
v.

2        Litex.

3                    THE COURT:  Good afternoon.  Would counsel
identify

4        themselves.

5                    MR. HURLEY:  Good afternoon, your Honor.
Matthew

6        Hurley, Mintz Levin, on behalf of Delphi Corporation.

7                    MR. HAMELINE:  Joseph Hameline also for Delphi

8        Corporation, your Honor.

9                    MR. MORRISON:  Good afternoon, your Honor.
Francis

10        Morrison from Hartford, Connecticut, for Litex.

11                    MR. GUTKOSKI:  John Gutkoski, Day, Berry and
Howard

12        in Boston, also for Litex, Inc.

13                    MS. FENNELL:  Alexandra Fennell, Day, Berry and

14        Howard, also for Litex.

15                    THE COURT:  Let me ask you this.  These are

16        cross-motions for summary judgment and absent fraudulent

17        inducement we've got a settlement agreement and the

18        settlement agreement will govern except that there's the

19        claim that it was fraudulently induced.

20                    There's quite an extensive record here and I
                                   Page 2

072005m11.txt

wonder

21    if you want, if you want to treat this case as a case
22    stated.

23        Now, understand the difference.  If you -- if I
24    treat it as cross-motions for summary judgment, I have
to
25    take all inferences against each side's motion, and

▯
                                                          3

1    conceivably both motions are denied, or the contrary.
If I
2    treat it as a case stated then I can resolve it.  And
let me
3    be clear, I guess, on the resolution.
4        The resolution can be that on this record there
was
5    fraudulent inducement and the, the settlement agreement
must
6    be set aside, or that there was not and the settlement
7    agreement is enforceable.
8        Do you want me to treat it as a case stated
having
9    made cross-motions for summary judgment?
10       MR. HURLEY:  Your Honor, our position is that
the
11   case is ready for adjudication on the motions for
summary
12   judgment and we feel that summary judgment obviously in
our
13   favor is warranted on this record.  However, if your
Honor

Page 3

072005m11.txt

14   does not feel that the case is ready for adjudication
based

15   on this record and would like to treat it as a case

16   stated --

17          THE COURT:  No, I think -- I don't think you

18   apprehend what -- I'm not trying to sandbag anyone; in
fact,

19   I'll give you longer to argue if it's a case stated.

20   Because if you both tell me it's a case stated the case
will

21   be adjudicated on this record.  That's what you're
saying.

22   You're saying this is the record, here it is, draw what

23   inferences are necessary with respect to it and come up
with

24   a result.

25          If you're saying no -- naturally, you think and

⬚

4

1   they think you'll win your motions for summary judgment.

2   But you've got cross-motions.  That's the only reason I
say

3   it.

4          MR. HURLEY:  I understand.

5          THE COURT:  In an attempt to move the thing
along.

6   I'm not favoring one side or another, and I don't have
an

7   agenda here.

Page 4

072005m11.txt

8          What to you say, do you want a case -- he jumps
up.

9      What do you say?  Do you want a case stated?

10          MR. MORRISON:  Well, I stood up, your Honor, I
did.

11          Your Honor's going to have to decide first the

12      fraudulent inducement issue anyway.

13          THE COURT:  Right.

14          MR. MORRISON:  It's an equitable matter.  I
think

15      the Court's got to decide it and you, the Court, has the

16      record.  We don't have any difficulty with the Court

17      treating it as a case stated --

18          THE COURT:  Fine.

19          MR. MORRISON:  -- and taking the record and --

20          THE COURT:  Fine.

21          MR. MORRISON:  -- deciding it.

22          THE COURT:  But you need to do it by agreement.

23          How do you people feel?

24          MR. HURLEY:  Your Honor, would I be able to
just

25      confer with my client who's here in the courtroom for,
for



                                                    5



1      ten seconds.

2          THE COURT:  Of course.  Of course.

3          MR. HURLEY:  Thank you.

                        Page 5

072005m11.txt

4          MR. MORRISON:  Your Honor, may I see my client

5     also?

6          THE COURT:  Of course.

7          I think we've waited long enough for Mr. -- you
go

8     ahead -- we've waited long enough for Mr. Koback.  Let's

9     call his case again.

10          (Whereupon other matters were handled by the
Court

11     and then the following transpired:)

12          THE CLERK:  Civil Action 05-10415, Delphi Corp.
v.

13     Litex.

14          MR. HURLEY:  Your Honor, we've conferred with
our

15     client.  I think that the other side was still
conferring

16     the last we saw, and they're coming in now.

17          (Pause in proceedings.)

18          THE COURT:  And what's your position, a case
stated

19     or no?  And there's no -- don't think that I'm -- I'm
urging

20     it only for the sake of efficiency.  I won't be offended
if

21     you don't want to do it.

22          MR. HURLEY:  Your Honor, we conferred with our

23     client and we would be amenable to going ahead.

24          THE COURT:  Amenable.

25          MR. MORRISON:  We would be also, your Honor.

Page 6

072005m11.txt

☐

6

```
         1              THE COURT:  All right, very well.  Fifteen
minutes

         2     a side.  This is the closing argument on this matter.  I

         3     will hear counsel.

         4              MR. HURLEY:  Thank you, your Honor.

         5              Your Honor, Litex seeks extraordinary relief in

         6     this matter.  They seek to undo a settlement agreement
that

         7     the parties entered into after, over two and-a-half
years of

         8     litigation, after two and-a-half years of discovery, and

         9     after the parties had agreed to enter into an agreement

        10     whereby for purposes of an arbitration we would assume
that

        11     there was a patent infringement and the issue of damages
was

        12     submitted to an arbitrator.  The arbitrator rendered his

        13     decision and Delphi has complied with that award that
was

        14     rendered to Litex.  Now Litex is before the Court asking
the

        15     Court to find that extraordinary circumstances exist
that

        16     would allow the reopening of the case and the throwing
out

        17     of that settlement agreement and release.  This is

        18     extraordinary relief.

        19              The burden is upon Litex to show that its fraud
in
```

Page 7

072005m11.txt

20    the inducement claim --

21              THE COURT:  But isn't --

22              MR. HURLEY:  -- vitiates this agreement.

23              THE COURT:  Yes, that's true.  But this is no

24    different than fraud in the inducement as to any
contract.

25    It happens to be in a litigation situation.  But you
don't

☐

                                                        7

1    suggest there's a higher burden of proof.  They would
have

2    to, now it's a case stated, I would have to on this
record

3    be satisfied by a fair preponderance of the evidence
that,

4    that through fraudulent statements by Delphi that's what

5    induced Litex to enter into the settlement agreement.

6              MR. HURLEY:  That's absolutely true, your
Honor.

7              THE COURT:  Okay.

8              MR. HURLEY:  The settlement agreement is a
contract

9    under Massachusetts law and the question is whether --

10             THE COURT:  And that's fixed.

11             MR. HURLEY:  Right.

12             THE COURT:  It's the fraudulent -- it's the

13    evidence of fraudulent inducement now that, and I
appreciate

                        Page 8

072005m11.txt
14    candidly both sides allowing me to evaluate and make
that

15    determination.  If I'm not persuaded the settlement

16    agreement stands and is fully valid and enforceable.  If
I

17    am persuaded the settlement agreement is void and of no

18    effect, and that's as far as I'm going.  I mean, those
are

19    the parameters of what I have to decide.

20            Go ahead.

21            MR. HURLEY:  Thank you, your Honor.

22            I guess the only difference between this and
sort

23    of a standard contract is that this agreement was
entered

24    into after the parties had entered into, had conducted

25    discovery for two and-a-half years and in our view Litex
had

☐

8

1    the full opportunity to assert the claims that they are
now

2    seeking to assert here and in fact they raised many of
the

3    same factual issues in that case that they now seek to

4    assert again, take another bite at the apple in this
case.

5            THE COURT:  Well, I follow.  You say it's in a

6    litigation context, so everyone was focused, the
litigators

7    were right in on everything that went on, this is not
Page 9

072005m11.txt

even a

8      large commercial contract where people are seeking or

9      wishing that they would have a relationship that would
be

10     mutual beneficial -- mutually beneficial.  This is the

11     knock-down, drag-out of a settlement.

12             MR. HURLEY:  Exactly, your Honor.  And
settlement

13     reached not just after some initial exchange of
documents

14     but a full-blown patent discovery case.

15             THE COURT:  Right.

16             MR. HURLEY:  So, your Honor, the burden is on
Litex

17     to show essentially five things here.  Their fraud in
the

18     inducement claim requires them to show that Delphi
knowingly

19     made false statements; that Delphi made these false

20     statements, which the statements were in 2001 and the

21     agreement was in 2003, that Delphi made these false

22     statements in 2001 with the intent to induce Litex to
enter

23     into this settlement agreement in 2003.

24             They also have to show that these statements
were

25     material to their decision to put their name on that

⬜

9

1      settlement agreement in 2003, and that they reasonably
                          Page 10

072005m11.txt

2    relied upon these 2001 statements.  And of course they
have

3    to show that they have been damaged by that reliance on

4    these allegedly fraudulent statements.

5              THE COURT:  Well, at least the last point for

6    purposes of my duty now, that's simple.  Because they're

7    bound to the requirements of a settlement agreement
where

8    theoretically the array of relief that was open to them
is

9    greater.

10              Do I have to analyze damages very much here?

11              MR. HURLEY:  Well, I think there is an issue
there,

12    your Honor.  Because they had two alternatives when they

13    entered into that settlement agreement and release.  The
one

14    alternative which they chose to pursue was to submit the

15    issue of damages to the arbitrator.  That issue was

16    submitted and that issue was decided.  The other
alternative

17    that they could have pursued at that time was to go
ahead

18    with the trial in what I'll call Litex I which was the

19    patent infringement case before your Honor.  Our
position is

20    that they should have asserted those claims which they
now

21    seek to assert in this case in Litex I.  We're talking
about

22    the same technology.  We're talking about the same

072005m11.txt

23    representations.  They allege that Delphi made certain

24    representations about that technology.

25                 THE COURT:  But it settled before it went to
trial.

▯
                                                          10


1                 MR. HURLEY:  The trial began and then the

2     settlement was entered into before there was a verdict.

3     That's correct, your Honor.

4                 THE COURT:  Because the argument you're making
now

5     has something of the flavor of res judicata or issue

6     preclusion.  What they did was and what you did, you
took

7     the certainty of a settlement agreement as opposed to
the

8     uncertainty of the litigation process whether by
arbitration

9     or before this Court.

10                MR. HURLEY:  That's true, your Honor.  But the

11    point I'm --

12                THE COURT:  And if they were fraudulently,

13    fraudulently induced to do that one imagines equitably
my

14    duty is to unwind it and put the parties back where they

15    were before.

16                MR. HURLEY:  My only point --

17                THE COURT:  Without going any further, that's
my,

072005m11.txt

18    that's my concern.

19         MR. HURLEY:  My point is simply that by, by

20    submitting this case to an arbitration, by fully

21    adjudicating the damages issue, by fully adjudicating
that

22    claim, one part of our argument is that they were
precluded

23    from ever asserting those same claims against us again.
And

24    in our view, which I'll discuss because it sort of plays

25    into each of these elements, I believe, they knew about

☐

                                                    11

1    these facts back during the litigation.

2         THE COURT:  Okay, you've argued that in your,
in

3    your brief and I have that very much in mind.  But I'll
hear

4    you on it for a little further.

5         But I need the chronology.  Where, where was
the

6    damages arbitration in all of this?

7         MR. HURLEY:  The damages arbitration, your
Honor --

8    it was a little bit of a unique situation.  The case
went to

9    trial in November 2003.

10        THE COURT:  Before me.

11        MR. HURLEY:  Before you, yes, your Honor.

                    Page 13

072005m11.txt

12          THE COURT:  Settled mid trial.

13          MR. HURLEY:  Eight days later.  Just a few days

14     into the actual trial the parties enter into a
settlement

15     terms sheet and release.

16          THE COURT:  Okay.

17          MR. HURLEY:  Which essentially said let's
assume

18     there is patent infringement.  There was no stipulation

19     along the lines, let's assume that there's patent

20     infringement, we're going to submit to binding
arbitration

21     on the issue of damages.

22          THE COURT:  Thank you.  Thank you.  Which
occurred,

23     resulted, and now the amount -- is there an amount?
It's

24     fixed.

25          MR. HURLEY:  The amount was fixed by the
arbitrator

☐

                                                        12

1     and the amount was paid by Delphi; there's no dispute
about

2     that.

3          THE COURT:  Okay.

4          MR. HURLEY:  Okay.

5          THE COURT:  And now all that having occurred
now --

6     well, I do see, I think there is, there is a damages
                          Page 14

072005m11.txt

issue,

7     isn't there?

8                    MR. HURLEY:  Yes, I believe there is.

9                    THE COURT:  Yes.  The choice is -- well, thank
you

10     very much.

11                    Why don't you make in about three or four
minutes

12     your argument that they knew all along.

13                    MR. HURLEY:  Sure.

14                    I guess I would start by saying that these

15     statements, and they've identified them as exhibits to

16     affidavit they submitted, there's five press releases.

17     These are not statements that were specifically targeted
at

18     Litex.  These were public statements; they were press

19     releases.  They were issued in 2001.  The statements
were

20     about some research that Delphi was doing on something

21     called non-thermal plasma.  It reduces exhaust emissions

22     from diesel engines.

23                    The statements essentially said here's the
results

24     of our laboratory research, this research looks
promising.

25     It also talked about an award that Delphi got for that
very

☐

13

Page 15

072005m11.txt

1    same research.

2           Now, that was in 2001.  In 2002, after Delphi had

3    taken, taken that laboratory research and tried to find the

4    same results on on-vehicle testing to see if they had a

5    viable commercial product, they determined after extensive

6    testing that this thing did not meet certain parameters

7    which they had set for commercial viability.  They made a

8    determination that big car manufacturers certainly were not

9    going to buy this technology because it did not produce the

10   results they were looking for and therefore it didn't make

11   sense to try to put it on cars at an additional price.

12          THE COURT:  But you have at least one of your

13   people on deposition saying, well, we didn't know how bad

14   this was until March.  Isn't that right?

15          MR. HURLEY:  Well, no, what we have somebody saying

16   is -- and you may be referring to Delphi's 30(b)(6) witness,

17   I believe.  That's the testimony that Litex cited in their

18   brief.  And what he said was Delphi hit the hard reality in

19   March 2002.  Which is absolutely true.  That is when the

20   decision-makers at Delphi finally decided based on all the

Page 16

072005m11.txt

21    evidence, on not only the laboratory research but the

22    on-vehicle testing, that this was not going to be a

23    commercially viable project at this time.

24            They had committed over $7 million to this,
your

25    Honor, since 1998 and they made a decision that on
behalf of

☐

14

1     their shareholders this did not make sense to continue
to

2     pursue this particular technology at that point in time.
So

3     they did hit that hard reality in 2002.

4            Now, I think the distinction that Litex blurs
over,

5     and it's an important distinction, is a distinction
between

6     Delphi's 2001 press releases, which were talking about

7     research in the laboratory, and their decision to
ultimately

8     abandon this project in 2002 because it was not
producing

9     the results that they were looking for in on-vehicle

10    testing.  This is sort of like the distinction between,
in a

11    biotech case, the lab results that somebody is seeing in

12    vitro and comparing that to what actually happens in a

13    clinical trial.

14            THE COURT:  All right, I think, I think I have
Page 17

072005m11.txt

your

15    argument in mind.

16                MR. HURLEY:  So that --

17                THE COURT:  I'll hear Litex.

18                MR. MORRISON:  May it please the Court, your
Honor.

19                Your Honor, first of all, the patent case
started

20    before Judge Tauro.  He recused himself.

21                THE COURT:  Oh, I remember it very well.

22                MR. MORRISON:  You got involved.  Okay.  I
guess, I

23    guess --

24                THE COURT:  Oh, no, this is the case and I, I

25    remember it vividly.  Because I got involved, was there
for

⬜

                                                        15

1    a morning and you decided to settle.  You all decided to

2    settle.  And I realized I was completely at sea in this

3    case.  I wanted to help him out.  But that's why you got

4    into this unique circumstance.  Maybe I'm somewhat at
fault

5    for that.

6                But that's neither here nor there.  It's all

7    happened now.  Now you've reminded me this is the case.
You

8    do have in my mind something of a long road to hoe here.

9                MR. MORRISON:  Your Honor, we are asking you to
                              Page 18

072005m11.txt

do

10    something extraordinary in the law.  We understand that.

11    And I agree with that.  But this is an extraordinary
case.

12    What was hidden, what was hidden from Litex, your Honor,
was

13    the following.  Litex signed the release that you have
in

14    front of you which bars any unknown claims.  They signed
the

15    release without knowing something that Delphi knew that
they

16    had been asked about in discovery and that they never
told

17    us.  And here's what it was, your Honor.

18         In the year 2001 -- and this testimony didn't
come

19    out until the arbitration which was in 2004.  The
release,

20    of course, was signed before the arbitration.  In 2001,
your

21    Honor, the testimony in the arbitration that we heard
for

22    the first time from the director of technology at
Delphi,

23    his name is Botti, B O T T I, he testified, your Honor,
that

24    as of July of 2001, I had no expectation that this,
meaning

25    the technology, the NTP, the non-thermal plasma, would
ever

☐

16

Page 19

072005m11.txt

1    work.  He said that, your Honor, at the arbitration, in

2    2001.  We heard it then for the first time.  The
technology

3    didn't work.  And I knew it in 2001.

4              Their public statements, your Honor, which they

5    made to the marketplace, in July, September, October,
and in

6    their annual report for 2001, which came out early in
2002,

7    those public statements, your Honor, were flatly
contrary to

8    what he said.  And it wasn't just a science experiment.

9    They made the statement, for example, in July:  Delphi
is

10   developing non-thermal plasma catalysis components and

11   systems relying upon its significant technical
capabilities

12   in sound, demonstrable and credible scientific
principles.

13             THE COURT:  But when, when relative to those

14   statements do you settle?

15             MR. MORRISON:  We settled it, your Honor, the

16   release is signed right before the arbitration in 2004.

17   The point was we relied, your Honor, on the correctness
of

18   those, of those statements.  We relied on the fact that
the

19   things Litex said to the marketplace, that they
developed

20   the product, that it worked, that they put it on a
Peugeot

Page 20

072005m11.txt

21    automobile, you know, to work on the exhaust.

22    THE COURT:  But you see that's, that's my
factual

23    problem here.  And you should, you should amplify on
this.

24    The key point for the fraudulent inducement to
grab

25    you is when you change your position, when you sign that

[]

17

1    release.  That's back, that's in 2004.

2    MR. MORRISON:  Yes, your Honor.

3    THE COURT:  Now, at that time, at that time
wasn't

4    it clear in the marketplace that this was a nonstarter?

5    MR. MORRISON:  We didn't know in 2004 that Mr.

6    Botti's opinion in 2001 when they were making all these

7    public statements about this technology working, we
didn't

8    know about that when we signed the release, your Honor.

9    THE COURT:  What difference does it make?

10    MR. MORRISON:  Well, it makes a lot, your
Honor.

11    Because if they simply were trying to get in the

12    marketplace, if that's all they were trying to do, and
they

13    were, they were the biggest competitor, they were
somebody,

14    they were the number one distributor, supplier of
automobile

Page 21

072005m11.txt

15      parts.  People left us, your Honor, potential financing

16      folks left us when they heard that Litex -- that Delphi
had

17      the technology and was going to go in the marketplace.

18              So, here's the difference it makes.  The
difference

19      it makes is they didn't tell us until the arbitration,
after

20      we signed the release, that they had decided three years

21      before that the technology, their technology, your
Honor,

22      wouldn't work.  They hid that from us.  And, your Honor
--

23              THE COURT:  Well, you -- no, the point that I'm

24      missing, which I, which I believe is in the record here,
and

25      just tell me I'm wrong if you think I'm wrong, here's,

□

                                                            18

1       here's the key, the sequence of events as you think
they're

2       important.

3               Mr. Botti comes to the realization that this is
not

4       going anywhere.  They make public statements which puff
this

5       product.  Time passes.  You sign the release.
Arbitration

6       takes place.  You learn about the early Botti
settlement.

7               Now, my point is after those puff statements it
                                Page 22

072005m11.txt

8  became apparent, did it not, that this, this technology

9  wasn't going anywhere?

10  MR. MORRISON:  I don't --

11  THE COURT:  Let me stop a minute because I --

12  MR. MORRISON:  That's fine, your Honor.

13  THE COURT:  I may be misconceiving this.  I
mean,

14  isn't that your point?

15  MR. HURLEY:  Absolutely, your Honor.

16  THE COURT:  Fine.

17  MR. HURLEY:  There's a --

18  THE COURT:  I understand.  Now, my duty is to
go

19  beyond the briefs and through this whole record because
it's

20  a case stated.  But that's what they're arguing.  Deal
with

21  that.

22  MR. MORRISON:  All right.

23  THE COURT:  Because if that's, if they're right
on

24  that I don't, I don't get your argument.

25  MR. MORRISON:  The state of the technology in
2001

☐

19

1  is the issue, your Honor, not the state of the
technology in

2  2004.  Because the question is the public statements
they

Page 23

072005m11.txt

3   were making about their technology, and I know your
Honor

4   called it puffing, but unfortunately, your Honor, they
said

5   some very specific things.

6           THE COURT:  This is not a stock fraud case and
that

7   was a poor choice of words.

8           MR. MORRISON:  That's all right.  But I do want

9   your Honor to know they said some very specific things
about

10  their technology in those years.  They said in their
annual

11  report we put this technology in a Peugeot automobile
and it

12  reduced the emissions.  It works.  They said that, your

13  Honor, publicly.  We heard it.  People who looked at us
to

14  help us in the marketplace said we're not going to
provide

15  you with financing because now Delphi's in the
marketplace.

16          When they said that, your Honor, when they made

17  that statement in their annual report, it wasn't true.
Mr.

18  Botti, Botti, I'm going to say it wrong, had already
come to

19  the conclusion that it was, that they weren't going to
have

20  any good technology.

21          THE COURT:  But, I'm sorry, and I am trying
very

Page 24

072005m11.txt
22    hard to understand.  That's 2002.  If it's known by 2004

23    that this plasma technology isn't going anywhere, how
can I

24    find now, because these are findings, that you were,
that it

25    was those 2002 misrepresentations.  I'll give you that
for


🗆

                                                             20


1    purposes of argument, that those were
misrepresentations.

2    How can that induce you to sign the release in 2004?

3           MR. MORRISON:  Well, our contractual
relationships,

4    your Honor, in 2001 were the ones that were interfered
with.

5    That's the tort claim, the interference claim, the tort

6    claims that we want to make.  Those happened when they
made

7    the misrepresentations publicly in 2001.  And, your
Honor,

8    in the discovery in the patent case, their witnesses,
their

9    30(b)(6) witness, a Mr. Kupe, continued to insist that
the

10    statements that they had made were correct.

11           THE COURT:  Let me see.  In essence you're
saying

12    that you didn't know how good your claims were when you

13    settled them.

14           MR. MORRISON:  We didn't know we had any, your
                          Page 25

072005m11.txt

15  Honor, when we settled.  And the reason we didn't know
we

16  had any, the reason we didn't know, your Honor, was
this.

17  If their statements were true that they made in the

18  marketplace, we've got this technology, we put it in a

19  Peugeot car, it works, if they were all true, we didn't
have

20  any claim against them for that.  It was when we found
out

21  that the things they said they had already decided
weren't

22  true, that the technology didn't work.  And that's,
that's

23  what we gave up and that's what we found out about at
the

24  arbitration when they said, oh, Mr. Botti's going to
come in

25  and say, you know, in 2001, in July, I knew this
wouldn't

口

21

1   work.  I told upper management.  I determined to end the

2   program.

3           And by the way, your Honor, that magic moment
when

4   they could affect the patent damages was in the
arbitration.

5   And that testimony, you know, the technology, that
Delphi's

6   technology wasn't going to work, the arbitrator relied
on

Page 26

072005m11.txt

7    it, Judge McKelvey relied on it, and that resulted in lower

8    damages for us.  And now, your Honor, what they say is that

9    Botti and Bonadies, Botti was their director of technology,

10   they've now told the Court in their reply brief that he

11   wasn't testifying on behalf of the company, it was a

12   personal opinion.  And, your Honor, they relied on that

13   testimony in their brief in the arbitration, they relied on

14   it to knock our damages down.  And now, your Honor, they're

15   back to saying that the 2001 statements were accurate.

16          We signed the release, your Honor, because we

17   assumed they were accurate.  Accurate in this sense.  We

18   assumed that they thought they had good technology.  In

19   fact, Mr. Botti said we didn't.

20          THE COURT:  Let me say it to you because I'm now

21   grasping the argument.

22          You signed it because you thought that their

23   representations when made were truthful even though more

24   information had come to light thereafter and you found out

25   in the arbitration that their representations when made were

⬚

22

1    not truthful.

Page 27

072005m11.txt

2          MR. MORRISON:  That's right.

3          THE COURT:  Have I got it?

4          MR. MORRISON:  Yes.  And can I add one other
thing

5     to that, your Honor.  We didn't just sit on our hands
after

6     we heard the representations.  We asked them about some
of

7     them.  We asked the CEO, Mr. Battenberg, and this is all
in

8     the record, Mr. Battenberg about his statement that you
put

9     it together with a Peugeot and it works.  We asked him
about

10    that after they had stopped the technology, after they
had

11    said, you know, we're going to stop our program.  And he

12    said that was a true statement when we made it to our

13    shareholders.  And their 30(b)(6) witness, your Honor,
said

14    we, we were very optimistic in 2001 about this product,

15    about this technology.  Mr. Botti got on the stand, your

16    Honor, and he contradicted those things.  And then we
said,

17    oh, my God, a reasonably prudent person, your Honor,

18    confronted with this release and being advised by
reasonably

19    prudent counsel, believing, not knowing about the

20    misrepresentations, would have signed the release, too.

21    Because if they were correct statements we didn't have a

22    claim.

Page 28

072005m11.txt

23          THE COURT:  All right, I'll take it under

24     advisement.  Thank you both very much.

25          MR. HURLEY:  Your Honor, could I make just one

☐

23

1     more point, your Honor?

2          THE COURT:  No, the order of argument is, I've
had

3     it, and I'm not having rebuttal.

4          This being a case stated it will require a
thorough

5     review, yes, I've read the briefs, but now I've got to
go

6     over the whole record myself.  If the parties -- I'm not

7     waiting on it now.  I'm taking it under advisement.  But
in

8     light of the oral argument if there's further memoranda
you

9     wish to submit you are welcome to do it.  I'm taking it

10    under advisement.

11          MR. HURLEY:  Thank you, your Honor.

12          MR. MORRISON:  Thank you, your Honor.

13          THE COURT:  We'll recess.

14          THE CLERK:  All rise.

15          (Whereupon the matter concluded.)

16

17

18

Page 29

072005m11.txt

19

20

21

22

23

24

25

[]

24

1                    C E R T I F I C A T E

2

3

4            I, Donald E. Womack, Official Court Reporter
for

5     the United States District Court for the District of

6     Massachusetts, do hereby certify that the foregoing
pages

7     are a true and accurate transcription of my shorthand
notes

8     taken in the aforementioned matter to the best of my
skill

9     and ability.

10

11

12

13

14                    _____
                         DONALD E. WOMACK
                            Page 30

072005m11.txt

15
Official Court Reporter
P.O. Box 51062

16
Boston, Massachusetts 02205-1062
womack@megatran.com

17

18

19

20

21

22

23

24

25