UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                            )
DELPHI CORPORATION,         )
                            )
          Plaintiff,        )
                            )
          v.                )   CIVIL ACTION
                            )   NO. 05-10415-WGY
LITEX, INC.,                )
                            )
          Defendant.        )
_____ )
```

MEMORANDUM AND ORDER

YOUNG, C.J.                                    October 13, 2005


I.    INTRODUCTION

Litex, Inc. ("Litex") attempts here to assert tort claims against Delphi Corporation ("Delphi") in alleged contravention of an earlier settlement agreement reached between the parties. Litex seeks to avoid the terms of the agreement by arguing that its assent was induced by Delphi's fraud. Delphi seeks a declaratory judgment that the parties' agreement bars Litex's claims as matter of law. Each party has moved for summary judgment against the other as to whether the settlement agreement is enforceable.

A.    **Factual Background**

In 1994, Delphi, an automotive products company, began researching the science of non-thermal plasma ("NTP") as a potential treating agent for automotive exhaust pollutants. Statement of Undisputed Material Facts in Supp. of Delphi Corp.'s Mot. for Summ. J. ("Pl.'s Facts") [Doc. No. 13] ¶¶ 1, 4. Delphi's research concentrated on combining NTP with a catalyst to remove nitrogen oxide pollutants from diesel engine exhaust. Id. at ¶ 2.  To make the technology commercially feasible, Delphi set three target goals for the project.  Id. at ¶ 3 (citations omitted).  According to Delphi, those goals were: (1) "90% reduction efficiency of nitrogen oxide in diesel exhaust", (2) a less than 3% "fuel penalty" to operate NTP on a vehicle, and (3) a low-cost commercial product.  Id.  As Litex points out, however, Delphi set additional goals.  Litex's Resp. to Delphi Corp.'s Statement of Undisputed Material Facts, and Litex's Statement of Undisputed Material Facts in Supp. of Litex's Cross-Mot. for Partial Summ. J. ("Def.'s Facts") [Doc. No. 18] at 1, ¶ 3.  A "much lower efficiency value," Litex notes, was required to meet those goals.  Id.

In 1999 and 2000, Delphi had achieved laboratory results suggesting that NTP could be a viable diesel exhaust treatment solution.  Pl.'s Facts ¶ 4.  Delphi subsequently issued press

releases in connection with its NTP research and applied for awards in industry research.  Id. at ¶ 5.  In 2001, however, Delphi began experiencing problems with "on-vehicle testing of its NTP project."  Pl.'s Facts ¶ 6.  According to Delphi, the "vehicle tests resulted in less that 15% [nitrogen oxide] reduction and a fuel penalty of 8%, results far shy of its goal and its earlier laboratory results."  Id.  Litex notes, however, that these results were "not 'far shy'" of Delphi's other stated goals.  Def.'s Facts at 2, ¶ 6.

By 2001, Delphi's management had become aware of the "diminishing success of the NTP project."  Pl.'s Facts ¶ 9.  In May 2001, Litex commenced an action in the United States District Court for the District of Massachusetts, asserting claims against Delphi for infringement of its NTP patents.  This civil action was randomly drawn to the Hon. Joseph L. Tauro.  Litex's Mem. in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of Litex's Cross-Mot. for Partial Summ. J. ("Def.'s Mem.") [Doc. No. 16] at 2.  By July 2001, because of the poor performance of its NTP project, Delphi "was not confident about the success or commercial viability of its NTP research."  Pl.'s Facts ¶ 10.

From the summer of 2001 until March of 2002, Delphi continued efforts to improve its NTP project.  Pl.'s Facts ¶ 14.  By 2002, Delphi had reduced the number of engineers working on the NTP project from 25 to 12 or 13.  Id. at ¶ 7.  Delphi claims that it

also cut its NTP research budget in half "compared to the level of funding budgeted for the NTP project in 1998." Id. at ¶ 8. According to Litex, however, the "actual funds for NTP remained constant between and including 1999 and 2002." Def.'s Facts at 2, ¶ 8.

In April of 2002, Judge Tauro issued a discovery order in the patent infringement lawsuit requiring that parties produce relevant documents relating to liability and damages and that they provide certain depositions. Pl.'s Facts ¶ 19. That same month, "Delphi abandoned research efforts on NTP catalysts." Id. at ¶ 15. Unable to commercialize an NTP product, "[in] September 2002, Delphi abandoned its entire NTP project." Id. at ¶ 16.

On November 23, 2003, a jury trial of the patent infringement case commenced before Judge Tauro. Id. at ¶ 33. After the fifth day of trial and the recusal of Judge Tauro,[1]

---

[1] My own involvement in these events is, upon reflection, regrettable. On the fourth day of trial, Judge Tauro realized that his wife held a few shares of stock of one of the parties and that mandatory recusal was in order. He asked me to step in for him and, in a flight of hubris, I accepted. As he was recusing himself, we did not discuss the substance in any way though he assigned me his very able law clerk and I carefully reviewed the record. On the fifth day of trial, he explained his disability to the jury, graciously introduced me to the jury, and left the courtroom. I took over.

It was a disaster. Whatever I may know about the trial of patent cases and however careful my preparation, I was utterly incapable mid-stream of making adequately considered rulings on relevance since I had heard neither the openings nor the first four days of trial. The lawyers knew it. We all struggled through the remainder of the trial day. As I so obviously failed the parties, they hammered out the alternate dispute resolution

Delphi and Litex settled their dispute and dismissed the case "with prejudice in favor of a private and confidential arbitration in accordance with the terms of the Settlement Term Sheet & Release." Id. at ¶ 34. According to the settlement agreement, Litex granted Delphi the following release:

> In consideration of the Settlement Term Sheet executed by the Parties on November 11, 2003, Litex hereby completely **RELEASES, ACQUITS AND FOREVER DISCHARGES** Delphi . . . and any and all other persons or entities acting in their behalf from any and all claims, demands, obligations, actions, liabilities or causes of action, under the patent laws, in tort, or otherwise in any jurisdiction including the claims for patent infringement in the Lawsuit, known or unknown, anticipated or unanticipated, regardless of whether such could have or could not have been brought in the Lawsuit, whether legal or equitable in nature and damages related to such any and all claims, demands, obligations, actions, liabilities or causes of action . . . . Such release shall not extend to future actions, including acts of alleged patent infringement.

Id. at ¶ 38.[2]

In April 2004, Roderick McKelvie, Esq., a former United States District Judge in the District of Delaware extremely experienced in the trial of patent cases, presided over the arbitration proceedings between the parties. Id. at ¶ 44. On September 7, 2004, the arbitrator issued his decision and awarded Litex damages and interest. Id. at ¶ 45. Delphi subsequently

---

at issue here.

[2] There is no dispute that the tort claims Litex now seeks to assert are barred by the language of the agreement. Thus, were this Court to conclude that the agreement is enforceable, that determination would effectively terminate the case.

paid, and Litex accepted, the award. Id. at ¶ 46. On March 1, 2005, Litex served Delphi written notice of "its intention to sue Delphi in tort for intentional and negligent interference with prospective business relations, fraud, negligent misrepresentation, trade libel, and unfair competition." Id. at ¶ 47. Pursuant to 28 U.S.C § 2201, Delphi commenced this declaratory judgment action on March 4, 2005, seeking enforcement of the parties' settlement agreement which bars Litex from asserting its proposed tort claims. Id. at ¶ 48.

On April 29, 2005, Litex answered Delphi's Complaint and asserted the following four counterclaims: (1) declaratory judgment that the parties' settlement agreement does not bar Litex's counterclaims due to Delphi's fraud; (2) intentional interference with prospective economic relations under California law; (3) negligent interference with prospective economic relations under California law; and (4) unfair competition under California law. Def.'s Answer [Doc. No. 8] ¶¶ 48-70.

In support of its declaratory judgment counterclaim, Litex alleges that Delphi fraudulently induced its execution of the settlement agreement because: (1) Delphi failed to disclose the alleged falsity of its various 2001 press releases and 2001 annual report, Def.'s Answer ¶¶ 48-54; (2) Delphi continued throughout 2001 and into 2002 to inform Litex and the public that Delphi was progressing with its development and commercialization

of an NTP product, <u>id.</u> at ¶¶ 6, 29; and (3) Delphi did not reveal to Litex until the arbitration proceedings in April 2004 that, by 2001, it lacked confidence in its NTP research and development efforts and had serious doubts as to the future of its NTP project. <u>Id.</u> at ¶¶ 7, 39, 40, 42.

### 1. **Delphi's Allegedly Fraudulent Statements**

Litex observes that on July 20, 2001, Delphi formulated the following "spokesperson's statement" responding to potential public inquires regarding Litex's patent infringement claims against Delphi:

> We are excited, however, to discuss our technology. Delphi is developing non-thermal plasma catalysis components and systems relying upon its significant technical capabilities and sound, demonstrable and credible scientific principles.

Delphi Corp.'s Resp. to Litex's Statement of Undisputed Material Facts in Supp. of Delphi Corp.'s Mot. for Summ. J. ("Pl.'s Resp.") [Doc. No. 21] ¶ 2; Def.'s Facts at 6, ¶ 2. According to Litex, these statements were false. Def.'s Facts at 7, ¶ 3. Delphi denies the falsity of this statement and asserts that as of July 20, 2001, it was developing NTP components and systems. Pl.'s Resp. ¶ 3.

Next, Litex observes, on July 30, 2001, Delphi issued a press release announcing that its NTP system had achieved "significant reduction in emissions." Def.'s Facts at 7, ¶ 4. This statement too, Litex alleges, was false. <u>Id.</u> at ¶ 5.

According to Delphi, the phrase quoted by Litex refers to the following laboratory test results presented in the same press release:

> In <u>steady-state testing in a diesel vehicle</u>, the NTP exhaust aftertreatment system demonstrated greater than 55 percent reduction in oxides of nitrogen emissions without the need to add additional hydrocarbons or other reductants to the exhaust stream as well as demonstrating a significant reduction in particulates.

Pl.'s Resp. ¶ 4 (emphasis added) (citation omitted).  Delphi maintains that read in its proper context (i.e., as applied to "steady-state testing") all of this information is true.  <u>Id.</u> at ¶ 5.

Litex notes further that in September 2001, Delphi's CEO and President J.T. Battenberg III ("Battenberg") "made a presentation to an international gathering of the automotive industry. Battenberg focused on Delphi's highlight technologies, including its alleged development of NTP."  Def.'s Facts at 7, ¶ 6.  During his presentation, Battenberg stated:

> Let me also mention that Delphi is the only supplier with full diesel injection and exhaust aftertreatment capability including our award winning non-thermal plasma aftertreatment technology that helps remove nitrogen oxide to improve emissions for diesel and lean burn.

<u>Id.</u>  Litex contends that these statements were false.  <u>Id.</u> at ¶ 7.  According to Delphi, however, these statements were true because the time the speech was made, "Delphi was developing NTP as an exhaust aftertreatment technology."  Pl.'s Resp. ¶ 7.

Next, Litex highlights Delphi's October 16, 2001 press release which stated:

> Delphi has developed an innovative aftertreatment solution, non-thermal plasma technology that works in conjunction with a catalytic converter and a particulate filter.

Def.'s Facts at 7, ¶ 8.  These statements, Litex contends, were also false.  Id. at ¶ 9.  Delphi maintains that the statement was true because it was developing the technology at the time of the statement's issuance.  Pl.'s Resp. ¶ 9.

Litex observes further that Delphi's 2001 annual report contained the following false statements:

> Responding to global demands for improved fuel efficiency and reduced exhaust emissions, Delphi offers advanced powertrain control systems such as cylinder deactivation, gasoline direct injection and non-thermal plasma (NTP) exhaust aftertreatment.
>
> . . . .
>
> Late in 2001, Delphi and PSA Peugeot Citroen debuted a Peugeot 206 Environmental Technologies Vehicle, featuring NTP exhaust aftertreatment which significantly reduces oxides of nitrogen emissions, enabling more rapid use of advanced fuel-efficient technologies.

Def.'s Facts at 8, ¶¶ 10-11 (emphasis in original).  According to Delphi, however, these statements were not false because at the time, it was "developing NTP."  Pl.'s Resp. ¶ 11.  Additionally, Delphi points out, its NTP technology was featured on a Peugeot "concept" vehicle that displayed several other "potential future technologies."  Pl.'s Post-Hr'g Mem. [Doc. No. 25] at 4.  Moreover, Delphi notes that its NTP technology "did technically

9

'work' – it removed [nitrogen oxide] from exhaust both in the laboratory and in vehicle testing." Id.

Litex next points out that during the parties' patent litigation discovery it specifically asked Delphi's Executive Vice-President Donald Runkle ("Runkle") about the accuracy of Delphi's press releases and public statements. Def.'s Facts at 8, ¶ 12. During Runkle's deposition the following exchange occurred:

> Q. Are you aware of whether Delphi has ever issued an inaccurate press release?
>
> A. No, I don't know that we have that I know of. We obviously try to not issue inaccurate press releases, documents, or anything. We pride ourselves on accuracy, timeliness, so forth.

Pl.'s Resp. ¶ 12 (citations omitted).

During his deposition, Battenberg was asked about the accuracy of Delphi's 2001 annual report and stated that, to his knowledge, it did not contain any inaccuracies. Def.'s Facts at 8, ¶ 13. Litex next observes that in October 2001 Delphi expressed its confidence in its NTP program in a presentation to Toyota Motor Corporation, a potential customer. Def.'s Facts at 9, ¶ 16. During that presentation, Delphi represented that it "would have NTP samples available in 2002 and was targeting overall production of NTP for 2005." Id. Litex notes that Delphi made similar representations to General Motors Power Train in December 2001. Id. at ¶ 17.

Litex further points out that in a February 21, 2002 letter in support of Delphi's nomination for a research and development award, Delphi's chief technologist Jean Botti ("Botti") stated:

> Delphi Automotive Systems is very excited about [NTP] and the technology that was developed for it over the last few years. In fact, Delphi has labeled this as one of our "Crown Jewel" technologies and we have put significant effort into developing this system to a commercial ready product . . . . We continue to invest our R&D resources in this technology, because it has shown such promise in reducing [nitrogen oxide] and particulate emissions in light and heavy-duty diesel engines.

Def.'s Facts at 9, ¶ 19.

Litex next observes that during the patent litigation discovery, Delphi's Rule 30(b)(6) witness Joachim Kupe ("Kupe") stated that it was not until March 2002 that Delphi realized that it did not have viable NTP technology. Id. at 10, ¶ 20. During the parties' post-settlement arbitration, however, Botti testified that by July 2001, Delphi had "[v]ery minimal" confidence in the NTP project. Id. at ¶ 21. Further, Joseph Bonadies, the program manager for Delphi's NTP program, testified during the post-settlement arbitration that in May 2001, he was "very skeptical that we would come up with a system that could achieve these really high [nitrogen oxide] efficiencies." Def.'s Facts at 11-12, ¶ 22.

Additionally, Litex points out, during the arbitration proceedings, Botti acknowledged that he reported the NTP team's

11

negative conclusions to Delphi management in 2001 and that by

July 2001, he was prepared to terminate the project:

> Q.  Right.  But as of . . . July 2001, did the company
> know it wouldn't work, or was that your personal opinion?
>
> A.  No.  I think – I mean, you know, like every big
> company there is inertia.  But I already had given my
> opinion to my upper management that this thing was not
> going the way I wanted it.
>
> . . . .
>
> Q.  And was there still speculation [that the NTP project
> would succed] in July 2001 among some people in the
> company?
>
> A.  Not anymore.  From my level to, uh, it was pretty
> clear already, you know.  I told my management I was
> going to stop the project.
>
> Q.  Uh, did the management ever give – you had told them
> that as of July 2001?
>
> A.  Well, I started to, uh, update the management after
> we had that PSA review that will show that the results
> were disastrous.  And, uh, you know, I – I had to step up
> and tell my management that, because I was a customer
> interface, and there was a shared, I would say,
> development I needed to update the management and say,
> we're not going anywhere with this.
>
> Q.  And do you recall when that occurred?
>
> A.  Uh, PSA review, quite honestly, I – I – I don't
> recall, but it was – I'm sure it was before July 2001.
> It must have been the spring of 2001 when we started to
> get those terrible results.

Id. at 12-13, ¶ 24 (internal citation omitted).

According to Litex, prior to the arbitration proceedings, it

had no knowledge of the falsity of Delphi's representations about

the 2001 success of its NTP project.  Id. at ¶ 27.  Litex

maintains further that it relied reasonably and to its detriment on those representations as material statements about Delphi's NTP program in deciding to enter into the settlement agreement with Delphi.  Id.  That is, "[a]t arbitration, Litex premised its damages arguments on the belief that in 2001 Delphi was successfully developing NTP, and therefore, would have willingly taken an exclusive license to Litex's patents in an arm's-length 'hypothetical negotiation' in July, 2001."  Id. at ¶ 29.

Because it was unaware that Delphi's statements were false, Litex argues, it "could not have appreciated when signing the [agreement] the tortious interference and unfair business practice claims it had against Delphi."  Def.'s Mem. at 9.  In other words, Litex "was led to believe that its only remedies lay in an award of damages for patent infringement."  Id.  According to Litex, Delphi admitted in arbitration that it lacked confidence in its NTP project as early as July 2001 because it was then advantageous for it to do so.[3]  Id. at 6.  "Finally knowing the truth, Litex, now seeks relief from the [allegedly] fraudulent Release so it may pursue Delphi's actual wrongs – not

_____

[3] That is, Litex suggests, by acknowledging at arbitration that it lacked confidence in its NTP project in 2001, that Delphi ensured that "the arbitrator could only award Litex minimal [patent infringement] damages for Delphi's short-lived, infringing testing activities."  Id. at 9 n.1.  By that time, the release agreement insulated Delphi from any of Litex's potential tort claims arising from its earlier representations of NTP success.  Id.

infringing Litex's patent by developing NTP, but rather

misleading the world into believing that Delphi was developing

NTP at all." Id. at 10.

## II. DISCUSSION

### A. Standard of Review

The parties originally configured the matter before the

Court as cross motions for summary judgment. Prior to oral

argument, however, the parties consented to this Court's

treatment of the matter as a case stated. Continental Grain Co.

v. Puerto Rico Mar. Shipping Auth., 972 F.2d 426, 429 n.7 (1st

Cir. 1992) (observing that resolution of a matter as case stated

rather than cross motions for summary judgment promotes judicial

efficiency); Boston Five Cents Sav. Bank v. Secretary of Dep't of

Hous. & Urban Dev., 768 F.2d 5, 11-12 (1st Cir. 1985) (same).

Unlike cross motions for summary judgment, this procedure allows

the Court to determine "significant issues of material fact."

Continental Grain Co., 972 F.2d at 429 n.7 (citing Boston Five,

768 F.2d at 11-12). Thus, the Court must review the record, draw

reasonable inferences, apply the governing law, and enter such

judgment as may be appropriate.

According to Delphi:

[t]he undisputed facts of this matter conclusively
demonstrate that: (1) the settlement [agreement] . . .
is enforceable, (2) Delphi did not fraudulently induce
Litex to sign the [agreement] . . . , and (3) Litex
knew or should have known of the factual allegations
underlying the tort claims it now seeks to assert

14

> before executing the [agreement], . . . making its
> reliance on Delphi's statements unreasonable as a
> matter of law.

Pl.'s Mem. at 1-2.  Litex maintains, however, that: (1) the
settlement agreement is not enforceable because it was induced by
Delphi's fraud, Def.'s Mem. at 10, and (2) its reliance on
Delphi's statements was reasonable.  Id. at 12.

### B.   Fraud in the Inducement

"A court cannot enforce a settlement contract which is
tainted . . . by fraud practiced upon a party to the contract."
Flebotte v. Dow Jones & Co., Inc., Civ. A. No. 97-30117-FHF, 2001
U.S. Dist. LEXIS 21327, *13 (D. Mass. June 28, 2001) (Freedman,
J.) (citation and alterations omitted) (unpublished opinion).
The First Circuit directs that, in these circumstances,
Massachusetts contract principles govern the evaluation of
fraudulent inducement claims.  Nash v. Trustees of Boston Univ.,
946 F.2d 960, 967 (1st Cir. 1991).  Under Massachusetts law, to
establish a claim for fraud in the inducement a plaintiff must
prove: (1) the defendant made knowingly false statements; (2)
those statements were made with the intent to deceive; (3) those
statements were material to the plaintiff's decision to execute
the agreement; (4) the plaintiff reasonably relied on those
statements; and (5) the plaintiff was injured as a result of her
reliance.  Zyla v. Wadsworth, 360 F.3d 243, 254 (1st Cir. 2004)

(citing <u>Kenda Corp.</u> v. <u>Pot O'Gold Money Leagues, Inc.</u>, 329 F.3d

216, 225 (1st Cir. 2003) (applying Massachusetts law)).

   1.   **Delphi's Intent to Induce Settlement with
        Allegedly False Statements**

     Delphi argues that Litex's claim of fraudulent inducement

must fail because there is no evidence that any of its statements

were intended to induce Litex's execution of the settlement

agreement.  Pl.'s Mem. at 11-12 (citing <u>Willett</u> v. <u>Herrick</u>, 258

Mass. 585, 596-97 (1927) ("To enable a party to rescind a

contract because of fraud or misrepresentation, the fraud or

misrepresentation relied on must have operated to cause him to

make the contract or have been intended to influence the action

in the particular complained of.")).  First, Delphi observes, the

press releases at issue were published in 2001, "years before"

the execution of the settlement agreement.  <u>Id.</u> at 12.

     Second, Delphi contends, the purpose of those statements was

to inform the industry publicly about its research and not "to

induce Litex to execute the Settlement Term Sheet & Release."

<u>Id.</u>  Additionally, Delphi suggests that it never made any

statements concerning its position on the success or failure of

its NTP project as of the summer of 2001 during the settlement

negotiations.  <u>Id.</u>  Accordingly, Delphi concludes that "Litex has

failed to satisfy the 'inducement' element of its fraudulent

misrepresentation claim."  <u>Id.</u>

In response, Litex first notes that "Delphi's argument indeed its entire motion, wrongly presumes that Delphi's lies ended in 2001 with the 2001 [s]tatements themselves." Def.'s Mem. at 11. In entering into the settlement agreement, Litex claims it "reasonably relied to its detriment not only on Delphi's press releases and public statements from 2001, but also on the NTP documents Delphi authored and produced in discovery, and Delphi's deposition testimony about the NTP program in 2001." Id.

The record demonstrates that during the parties' discovery, Delphi did, in fact, make representations to Litex regarding the success of its NTP research.

For example, one Delphi employee testified during his deposition that it was not until March 2002 that Delphi realized that it did not have viable NTP technology. Def.'s Facts at 10, ¶ 20 (citation omitted). That same employee testified that as of February 21, 2002 Delphi still considered NTP one of its "crown jewel technolog[ies]" and that it was in March 2002 that Delphi "hit the hard reality" that there was "[n]o [c]rown [j]ewel, no technology proven, no product." Id. (citations omitted). During the post-settlement arbitration, however, Botti, Delphi's chief technologist, testified that Delphi management was aware that the NTP project was not working by July of 2001 and that Botti wanted to terminate the project. Id. at 12, ¶ 24 (citations omitted).

17

Further, although the statements in Delphi's 2001 press releases
and annual report were not made directly to Litex, Delphi's Vice
President Runkle testified during the patent litigation discovery
that all of Delphi's press releases were true.  Pl.'s Resp. ¶ 12.
Further, Delphi's CEO Battenberg testified in his deposition that
Delphi's 2001 annual report was "accurate."  Def.'s Facts at 8, ¶
13 (citations omitted).

        In short, Delphi's argument that its 2001 press releases
were issued years before the settlement was reached and that such
releases were not made directly to Litex is unavailing because
Delphi affirmed their accuracy during the parties' discovery.
Delphi's argument that it never made "any statements concerning
Delphi's position on the success or failure of its NTP project as
of the summer of 2001" is inaccurate.  Pl.'s Mem. at 12.  That
is, during discovery, Delphi affirmed the accuracy of the claims
made in its 2001 press releases.  Moreover, during discovery,
Delphi represented that through February 2002 it considered NTP
one of its "crown jewel technologies."  Def.'s Facts at 10, ¶ 20.

        Therefore, the 2001 origin of Delphi's public statements
does not foreclose a finding that Delphi's discovery statements
were made, in part, to induce Litex's execution of the settlement
agreement.  <u>Trent Partners & Assocs., Inc.</u> v. <u>Digital Equip.
Corp.</u>, 120 F. Supp. 2d 84, 108 (D. Mass. 1999) (Woodlock, J.)
(noting that the existence of fraudulent intent is normally a

question of fact).  This Court, however, need not resolve this issue because, as discussed below, even if Delphi made false statements intended to induce Litex's execution of the settlement agreement, Litex's reliance on such statements was unreasonable.

> 2. **Alleged Falsity of Delphi's Pre-Settlement Statements**

Delphi next argues that Litex's claim of fraudulent inducement must fail because all of its statements were true in that they accurately reflected the state of Delphi's NTP project. Delphi's Opp'n to Litex's Cross-Mot. for Partial Summ. J. and Reply Mem. in Further Supp. of Delphi's Mot. for Summ. J. ("Pl.'s Opp'n") [Doc. No. 20] at 6.  For example, Delphi points out that its October 16, 2001 press release stating that "Delphi ha[s] developed . . . non-thermal plasma technology (NTP) that works in conjunction with a catalytic converter and a particulate filter" was true.  Id. at 7.  Litex contends that this statement was false in that Delphi had not "developed" any NTP technology at all.  Litex's Reply Br. in Further Supp. of Cross-Mot. for Partial Summ. J. ("Def.'s Reply Mem.") [Doc. No. 22] at 4. Rather, Litex observes that at the time Delphi issued the press release, it had concluded that NTP was something "it could never make work" and was "going to stop."  Id.

As Delphi points out, however, Litex blurs the important distinction between the NTP results Delphi was able to achieve in the laboratory and its ultimate inability to commercialize an NTP

product.  Pl.'s Post-H'rg Mem. at 4.  It is undisputed that
Delphi's NTP project yielded positive laboratory results.  Pl.'s
Facts ¶¶ 4, 6; Def.'s Facts at 2, ¶¶ 4, 6.  Further, as Delphi
points out, "the record establishes that Delphi's NTP system did
technically 'work' – it removed [nitrogen oxide] from exhaust
both in the laboratory and in vehicle testing."  Pl.'s Post-H'rg
Mem. at 4.  Delphi's "statements about its promising research
results are [not] inaccurate" simply because "it later turn[ed]
out that the research d[id] not lead to a commercial product."
Id.

     Thus, Delphi's skepticism regarding its ability ultimately
to commercialize an NTP product does not belie the initial
success Delphi enjoyed in developing NTP.  Indeed, despite its
pessimism in 2001, Delphi's early laboratory success led it to
continue the NTP program for another year and to expend an
additional million dollars on the project.  Id. at 5.  Thus,
Litex has not met its burden of establishing that Delphi's
October 16, 2001 statement that it "has developed" NTP technology
was knowingly false because that statement did not claim that
Delphi had developed a commercial product.[4]

_____

     [4] Indeed, such a finding would directly conflict with the
finding of the arbitrator that "[b]y the fall of 1999, Delphi had
developed an NTP Exhaust Aftertreatment System . . . ."  Decl. of
Leon Ekchian in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J.
[Doc. No. 17] ("Ekchian Decl."), Ex. 16 (Decision of Arbitrator)
at 4 (emphasis added).

Delphi next argues that each of its 2001 press releases and its 2001 annual report are true.  Pl.'s Opp'n at 6-9.  At most, Delphi argues, the statements contained in those documents constituted "nothing more than 'puffery' or 'trade talk' which cannot possibly give rise to a fraud claim."  Id. at 9-10. "Puffing has generally been defined as exaggerated, vague, or loosely optimistic statements about a company."  In re Allaire Corp. Secs. Litig., 224 F. Supp. 2d 319, 327 (D. Mass. 2002) (internal quotation marks and citation omitted).  "[S]tatements of opinion, especially trade talk and puffing, are generally not adequate predicates for a finding of fraud unless the statements suggest that a significant amount of factual information underlies the opinion . . . ."  Putnam Res. v. Pateman, 958 F.2d 448, 460 n.8 (1st Cir. 1992).  Whether statements are mere puffery or trade talk is matter of fact.  See, e.g., McLaughlin v. Denharco, Inc., 129 F. Supp. 2d 32, 39 (D. Me. 2001); White v. ABC Home Inspection, Inc., 2000 Mass. Super. LEXIS 336, *15 (June 27, 2000) (Botsford, J.) (unpublished opinion).

According to Delphi, each of the statements cited by Litex "merely indicated that Delphi was researching and developing NTP for exhaust treatment applications.  Such statements are not strongly optimistic, concrete or definite."  Pl.'s Opp'n at 10. "The project's unresolved problems," Delphi maintains, "did not require disclosure and did not render Delphi's statements

21

fraudulent." <u>Id.</u> <u>See also id.</u> (citing <u>Van Ormer</u> v. <u>Aspen Tech.,</u> <u>Inc.</u>, 145 F. Supp. 2d 101, 105 (D. Mass. 2000) (Zobel, J.) (noting there exists no duty "to disclose technological problems")). Litex contends, however, that Delphi's statements went beyond mere puffery. Def.'s Mem. at 12-13; Def.'s Reply at 3-4. The issue, Litex suggests, is not whether Delphi's 2001 statements claimed ultimate commercial viability of NTP but whether they claimed to "ha[ve] developed" a working NTP system achieving "significant" reductions in emissions "as opposed to a failed project Delphi 'could never make work' and was 'going to stop.'" Def.'s Reply at 4.

Thus, the 2001 statements with which Litex takes issue center not only on Delphi's opinions about NTP but whether Delphi had actually "<u>developed</u> an innovative after-treatment solution, nonthermal plasma technology (NTP) that [was] work[ing] in conjunction with a catalytic converter and particulate filter." Ekchian Decl., Ex. 4 (Delphi News Release of Oct. 16, 2001) (emphasis added). As discussed above, however, Litex, in eschewing the distinction between laboratory research and commercial readiness, has failed to demonstrate the falsity of this statement. Thus, even if this statement went beyond mere

puffery, it cannot provide Litex with the basis for a fraudulent inducement claim.[5]

Litex next cites Delphi's statements made during the parties' patent litigation discovery. Def.'s Reply at 5. During that discovery, Delphi's witness testified that as of February 21, 2002, Delphi remained "very hopeful" that its NTP project would succeed, that NTP was one of its "crown jewel technolog[ies]," and that it was March 2002 when Delphi "hit the hard reality" that there was "[n]o [c]rown [j]ewel, no technology proven, no product." Def.'s Facts at 10, ¶ 20. During the arbitration proceedings, however, Delphi maintained that by July 2001, Delphi did not expect its NTP project to succeed. Id. at 12-13, ¶ 24.

Delphi argues that the testimony of its witnesses at the arbitration proceedings "fall far short of demonstrating" that Delphi made knowingly false statements. Pl.'s Opp'n at 8. "Nor does this testimony establish that Delphi actually terminated its NTP project in 2001 or knew in 2001 that the project would never commercially succeed, as Litex now contends." Id. at 9. At best, Delphi contends, the testimony cited by Litex "shows that those individual witnesses were skeptical about the ultimate

---

[5] To the extent Litex relies on Delphi's allegedly false statement in its 2001 annual report that it "offers" NTP, its reliance on that statement, as discussed below, was unreasonable. Def.'s Reply at 3 n.1.

commercial success of the NTP program as early as 2001." Id.
The personal opinions of those witnesses, Delphi maintains, does
not show "that Delphi as an institution knew in 2001 that its NTP
program would never achieve commercial viability." Id. "To the
contrary," Delphi observes, it "continued to pursue its NTP
program into 2002 – an undisputed fact that completely undermines
Litex's contention that Delphi's NTP program was effectively dead
in 2001." Id.[6]

Even if Delphi did not "know" in 2001 that its NTP program
ultimately would fail, the record demonstrates that, by 2001,
Delphi was institutionally pessimistic about the project's
potential success. During his arbitration testimony, Botti not
only indicated that he personally lacked confidence in the NTP
project by July 2001 but that the "company" was apprised of that
opinion as well. Def.'s Facts at 12, ¶ 24. Furthermore, Botti
testified that as of July 2001 there was no speculation among
anyone at Delphi that the NTP project ultimately would succeed.
Id. Furthermore, during the 2004 arbitration proceedings Delphi,

_____

[6] Indeed, Botti's arbitration testimony reveals that
although he was ready to cancel the NTP project in July 2001, the
project proceeded because he had not yet "confirm[ed] that the
science was not there for that technology" through additional
testing. Ekchian Decl., Ex. 14 (Transcript of Testimony of
4/7/04) at 841. Thus, the record does not establish that by July
2001, Delphi had decided to cancel its NTP project nor that it
knew definitively that the project ultimately would fail. It is,
in fact uncontested that "Delphi continued its efforts to improve
its NTP project through additional testing during the summer of
2001 until March 2002." Pl.'s Facts ¶ 14 (emphasis added).

24

in arguing that it would have been willing to pay only a minimal
fee to license Litex's patent, expressly relied on Botti's
testimony to establish that "Delphi seriously doubted the future
of its NTP project by May 2001."  Def.'s Reply Mem. at 2
(citation omitted).

     The record evidence thus permits the inference that, during
the parties' discovery, Delphi made knowingly false statements
regarding <u>when</u> Delphi began to doubt the success of its NTP
project.[7]  That is, during discovery Delphi maintained that it
was "very hopeful" about its NTP project and considered it a
"crown jewel technology" until February 2002.  Def.'s Facts at
10, ¶ 20.  At the parties' post-settlement arbitration, however,
Delphi stated that by July 2001 there was "no expectation" that
the NTP project would succeed.  <u>Id.</u> at 11, ¶ 21.  One of these
statements must be false.  Moreover, that Delphi did not
officially terminate its NTP project until 2002 is not
dispositive of whether Delphi made false statements to Litex
regarding when it began to doubt that its NTP project would
ultimately succeed.

          3.   **Reasonableness of Litex's Reliance**

     Delphi next argues that judgment must be granted in its
favor because Litex cannot establish a necessary element of its

_____

     [7] Whether this Court draws such an inference is of no
consequence because as discussed below, Litex's reliance on such
statements was unreasonable.

claim of fraud in the inducement, namely, reasonable reliance on
its allegedly false statements.  Pl.'s Mem. at 12.  As Delphi
points out, a claim for fraudulent inducement fails when the
plaintiff knew that the defendant's statement was false.  Id.
(citing Northeastern Univ. v. Deutsch, 14 Mass. L. Rep. 423, 2000
Mass. Super. LEXIS 100, *10 (Mass. Super. Mar. 21, 2002)
(Connolly, J.) ("[T]he plaintiff's claim will fail when the
plaintiff knew that the defendant made a false statement, thereby
making his reliance unreasonable . . . .  Thus, the plaintiff
must prove that he did not know of the facts which made his
reliance unreasonable." (internal citation omitted)).  See also
Cote v. Astra USA, Inc., Civ. A. No. 96-2501-J, 1998 Mass. Super
LEXIS 276, *15 (1998) (Botsford, J.) (unpublished opinion)
("Massachusetts courts have denied relief in those instances
where the plaintiff alleging fraudulent misrepresentation knew of
facts which made his reliance on the misrepresentation
unreasonable.").  Delphi observes that prior to the execution of
the settlement agreement, Litex alleged that Delphi's public
releases were inaccurate.  Pl.'s Mem. at 12.  Therefore, Delphi
suggests, Litex could not have reasonably relied on those
statements.  Id. at 13.

        According to Litex, "Delphi blurs the facts here."  Def.'s
Mem. at 14.  That is, "[e]ach of the excerpts Delphi quotes from
Litex's depositions, briefs and expert report show Litex was

26

aware, and concerned, that Delphi's 2001 statements inaccurately claimed as Delphi's the NTP technology Litex had developed." Id. Thus, Litex argues, during the patent case, it believed that the 2001 statements inaccurately represented who had invented and owned NTP technology. Id. "In contrast, Litex had no knowledge that, separate and apart from who had invented and owned the NTP technology, Delphi was misrepresenting that it was successfully using the technology." Id. In his deposition during the patent litigation, Litex's CEO, Dr. Leon Ekchian ("Ekchian") explained Litex's concern at the time:

> Q. [B]ut my question really is focused on why do you
> believe that whatever Delphi's activities are that they
> have adversely impacted Litex's ability to license in the
> diesel or lean burn area?
>
> A.  It's Delphi's infringement, Delphi's very active
> press release activities which have stated that Delphi
> developed NTP.  I believe those are the words, suggesting
> that Delphi invented NTP.  Delphi's total disregard for
> Litex's existence in all the papers it has filed and that
> have issued.  Delphi's statement that they will be the
> first to market with revolutionary new technology,
> suggesting that they again are the first to develop the
> technology.

Id. at 15 (citation omitted).  According to Litex, it had no knowledge until after signing the settlement agreement that Delphi's 2001 statements also misrepresented the progress Delphi was making with NTP.  Id.

Delphi counters that "Litex's questioning of Delphi's press releases during [the patent litigation] was not confined to ownership issues."  Pl.'s Opp'n at 15.  That is, during the

27

patent litigation, Litex also believed that Delphi's public statements regarding NTP were "overly optimistic." Pl.'s Opp'n at 15. To support its contention, Delphi cites the following portion of Ekchian's deposition:

> Q. [B]ut can you tell me what you have in mind by the concept of inaccurate press releases?
>
> . . . .
>
> A. Well, I find that now, frankly, quite surprising that Delphi was making those press[] releases that they'll be <u>first to market being very confident</u> in the statement that its making and now from what I understand in reading some of the documents . . . stating that <u>Delphi was being overly optimistic</u>, I find that very surprising. I would think that a corporation would need to be more careful about statements it makes, about how confident they are, because it impacts other companies, particularly small companies. Again, investors, customers reading these press releases, you know, it's very difficult for Litex to try to placate the concerns of potential investors when there are these kinds of statements, <u>very confident statements by Delphi that they will be first to market and they're targeting 2004, and now I'm reading that maybe they were overly optimistic</u>. I find that to be unreasonable and cause damage.

<u>Id.</u> at 16.

These facts, Delphi suggests, confirm that during the patent litigation, Litex believed and asserted that Delphi's overly optimistic press releases regarding its NTP program harmed Litex by interfering with its "licensing, financing, and business relationships." <u>Id.</u> at 17. "Nevertheless, Litex executed the [settlement agreement] knowing full well that it was releasing Delphi from any claims arising out of those allegations." <u>Id.</u> Litex maintains, however, that when it signed the agreement it

28

was "unaware that Delphi's 2001 [s]tatements contained fraudulent representations actionable as tortious interference." Def.'s Reply at 6.

That is, Ekchian's testimony that he believed Delphi's press releases were "overly optimistic," does not evince his belief that they were knowingly false. Id. at 6-7. Indeed, Ekchian's suggestion that Delphi had been overly optimistic is exactly the opposite of what Litex now claims: that Delphi had no hope of successfully developing NTP as of July 2001 but continued to knowingly misrepresent its success in that area. Id. at 7. As Litex observes, Delphi's witness testified during discovery that, as of February 2002, it was still "very hopeful" that the project would succeed and that it was not until March 2002 that it realized that the project would not work. Def.'s Facts. at 10, ¶ 20.

According to Delphi, however, Litex could not reasonably have relied on its statements regarding its NTP success because "Litex possessed sufficient evidence during [the patent litigation] to know that Delphi doubted the success of its NTP project in 2001 . . . ." Pl.'s Opp'n at 17. That is, contends Delphi, the patent litigation record shows that it disclosed to Litex that:

> (1) Delphi abandoned catalyst development for its NTP project in April 2002;

29

(2) Delphi terminated its entire NTP research project in September 2002;

(3) During the Summer and Fall of 2001, Delphi's tests of its NTP project recorded less than 15% [nitrogen oxide] reduction efficiencies when 90% [nitrogen oxide] reduction efficiencies w[]ere need[ed] for a viable commercial product;

(4) In 2001, Delphi had 25 engineers working on the NTP project; in 2002, that number was reduced to 12 or 13;

(5) By 2002, Delphi had cut its NTP research project budget in half, compared to the level of funding budgeted for the same project in 1998;

(6) Delphi's management knew of the diminishing success of the NTP project;

(7) By July 2001, based on poor testing results, Delphi was not confident about the success or commercial viability of its NTP research.

Pl.'s Mem. at 17-18 (internal citations omitted).

According to Delphi, "[t]hese facts establish that during the time proximate to the press releases (2001-2002), Delphi's NTP project was achieving unfavorable results, the budget and work force assign[ed] to the project had been reduced, and that Delphi's management knew of the waning success." Id. at 18. Further, Delphi observes, within months of the press releases, Delphi terminated the project. Id. Therefore, Delphi maintains, "the only reasonable inference to draw is that Litex knew, long before executing the [settlement agreement] that Delphi itself doubted the commercial viability of NTP in 2001." Id.

In response, Litex points out that the first two "facts" cited by Litex refer only to events occurring in 2002 and are far

30

from conclusive proof of Delphi's state of mind in 2001.  Def.'s

Mem. at 17.  The third "fact" cited by Delphi demonstrates that

Delphi had not reached its target goal of 90% nitrogen oxide

reduction, it does not, however, establish Delphi's pessimism

regarding the project's ultimate success.  The fourth and fifth

"facts" referring to Delphi's NTP budget and the number of

engineers working on project similarly do not conclusively show

that Delphi lacked confidence in the project by July 2001.

The sixth "fact" mentioned by Delphi concerns the September

6, 2002 deposition testimony of Runkle.  Pl.'s Opp'n at 18.

During that deposition the following exchange occurred:

> Q.  At what point did Delphi realize it was having trouble
> developing its NTP catalyst?
>
> A.  I don't know when we realized it.  I guess when I
> realized that it wasn't turning as we had hoped probably was
> over the last year and a half I would say when the results
> were not as good as we thought.

Aff. of William Cosnowski [Ex. 12, Doc. No. 14] (Dep. of Donald

L. Runkle) at 114 (emphasis added).  According to Litex, Runkle's

"equivocal" answer "stand[s] in stark contrast to [Kupe's]

testimony about NTP that unequivocally placed the change in the

NTP program in March, 2002 and not before."  Def.'s Reply at 5-6

(citation omitted).  Thus, Litex contends, Runkle's testimony

"did not put Litex on notice that Delphi was lying or render

Litex's continued reliance on the 2001 [s]tatements

unreasonable."  Id. at 6.

The seventh "fact" cited by Delphi refers to the report of Delphi's damages expert Dr. Abram E. Hoffman which was submitted during the parties' patent litigation. As Delphi notes, that report stated that "[e]ven in July 2001 and beyond, Delphi remained unsure that it could develop a suitable catalyst or produce an NTP system at an acceptable economic or energy cost." Pl.'s Mem. at 19 (emphasis added). Further, the report noted, "By July 2001 . . . because Delphi did not have a commercial NTP product and was not confident that it would, it would have only wanted a license for testing purposes and possibly an option for future commercialization . . . ." Id. (emphasis added). According to Delphi, "no doubt exists that the information provided by Delphi's witnesses and summarized in Dr. Hoffman's report directly contradicts Litex's current position alleging that Delphi failed to disclose its concerns over the success of the NTP project as of the [s]ummer of 2001." Id. at 19-20.

Whether reliance is reasonable is matter of fact. Massachusetts Laborer's Health & Welfare Fund v. Phillip Morris, Inc., 62 F. Supp. 2d 236, 242 (D. Mass. 1999) (O'Toole, J.). This issue may be determined as matter of law only if no reasonable factfinder could conclude that the reliance was reasonable. Trent Partners, 120 F. Supp. 2d at 105. In addressing Delphi's damage expert's report, Litex acknowledges that the report "summarize[s] the information Dr. Hoffman

believed Delphi would consider in a[] hypothetical negotiation with Litex." Def.'s Mem. at 18. The hypothetical negotiation contemplated by the report was to take place on July 3, 2001. Aff. of William Cosnowski [Ex. 8, Doc. No. 14] (Rebuttal Expert Witness Report of Abram E. Hoffman ("Hoffman Report")) ¶ 151.

Inexplicably, Litex suggests that Dr. Hoffman's report did not put it on notice of the fact that Delphi lacked confidence in its NTP project in 2001 because the report "cite[s] no factual support" for its statements. Def.'s Mem. at 18. Whether Delphi stated further information beyond its admission that it lacked confidence in its NTP project in 2001, however, is irrelevant to whether Litex was put on notice of Delphi's pessimism at the time. In any event, Dr. Hoffman did cite specific factual information for the conclusion that Delphi lacked confidence in its NTP project in July 2001. Hoffman Report ¶ 52, 158 (citing as reasons for Delphi's pessimism regarding its NTP project (1) "technological and cost hurdles", (2) the uncertainty that Delphi could "produce an NTP system at an acceptable economic or energy cost", (3) Delphi's inability to "find a suitable catalyst", and (4) that "the fuel penalty was above the level that customers would accept").

Confusingly, Litex also claims that no part of the report "address[es], let alone clarif[ies], the state of Delphi's NTP program before March, 2002, as opposed to after." Def.'s Mem. at

18. A cursory reading of the report, however, reveals that this position is untenable:

> Delphi <u>was not at all confident</u> about the future commercial success of its NTP product <u>at [the July 2001 hypothetical] negotiation date</u> given the technological and cost hurdles it had to overcome.
>
> . . . .
> Even <u>in July 2001 and beyond</u>, Delphi <u>remained</u> unsure that it could . . . produce an NTP system at an acceptable economic or energy cost.
>
> . . . .
>
> Because Delphi <u>was uncertain whether NTP technology would ever be commercially viable</u>, <u>it had no definite plans for commercialization</u> . . . . <u>[B]y July 2001</u> . . . . Delphi <u>was even less certain</u> that an NTP product would succeed.

Hoffman Report ¶¶ 52, 156, 158.

Thus, Litex's assertion that "none of the 'facts' cited by Delphi put [it] on notice of the true state of Delphi's NTP program in 2001" is incomprehensible. Def.'s Mem. at 19. Litex is also mistaken in contending that the report fails to "contradict[] . . . [its contention] that Delphi failed to disclose its concerns over the success of the NTP project as of the [s]ummer of 2001." Def.'s Mem. at 19 (internal quotation marks and citation omitted). As cited passages above demonstrate, Dr. Hoffman's report clearly revealed Delphi's July 2001 pessimism.

Litex argues further that the report did not put it on notice of the true state of Delphi's NTP project in 2001 because "Dr. Hoffman opine[d] based upon the eventual cancellation of the

34

NTP program" using the "so-called 'Book of Wisdom'" hindsight approach. Def.'s Mem. at 18-19 n.6. Therefore, Litex contends, the report did not "delineate the circumstances before and after any point in time, including March, 2002." Id. Again, Litex's argument is moribund because, as the cited passages establish, the damage report specifically addressed the state of Delphi's NTP project in July 2001 without reference to future events.

As Litex recognizes, in agreeing to arbitrate its patent dispute with Delphi "Litex premised its damages arguments on the belief that in 2001 Delphi was successfully developing NTP, and therefore, would have willingly taken an exclusive license to Litex's patents in an arm's-length 'hypothetical negotiation' in July, 2001." Def.'s Mem. at 9 n.1 (emphasis added). "Instead," Litex suggests, "Delphi ambushed Litex before the arbitrator with the truth, revealing that in 2001 Delphi . . . would not have taken an exclusive license at all." Id. (emphasis added). This argument completely ignores the evidence discussed above. Delphi's damage expert's report explicitly noted:

> As technological demands shift and potentially multiple technologies need support, suppliers such as Delphi would not pay a large fixed payment for an exclusive license to unproven technology that their OEM customers may not demand.
>
> . . . .
>
> The hypothetical negotiation would have taken place on . . . July 3, 2001 concurrent with the issue dates of the patents. The negotiation would occur between a willing buyer and a willing seller . . . . Also, the negotiation

would be for the <u>non-exclusive rights</u> to practice the two
patents in suit only. . . . Delphi would have come to the
negotiating table aware that: <u>[i]t has no current
commercial product and is uncertain of the commercial
viability of its NTP product</u>.

Hoffman Report ¶¶ 52, 151-52 (emphasis added).  Further, Hoffman

observed:

> <u>By July 2001</u> . . . . because Delphi did not have a
> commercial NTP product and was <u>not confident that it
> would, it would have only wanted a license for testing
> purposes</u> and possibly an option for future
> commercialization.

<u>Id.</u> at ¶ 159 (emphasis added).

Based on the evidence described above, Litex could not

reasonably have relied on Delphi's discovery statements that it

did not lose confidence in its NTP project until March 2002.  As

Litex acknowledges, its claim of fraudulent inducement relies on

its allegation that Delphi fraudulently indicated that it "had

only the greatest confidence in and highest expectations for its

technology up until March, 2002" and that it was not until

arbitration that Delphi acknowledged the dubious state of its NTP

program in 2001.  Def.'s Mem. at 6.  Given the information

contained in Delphi's damage report, Litex's reliance on any

statements to the contrary, either in Delphi's 2001 public

statements or during discovery, was unreasonable.  <u>Yorke</u> v.

<u>Taylor</u>, 332 Mass. 368, 374 (1955) (holding that plaintiff's

reliance unreasonable as matter of law where oral statements were

"palpably false" in light of contradictory written statements).

36

See also <u>Trifiro</u> v. <u>New York Life Ins. Co.</u>, 845 F.2d 30, 33-34 (1st Cir. 1988) (holding plaintiff's reliance on one of defendant's two contradictory statements unreasonable as matter of law because "[t]he conflicting content of [the two statements] should have placed petitioner on notice that he should not rely on either statement. Confronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying."); <u>Guilbeault</u> v. <u>R.J. Reynolds Tobacco Co.</u>, 84 F. Supp. 2d 263, 281 (D.R.I. 2000) (noting that plaintiff's reliance on statement is unreasonable as matter of law when defendant's statement conflicts with plaintiff's own knowledge of facts).

Accordingly, even if Delphi's 2001 press releases falsely touted the success of its NTP project and even if one of Delphi's witnesses falsely stated that Delphi did not begin to lose confidence until March 2002, Litex could not reasonably have relied on those statements given the contradictory statements contained in Delphi's damage expert's report. That report conspicuously indicated that as of July 2001, Delphi was not at all confident in its NTP project. Litex's contention that Delphi "ambushed" it during arbitration with this admission is preposterous in light of this record evidence.

Moreover, to the extent that Litex claims reliance on the allegedly false statement in Delphi's 2001 annual report that it

37

"offer[ed]" NTP and that it placed a working NTP system on a Peugeot vehicle, such reliance is also unreasonable.  During Battenberg's deposition, the following exchange occurred with counsel for Litex:

Q.  And what did you mean by saying that Delphi offered nonthermal plasma (NTP) exhaust aftertreatment?

. . . .

A.  Well, as it says in the next sentence that Delphi and Peugeot debuted an environmental technology vehicle featuring NTP exhaust aftertreatment.  So we have a technology vehicle <u>which is an R&D platform</u> which we identified here.

. . . .

Q.  How is it that you can say that you offer something if it's only in a research and development stage?

A.  Well, it's quite common.  Many of the items on this page are in research and development.  That's the nature of the business we're in.

. . . .

Q.  Why did you put something that you considered to be in a research and development state into the annual report?

. . . .

A.  Well, as I said several times before, the nature of the industry is such that it's three- to four- to five-year lead times and many technologies are put on research and development vehicles years in advance because it takes hundreds of thousands of miles of research and development to find out if they're going to work.

Q.  All right.  And is it your practice to describe <u>research activities that you don't know if they're going to work or not</u> --

A. Absolutely.

Q.-- in an annual report?

A. Yes.

Q. Why would you describe something in an annual report if <u>you didn't know if it was going to work</u>?

. . . .

A. . . . It's common practice.

Ekchian Decl., Ex. 7 (Dep. of J.T. Battenberg III) at 119-21 (emphasis added).[8]

Thus, to the extent that the 2001 press release can be read as making the false claim that Delphi had developed a working NTP product beyond the mere research and development stage, Litex could not reasonably have relied on such a statement in light of Battenberg's testimony and Dr. Hoffman's report. Indeed, during the parties' discovery, Delphi specifically acknowledged that it never was able to develop a marketable NTP product. Ekchian Decl., Ex. 13 (Dep. of Joachim Kupe) at 363-65.

Because Litex cannot establish its reasonable reliance on Delphi's false statements, its fraudulent inducement claim must fail. <u>Zyla</u>, 360 F.3d at 254. As the First Circuit has noted:

---

[8] Further, Dr. Hoffman's report stated that:

Delphi continued testing its NTP prototype with companies such as [Peugeot] and Renault, but it still did not have a commercial product. They could not find a suitable catalyst and the fuel penalty was above the level that customers would accept. If anything, Delphi was even less certain that an NTP product would succeed.

Hoffman Report ¶ 158.

> Explicit conflict engenders doubt, and to rely on a
> statement the veracity of which one should doubt is
> unreasonable.  The law does not supply epistemological
> insurance.  Nor does it countenance reliance on one of a
> pair of contradictories simply because it facilitates the
> achievement of one's goal. [This] reasoning stands behind
> the principle of tort law that "the maker of a fraudulent
> misrepresentation is not liable to one who does not
> re[]ly upon its truth but upon the expectation that the
> maker will be held liable in damages for its falsity."
> <u>See</u> Restatement, Second, Torts § 548.

<u>Trifiro</u>, 845 F.2d at 34.

Because Litex's claim of fraudulent inducement must fail, the parties' settlement agreement is enforceable.  Because Litex does not dispute that the tort claims it seeks to assert are barred by the settlement agreement, summary judgment must be granted in Delphi's favor as Litex's assertion of its counterclaims violates the terms of the parties' settlement.

**C.   Attorneys Fees**

Delphi has requested attorneys fees.  Pl.'s Post-Hr'g Mem. at 12.  Litex's fraud claim is, however, not "so completely at odds with the factual record and so devoid of legal merit," <u>id.</u> that an award of attorneys fees and costs is in order.

**III. CONCLUSION**

Accordingly, Litex's Cross Motion for Partial Summary Judgment [Doc No. 15] is DENIED and Delphi's Motion for Summary Judgment [Doc. No. 10] is ALLOWED, save for an award of attorneys fees. Because the parties' settlement agreement is enforceable, all of Litex's counterclaims are hereby dismissed with prejudice.

SO ORDERED.

/s/ William G. Young
_____
WILLIAM G. YOUNG
CHIEF JUDGE